# EXHIBIT A

# SENATE COMMITTEE ON PUBLIC SAFETY

**Senator Nancy Skinner, Chair**
**2019 - 2020 Regular**

| | | | |
|---|---|---|---|
| **Bill No:** | SB 132 | **Hearing Date:** | April 23, 2019 |
| **Author:** | Wiener | | |
| **Version:** | March 14, 2019 | | |
| **Urgency:** | No | **Fiscal:** | Yes |
| **Consultant:** | SJ | | |

**Subject:** ***Corrections***

## HISTORY

Source: ACLU of California
Equality California
Lambda Legal
TGI Justice Project
Transgender Law Center
TransLatin@

Prior Legislation: SB 990 (Wiener), held in Assembly Appropriations in 2018
SB 310 (Atkins), Ch. 856, Stats. 2017
SB 179 (Atkins), Ch. 853, Stats. 2017
AB 633 (Ammiano), vetoed in 2010
AB 382 (Ammiano), vetoed in 2009

Support: ACCESS Women's Health Justice; API Equality-LA; API Equality-Northern California; California Civil Liberties Advocacy; Californians United for a Responsible Budget; Ella Baker Center for Human Rights; Empowering Pacific Islander Communities; Initiate Justice; Lawyers' Committee for Civil Rights of the San Francisco Bay Area; Legal Services for Prisoners with Children; National Center for Lesbian Rights; Root & Rebound; Tides Advocacy; Women's Foundation of California

Opposition: None known

## PURPOSE

***The purpose of this bill is to: 1) require the Department of Corrections and Rehabilitation (CDCR) to ask each person entering into its custody specified information, including the individual's gender identity, sex assigned at birth, preferred first name, gender pronoun, honorific, and preferred gender identity of any officer who may conduct a lawful body search of the individual; 2) require CDCR to issue identification to the person with a gender marker consistent with the gender identity the individual most recently specified; 3) require staff and contractors to consistently use the gender pronoun and honorific an individual has specified in all verbal and written communications with or regarding that individual that involve the use of a pronoun or honorific; 4) require CDCR, for a person who has a gender identity that differs from their sex assigned at birth, to only conduct a search of that person by an officer of the gender identity of the person's preference; and 5) require CDCR to house a person who has a gender identity that differs from their sex assigned at birth in a correctional facility designated for men or women consistent with the incarcerated individual's gender identity, except as specified.***

*Existing law* provides the process by which a person may petition the court for a name change, including a name change to conform the petitioner's name to the petitioner's gender identity. (Code Civ. Proc., §§ 1276, 1277.5.)

*Existing law* provides that a person under the jurisdiction of CDCR or sentenced to county jail has the right to petition the court to obtain a name or gender change, as specified. (Code Civ. Proc., § 1279.5, subd. (b).)

*Existing law* requires a person under the jurisdiction of CDCR to provide a copy of the petition for a name change to the department, in a manner prescribed by the department, at the time the petition is filed. Requires a person sentenced to county jail to provide a copy of the petition for name change to the sheriff's department, in a manner prescribed by the department, at the time the petition is filed. (Code Civ. Proc., § 1279.5, subd. (c).)

*Existing law* requires that in all documentation of a person under the jurisdiction of the CDCR or imprisoned within a county jail, the new name of a person who obtains a name change to be used, and prior names to be listed as an alias. (Code Civ. Proc., § 1279.5, subd. (d).)

*Existing law* provides that a person may file a petition with the superior court in any county seeking a judgment recognizing the change of gender to female, male, or nonbinary. (Health & Saf. Code, § 103425, subd. (a).)

*Existing law* requires CDCR to consider certain factors in determining housing assignments in order to prevent violence and promote inmate safety. (Cal. Code Regs., tit. 15, § 3269.)

*Existing federal law*, the Prison Rape Elimination Act, establishes a zero-tolerance standard for the incidence of prison rape in prisons in the United States, provides for the development and implementation of national standards for the detection, prevention, reduction, and punishment of prison rape, and mandates the review and analysis of the incidence and effects of prison rape. (34 U.S.C. § 30301 et seq.)

*This bill* includes the following findings and declarations:

- The United States Supreme Court recognized that incarcerated transgender individuals are particularly vulnerable to sexual abuse and sexual harassment and that disregarding the known risks to a transgender woman constitutes deliberate indifference in violation of the federal constitution.
- In California, a study of the state's prisons found that the rate of sexual assault for transgender women in those prisons was 13 times higher than for men in the same prisons.
- Official data collected by the federal Bureau of Justice Statistics confirm that, nationwide, incarcerated transgender individuals experience exceptionally high rates of sexual victimization. In a 2011–12 survey, almost 40 percent of incarcerated transgender individuals reported experiencing sexual victimization while incarcerated compared to 4 percent of all incarcerated individuals.
- A congressional study found that instances of prison rape often go unreported, and that "most prison staff are not adequately trained or prepared to prevent, report or treat inmate sexual assaults."
- Forty percent of transgender women respondents reported harassment from other incarcerated individuals.
- Thirty-eight percent reported being harassed by correctional officers or staff.

- Correctional officers and other incarcerated people predominantly refer to transgender women as men, using masculine pronouns.

*This bill* requires CDCR, during the initial intake and classification process, to ask each individual entering into its custody to specify the individual's:

- Gender identity and sex assigned at birth.
- Preferred first name, gender pronoun, honorific.
- Preferred gender identity of any officer who may conduct a lawful body search of the individual.

*This bill* requires a person incarcerated by CDCR to be issued identification reflecting a gender marker consistent with the gender identity the individual has most recently specified.

*This bill* provides that a person incarcerated by CDCR may not be disciplined for refusing to answer, or for not disclosing complete information in response to, the questions pursuant to this section.

*This bill* provides that at any time, a person under the jurisdiction of CDCR may inform facility staff of their gender identity, and facility staff must promptly repeat the process of offering the individual an opportunity to specify the gender pronoun and honorific most appropriate for staff to use in reference to that individual, as specified above.

*This bill* requires staff and contractors of CDCR to consistently use the gender pronoun and honorific an individual has specified in all verbal and written communications with or regarding the individual that involve use of a pronoun and honorific.

*This bill* provides the following definitions:

- "Gender pronoun" means a third-person singular personal pronoun such as "he," "she," or "they."
- "Honorific" means a form of respectful address typically combined with an individual's surname, such as "Mr.," "Ms.," or "Mx."

*This bill* requires that an individual incarcerated by CDCR who has a gender identity that differs from their sex assigned at birth, with or without a diagnosis of gender dysphoria or any other physical or mental health diagnosis, and regardless of anatomy, be:

- Addressed in a manner consistent with the incarcerated individual's gender identity.
- If lawfully searched, searched by an officer of the gender identity of the incarcerated individual's preference. Requires the search be conducted by an officer whose gender identity is female if the incarcerated individual's preference or gender identity cannot be determined.
- Housed at a correctional facility designated for men or women consistent with the incarcerated individual's gender identity, unless the incarcerated individual's perception of their own health and safety needs requires a different placement, in which case the person shall be housed in accordance with their stated health and safety needs.

*This bill* requires that placement in housing within a facility, for example, single cell, double cell, dorm, protective custody, or general population, be based on the incarcerated individual's perception of health and safety, except as provided.

*This bill* requires that if there are significant security or management concerns with placing an incarcerated individual within a facility based on the individual's perception of health and safety, the Secretary of CDCR, or the secretary's designee, certify in writing a specific and articulable basis as to why a particular placement would present significant security or management concerns prior to housing the incarcerated individual in a manner contrary to the person's perception of health and safety.

*This bill* requires that if an incarcerated individual's housing and placement be reassessed if the individual raises concerns for their health or safety at any time.

**COMMENTS**

**1. Need for This Bill**

According to the author:

> SB 132 addresses a very real problem facing incarcerated transgender individuals, namely, transgender people being housed according to their birth-assigned gender, not their gender identity or their perception of safety, resulting in significant risk of violence. Transgender women housed in male facilities face particular risk of rape and assault. To house incarcerated transgender people in facilities that do not correspond with their gender identity or perception of safety puts these individuals at great risk of physical assault and sexual victimization, and reduces access to programming that creates a successful transition from prison back to their community. The risk of violence often leads to incarcerated transgender people being placed in isolation "for their own protection," resulting in loss of access to medical and rehabilitation services and leads to increased recidivism rates. SB 132 also allows CDCR, if specific security or management concerns exist regarding the incarcerated person's housing placement, to exercise their judgment and override the placement.
>
> CDCR has separate institutions for men and women. Current California law provides that incarcerated people be housed according to their sex, age, criminal sophistication, seriousness of crime charged, physical or mental health needs, assaultive/non-assaultive behavior and other criteria which will provide for the safety of the incarcerated people and staff. Current law mandates that the CDCR assess all new people entering CDCR custody, including all aspects of their backgrounds and history, in order to determine where they will be housed. After that assessment, the CDCR assigns incarcerated people "to the institution of the appropriate security level and gender population." In the case of transgender people, the California Code of Regulations establishes a process by which an incarcerated transgender person is assigned to housing at a designated institution. These processes and criteria fail to take into account a person's gender identity and their perception of safety, making them more vulnerable to violence from other incarcerated people and solitary confinement while incarcerated.

The Supreme Court correctly recognized that incarcerated transgender people are particularly vulnerable to sexual abuse and sexual harassment and that disregarding the known risks to a transgender woman constitutes deliberate indifference in violation of the Constitution. A congressional study found that instances of prison rape often go unreported, and that "most prison staff are not adequately trained or prepared to prevent, report or treat inmate sexual assaults." Official data collected by the Bureau of Justice Statistics confirm that, nationwide, incarcerated transgender people experience exceptionally high rates of sexual victimization. In a 2011-2012 survey, almost 40% of incarcerated transgender individuals reported experiencing sexual victimization while incarcerated compared to four percent of all incarcerated individuals, and 38% reported being harassed by correctional officers or staff. In California, a study of the state's prisons designated for men found that the rate of sexual assault for transgender women in those prisons was 13 times higher than for men in the same prisons.

**2. CDCR Policies: Intake and Classification**

Penal Code section 2900 provides that defendants sentenced to state prison shall be delivered to the custody of the Secretary at the place designated by the Secretary to serve the term of imprisonment ordered by the court. Chapter 6 of CDCR's Department Operations Manual (DOM) establishes the procedures for the reception, processing, and transfer of inmates into CDCR institutions.

When a person is committed to CDCR, the person first goes to a Reception Center where he or she goes through the reception and classification process. Several institutions have been designated as Reception Centers. Reception Center processing staff is responsible for collecting social and criminal history information for each inmate received by CDCR, as well as interviewing and testing newly received inmates. (DOM § 61010.4.) Classification of inmates is typically made pursuant to the CDCR Inmate Classification Score System. A staff member reviews all relevant documents available during the Reception Center process to complete the score sheet. The placement score generally determines the security level and the institution to which an inmate will be assigned. The inmate is interviewed during this process and has an opportunity to verbally contest specific score items or case factors. Certain case factors require a minimum mandatory score. For example, an inmate sentenced to a life term is subject to the mandatory minimum score requirement. (DOM § 61010.11.5.)

An inmate's placement score will fall within one of four placement score ranges, each of which corresponds to a security level. CDCR facilities are categorized into four levels, from Level I to Level IV with Level I being the lowest security level and Level IV being the highest security level. After the inmate is recommended for placement at a specific institution, endorsement to the institution must be approved before the inmate is transported to that institution. An inmate has the opportunity to reduce their placement score as the result of programming and avoiding disciplinary actions. However, an inmate's score and subsequent housing level can be increased due to receiving disciplinary actions.

Each determination affecting an inmate's placement within an institution or facility, transfer between facilities, program participation, work group, or custody designation is made by a classification committee. The Institutional Classification Committee (ICC) is an institution's highest level of committee and consists of at least three members and is chaired by the Warden or Chief Deputy Warden of the institution. (DOM § 62010.8.) It makes all decisions affecting transfer, program participation, supervision, security, housing, and safety of persons. Each

institution is requires to establish an initial classification committee to review and initiate a suitable program for each inmate within 14 days after arrival at the institution. (DOM § 62010.8.3.) Each program unit is required to establish a Unit Classification Committee (UCC) to provide routine classification of inmates. (DOM § 62010.8.4.) It reviews each inmate's case at least annually to consider the accuracy of the inmate's classification score, custody designation, program and institution placement which includes recommendation for transfer.

### 3. CDCR Policies: Housing Assignments

#### a. Types of Inmate Housing Assignments

Most inmates are housed in a general population setting. General population housing units are characterized as those that house minimum to medium custody inmates where work, vocational, academic, and self-help programming opportunities are available. Other types of housing include a Sensitive Needs Yard (SNY) and the Administrative Segregation Unit (ASU). SNY was designed to provide additional protection to inmates with particular safety needs (e.g., an inmate with a disability, an inmate convicted of a sex offense, an inmate who had debriefed from a prison gang, etc.) ASU primarily houses inmates who have been accused of or found guilty of engaging in some type of serious misconduct. However, ASU may also be used to house inmates who are alleged to be the victim of an assault, or who CDCR has identified as being vulnerable to an attack. ASU is a restrictive housing setting in which inmates remain in their cells for most of the day and must be escorted by a staff member when leaving their cell.

#### b. Specific Housing Assignment Policies

CDCR policy provides that inmates accept all inmate housing assignments. The DOM provides: "The Warden/Administrator of the institution/facility shall be responsible for maximizing proper bed utilization, ensuring inmates are appropriately housed at the institution, implementing departmental policy in accordance with prison design and institution safety and security. Staff must use correctional experience and training, correctional awareness, and a sense of correctional reasonableness to determine suitability for dormitory, celled, and single-celled housing." (DOM § 54046.3.) Staff members involved in the review and approval of an inmate's housing assignment is required to consider all available factors prior to determining an inmate housing assignment. In making a decision about an inmate's housing assignment, the deciding authority must consider, but is not limited to, the following: length of sentence; enemies and victimization history; criminal influence demonstrated over other inmates; vulnerability of the inmate due to medical, mental health, and disabilities; reason(s) for segregation; history of "S" suffix determination; history of in-cell assaults and/or violence; prison gang or disruptive group affiliation and/or association; and nature of commitment offense. (DOM § 54046.4.)

In addition to the above, "[s]taff involved in the review of an inmate's case factors must be particularly aware of case factors that indicate an inmate has been either the victim of, or the perpetrator of, a sexual assault, and must screen for appropriate housing." (*Id.*) The DOM further provides:

> A classification committee and/or the screening authority shall review the Central File (C-file) and other available information to determine if the inmate has a history of in-cell assaultive, abusive, or predatory behavior towards a cellmate, or has been the victim of a sexual assault. … Staff shall weigh circumstances documented in the

C-file such as documented reports from a prior cellmate the inmate intimidated, threatened, forced, and/or harassed him or her for sex, documentation the cellmate refused to return to a cell occupied by the inmate because of fear, threats, or abuse perpetrated by the inmate, documentation the inmate has been the victim of a sexual assault, and adjudicated department Rules Violations Reports (RVR) where the inmate was found guilty as a perpetrator in an act of physical abuse, sexual abuse, sodomy, or other act of force against a cellmate. (*Id*.)

**c. Transgender Inmates**

With respect to housing transgender inmates, the DOM provides: "Inmates who have been diagnosed as transgender or intersex, as documented on the Medical Classification Chrono, shall be referred to a classification committee for review of all case factors and determination of appropriate institutional placement and housing assignment." (DOM § 62080.14.) CDCR specifies the institutions where transgender inmates are to be housed "[i]n order to ensure inmate-patients receive the necessary medical care/mental health treatment, transgender or intersex inmate-patients." (*Id*.) Those institutions include: California Medical Facility, Richard J. Donovan, San Quentin State Prison, Mule Creek State Prison, California Substance Abuse Treatment Facility, California State Prison Sacramento, Salinas Valley State Prison, Correctional Institution for Men, Kern Valley State Prison, California Men's Colony, California Health Care Facility, and all three of the state's women's prisons.

**4. CDCR Policies: Cross-Gender Searches of Inmates**

CDCR policy provides that "[b]ody search procedures for clothed female inmates recognize, address, and minimize the effects of cross-gender contact inherent in the body search process by limiting this function to female correctional staff unless an emergency exists that threatens death, inmate escape, or great bodily injury to staff , inmates, or visitors." (DOM § 52050.16.4.) The policy reiterates that "under no circumstances shall male correctional staff perform non-emergency clothed body searches of female inmate." (*Id*.) With respect to unclothed searches, correctional staff, other than qualified medical staff, is prohibited from conducting unclothed body inspections or searches "of an inmate of the opposite sex, except in an emergency." (DOM § 52050.16.5.) Routine unclothed body searches are prohibited from being completed by staff "of the opposite biological sex." (*Id*.) Finally, CDCR policy provides that unclothed body searches of inmates "by staff of the opposite biological sex" are limited to emergency situations, and that a required cross-gender unclothed body search must be documented. (*Id*.)

**5. Transgender Inmates are Particularly Vulnerable to Assault**

Nearly one in six transgender people, and one in two black transgender people, has been incarcerated in prison. (<https://www.lambdalegal.org/sites/default/files/2015_transgender-incarcerated-people-in-crisis-fs-v5-singlepages.pdf> [as of Apr. 17, 2019].) This population is particularly vulnerable to being assaulted while incarcerated. A UC Irvine study found that transgender inmates were 13 times more likely to be sexually assaulted in prison than non-transgender inmates. (Valerie Jenness, *Transgender Inmates in California Prisons: An Empirical Study of a Vulnerable Population* <http://ucicorrections.seweb.uci.edu/files/2013/06/Transgender-Inmates-in-CAs-Prisons-An-Empirical-Study-of-a-Vulnerable-Population.pdf>.) In order to maintain the safety of inmates who are particularly vulnerable to assault, including transgender inmates, CDCR sometimes remove these inmates from the general population. The removal of vulnerable inmates from the general population is subject to various laws, regulations, and department policies.

**6. Prison Rape Elimination Act (PREA)**

**a. Federal Law**

PREA was passed by Congress in 2003. It applies to all correctional facilities, including prisons, jails, and juvenile facilities. Among the many stated purposes for PREA are: to establish a zero-tolerance standard for the incidence of prison rape in prisons in the United States; to develop and implement national standards for the detection, prevention, reduction, and punishment of prison rape; to increase of the available data and information on the incidence of prison rape to improve the management and administration of correctional facilities; and to increase the accountability of prison officials who fail to detect, prevent, reduce, and punish prison rape. (34 U.S.C. § 30301 et seq.) The act also created the National Prison Rape Elimination Commission and charged it with developing standards for the elimination of prison rape.

**b. PREA Standards**

The PREA standards developed by the National Prison Rape Elimination Commission were issued as a final rule by the U.S. Department of Justice in 2012. (77 Fed.Reg. 37106 (Jun. 20, 2012).) Among other things, the standards require each agency and facility to: designate a PREA point person to coordinate compliance efforts; develop and document a staffing plan, taking into account a set of specified factors, that provides for adequate levels of staffing, and, where applicable, video monitoring, to protect inmates against sexual abuse; and train staff on key topics related to preventing, detecting, and responding to sexual abuse. In addition, the standards provide requirements regarding the avenues for reporting sexual abuse, investigation of sexual abuse, and access to medical and mental health care for inmate victims of sexual abuse.

The PREA standards account in various ways for the particular vulnerabilities of inmates who are LGBTI or whose appearance or manner does not conform to traditional gender expectations. (*Id*. at 37149-37154.) The standards require training in effective and professional communication with LGBTI and gender nonconforming inmates and require the screening process to consider whether the inmate is, or is perceived to be, LGBTI or gender nonconforming. The standards also require that post-incident reviews consider whether the incident was motivated by the inmate's LGBTI identification, status, or perceived status. In addition, the standards do not allow placement of LGBTI inmates in dedicated facilities, units, or wings in adult prisons, jails, or community confinement facilities solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates. Such placement is not allowed at all in juvenile facilities.

The standards impose a complete ban on searching or physically examining a transgender inmate for the sole purpose of determining the inmate's genital status. Agencies are required to train security staff in conducting professional and respectful cross-gender pat-down searches and searches of transgender inmates. In deciding whether to assign a transgender inmate to a facility for male or female inmates, and in making other housing and programming assignments, an agency may not simply assign the inmate to a facility based on genital status. Rather, the agency must consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems, giving serious consideration to the inmate's own views regarding his or her

own safety. In addition, the standards require that transgender inmates are given the opportunity to shower separately from other inmates.

**c. CDCR PREA Policy**

AB 550 (Goldberg), Chapter 303, Statutes of 2005, established the Sexual Abuse in Detention Elimination Act. The Act made several legislative findings and declarations regarding sexual abuse at CDCR institutions and required CDCR to adopt specified policies, practices, and protocols related to the placement of inmates, physical and mental health care of inmate victims, and investigation of sexual abuse.

CDCR's PREA policy provides guidelines for the prevention, detection, response, investigation, and tracking of sexual violence, staff sexual misconduct and sexual harassment against CDCR inmates. (DOM §§ 54040.1-5404.22.) The policy applies to all offenders and persons employed by CDCR, including volunteers and independent contractors assigned to an institution, community correctional facility, conservation camp, or parole. With respect to inmates who are at a high risk for sexual victimization, CDCR's PREA policy provides:

> *Offenders at high risk for sexual victimization, as identified on the electronic Initial Housing Review, shall not be placed in segregated housing unless an assessment of all available alternatives has been completed, and a determination has been made that there is no available alternative means of separation from likely abusers.*
>
> Offenders at high risk for sexual victimization shall have a housing assessment completed immediately or within 24 hours of placement into segregated housing. If temporary segregation is required, the inmate shall be issued an Administrative Segregation Placement Notice, explaining the reason for segregation is the need to complete a housing assessment based on the high risk for sexual victimization. If a determination is made at the conclusion of the assessment that there are no available alternative means of separation from likely abusers, the inmate will be retained in segregated housing and issued an Administrative Segregation Placement Notice, explaining the reason for retention. The assigned counseling staff shall schedule the offender for appearance before the Institution Classification Committee for discussion of his/her housing needs. The offender's retention in segregation should not ordinarily exceed 30 days. (Italics added) (DOM § 54040.6.)

The policy further provides:

> Based on information that the offender has been a victim of sexual violence or victimization, the custody supervisor conducting the initial screening shall discuss housing alternatives with the offender in a private location. *The custody supervisor shall not automatically place the offender into administrative segregation.* Consideration shall be given to housing this offender with another offender who has compatible housing needs. If single cell status is appropriate, the custody supervisor may designate the offender for single cell housing pending a classification review.
>
> An inmate's risk level shall be reassessed when warranted due to a referral, request, incident of sexual abuse, or receipt of additional information that bears on the inmate's risk of sexual victimization or abusiveness. (DOM § 54040.7.)

**7. Effect of this Legislation**

***Changes that Apply to All Inmates***

This bill makes various changes to CDCR's initial intake and classification process, as well as inmate identification. Specifically, this bill requires:

- CDCR to ask each person entering into its custody to specify the individual's gender identity and sex assigned at birth; preferred first name, gender pronoun, honorific; and preferred gender identity of any officer who may conduct a body search of the individual.

- CDCR to issue identification to inmates that reflect a gender marker consistent with the gender identity the inmate has most recently specified.

- CDCR staff to promptly repeat the process of offering the individual an opportunity to specify the gender pronoun and honorific most appropriate for staff to use in reference to that individual after being informed by an inmate of their gender identity, which may occur at any time.

- CDCR staff and contractors to consistently use the gender pronoun and honorific an inmate has specified in all verbal and written communications with or regarding the inmate that involve use of a pronoun and honorific.

***Changes that Apply to Transgender Inmates***

This bill makes a number of changes to the treatment of inmates who identify as transgender. Specifically, this bill requires that an inmate who has a gender identity that differs from their sex assigned at birth, with or without a diagnosis of gender dysphoria or any other physical or mental health diagnosis, and regardless of anatomy, be:

- Addressed in a manner consistent with the inmate's gender identity.
- Searched by an officer of the gender identity of inmate's preference, and if the inmate's preference or gender identity cannot be determined, then the search must be conducted by a female officer.
- Housed at a facility designated for men or women consistent with the inmate's gender identity, unless the inmate's perception of their own health and safety needs requires a different placement, in which case the inmate must be housed in accordance with their stated health and safety needs.

This bill mandates that the housing placement of the inmate be based on the inmate's perception of health and safety. However, in the event that there are significant security or management concerns with placing an inmate within a facility based on the inmate's perception of health and safety, this bill authorizes a different placement but requires the Secretary of CDCR, or the secretary's designee, to certify a specific and articulable basis as to why the inmate's preferred placement would present significant security or management concerns prior to making that housing assignment. Finally, this bill requires that an inmate's housing and placement be reassessed if the inmate raises concerns for their health or safety at any time.

**7. Comments**

While several of the bill's provisions are consistent with current policy or law as well as the department's proposed internal policy changes, the provisions related to searches of inmates are a noticeable departure from existing law and policy. Specifically, this bill would require that all inmates be afforded an opportunity at intake to specify the preferred gender identity of an officer in the event of a body search. This bill also requires that a transgender inmate be searched by an officer of the inmate's preferred gender identity. And, in the case of an inmate whose preference or gender identity cannot be determined, this bill requires that the body search be conducted by a female officer. Current policy permits male and female officers to conduct clothed searches of male inmates. (DOM § 52050.16.4.) Only female officers are permitted to conduct clothed searches of female inmates unless there is an emergency. (*Id*.) For unclothed searches, searches of inmates "by staff of the opposite biological sex" are limited to emergency situations and must be documented. (DOM § 52050.16.5.)

Although the exact ratio of male to female correctional officers is unknown, it appears likely—based on anecdotal evidence—that there are significantly more male than female officers employed by CDCR. In acknowledging that the proposed Penal Code section 2605, subdivision (a)(3), only requires CDCR to ask each an inmate to specify the preferred gender identity of an officer who conducts a body search, it is unclear whether the department will be able to meet the expectations of inmates in the event that a high percentage of inmates expressed a preference for female officers to conduct a search. In addition, there may be some instances where an inmate's expressed preference may not be appropriate (e.g., it may not be appropriate for a self-identified male inmate with a history of sex offenses against women to express a preference to be searched by self-identified female officers). Notably, the proposed Penal Code section 2606, subdivision (b), requires that a transgender inmate be searched by an officer of the gender identity of the inmate's preference. In the event that a high percentage of transgender inmates express a preference to be searched by female officers, it is unclear whether CDCR will be able to comply this mandate.

Other notable provisions of the bill aim to eliminate the practice of placing transgender inmates in segregated housing units when the inmate does not perceive a risk of violence or victimization if housed in another type of housing, and to require that transgender inmates are housed at a facility consistent with the inmate's gender identity.

**-- END --**

# EXHIBIT B

# SENATE COMMITTEE ON APPROPRIATIONS

**Senator Anthony Portantino, Chair**
**2019 - 2020 Regular Session**

**SB 132 (Wiener) - Corrections**

**Version:** March 14, 2019
**Urgency:** No
**Hearing Date:** May 6, 2019

**Policy Vote:** PUB. S. 4 - 1
**Mandate:** No
**Consultant:** Shaun Naidu

**Bill Summary:** SB 132 would make a number of reforms to Department of Corrections and Rehabilitation (CDCR) procedures related to transgender inmates.

**Fiscal Impact:**

- Staff training: One-time, potentially-major costs ranging from the high hundreds of thousands of dollars to the low millions of dollars to develop and implement staff training consistent with this measure on a statewide basis. (General Fund)

- Information system update: Unknown one-time costs, potentially in the low-to-mid hundreds of thousands of dollars, to update the Strategic Offender Management System and/or the Electronic Record Management System to capture inmates' gender identity, preferred gender pronoun, honorific, preferred gender identity of the officer who may conduct a lawful search of the person's body, and any other data point required by SB 132. (General Fund)

- Identification cards: Costs in the low hundreds of thousands of dollars for procuring and issuing new identification cards for the inmate population that include gender markers consistent with a person's gender identity. Currently, CDCR does not include a gender marker on identification issued to inmates. (General Fund)

- Transfer committee and process: Unknown, potentially-significant one-time costs in the hundreds of thousands of dollars to establish a new housing placement committee and process for safely housing inmates in facilities consistent with their gender identity. (General Fund)

- Regulation and manual revision: One-time costs of around $150,000 to update relevant regulations (Title 15) and the Department Operations Manual to reflect the changes that would be made by this measure, such as the requirement that staff and contractors address inmates with their preferred gender pronoun and honorifics. (General Fund)

**Background:** A person under the jurisdiction of CDCR or sentenced to county jail has the right to petition the court to obtain a name or gender change, as specified. A person under the jurisdiction of CDCR must provide a copy of the petition for a name change to the department, in a manner prescribed by the department, at the time the petition is filed. The department must use the new name in all documentation of a person who obtains a name change, and prior names are to be listed as aliases.

Existing law requires CDCR to consider certain factors in determining housing assignments in order to prevent violence and promote inmate safety. Additionally, the Prison Rape Elimination Act establishes a zero-tolerance standard for the incidence of prison rape in prisons in the United States, provides for the development and implementation of national standards for the detection, prevention, reduction, and punishment of prison rape and mandates the review and analysis of the incidence and effects of prison rape.

**Proposed Law:** This bill would:

- Require CDCR to ask each person entering into its custody specified information, including the individual's gender identity, sex assigned at birth, preferred first name, gender pronoun, honorific, and preferred gender identity of any officer who may conduct a lawful body search of the individual.
- Require CDCR to issue identification to the person with a gender marker consistent with the gender identity the individual most recently specified.
- Require staff and contractors to consistently use the gender pronoun and honorific an individual has specified in all verbal and written communications with or regarding that individual that involve the use of a pronoun or honorific.
- Require CDCR, for a person who has a gender identity that differs from their sex assigned at birth, to conduct a search of that person only by an officer of the gender identity of the person's preference.
- Require CDCR to house a person who has a gender identity that differs from their sex assigned at birth in a correctional facility designated for men or women consistent with the incarcerated individual's gender identity, except as specified.

**Related Legislation:** SB 990 (Wiener, 2018) would have required CDCR and local jails to recognize each inmate's gender identity and provide equal access to programs for inmates who are not housed with the general population because they require protection from harassment or victimization. SB 990 was held on the Suspense File of the Assembly Committee on Appropriations.

**-- END --**

# EXHIBIT C

# SENATE COMMITTEE ON APPROPRIATIONS

**Senator Anthony Portantino, Chair**
**2019 - 2020 Regular Session**

**SB 132 (Wiener) - Corrections**

**Version:** March 14, 2019
**Urgency:** No
**Hearing Date:** May 16, 2019

**Policy Vote:** PUB. S. 4 - 1
**Mandate:** No
**Consultant:** Shaun Naidu

## *********** ANALYSIS ADDENDUM – SUSPENSE FILE ***********

**The following information is revised to reflect amendments adopted by the committee on May 16, 2019**

**Bill Summary:** SB 132 would make a number of reforms to Department of Corrections and Rehabilitation (CDCR) procedures related to transgender inmates.

**Fiscal Impact:**

- <u>Staff training</u>: One-time, potentially-major costs ranging from the high hundreds of thousands of dollars to the low millions of dollars to develop and implement staff training consistent with this measure on a statewide basis. (General Fund)

- <u>Information system update</u>: Unknown one-time costs, potentially in the low-to-mid hundreds of thousands of dollars, to update the Strategic Offender Management System and/or the Electronic Record Management System to capture inmates' gender identity, preferred gender pronoun, honorific, preferred gender identity of the officer who may conduct a lawful search of the person's body, and any other data point required by SB 132. (General Fund)

- <u>Identification cards</u>: Costs in the low hundreds of thousands of dollars for procuring and issuing new identification cards for the inmate population that include gender markers consistent with a person's gender identity. Currently, CDCR does not include a gender marker on identification issued to inmates. (General Fund)

- <u>Transfer committee and process</u>: Unknown, potentially-significant one-time costs in the hundreds of thousands of dollars to establish a new housing placement committee and process for safely housing inmates in facilities consistent with their gender identity. (General Fund)

- <u>Regulation and manual revision</u>: One-time costs of around $150,000 to update relevant regulations (Title 15) and the Department Operations Manual to reflect the changes that would be made by this measure, such as the requirement that staff and contractors address inmates with their preferred gender pronoun and honorifics. (General Fund)

**Committee Amendments:** Strike the intake question to all inmates regarding the preferred gender of an officer conducting a search.

**-- END --**

# EXHIBIT D

**SENATE RULES COMMITTEE**
Office of Senate Floor Analyses
(916) 651-1520 Fax: (916) 327-4478

SB 132

THIRD READING

Bill No: SB 132
Author: Wiener (D)
Amended: 5/17/19
Vote: 21

SENATE PUBLIC SAFETY COMMITTEE: 4-1, 4/23/19
AYES: Skinner, Bradford, Jackson, Wiener
NOES: Morrell
NO VOTE RECORDED: Moorlach, Mitchell

SENATE APPROPRIATIONS COMMITTEE: 4-2, 5/16/19
AYES: Portantino, Bradford, Hill, Wieckowski
NOES: Bates, Jones

**SUBJECT:** Corrections

**SOURCE:** ACLU of California
Equality California
Lambda Legal
TGI Justice Project
Transgender Law Center
TransLatin@

**DIGEST:** This bill requires the Department of Corrections and Rehabilitation (CDCR) to ask each person entering into its custody specified information, including the individual's gender identity, sex assigned at birth, preferred first name, gender pronoun, and honorific; requires CDCR to issue identification to the person with a gender marker consistent with the gender identity the individual most recently specified; requires staff and contractors to consistently use the gender pronoun and honorific an individual has specified in all verbal and written communications with or regarding that individual that involve the use of a pronoun or honorific; requires CDCR, for a person who has a gender identity that differs from their sex assigned at birth, to only conduct a search of that person by an

officer of the gender identity of the person's preference; and requires CDCR to house a person who has a gender identity that differs from their sex assigned at birth in a correctional facility designated for men or women consistent with the incarcerated individual's gender identity, except as specified.

**ANALYSIS:** Existing federal law establishes, via the Prison Rape Elimination Act, a zero-tolerance standard for the incidence of prison rape in prisons in the United States, provides for the development and implementation of national standards for the detection, prevention, reduction, and punishment of prison rape, and mandates the review and analysis of the incidence and effects of prison rape. (34 U.S.C. § 30301 et seq. [previously classified as 42 U.S.C. § 15601 et seq.])

Existing state law:

1) Provides the process by which a person may petition the court for a name change, including a name change to conform the petitioner's name to the petitioner's gender identity. (Code Civ. Proc., §§ 1276, 1277.5.)

2) Provides that a person under the jurisdiction of CDCR or sentenced to county jail has the right to petition the court to obtain a name or gender change, as specified. (Code Civ. Proc., § 1279.5, subd. (b).)

3) Requires a person under the jurisdiction of CDCR to provide a copy of the petition for a name change to the department, in a manner prescribed by the department, at the time the petition is filed. Requires a person sentenced to county jail to provide a copy of the petition for name change to the sheriff's department, in a manner prescribed by the department, at the time the petition is filed. (Code Civ. Proc., § 1279.5, subd. (c).)

4) Requires that in all documentation of a person under the jurisdiction of the CDCR or imprisoned within a county jail, the new name of a person who obtains a name change to be used, and prior names to be listed as an alias. (Code Civ. Proc., § 1279.5, subd. (d).)

5) Provides that a person may file a petition with the superior court in any county seeking a judgment recognizing the change of gender to female, male, or nonbinary. (Health & Saf. Code, § 103425, subd. (a).)

6) Requires CDCR to consider certain factors in determining housing assignments in order to prevent violence and promote inmate safety. (Cal. Code Regs., tit. 15, § 3269.)

This bill:

1) Requires CDCR, during the initial intake and classification process, to ask each individual entering into its custody to specify the individual's gender identity and sex assigned at birth, as well as preferred first name, gender pronoun, and honorific.

2) Requires a person incarcerated by CDCR to be issued identification reflecting a gender marker consistent with the gender identity the individual has most recently specified.

3) Provides that a person incarcerated by CDCR may not be disciplined for refusing to answer, or for not disclosing complete information in response to, the questions pursuant to this section.

4) Provides that at any time, a person under the jurisdiction of CDCR may inform facility staff of their gender identity, and facility staff must promptly repeat the process of offering the individual an opportunity to specify the gender pronoun and honorific most appropriate for staff to use in reference to that individual, as specified above.

5) Requires staff and contractors of CDCR to consistently use the gender pronoun and honorific an individual has specified in all verbal and written communications with or regarding the individual that involve use of a pronoun and honorific.

6) Defines "gender pronoun" as a third-person singular personal pronoun such as "he," "she," or "they."

7) Defines "honorific" as a form of respectful address typically combined with an individual's surname, such as "Mr.," "Ms.," or "Mx."

8) Requires that an individual incarcerated by CDCR who has a gender identity that differs from their sex assigned at birth, with or without a diagnosis of gender dysphoria or any other physical or mental health diagnosis, and regardless of anatomy, be:

   a) Addressed in a manner consistent with the incarcerated individual's gender identity.

   b) If lawfully searched, searched by an officer of the gender identity of the incarcerated individual's preference. Requires the search be conducted by

an officer whose gender identity is female if the incarcerated individual's preference or gender identity cannot be determined.

c) Housed at a correctional facility designated for men or women consistent with the incarcerated individual's gender identity, unless the incarcerated individual's perception of their own health and safety needs requires a different placement, in which case the person shall be housed in accordance with their stated health and safety needs.

9) Requires that placement in housing within a facility, for example, single cell, double cell, dorm, protective custody, or general population, be based on the incarcerated individual's perception of health and safety, except as provided.

10) Requires that if there are significant security or management concerns with placing an incarcerated individual within a facility based on the individual's perception of health and safety, the Secretary of CDCR (Secretary), or the Secretary's designee, certify in writing a specific and articulable basis for why a particular placement would present significant security or management concerns before housing the incarcerated individual in a manner contrary to the person's perception of health and safety.

11) Requires that if an incarcerated individual's housing and placement be reassessed if the individual raises concerns for their health or safety at any time.

12) Includes several legislative findings and declarations.

**Background**

Penal Code Section 2900 provides that defendants sentenced to state prison shall be delivered to the custody of the Secretary at the place designated by the Secretary to serve the term of imprisonment ordered by the court. Chapter 6 of CDCR's Department Operations Manual (DOM) establishes the procedures for the reception, processing, and transfer of inmates into CDCR institutions. The DOM provides further details on the procedures determining appropriate inmate housing assignments. (DOM §§ 54046.3-54046.4.)

*Housing of Transgender Inmates*

With respect to housing transgender inmates, the DOM provides: "Inmates who have been diagnosed as transgender or intersex, as documented on the Medical Classification Chrono, shall be referred to a classification committee for review of all case factors and determination of appropriate institutional placement and

housing assignment." (DOM § 62080.14.) CDCR specifies the institutions where transgender inmates are to be housed "[i]n order to ensure inmate-patients receive the necessary medical care/mental health treatment, transgender or intersex inmate-patients." (*Id*.) Those institutions include: California Medical Facility, Richard J. Donovan, San Quentin State Prison, Mule Creek State Prison, California Substance Abuse Treatment Facility, California State Prison Sacramento, Salinas Valley State Prison, Correctional Institution for Men, Kern Valley State Prison, California Men's Colony, California Health Care Facility, and all three of the state's women's prisons.

*Cross-Gender Searches of Inmates*

CDCR policy provides that "[b]ody search procedures for clothed female inmates recognize, address, and minimize the effects of cross-gender contact inherent in the body search process by limiting this function to female correctional staff unless an emergency exists that threatens death, inmate escape, or great bodily injury to staff, inmates, or visitors." (DOM § 52050.16.4.) The policy reiterates that "under no circumstances shall male correctional staff perform non-emergency clothed body searches of female inmate." (*Id*.) With respect to unclothed searches, correctional staff, other than qualified medical staff, is prohibited from conducting unclothed body inspections or searches "of an inmate of the opposite sex, except in an emergency." (DOM § 52050.16.5.) Routine unclothed body searches are prohibited from being completed by staff "of the opposite biological sex." (*Id*.) Finally, CDCR policy provides that unclothed body searches of inmates "by staff of the opposite biological sex" are limited to emergency situations, and that a required cross-gender unclothed body search must be documented. (*Id*.)

*Prison Rape Elimination Act (PREA) and the National PREA Standards*

PREA was passed by Congress in 2003. It applies to all correctional facilities, including prisons, jails, and juvenile facilities. Among the many stated purposes for PREA are: to establish a zero-tolerance standard for the incidence of prison rape in prisons in the United States; to develop and implement national standards for the detection, prevention, reduction, and punishment of prison rape; to increase the available data and information on the incidence of prison rape to improve the management and administration of correctional facilities; and to increase the accountability of prison officials who fail to detect, prevent, reduce, and punish prison rape. (34 U.S.C. § 30301 et seq. [previously classified as 42 U.S.C. § 15601 et seq.]) PREA also created the National Prison Rape Elimination Commission and charged it with developing standards for the elimination of prison rape.

The PREA standards developed by the National Prison Rape Elimination Commission were issued as a final rule by the U.S. Department of Justice in 2012. (77 Fed.Reg. 37106 (Jun. 20, 2012).) Among other things, the standards require each agency and facility to: designate a PREA point person to coordinate compliance efforts; develop and document a staffing plan, taking into account a set of specified factors, that provides for adequate levels of staffing, and, where applicable, video monitoring, to protect inmates against sexual abuse; and train staff on key topics related to preventing, detecting, and responding to sexual abuse. In addition, the standards provide requirements regarding the avenues for reporting sexual abuse, investigation of sexual abuse, and access to medical and mental health care for inmate victims of sexual abuse.

The PREA standards account in various ways for the particular vulnerabilities of inmates who identify as LGBTI or whose appearance or manner does not conform to traditional gender expectations. (*Id*. at pp. 37149-37154.) The standards require training in effective and professional communication with LGBTI and gender nonconforming inmates and require the screening process to consider whether the inmate is, or is perceived to be, LGBTI or gender nonconforming. The standards also require that post-incident reviews consider whether the incident was motivated by the inmate's LGBTI identification, status, or perceived status. In addition, the standards do not allow placement of LGBTI inmates in dedicated facilities, units, or wings in adult prisons, jails, or community confinement facilities solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates.

The standards impose a complete ban on searching or physically examining a transgender inmate for the sole purpose of determining the inmate's genital status. Agencies are required to train security staff in conducting professional and respectful cross-gender pat-down searches and searches of transgender inmates. In deciding whether to assign a transgender inmate to a facility for male or female inmates, and in making other housing and programming assignments, an agency may not simply assign the inmate to a facility based on genital status. Rather, the agency must consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems, giving serious consideration to the inmate's own views regarding their own safety. In addition, the standards require that transgender inmates be given the opportunity to shower separately from other inmates.

*CDCR PREA Policy*

AB 550 (Goldberg, Chapter 303, Statutes of 2005) established the Sexual Abuse in Detention Elimination Act. The Act requires CDCR to adopt specified policies, practices, and protocols related to the placement of inmates, physical and mental health care of inmate victims, and investigation of sexual abuse.

CDCR's PREA policy provides guidelines for the prevention, detection, response, investigation, and tracking of sexual violence, staff sexual misconduct, and sexual harassment against CDCR inmates. (DOM §§ 54040.1-5404.22.) The policy applies to all offenders and persons employed by CDCR, including volunteers and independent contractors assigned to an institution, community correctional facility, conservation camp, or parole. With respect to inmates who are at a high risk for sexual victimization, CDCR's PREA policy provides:

> *Offenders at high risk for sexual victimization, as identified on the electronic Initial Housing Review, shall not be placed in segregated housing unless an assessment of all available alternatives has been completed, and a determination has been made that there is no available alternative means of separation from likely abusers.*
>
> Offenders at high risk for sexual victimization shall have a housing assessment completed immediately or within 24 hours of placement into segregated housing. . . . If a determination is made at the conclusion of the assessment that there are no available alternative means of separation from likely abusers, the inmate will be retained in segregated housing…The offender's retention in segregation should not ordinarily exceed 30 days. (Italics added) (DOM § 54040.6.)

The policy further provides:

> Based on information that the offender has been a victim of sexual violence or victimization, the custody supervisor conducting the initial screening shall discuss housing alternatives with the offender in a private location. *The custody supervisor shall not automatically place the offender into administrative segregation*. Consideration shall be given to housing this offender with another offender who has compatible housing needs. . . .
>
> An inmate's risk level shall be reassessed when warranted due to a referral, request, incident of sexual abuse, or receipt of additional information that bears on the inmate's risk of sexual victimization or abusiveness. (DOM § 54040.7.)

**FISCAL EFFECT:** Appropriation: No Fiscal Com.: Yes Local: No

According to the Senate Appropriations Committee:

- *Staff training*: One-time, potentially-major costs ranging from the high hundreds of thousands of dollars to the low millions of dollars to develop and implement staff training consistent with this measure on a statewide basis. (General Fund)

- *Information system update*: Unknown one-time costs, potentially in the low-to-mid hundreds of thousands of dollars, to update the Strategic Offender Management System and/or the Electronic Record Management System to capture inmates' gender identity, preferred gender pronoun, honorific, preferred gender identity of the officer who may conduct a lawful search of the person's body, and any other data point required by SB 132. (General Fund)

- *Identification cards*: Costs in the low hundreds of thousands of dollars for procuring and issuing new identification cards for the inmate population that include gender markers consistent with a person's gender identity. Currently, CDCR does not include a gender marker on identification issued to inmates. (General Fund)

- *Transfer committee and process*: Unknown, potentially-significant one-time costs in the hundreds of thousands of dollars to establish a new housing placement committee and process for safely housing inmates in facilities consistent with their gender identity. (General Fund)

- *Regulation and manual revision*: One-time costs of around $150,000 to update relevant regulations (Title 15) and DOM to reflect the changes that would be made by this measure, such as the requirement that staff and contractors address inmates with their preferred gender pronoun and honorifics. (General Fund)

**SUPPORT:** (Verified 5/17/19)

ACLU of California (co-source)
Equality California (co-source)
Lambda Legal (co-source)
TGI Justice Project (co-source)
Transgender Law Center (co-source)
TransLatin@ (co-source)
ACCESS Women's Health Justice
API Equality-LA

API Equality-Northern California
California Civil Liberties Advocacy
Californians United for a Responsible Budget
Conference of California Bar Associations
Ella Baker Center for Human Rights
Empowering Pacific Islander Communities
Initiate Justice
Lawyers' Committee for Civil Rights of the San Francisco Bay Area
Legal Services for Prisoners with Children
Medina Orthwein LLP
National Center for Lesbian Rights
Root & Rebound
St. James Infirmary
Tides Advocacy
Women's Foundation of California

**OPPOSITION:** (Verified 5/17/19)

None received

Prepared by: Stephanie Jordan / PUB. S. /
5/20/19 13:45:29

****** END ******

# EXHIBIT E

Date of Hearing: June 25, 2019
Counsel: Lorraine Black

ASSEMBLY COMMITTEE ON PUBLIC SAFETY
Reginald Byron Jones-Sawyer, Sr., Chair

SB 132 (Wiener) – As Amended May 17, 2019

**SUMMARY:** Requires the California Department of Corrections and Rehabilitation (CDCR) to take into account an incarcerated person's gender identity and perception of safety when determining where they will be housed. Specifically, **this bill**:

1) Finds that, nationwide, incarcerated transgender individuals experience exceptionally high rates of sexual victimization.

2) Requires CDCR to ask each individual entering into the custody of the department to specify their gender identity, sex assigned at birth, preferred first name, gender pronoun, and honorific.

3) Prohibits CDCR from disciplining an individual for refusing to answer or not disclosing complete information.

4) Requires that CDCR staff and contractors consistently use the gender pronoun and honorific an individual has specified in all verbal and written communications with or regarding that individual.

5) Requires CDCR to issue identification to the person with a gender marker consistent with the gender identity the individual specified.

6) Authorizes a person under CDCR jurisdiction to update their gender identity at any time by informing facility staff, who shall promptly repeat the process of offering an opportunity to specify gender identity, pronoun and honorific.

7) Requires CDCR to only conduct a search of an individual who has a gender identity that differs from their sex assigned at birth by an officer of the individual's preference.

8) Requires CDCR to house individuals in a correctional facility consistent with their gender identity, except as specified:

   a) The individual's perception of their health and safety needs require a different placement; or

   b) There are significant security or management concerns regarding housing the individual based on their perception of safety.

9) Requires that, if there are significant security or management concerns regarding housing for a transgender inmate, the Secretary of the Department of Corrections and Rehabilitation, or

their designee, shall certify in writing a specific and articulable basis for why a particular placement would present significant security or management concerns before housing the individual in a manner contrary to the person's perception of health and safety.

10) Requires that an incarcerated individual's housing and placement be reassessed if they raise concerns for their health or safety at any time.

11) Defines "gender pronoun" as a third-person singular personal pronoun, such as "he", "she", or "they"; and "honorific" as a form of respectful address combined with an individual's surname, such as "Mr.", "Ms.", or "Mx.".

**EXISTING LAW**:

1) Provides that transgender people can obtain state-issued identification documents that provide full legal recognition of their accurate gender identity. (Code Civ. Proc., § 1277.5, subd. (a).)

2) Provides that a person under the jurisdiction of CDCR or sentenced to county jail has the right to petition the court to obtain a name or gender change, as specified. (Code Civ. Proc., § 1279.5, subd. (b).)

3) Requires a person under the jurisdiction of CDCR to provide a copy of the petition for a name change to the department, in a manner prescribed by the department, at the time the petition is filed. Requires a person sentenced to county jail to provide a copy of the petition for name change to the sheriff's department, in a manner prescribed by the department, at the time the petition is filed. (Code Civ. Proc., § 1279.5, subd. (c).)

4) Requires that in all documentation of a person under the jurisdiction of CDCR or imprisoned within a county jail, the new name of a person who obtains a name change to be used, and prior names to be listed as an alias. (Code Civ. Proc., § 1279.5, subd. (d).)

5) Requires CDCR to consider available documentation and individual case factors in determining housing assignments in order to prevent violence and promote inmate safety. (Cal. Code Regs., tit. 15, § 3269, subd. (a).)

6) Requires CDCR to refer transgender inmates to a classification committee for a determination of appropriate housing. (Cal. Code Regs., tit. 15, § 3269, subd. (g).)

**EXISTING FEDERAL LAW**: The *Prison Rape Elimination Act* (PREA) establishes a zero-tolerance standard for the incidence of prison rape in prisons in the United States, provides for the development and implementation of national standards for the detection, prevention, reduction, and punishment of prison rape, and mandates the review and analysis of the incidence and effects of prison rape. (34 U.S.C. § 30301.)

**FISCAL EFFECT**: Unknown.

**COMMENTS**:

1) **Author's Statement**: According to the author, "SB 132 addresses a very real problem facing incarcerated transgender individuals, namely, transgender people being housed according to their birth-assigned gender, not their gender identity or their perception of safety, resulting in significant risk of violence. Transgender women housed in male facilities face particular risk of rape and assault. To house incarcerated transgender people in facilities that do not correspond with their gender identity or perception of safety puts these individuals at great risk of physical assault and sexual victimization, and reduces access to programming that creates a successful transition from prison back to their community. The risk of violence often leads to incarcerated transgender people being placed in isolation 'for their own protection,' resulting in loss of access to medical and rehabilitation services and leads to increased recidivism rates. SB 132 also allows CDCR, if specific security or management concerns exist regarding the incarcerated person's housing placement, to exercise their judgment and override the placement."

2) **Transgender Prisoners and Sexual Assault/Abuse:** Transgender inmates are particularly vulnerable to abuse from staff and other prisoners. The PREA requires that decisions regarding housing for transgender inmates should be based on case-by-case assessment, not anatomy or gender at birth. According to the National Center for Transgender Equality, placing transgender inmates in facilities based on their anatomy puts them "at extremely high risk of violence and abuse". (National Center for Transgender Equality, *LGBTQ People Behind Bars,* p.14, available at: https://transequality.org/sites/default/files/docs/resources/TransgenderPeopleBehindBars.pdf) In a 2011-2012 survey conducted by the Bureau of Justice Statistics, 40% of transgender inmates reported that they experienced at least one incident of sexual victimization in state or federal prison. (See *Sexual Victimization in Prisons and Jails Reported by Inmates 2011-2012*, p. 17, available at: https://www.bjs.gov/content/pub/pdf/svpjri1112_st.pdf)

3) **Current CDCR Policies:** CDCR has multiple policies in place regarding transgender inmates.

   Regarding CDCR housing of transgender inmates: "Transgender inmates and inmates having symptoms of gender dysphoria as identified and documented by Strategic Offender Management System (SOMS) by medical or mental health personnel within a CDCR institution shall be referred to a classification committee for a determination of appropriate housing at a designated institution…" (Cal. Code Regs., tit. 15, § 3269, subd. (g))

   Regarding clothing for transgender inmates: "Transgender inmates and inmates having symptoms of gender dysphoria as identified and documented in SOMS by medical or mental health personnel within a CDCR institution shall be allowed to possess the state-issued clothing that corresponds to their gender identities in place of the state-issued clothing that corresponds to their assigned sex at birth at designated institutions." (Cal. Code Regs., tit. 15, § 3030, subd. (c))

   Regarding lawful searches of transgender inmates: "In the event that there is an individual going through Receiving and Release (R&R) who self-identifies as transgender or self-identifies with a gender that seems not to match their biological sex, the search will be conducted by staff of the same biological sex as the inmate to be searched." (DOM,

Unclothed and Clothed Body Searches of Transgender or Intersex Inmates, Section 52050.6.7)

Regarding individuals at high risk for sexual victimization: "Offenders at high risk for sexual victimization, as identified on the PREA Screening Form, shall not be placed in segregated housing unless an assessment of all available alternatives has been completed, and a determination has been made that there is no available alternative means of separation from likely abusers…. Offenders at high risk for sexual victimization shall have a housing assessment completed immediately or within 24 hours of placement into segregated housing. If temporary segregation is required, the inmate shall be issued an Administrative Segregation Placement Notice, explaining the reason for segregation is the need to complete a housing assessment based on the high risk for sexual victimization. If a determination is made at the conclusion of the assessment that there are no available alternative means of separation from likely abusers, the inmate will be retained in segregated housing and issued an Administrative Segregation Placement Notice, explaining the reason for retention. The assigned counseling staff shall schedule the offender for appearance before the Institution Classification Committee for discussion of his/her housing needs. The offender's retention in segregation should not ordinarily exceed 30 days…" (DOM (Department of Operations Manual), Offender Housing, Section 54040.6)

Regarding PREA compliance: "On a bi-annual basis, Division of Adult Institutions (DAI) staff will send each PREA Compliance Manager (PCM) a list of identified transgender and intersex inmates, as known to the Department. This list will reflect the institution's respective inmates, along with the month of the inmate's next scheduled annual classification review. If an inmate is due to be seen for his/her annual classification review during the identified review period (August through January or February through July), the assigned caseworker will ask the inmate about any threats they have received during the pre-committee interview. In addition to interviewing the inmate, the assigned caseworker shall review the inmate's case factors in SOMS and [Electronic Records Management System] ERMS for any additional information which may indicate the inmate has any placement or programming concerns….After the annual review is completed, the assigned caseworker will document his/her actions, as they relate to the PREA Biannual Assessment, in the Classification Committee Chrono." (DOM, Transgender Biannual Reassessment for Safety in Placement and Programming, Section 54040.14.2)

SB 132 would eliminate the requirement that transgender inmates or inmates with gender dysphoria be identified or diagnosed by CDCR. Transgender inmates will be able to express their gender preference and perception of safety regarding their placement in housing, instead of being referred to a classification committee. This bill would also allow transgender inmates to express their preference as to the gender of the officer conducting a search; CDCR currently requires that a transgender inmate be searched by an officer of the same "biological sex". And lastly, this bill seeks to recognize that transgender inmates are offenders at high risk for sexual victimization, therefore transgender inmates will not need to be classified as such via PREA Screening Forms. SB 132 would not impact CDCR's current policies regarding PREA compliance.

4) **Prior Veto Message:** This bill is substantially similar to AB 633 (Ammiano) of the 2009-2010 Legislative Session, which was vetoed by Governor Schwarzenegger. The veto message said:

"This bill would add, among other provisions, the sexual orientation and gender identity of an inmate or ward to the list of risk factors considered as part of the [CDCR] inmate and ward classification assignment procedures. This bill is unnecessary because CDCR already considers these factors when determining where to house inmates."

5) **Prison Rape Elimination Act:** PREA was passed by Congress in 2003. It applies to all correctional facilities, including prisons, jails, and juvenile facilities. Among the many stated purposes for PREA are: to establish a zero-tolerance standard for the incidence of prison rape in prisons in the United States; to develop and implement national standards for the detection, prevention, reduction, and punishment of prison rape; to increase of the available data and information on the incidence of prison rape to improve the management and administration of correctional facilities; and to increase the accountability of prison officials who fail to detect, prevent, reduce, and punish prison rape. (34 U.S.C. § 30301 et seq.) The act also created the National Prison Rape Elimination Commission and charged it with developing standards for the elimination of prison rape. Regarding transgender inmates, the PREA requires that decisions about where transgender inmates will be housed should be made on a case-by-case basis.

6) **Argument in Support**: According to *Equality California*, "Transgender incarcerated individuals face disproportionately high rates of violence, bias, and harassment. In a 2011-2012 survey, almost 40% of incarcerated transgender individuals reported experiencing sexual victimization while incarcerated, compared to four percent of all incarcerated individuals, and 38% reported being harassed by correctional officers or staff. In California, a study of the state's prisons designated for men found that the rate of sexual assault for transgender women in those prisons was 13 times higher than for men in the same prisons."

"SB 132 will help ensure both the safety of people in CDCR custody by requiring CDCR to house transgender incarcerated individuals according to the transgender person's sense of health and safety. SB 132 would also require CDCR staff and contractors to consistently use the gender pronoun and honorific an individual has specified, to foster respect and preserve dignity."

"SB 132 will help ensure both the safety and dignity of transgender people."

7) **Argument in Opposition**: According to *Feminists in Struggle*, "…as a result of SB 179, any man may declare himself a woman and change his birth certificate, with no requirements or oversight and in total disregard of biological reality, opening the door for sexual predators of various types, from voyeurs to rapists, to reinvent themselves as female by taking on female names and identities. Add to this the reality that the majority of female prisoners have been molested, raped, sexually assaulted, trafficked, coerced or forced into pornography and/or prostitution, and the potential harm to incarcerated women and girls is greatly increased if SB 132 also passes."

"Feminists in Struggle believes SB 132 poses a grave risk to actual women, who comprise 52% of the general population and a growing percentage of the prison population, and therefore to public safety…We urge that members of the Public Safety Committee oppose its going to the floor of the Assembly for a vote.

8) **Prior Legislation**:

a) SB 990 (Wiener) of the 2017-2018 Legislative Session, was substantially similar to this bill, and would have required CDCR to consider sexual orientation and gender identity when classifying inmates in order to prevent sexual violence. SB 990 was held in the Assembly Appropriations Committee.

b) SB 310 (Atkins), Chapter 856, Statutes of 2017, provides individuals under the jurisdiction of CDCR the ability to seek a name change without department approval.

c) SB 179 (Atkins), Chapter 853, Statutes of 2017, improves the procedures that allow transgender and nonbinary individuals to change their name and/or gender marker to conform to their gender identity in several identity documents including birth certificates and driver's licenses.

d) AB 633 (Ammiano), of the 2010-2011 Legislative Session, would have required CDCR to consider self-reported safety concerns related to sexual orientation and gender identity when classifying inmates/wards in order to prevent sexual victimization. This bill was substantially similar to SB 132 and was vetoed by the Governor.

e) AB 382 (Ammiano), of the 2009-2010 Legislative Session, would have required CDCR to consider sexual orientation and gender identity when classifying inmates in order to prevent sexual violence. AB 382 was vetoed by the Governor.

**REGISTERED SUPPORT / OPPOSITION**:

**Support**

American Civil Liberties Union of California (Co-Sponsor)
Equality California (Co-Sponsor)
Medina Orthwein LLP (Co-Sponsor)
ACCESS Women's Health Justice
API Equality-LA
API Equality-Northern California
APLA Health
Bay Area Lawyers for Individual Freedom
Bienestar Human Services
California Public Defenders Association
California United for a Responsible Budget
California Women's Law Center
Conference of California Bar Associations
Ella Baker Center for Human Rights
Empowering Pacific Islander Communities
Human Impact Partners
Initiate Justice
Lambda Legal
Latino Equality Alliance
Lawyers Committee for Civil Rights of the San Francisco Bay Area
Legal Services for Prisoners with Children

National Association of Social Workers, California Chapter
National Center for Lesbian Rights
National Lawyers Guild San Francisco Bay Area Chapter
Public Health Justice Collective
Root and Rebound Reentry Advocates
St James Infirmary
Stonewall Democratic Club
The LGBTQ Center Long Beach
The Women's Foundation of California
Tides Advocacy
Time for Change Foundation
Transgender Law Center

**Opposition**

Feminists in Struggle

**Analysis Prepared by**: Lorraine Black / PUB. S. / (916) 319-3744

# EXHIBIT F

Date of Hearing: July 10, 2019

ASSEMBLY COMMITTEE ON APPROPRIATIONS
Lorena Gonzalez, Chair
SB 132 (Wiener) – As Amended May 17, 2019

Policy Committee: Public Safety Vote: 5 - 1

Urgency: No State Mandated Local Program: No Reimbursable: No

**SUMMARY**:

This bill requires the California Department of Corrections and Rehabilitation (CDCR) to house an individual in a correctional facility consistent with their gender identity, except where the individual's perception of their health and safety needs require a different placement or where there are significant security or management concerns regarding housing the individual based on their perception of safety. This bill also requires that, if there are significant security or management concerns regarding housing for a transgender inmate, the Secretary of CDCR shall certify in writing a specific and articulable basis for why a particular placement would present significant security or management concerns before housing the individual in a manner contrary to the individual's perception of health and safety.

**FISCAL EFFECT**:

1) One-time costs (GF) likely in the hundreds of thousands of dollars for CDCR to develop and implement staff training consistent with the identification and housing requirements for transgender inmates, as required by this bill.

2) One-time costs (GF) between $150,000 and $200,000 for CDCR to update the Strategic Offender Management System (SOMS) and the Electronic Record Management System to capture inmates' gender identity, preferred gender pronoun, honorific, preferred gender identity of the officer who may conduct a lawful search of the inmate's body, and any other data point required by this bill.

3) One-time costs (GF) in the low hundreds of thousands of dollars for CDCR to create new identification cards for the inmate population that include gender markers consistent with a person's gender identity.

**COMMENTS**:

1) **Purpose.** According to the author:

> SB 132 addresses a very real problem facing incarcerated transgender individuals, namely, transgender people being housed according to their birth-assigned gender, not their gender identity or their perception of safety, resulting in significant risk of violence.

2) **Existing Law.** The Prison Rape Elimination Act (PREA) establishes a zero-tolerance standard for the incidence of prison rape in prisons in the United States, provides for the

development and implementation of national standards for the detection, prevention, reduction and punishment of prison rape and mandates the review and analysis of the incidence and effects of prison rape.

The PREA also requires decisions regarding housing for transgender inmates be based on case-by-case assessment, not anatomy or gender at birth. CDCR has multiple policies in place regarding transgender inmates. Transgender inmates and inmates having symptoms of gender dysphoria are referred to a classification committee for a determination of appropriate housing at a designated institution.

This bill eliminates the requirement that transgender inmates or inmates with gender dysphoria be identified or diagnosed by CDCR medical staff. Transgender inmates will be able to express their gender preference and perception of safety regarding their placement in housing, instead of being referred to a classification committee. This bill would also allow transgender inmates to express their preference as to the gender of the officer conducting a search.

3) **Prior Legislation.** SB 990 (Wiener), of the 2017-2018 Legislative Session, was substantially similar to this bill and would have required CDCR to consider sexual orientation and gender identity when classifying inmates in order to prevent sexual violence. SB 990 was held in the Assembly Appropriations Committee.

**Analysis Prepared by**: Kimberly Horiuchi / APPR. / (916) 319-2081

# EXHIBIT G

SENATE THIRD READING
SB 132 (Wiener)
As Amended May 17, 2019
Majority vote

## SUMMARY:

Requires the California Department of Corrections and Rehabilitation (CDCR) to take into account an incarcerated person's gender identity and perception of safety when determining where they will be housed.

**Major Provisions**

1) Requires CDCR to ask each person entering into the custody of the department to specify their gender identity, sex assigned at birth, and gender pronoun and honorific if the person's gender identity is different from their sex assigned at birth.

2) States that CDCR staff and contractors shall not consistently fail to use the gender pronoun and honorific an individual has specified in all verbal and written communications with or regarding that individual.

3) Requires CDCR to conduct a search of an individual who has a gender identity that differs from their sex assigned at birth according to the search policy for their gender identity or according to the gender designation of the facility where they are housed, based on the individual's search preference.

4) Requires CDCR to house an individual in a correctional facility designated for men or women based on the individual's preference.

5) Provides that if CDCR has management or security concerns with an incarcerated individual's search or housing preference, CDCR must certify in writing a specific and articulable basis as to why the department cannot accommodate that search or housing preference.

## COMMENTS:

**According to the Author:**
"SB 132 addresses a very real problem facing incarcerated transgender individuals, namely, transgender people being housed according to their birth-assigned gender, not their gender identity or their perception of safety, resulting in significant risk of violence. Transgender women housed in male facilities face particular risk of rape and assault. To house incarcerated transgender people in facilities that do not correspond with their gender identity or perception of safety puts these individuals at great risk of physical assault and sexual victimization, and reduces access to programming that creates a successful transition from prison back to their community. The risk of violence often leads to incarcerated transgender people being placed in isolation 'for their own protection,' resulting in loss of access to medical and rehabilitation services and leads to increased recidivism rates. SB 132 also allows CDCR, if specific security or management concerns exist regarding the incarcerated person's housing placement, to exercise their judgment and override the placement."

**Arguments in Support:**
According to Equality California, "Transgender incarcerated individuals face disproportionately high rates of violence, bias, and harassment. In a 2011-2012 survey, almost 40% of incarcerated transgender individuals reported experiencing sexual victimization while incarcerated, compared to four percent of all incarcerated individuals, and 38% reported being harassed by correctional officers or staff. In California, a study of the state's prisons designated for men found that the rate of sexual assault for transgender women in those prisons was 13 times higher than for men in the same prisons."

"SB 132 will help ensure both the safety of people in CDCR custody by requiring CDCR to house transgender incarcerated individuals according to the transgender person's sense of health and safety. SB 132 would also require CDCR staff and contractors to consistently use the gender pronoun and honorific an individual has specified, to foster respect and preserve dignity."

"SB 132 will help ensure both the safety and dignity of transgender people."

**Arguments in Opposition:**
According to Feminists in Struggle, "…as a result of SB 179, any man may declare himself a woman and change his birth certificate, with no requirements or oversight and in total disregard of biological reality, opening the door for sexual predators of various types, from voyeurs to rapists, to reinvent themselves as female by taking on female names and identities. Add to this the reality that the majority of female prisoners have been molested, raped, sexually assaulted, trafficked, coerced or forced into pornography and/or prostitution, and the potential harm to incarcerated women and girls is greatly increased if SB 132 also passes."

"Feminists in Struggle believes SB 132 poses a grave risk to actual women, who comprise 52% of the general population and a growing percentage of the prison population, and therefore to public safety…We urge that members of the Public Safety Committee oppose its going to the floor of the Assembly for a vote.

## FISCAL COMMENTS:

According to the Assembly Appropriations Committee:

1) Costs (General Fund (GF)/DNA Identification Fund) of approximately $854,000 annually for the Department of Justice (DOJ) for personnel, operating expenses and equipment.

2) Possible state reimbursable costs (local funds/GF) in the hundreds of thousands of dollars annually for local law enforcement agencies. The Los Angeles County Sheriff's Department anticipates additional personnel costs of about $450,000 to process the evidence within the timeframe required. Local costs to comply with this bill would be subject to reimbursement by the state to the extent the Commission on State Mandates determines this bill imposes a reimbursable state-mandated local program.

## VOTES:

**SENATE FLOOR: 29-8-1**
**YES:** Allen, Archuleta, Atkins, Beall, Bradford, Caballero, Chang, Dodd, Durazo, Galgiani, Glazer, Hertzberg, Hill, Hueso, Hurtado, Jackson, Leyva, McGuire, Mitchell, Monning, Pan, Portantino, Roth, Rubio, Skinner, Stern, Umberg, Wieckowski, Wiener

**NO:** Bates, Borgeas, Grove, Jones, Moorlach, Morrell, Nielsen, Stone
**ABS, ABST OR NV:** Wilk

**ASM PUBLIC SAFETY: 5-1-2**
**YES:** Jones-Sawyer, Bauer-Kahan, Kamlager-Dove, Santiago, Wicks
**NO:** Lackey
**ABS, ABST OR NV:** Mathis, Quirk

**ASM APPROPRIATIONS: 11-5-2**
**YES:** Gonzalez, Bloom, Bonta, Calderon, Carrillo, Chau, Eggman, Gabriel, Eduardo Garcia, Quirk, Robert Rivas
**NO:** Bigelow, Brough, Diep, Fong, Obernolte
**ABS, ABST OR NV:** Maienschein, Petrie-Norris

**UPDATED:**

VERSION: September 3, 2019

CONSULTANT: Lorraine Black/ Sandy Uribe (Counsel) / PUB. S. / (916) 319-3744 FN: 0001738

# EXHIBIT H

SENATE THIRD READING
SB 132 (Wiener)
As Amended September 6, 2019
Majority vote

## SUMMARY:

Requires the California Department of Corrections and Rehabilitation (CDCR) to take into account an incarcerated person's gender identity and perception of safety when determining where they will be housed.

**Major Provisions**

1) Require CDCR to ask each person entering into the custody of the department to specify their gender identity, sex assigned at birth, and gender pronoun and honorific if the person's gender identity is different from their sex assigned at birth.

2) State that CDCR staff and contractors shall not consistently fail to use the gender pronoun and honorific an individual has specified in all verbal and written communications with or regarding that individual.

3) Require CDCR to conduct a search of an individual who has a gender identity that differs from their sex assigned at birth according to the search policy for their gender identity or according to the gender designation of the facility where they are housed, based on the individual's search preference.

4) Require CDCR to house an individual in a correctional facility designated for men or women based on the individual's preference.

5) Provide that if CDCR has management or security concerns with an incarcerated individual's search or housing preference, CDCR must certify in writing a specific and articulable basis as to why the department cannot accommodate that search or housing preference.

6) Delay implementation until January 1, 2021.

## COMMENTS:

**According to the Author:**

"SB 132 addresses a very real problem facing incarcerated transgender individuals, namely, transgender people being housed according to their birth-assigned gender, not their gender identity or their perception of safety, resulting in significant risk of violence. Transgender women housed in male facilities face particular risk of rape and assault. To house incarcerated transgender people in facilities that do not correspond with their gender identity or perception of safety puts these individuals at great risk of physical assault and sexual victimization, and reduces access to programming that creates a successful transition from prison back to their community. The risk of violence often leads to incarcerated transgender people being placed in isolation 'for their own protection,' resulting in loss of access to medical and rehabilitation services and leads to increased recidivism rates. SB 132 also allows CDCR, if specific security

or management concerns exist regarding the incarcerated person's housing placement, to exercise their judgment and override the placement."

**Arguments in Support:**
According to Equality California, "Transgender incarcerated individuals face disproportionately high rates of violence, bias, and harassment. In a 2011-2012 survey, almost 40% of incarcerated transgender individuals reported experiencing sexual victimization while incarcerated, compared to four percent of all incarcerated individuals, and 38% reported being harassed by correctional officers or staff. In California, a study of the state's prisons designated for men found that the rate of sexual assault for transgender women in those prisons was 13 times higher than for men in the same prisons."

"SB 132 will help ensure both the safety of people in CDCR custody by requiring CDCR to house transgender incarcerated individuals according to the transgender person's sense of health and safety. SB 132 would also require CDCR staff and contractors to consistently use the gender pronoun and honorific an individual has specified, to foster respect and preserve dignity."

"SB 132 will help ensure both the safety and dignity of transgender people."

**Arguments in Opposition:**
According to Feminists in Struggle, "…as a result of SB 179, any man may declare himself a woman and change his birth certificate, with no requirements or oversight and in total disregard of biological reality, opening the door for sexual predators of various types, from voyeurs to rapists, to reinvent themselves as female by taking on female names and identities. Add to this the reality that the majority of female prisoners have been molested, raped, sexually assaulted, trafficked, coerced or forced into pornography and/or prostitution, and the potential harm to incarcerated women and girls is greatly increased if SB 132 also passes."

"Feminists in Struggle believes SB 132 poses a grave risk to actual women, who comprise 52% of the general population and a growing percentage of the prison population, and therefore to public safety…We urge that members of the Public Safety Committee oppose its going to the floor of the Assembly for a vote.

## FISCAL COMMENTS:

According to the Assembly Appropriations Committee:

1) Costs (General Fund (GF)/DNA Identification Fund) of approximately $854,000 annually for the Department of Justice (DOJ) for personnel, operating expenses and equipment.

2) Possible state reimbursable costs (local funds/GF) in the hundreds of thousands of dollars annually for local law enforcement agencies. The Los Angeles County Sheriff's Department anticipates additional personnel costs of about $450,000 to process the evidence within the timeframe required. Local costs to comply with this bill would be subject to reimbursement by the state to the extent the Commission on State Mandates determines this bill imposes a reimbursable state-mandated local program.

## VOTES:

**SENATE FLOOR: 29-8-1**
**YES:** Allen, Archuleta, Atkins, Beall, Bradford, Caballero, Chang, Dodd, Durazo, Galgiani, Glazer, Hertzberg, Hill, Hueso, Hurtado, Jackson, Leyva, McGuire, Mitchell, Monning, Pan, Portantino, Roth, Rubio, Skinner, Stern, Umberg, Wieckowski, Wiener
**NO:** Bates, Borgeas, Grove, Jones, Moorlach, Morrell, Nielsen, Stone
**ABS, ABST OR NV:** Wilk

**ASM PUBLIC SAFETY: 5-1-2**
**YES:** Jones-Sawyer, Bauer-Kahan, Kamlager-Dove, Santiago, Wicks
**NO:** Lackey
**ABS, ABST OR NV:** Mathis, Quirk

**ASM APPROPRIATIONS: 11-5-2**
**YES:** Gonzalez, Bloom, Bonta, Calderon, Carrillo, Chau, Eggman, Gabriel, Eduardo Garcia, Quirk, Robert Rivas
**NO:** Bigelow, Brough, Diep, Fong, Obernolte
**ABS, ABST OR NV:** Maienschein, Petrie-Norris

## UPDATED:

VERSION: September 6, 2019

CONSULTANT: Lorraine Black / Sandy Uribe / PUB. S. / (916) 319-3744 FN: 0002132

# EXHIBIT I

SENATE THIRD READING
SB 132 (Wiener)
As Amended August 24, 2020
Majority vote

## SUMMARY:

Requires the California Department of Corrections and Rehabilitation (CDCR) to take into account an incarcerated person's gender identity and perception of safety when determining where they will be housed.

**Major Provisions**

1) Require CDCR, in a private setting, to ask each person entering into the custody of the department to specify their gender identity, whether they identify as transgender, nonbinary, or intersex, and their gender pronoun and honorific.

2) State that CDCR staff, contractors, and volunteers shall not consistently fail to use the gender pronoun and honorific an individual has specified in all verbal and written communications with or regarding that individual.

3) Require CDCR to conduct a search of an individual who is transgender, nonbinary, or intersex, regardless of anatomy, according to the search policy for their gender identity or according to the gender designation of the facility where they are housed, based on the individual's search preference.

4) Require CDCR to house an individual in a correctional facility designated for men or women based on the individual's preference, including, if eligible, at a residential program for individuals under the department's jurisdiction.

5) Require CDCR to give an individual's perception of health and safety serious consideration in any bed assignment, placement, or programming decision within the facility in which they are housed, including, but not limited to, granting single-cell status, housing the individual with another incarcerated person of their choice, or removing the individual or individuals who pose a threat from any location where they may have access to the individual who has expressed a safety concern.

6) Provide that if CDCR has management or security concerns with an incarcerated individual's search or housing preference, CDCR must certify in writing a specific and articulable basis as to why the department cannot accommodate that search or housing preference.

## COMMENTS:

**According to the Author:**
"SB 132 addresses a very real problem facing incarcerated transgender individuals, namely, transgender people being housed according to their birth-assigned gender, not their gender identity or their perception of safety, resulting in significant risk of violence. Transgender women housed in male facilities face particular risk of rape and assault. To house incarcerated transgender people in facilities that do not correspond with their gender identity or perception of

safety puts these individuals at great risk of physical assault and sexual victimization, and reduces access to programming that creates a successful transition from prison back to their community. The risk of violence often leads to incarcerated transgender people being placed in isolation 'for their own protection,' resulting in loss of access to medical and rehabilitation services and leads to increased recidivism rates. SB 132 also allows CDCR, if specific security or management concerns exist regarding the incarcerated person's housing placement, to exercise their judgment and override the placement."

**Arguments in Support:**
According to Equality California, "Transgender incarcerated individuals face disproportionately high rates of violence, bias, and harassment. In a 2011-2012 survey, almost 40% of incarcerated transgender individuals reported experiencing sexual victimization while incarcerated, compared to four percent of all incarcerated individuals, and 38% reported being harassed by correctional officers or staff. In California, a study of the state's prisons designated for men found that the rate of sexual assault for transgender women in those prisons was 13 times higher than for men in the same prisons."

"SB 132 will help ensure both the safety of people in CDCR custody by requiring CDCR to house transgender incarcerated individuals according to the transgender person's sense of health and safety. SB 132 would also require CDCR staff and contractors to consistently use the gender pronoun and honorific an individual has specified, to foster respect and preserve dignity."

"SB 132 will help ensure both the safety and dignity of transgender people."

**Arguments in Opposition:**
According to Feminists in Struggle, "…as a result of SB 179, any man may declare himself a woman and change his birth certificate, with no requirements or oversight and in total disregard of biological reality, opening the door for sexual predators of various types, from voyeurs to rapists, to reinvent themselves as female by taking on female names and identities. Add to this the reality that the majority of female prisoners have been molested, raped, sexually assaulted, trafficked, coerced or forced into pornography and/or prostitution, and the potential harm to incarcerated women and girls is greatly increased if SB 132 also passes."

"Feminists in Struggle believes SB 132 poses a grave risk to actual women, who comprise 52% of the general population and a growing percentage of the prison population, and therefore to public safety…We urge that members of the Public Safety Committee oppose its going to the floor of the Assembly for a vote.

## FISCAL COMMENTS:

According to the Assembly Appropriations Committee:

1) Costs (General Fund (GF)/DNA Identification Fund) of approximately $854,000 annually for the Department of Justice (DOJ) for personnel, operating expenses and equipment.

2) Possible state reimbursable costs (local funds/GF) in the hundreds of thousands of dollars annually for local law enforcement agencies. The Los Angeles County Sheriff's Department anticipates additional personnel costs of about $450,000 to process the evidence within the timeframe required. Local costs to comply with this bill would be subject to reimbursement

by the state to the extent the Commission on State Mandates determines this bill imposes a reimbursable state-mandated local program.

## VOTES:

**SENATE FLOOR: 29-8-1**
**YES:** Allen, Archuleta, Atkins, Beall, Bradford, Caballero, Chang, Dodd, Durazo, Galgiani, Glazer, Hertzberg, Hill, Hueso, Hurtado, Jackson, Leyva, McGuire, Mitchell, Monning, Pan, Portantino, Roth, Rubio, Skinner, Stern, Umberg, Wieckowski, Wiener
**NO:** Bates, Borgeas, Grove, Jones, Moorlach, Morrell, Nielsen, Stone
**ABS, ABST OR NV:** Wilk

**ASM PUBLIC SAFETY: 5-1-2**
**YES:** Jones-Sawyer, Bauer-Kahan, Kamlager-Dove, Santiago, Wicks
**NO:** Lackey
**ABS, ABST OR NV:** Mathis, Quirk

**ASM APPROPRIATIONS: 11-5-2**
**YES:** Gonzalez, Bloom, Bonta, Calderon, Carrillo, Chau, Eggman, Gabriel, Eduardo Garcia, Quirk, Robert Rivas
**NO:** Bigelow, Brough, Diep, Fong, Obernolte
**ABS, ABST OR NV:** Maienschein, Petrie-Norris

## UPDATED:

VERSION: August 24, 2020

CONSULTANT: Cheryl Anderson / PUB. S. / (916) 319-3744 FN: 0003200

# EXHIBIT J

**SENATE RULES COMMITTEE** SB 132
Office of Senate Floor Analyses
(916) 651-1520 Fax: (916) 327-4478

UNFINISHED BUSINESS

Bill No: SB 132
Author: Wiener (D), et al.
Amended: 8/24/20
Vote: 21

SENATE PUBLIC SAFETY COMMITTEE: 4-1, 4/23/19
AYES: Skinner, Bradford, Jackson, Wiener
NOES: Morrell
NO VOTE RECORDED: Moorlach, Mitchell

SENATE APPROPRIATIONS COMMITTEE: 4-2, 5/16/19
AYES: Portantino, Bradford, Hill, Wieckowski
NOES: Bates, Jones

SENATE FLOOR: 29-8, 5/23/19
AYES: Allen, Archuleta, Atkins, Beall, Bradford, Caballero, Chang, Dodd, Durazo, Galgiani, Glazer, Hertzberg, Hill, Hueso, Hurtado, Jackson, Leyva, McGuire, Mitchell, Monning, Pan, Portantino, Roth, Rubio, Skinner, Stern, Umberg, Wieckowski, Wiener
NOES: Bates, Borgeas, Grove, Jones, Moorlach, Morrell, Nielsen, Stone
NO VOTE RECORDED: Wilk

ASSEMBLY FLOOR: 52-15, 8/30/20 - See last page for vote

**SUBJECT:** Corrections

**SOURCE:** ACLU of California
Equality California
Lambda Legal
TGI Justice Project
Transgender Law Center
TransLatin@

**DIGEST:** This bill requires the Department of Corrections and Rehabilitation (CDCR) to ask each person entering into its custody specified information, including the individual's gender identity; requires CDCR to conduct searches of and assign housing to transgender inmates based on the inmate's individual preferences, as specified; and requires CDCR to articulate the reasons for denying a search or housing preference if the department has management or security concerns.

*Assembly Amendments* require that a CDCR inmate who is transgender, nonbinary, or intersex be searched according to the search policy for their gender identity or according to the gender designation of the facility where they are housed, based on the individual's search preference, and require that these inmates be housed based on their preference; prohibit the denial of search or housing preferences based on any discriminatory reason, as specified; and require CDCR to provide a written copy of a denial of an inmate's search or housing preference to the inmate, provide a meaningful opportunity for the inmate to verbally raise any objections to that denial, and document those objections.

**ANALYSIS:** Existing federal law establishes, via the Prison Rape Elimination Act, a zero-tolerance standard for the incidence of prison rape in prisons in the United States, provides for the development and implementation of national standards for the detection, prevention, reduction, and punishment of prison rape, and mandates the review and analysis of the incidence and effects of prison rape. (34 U.S.C. § 30301 et seq. [previously classified as 42 U.S.C. § 15601 et seq.])

Existing state law:

1) Provides the process by which a person may petition the court for a name change, including a name change to conform the petitioner's name to the petitioner's gender identity. (Code Civ. Proc., §§ 1276, 1277.5.)

2) Provides that a person under the jurisdiction of CDCR or sentenced to county jail has the right to petition the court to obtain a name or gender change, as specified. (Code Civ. Proc., § 1279.5, subd. (b).)

3) Requires a person under the jurisdiction of CDCR to provide a copy of the petition for a name change to the department, in a manner prescribed by the department, at the time the petition is filed. Requires a person sentenced to county jail to provide a copy of the petition for name change to the sheriff's department, in a manner prescribed by the department, at the time the petition is filed. (Code Civ. Proc., § 1279.5, subd. (c).)

4) Requires that in all documentation of a person under the jurisdiction of the CDCR or imprisoned within a county jail, the new name of a person who obtains a name change to be used, and prior names to be listed as an alias. (Code Civ. Proc., § 1279.5, subd. (d).)

5) Provides that a person may file a petition with the superior court in any county seeking a judgment recognizing the change of gender to female, male, or nonbinary. (Health & Saf. Code, § 103425, subd. (a).)

6) Requires CDCR to consider certain factors in determining housing assignments in order to prevent violence and promote inmate safety. (Cal. Code Regs., tit. 15, § 3269.)

This bill:

1) Requires CDCR, during the initial intake and classification process, to ask each individual entering into its custody to specify the individual's gender identity and sex assigned at birth, as well as preferred first name, gender pronoun, and honorific.

2) Requires a person incarcerated by CDCR to be issued identification reflecting a gender marker consistent with the gender identity the individual has most recently specified.

3) Provides that a person incarcerated by CDCR may not be disciplined for refusing to answer, or for not disclosing complete information in response to, the questions pursuant to this bill.

4) Provides that at any time, a person under the jurisdiction of CDCR may inform facility staff of their gender identity, and facility staff must promptly repeat the process of offering the individual an opportunity to specify the gender pronoun and honorific most appropriate for staff to use in reference to that individual, as specified above.

5) Requires staff and contractors of CDCR to consistently use the gender pronoun and honorific an individual has specified in all verbal and written communications with or regarding the individual that involve use of a pronoun and honorific.

6) Defines "gender pronoun" as a third-person singular personal pronoun such as "he," "she," or "they."

7) Defines "honorific" as a form of respectful address typically combined with an individual's surname, such as "Mr.," "Ms.," or "Mx."

8) Requires that an individual incarcerated by CDCR who has a gender identity that differs from their sex assigned at birth, with or without a diagnosis of gender dysphoria or any other physical or mental health diagnosis, and regardless of anatomy, be:

   a) Addressed in a manner consistent with the incarcerated individual's gender identity.

   b) If lawfully searched, searched by an officer of the gender identity of the incarcerated individual's preference. Requires the search be conducted by an officer whose gender identity is female if the incarcerated individual's preference or gender identity cannot be determined.

   c) Housed at a correctional facility designated for men or women consistent with the incarcerated individual's gender identity, unless the incarcerated individual's perception of their own health and safety needs requires a different placement, in which case the person shall be housed in accordance with their stated health and safety needs.

9) Requires that placement in housing within a facility, for example, single cell, double cell, dorm, protective custody, or general population, be based on the incarcerated individual's perception of health and safety, except as provided.

10) Requires that if there are significant security or management concerns with placing an incarcerated individual within a facility based on the individual's perception of health and safety, the Secretary of CDCR (Secretary), or the Secretary's designee, certify in writing a specific and articulable basis for why a particular placement would present significant security or management concerns before housing the incarcerated individual in a manner contrary to the person's perception of health and safety.

11) Requires that if an incarcerated individual's housing and placement be reassessed if the individual raises concerns for their health or safety at any time.

12) Includes several legislative findings and declarations.

**Background**

Penal Code Section 2900 provides that defendants sentenced to state prison shall be delivered to the custody of the Secretary at the place designated by the Secretary to serve the term of imprisonment ordered by the court. Chapter 6 of CDCR's Department Operations Manual (DOM) establishes the procedures for the reception, processing, and transfer of inmates into CDCR institutions. The DOM provides further details on the procedures determining appropriate inmate housing assignments. (DOM §§ 54046.3-54046.4.)

*Housing of Transgender Inmates*

With respect to housing transgender inmates, the DOM provides: "Inmates who have been diagnosed as transgender or intersex, as documented on the Medical Classification Chrono, shall be referred to a classification committee for review of all case factors and determination of appropriate institutional placement and housing assignment." (DOM § 62080.14.) CDCR specifies the institutions where transgender inmates are to be housed "[i]n order to ensure inmate-patients receive the necessary medical care/mental health treatment, transgender or intersex inmate-patients." (*Id*.) Those institutions include: California Medical Facility, Richard J. Donovan, San Quentin State Prison, Mule Creek State Prison, California Substance Abuse Treatment Facility, California State Prison Sacramento, Salinas Valley State Prison, Correctional Institution for Men, Kern Valley State Prison, California Men's Colony, California Health Care Facility, and all three of the state's women's prisons.

*Cross-Gender Searches of Inmates*

CDCR policy provides that "[b]ody search procedures for clothed female inmates recognize, address, and minimize the effects of cross-gender contact inherent in the body search process by limiting this function to female correctional staff unless an emergency exists that threatens death, inmate escape, or great bodily injury to staff, inmates, or visitors." (DOM § 52050.16.4.) The policy reiterates that "under no circumstances shall male correctional staff perform non-emergency clothed body searches of female inmate." (*Id*.) With respect to unclothed searches, correctional staff, other than qualified medical staff, is prohibited from conducting unclothed body inspections or searches "of an inmate of the opposite sex, except in an emergency." (DOM § 52050.16.5.) Routine unclothed body searches are prohibited from being completed by staff "of the opposite biological sex." (*Id*.) Finally, CDCR policy provides that unclothed body searches of inmates "by staff of the opposite biological sex" are limited to emergency situations, and that a required cross-gender unclothed body search must be documented. (*Id*.)

*Prison Rape Elimination Act (PREA) and the National PREA Standards*

PREA was passed by Congress in 2003. It applies to all correctional facilities, including prisons, jails, and juvenile facilities. Among the many stated purposes for PREA are: to establish a zero-tolerance standard for the incidence of prison rape in prisons in the United States; to develop and implement national standards for the detection, prevention, reduction, and punishment of prison rape**;** to increase the available data and information on the incidence of prison rape to improve the management and administration of correctional facilities; and to increase the accountability of prison officials who fail to detect, prevent, reduce, and punish prison rape. (34 U.S.C. § 30301 et seq. [previously classified as 42 U.S.C. § 15601 et seq.]) PREA also created the National Prison Rape Elimination Commission and charged it with developing standards for the elimination of prison rape.

The PREA standards developed by the National Prison Rape Elimination Commission were issued as a final rule by the U.S. Department of Justice in 2012. (77 Fed.Reg. 37106 (Jun. 20, 2012).) Among other things, the standards require each agency and facility to: designate a PREA point person to coordinate compliance efforts; develop and document a staffing plan, taking into account a set of specified factors, that provides for adequate levels of staffing, and, where applicable, video monitoring, to protect inmates against sexual abuse; and train staff on key topics related to preventing, detecting, and responding to sexual abuse. In addition, the standards provide requirements regarding the avenues for reporting sexual abuse, investigation of sexual abuse, and access to medical and mental health care for inmate victims of sexual abuse.

The PREA standards account in various ways for the particular vulnerabilities of inmates who identify as LGBTI or whose appearance or manner does not conform to traditional gender expectations. (*Id*. at pp. 37149-37154.) The standards require training in effective and professional communication with LGBTI and gender nonconforming inmates and require the screening process to consider whether the inmate is, or is perceived to be, LGBTI or gender nonconforming. The standards also require that post-incident reviews consider whether the incident was motivated by the inmate's LGBTI identification, status, or perceived status. In addition, the standards do not allow placement of LGBTI inmates in dedicated facilities, units, or wings in adult prisons, jails, or community confinement facilities solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates.

The standards impose a complete ban on searching or physically examining a transgender inmate for the sole purpose of determining the inmate's genital status. Agencies are required to train security staff in conducting professional and respectful cross-gender pat-down searches and searches of transgender inmates. In deciding whether to assign a transgender inmate to a facility for male or female inmates, and in making other housing and programming assignments, an agency may not simply assign the inmate to a facility based on genital status. Rather, the agency must consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems, giving serious consideration to the inmate's own views regarding their own safety. In addition, the standards require that transgender inmates be given the opportunity to shower separately from other inmates.

*CDCR PREA Policy*

AB 550 (Goldberg, Chapter 303, Statutes of 2005) established the Sexual Abuse in Detention Elimination Act. The Act requires CDCR to adopt specified policies, practices, and protocols related to the placement of inmates, physical and mental health care of inmate victims, and investigation of sexual abuse.

CDCR's PREA policy provides guidelines for the prevention, detection, response, investigation, and tracking of sexual violence, staff sexual misconduct, and sexual harassment against CDCR inmates. (DOM §§ 54040.1-5404.22.) The policy applies to all offenders and persons employed by CDCR, including volunteers and independent contractors assigned to an institution, community correctional facility, conservation camp, or parole. With respect to inmates who are at a high risk for sexual victimization, CDCR's PREA policy provides:

> *Offenders at high risk for sexual victimization, as identified on the electronic Initial Housing Review, shall not be placed in segregated housing unless an assessment of all available alternatives has been completed, and a determination has been made that there is no available alternative means of separation from likely abusers.*
>
> Offenders at high risk for sexual victimization shall have a housing assessment completed immediately or within 24 hours of placement into segregated housing. . . . If a determination is made at the conclusion of the assessment that there are no available alternative means of separation from likely abusers, the inmate will be retained in segregated housing…The offender's retention in segregation should not ordinarily exceed 30 days. (Italics added) (DOM § 54040.6.)

The policy further provides:

> Based on information that the offender has been a victim of sexual violence or victimization, the custody supervisor conducting the initial screening shall discuss housing alternatives with the offender in a private location. *The custody supervisor shall not automatically place the offender into administrative segregation*. Consideration shall be given to housing this offender with another offender who has compatible housing needs. . . .
>
> An inmate's risk level shall be reassessed when warranted due to a referral, request, incident of sexual abuse, or receipt of additional information that bears on the inmate's risk of sexual victimization or abusiveness. (DOM § 54040.7.)

**FISCAL EFFECT:** Appropriation: No Fiscal Com.:Yes Local:No

According to the Assembly Appropriations Committee:

- One-time costs (GF) likely in the hundreds of thousands of dollars for CDCR to develop and implement staff training consistent with the identification and housing requirements for transgender inmates, as required by this bill.
- One-time costs (GF) between $150,000 and $200,000 for CDCR to update the Strategic Offender Management System (SOMS) and the Electronic Record Management System to capture inmates' gender identity, preferred gender pronoun, honorific, preferred gender identity of the officer who may conduct a lawful search of the inmate's body, and any other data point required by this bill.
- One-time costs (GF) in the low hundreds of thousands of dollars for CDCR to create new identification cards for the inmate population that include gender markers consistent with a person's gender identity.

**SUPPORT:**(Verified 8/29/20)

ACLU of California (co-source)
Equality California (co-source)
Lambda Legal (co-source)
TGI Justice Project (co-source)
Transgender Law Center (co-source)
TransLatin@ (co-source)
ACCESS Women's Health Justice
API Equality-LA

API Equality-Northern California
California Civil Liberties Advocacy
Californians United for a Responsible Budget
Conference of California Bar Associations
Ella Baker Center for Human Rights
Empowering Pacific Islander Communities
Initiate Justice
Lawyers' Committee for Civil Rights of the San Francisco Bay Area
Legal Services for Prisoners with Children
Medina Orthwein LLP
National Center for Lesbian Rights
Root & Rebound
St. James Infirmary
Tides Advocacy
Women's Foundation of California

**OPPOSITION:** (Verified 8/29/20)

None received

ASSEMBLY FLOOR: 52-15, 8/30/20
AYES: Aguiar-Curry, Arambula, Bauer-Kahan, Berman, Bloom, Boerner Horvath, Bonta, Burke, Calderon, Carrillo, Cervantes, Chau, Chiu, Chu, Daly, Diep, Friedman, Gabriel, Cristina Garcia, Gipson, Gloria, Gonzalez, Holden, Irwin, Jones-Sawyer, Kalra, Kamlager, Levine, Limón, Low, Maienschein, Mayes, McCarty, Medina, Mullin, Muratsuchi, Nazarian, O'Donnell, Petrie-Norris, Quirk, Quirk-Silva, Ramos, Reyes, Luz Rivas, Robert Rivas, Blanca Rubio, Santiago, Mark Stone, Ting, Weber, Wood, Rendon
NOES: Bigelow, Brough, Chen, Choi, Cunningham, Megan Dahle, Flora, Fong, Gallagher, Kiley, Lackey, Mathis, Obernolte, Patterson, Salas
NO VOTE RECORDED: Cooley, Cooper, Eggman, Frazier, Eduardo Garcia, Gray, Grayson, Rodriguez, Smith, Voepel, Waldron, Wicks

Prepared by: Stephanie Jordan / PUB. S. /
8/31/20 0:45:16

****** END ******

# EXHIBIT K

California LEGISLATIVE INFORMATION

Home | Bill Information | California Law | Publications | Other Resources | My Subscriptions | My Favorites

## SB-132 Corrections. (2019-2020)

| Date | Action |
|---|---|
| 09/26/20 | Chaptered by Secretary of State. Chapter 182, Statutes of 2020. |
| 09/26/20 | Approved by the Governor. |
| 09/10/20 | Enrolled and presented to the Governor at 3 p.m. |
| 08/31/20 | Assembly amendments concurred in. (Ayes 29. Noes 10. Page 4544.) Ordered to engrossing and enrolling. |
| 08/30/20 | In Senate. Concurrence in Assembly amendments pending. |
| 08/30/20 | Read third time. Passed. (Ayes 52. Noes 15. Page 5305.) Ordered to the Senate. |
| 08/24/20 | Ordered to third reading. |
| 08/24/20 | Read third time and amended. |
| 06/26/20 | Ordered to third reading. |
| 06/26/20 | From inactive file. |
| 06/18/20 | Notice of intention to remove from inactive file given by Assembly Member Mark Stone. |
| 09/12/19 | Ordered to inactive file on request of Assembly Member Calderon. |
| 09/06/19 | Ordered to third reading. |
| 09/06/19 | Read third time and amended. |
| 09/04/19 | Read second time. Ordered to third reading. |
| 09/03/19 | Read second time and amended. Ordered to second reading. |
| 08/30/19 | From committee: Do pass as amended. (Ayes 11. Noes 5.) (August 30). |
| 07/10/19 | July 10 set for first hearing. Placed on APPR. suspense file. |
| 06/26/19 | From committee: Do pass and re-refer to Com. on APPR. (Ayes 5. Noes 1.) (June 25). Re-referred to Com. on APPR. |
| 06/03/19 | Referred to Com. on PUB. S. |
| 05/24/19 | In Assembly. Read first time. Held at Desk. |
| 05/23/19 | Read third time. Passed. (Ayes 29. Noes 8. Page 1262.) Ordered to the Assembly. |
| 05/20/19 | Read second time. Ordered to third reading. |
| 05/17/19 | Read second time and amended. Ordered to second reading. |
| 05/17/19 | From committee: Do pass as amended. (Ayes 4. Noes 2. Page 1090.) (May 16). |
| 05/10/19 | Set for hearing May 16. |
| 05/06/19 | May 6 hearing: Placed on APPR. suspense file. |
| 04/30/19 | Set for hearing May 6. |
| 04/24/19 | From committee: Do pass and re-refer to Com. on APPR. (Ayes 4. Noes 1. Page 802.) (April 23). Re-referred to Com. on APPR. |
| 03/29/19 | Set for hearing April 23. |
| 03/27/19 | Re-referred to Com. on PUB. S. |
| 03/14/19 | From committee with author's amendments. Read second time and amended. Re-referred to Com. on RLS. |
| 01/24/19 | Referred to Com. on RLS. |
| 01/15/19 | From printer. May be acted upon on or after February 14. |
| 01/14/19 | Introduced. Read first time. To Com. on RLS. for assignment. To print. |

# EXHIBIT L

California LEGISLATIVE INFORMATION

Home | Bill Information | California Law | Publications | Other Resources | My Subscriptions | My Favorites

## SB-132 Corrections. (2019-2020)

SHARE THIS:

Date Published: 09/29/2020 10:00 AM

### Senate Bill No. 132

### CHAPTER 182

An act to add Sections 2605 and 2606 to the Penal Code, relating to corrections.

[ Approved by Governor September 26, 2020. Filed with Secretary of State September 26, 2020. ]

### LEGISLATIVE COUNSEL'S DIGEST

SB 132, Wiener. Corrections.

Existing law establishes the state prisons under the jurisdiction of the Department of Corrections and Rehabilitation. Existing law authorizes a person sentenced to imprisonment in the state prison or a county jail for a felony to be, during the period of confinement, deprived of those rights, and only those rights, as is reasonably related to legitimate penological interests.

This bill would require the Department of Corrections and Rehabilitation to, during initial intake and classification, and in a private setting, ask each individual entering into the custody of the department to specify the individual's gender identity whether the individual identifies as transgender, nonbinary, or intersex, and their gender pronoun and honorific. The bill would prohibit the department from disciplining a person for refusing to answer or not disclosing complete information in response to these questions. The bill would authorize a person under the jurisdiction of the department to update this information. The bill would prohibit staff, contractors, and volunteers of the department from failing to consistently use the gender pronoun and honorific an individual has specified in verbal and written communications with or regarding that individual that involve the use of a pronoun or honorific.

The bill would require the department, for a person who is transgender, nonbinary, or intersex to only conduct a search of that person according to the search policy for their gender identity or according to the gender designation of the facility where they are housed, based on the individual's search preference. The bill would additionally require the department to house the person in a correctional facility designated for men or women based on the individual's preference, except as specified.

Vote: majority Appropriation: no Fiscal Committee: yes Local Program: no

### THE PEOPLE OF THE STATE OF CALIFORNIA DO ENACT AS FOLLOWS:

**SECTION 1.** This act shall be known, and may be cited, as "The Transgender Respect, Agency, and Dignity Act."

**SEC. 2.** The Legislature finds and declares all of the following:

(a) The term "transgender" is broad and inclusive of all gender identities different from the gender a person was assigned at birth including, but not limited to, transsexual, two-spirit, and māhū. "Nonbinary" is an inclusive term used to describe individuals who may experience a gender identity that is neither exclusively male nor female or is in between or beyond both of those genders, including, but not limited to, gender fluid, agender or without gender, third gender, genderqueer, gender variant, and gender nonconforming. The term "intersex" is a broad and inclusive term referring to people whose anatomy, hormones, or chromosomes fall outside the strict male and female binary.

(b) The United States Supreme Court recognized that incarcerated transgender individuals are particularly vulnerable to sexual abuse and sexual harassment and that disregarding the known risks to a transgender woman constitutes deliberate indifference in violation of the federal constitution.

(c) In California, a study of the state's prisons found that the rate of sexual assault for transgender women in those prisons was 13 times higher than for men in the same prisons.

(d) Transgender men in California prisons also report high rates of sexual and gender-based violence, harassment, and discrimination.

(e) Official data collected by the federal Bureau of Justice Statistics confirm that, nationwide, incarcerated transgender individuals experience exceptionally high rates of sexual victimization. In a 2011–12 survey, almost 40 percent of incarcerated transgender individuals reported experiencing sexual victimization while incarcerated compared to 4 percent of all incarcerated individuals.

(f) A congressional study found that instances of prison rape often go unreported, and that "most prison staff are not adequately trained or prepared to prevent, report or treat inmate sexual assaults."

(g) Forty percent of transgender women respondents reported harassment from other incarcerated individuals.

(h) Thirty-eight percent reported being harassed by correctional officers or staff.

(i) Correctional officers and other incarcerated people predominantly refer to transgender women as men, using masculine pronouns, and transgender men as women, using feminine pronouns.

(j) Gender transition is a deeply personal experience that may involve some combination of social transition, legal transition, medical transition, or none of these. Some transgender, nonbinary, and intersex people experience gender dysphoria that requires medical treatment, while others do not experience gender dysphoria. Due to safety concerns, inconsistent medical and mental health care, insufficient education and resources, and other factors, incarceration often serves as a barrier to gender transition. Regardless of the ways in which a person chooses or is able to express their gender or to take medical, social, or legal transition steps, they deserve respect, agency, and dignity.

**SEC. 3.** Section 2605 is added to the Penal Code, to read:

**2605.** (a) During the initial intake and classification process, and in a private setting, the Department of Corrections and Rehabilitation shall ask each individual entering into the custody of the department to specify all of the following:

(1) The individual's gender identity of female, male, or nonbinary.

(2) Whether the individual identifies as transgender, nonbinary, or intersex.

(3) The individual's gender pronoun and honorific.

(b) A person incarcerated by the department may not be disciplined for refusing to answer, or for not disclosing complete information in response to, the questions pursuant to this section.

(c) At any time, a person under the jurisdiction of the department may inform designated facility staff of their gender identity, and designated facility staff shall promptly repeat the process of offering the individual an opportunity to specify the gender pronoun and honorific most appropriate for staff to use in reference to that individual, in accordance with subdivision (a).

(d) Staff, contractors, and volunteers of the department shall not consistently fail to use the gender pronoun and honorific an individual has specified in all verbal and written communications with or regarding the individual that involve use of a pronoun and honorific.

(e) For the purposes of this section, the following terms have the following meanings:

(1) "Gender pronoun" means a third-person singular personal pronoun, such as "he," "she," or "they."

(2) "Honorific" means a form of respectful address typically combined with an individual's surname.

**SEC. 4.** Section 2606 is added to the Penal Code, to read:

**2606.** (a) An individual incarcerated by the Department of Corrections and Rehabilitation who is transgender, nonbinary, or intersex, regardless of anatomy, shall:

(1) Be addressed in a manner consistent with the incarcerated individual's gender identity.

(2) If lawfully searched, be searched according to the search policy for their gender identity or according to the gender designation of the facility where they are housed, based on the individual's search preference. If the incarcerated individual's preference or gender identity cannot be determined, the search shall be conducted according to the gender designation of the facility where they are housed.

(3) Be housed at a correctional facility designated for men or women based on the individual's preference, including, if eligible, at a residential program for individuals under the jurisdiction of the department. These programs include, but are not limited to, the Alternative Custody Program, Custody to Community Transitional Reentry Program, Male Community Reentry Program, or Community Prisoner Mother Program.

(4) Have their perception of health and safety given serious consideration in any bed assignment, placement, or programming decision within the facility in which they are housed pursuant to paragraph (3) of subdivision (a) or subdivision (b), including, but not limited to, granting single-cell status, housing the individual with another incarcerated person of their choice, or removing the individual or individuals who pose a threat from any location where they may have access to the individual who has expressed a safety concern. If, pursuant to this paragraph, the individual is not granted an alternative based on their perception of health and safety, the department shall document the reasons for that denial and share them with the individual.

(b) If the Department of Corrections and Rehabilitation has management or security concerns with an incarcerated individual's search preference pursuant to paragraph (2) of subdivision (a) or preferred housing placement pursuant to paragraph (3) of subdivision (a), the Secretary of the Department of Corrections and Rehabilitation, or the secretary's designee, shall, before denying a search preference or housing the incarcerated individual in a manner contrary to the person's preferred housing placement, certify in writing a specific and articulable basis why the department is unable to accommodate that search or housing preference.

(c) The Department of Corrections and Rehabilitation shall not deny a search preference pursuant to paragraph (2) of subdivision (a) or a housing placement pursuant to paragraph (3) of subdivision (a) based on any discriminatory reason, including, but not limited to, any of the following:

(1) The anatomy, including, but not limited to, the genitalia or other physical characteristics, of the incarcerated person.

(2) The sexual orientation of the incarcerated person.

(3) For a denial of a housing preference pursuant to paragraph (3) of subdivision (a), a factor present among other people incarcerated at the preferred type of facility.

(d) The incarcerated individual shall receive a copy of the written statement described in subdivision (b) and, within a reasonable time following the individual's receipt of the statement, the Department of Corrections and Rehabilitation shall provide the individual with a meaningful opportunity to verbally raise any objections to that denial, and have those objections documented.

(e) If an incarcerated individual raises concerns for their health or safety at any time, their housing and placement shall be reassessed.

# EXHIBIT M

Instagram



womaniiwomaninc • Follow
Central California Women's Facility

new issue or a new assignment from the lawyers over at WoLF. We are getting there though. We're making sure everything is done the right way, so we don't have to go back, because we know once we take off there's not going to be time to look back. All gas no brakes right? For those of you who haven't heard yet, a few of us decided to finally create a non-profit organization that is for us and by us. We initially did this in

22 likes
MAY 26, 2021

Add a comment... Post

More posts from womaniiwomaninc
















Instagram










Meta About Blog Jobs Help API Privacy Terms Top Accounts Hashtags Locations Instagram Lite

English © 2022 Instagram from Meta

# EXHIBIT N

Home
Explore
Notifications
Messages
Bookmarks
Lists
Profile
More
Tweet

← **Tweet**

Search Twitter

**Woman II Woman**
@womaniiwomaninc

Things just got real. Thankful for the guidance from our WoLF mothers ✊♀ #womanIIwomaninc #w2winc #formerparolees #advocacy #sisnotcis #voiceofthevoiceless @WomensLibFront




7:52 PM · Apr 10, 2021 from California, USA · Twitter for Android

**4** Retweets **1** Quote Tweet **15** Likes

Tweet your reply

**Ancorso**
@Ancorso

## Relevant people

**Woman II Woman**
@womaniiwomanir
Advocating BY form women FOR incarce Providing dignified partnerships, BPH p the voiceless.

**WoLF**
@WomensLibFront
An unapologetically women-only nonpr dedicated to the to women. #WomenSt tiny.one/50-states

## What's happening

Politics · LIVE
**Day three of hearings brin more questioning for Supr Court nominee Ketanji Bro Jackson**
Trending with Barrett, #SCOTUSConfirmation

War in Ukraine · LIVE
**War in Ukraine continues a Russia strikes besieged city Mariupol**

Politics · Trending
**Paul Manafort**
67.1K Tweets

**POPSUGAR** · 29 minutes
**The Best Looks From the iH Radio Awards Red Carpet**

Politics · LIVE
**Former US Secretary of Sta Madeleine Albright dies at**
Trending with Madeleine Albrigh Madam Secretary

Show more

Terms of Service Privacy Policy Accessibility Ads info More ···
© 2022 Twitter, Inc.

**Messages**

Search Twitter

Home
Explore
Notifications
Messages
Bookmarks
Lists
Profile
More
Tweet

**WoLF** @WomensLibFront · Apr 10, 2021
Replying to @womaniiwomaninc
You're have tremendous persistence and heart for the women you know. That's the hardest part to get right. You're doing great.

And thank you for reaching out to us.

1 2

**Lauren Adams** @laurenrachel22 · Apr 11, 2021
Replying to @womaniiwomaninc and @WomensLibFront
Oh snap!

1 3

**Ancorso**
@Ancorso

**Messages**

# EXHIBIT O




# PROGRAMS & SERVICES.

## Re-Entry Support

I'm a paragraph. Click here to add your own text and edit me. I'm a great place for you to tell a story and let your users know a little more about you.

## Parole Hearing Preparation

I'm a paragraph. Click here to add your own text and edit me. I'm a great place for you to tell a story and let your users know a little more about you.

## Advocacy for Safety & Dignity

I'm a paragraph. Click here to add your own text and edit me. I'm a great place for you to tell a story and let your users know a little more about you.

# OUR WORK.

## SAFETY & DIGNITY FOR INCARCERATED WOMEN TO THOSE WITH THE POWER TO MAKE IT STOP!

Since Senator Scott Wiener and Governor Gavin Newsom passed SB 132, "The Transgender Respect, Agency and Dignity Act" we have received hundreds of distressed messages from our sisters inside. They are scared, angry, confused and in disbelief that legislators completely left them out of a decision that affects their mental health and safety 24 hours a day. We started working on getting this information moving and into the ears of the right people. And the calls and cries for help kept coming.

Incarcerated women in California are preparing themselves for a major influx of transfers from the men's prisons. This isn't limited to transwomen, who deserve to safely do their time as well. This includes any man who checks the "non-binary" box and can call himself anything he wants. Anyone can gender self ID to get a transfer, and who wouldn't? What predator wouldn't take advantage of this opportunity to serve their sentence surrounded by potential new victims who are too scared to stand up for themselves because they've been silenced and ignored so much that they think they don't matter? Who wouldn't take advantage of this golden ticket chance to take over a whole prison and extort everyone? How does it protect transwomen to bring the same problems to the women's prisons?

There's some very unwell people in this world and most of you do not understand what that truly means, but most incarcerated women understand all too well. There is a spirit of defeat, fear and anxiety lingering around the units trying to infect their minds. They're strong, but each person can only take so much.
You have to understand some things. Men's prisons and women's prisons are different. The people whose transfer requests are being granted are coming from an entirely different environment. The men wake up early everyday to work out. They're militant, they're training everyday in preparation for the worst circumstances and they live in a concrete hell that is similar, but much worse, than everything you've seen on TV. They're often segregated by race, gang affiliation, or nature of crime. A men's level 4 prison is nothing like a woman's level 4 prison.

Women wake up in the morning and make each other coffee. Some women get up early to pray, some do yoga, others have to get ready for work, and all eight of us do this in a cell that was built for four people. All eight women are different security levels; shoplifters and killers are all housed together. In this tiny room, we eat, sleep, shower and use the toilet. All eight of us.

There is solidarity and there is a sense of community of women surviving together. These women are trying to learn how to heal, and now they're making sleep schedules so that one woman is always on watch to make sure no one gets raped. The prisons have brought in new, stronger cans of pepper spray and riot control measures, because they know the transfers are stronger and used to frequent violence. This places women at further risk of harm both physical and mental.

Yesterday we were told that CCWF is cutting down the only shade trees in the yard because the transfers will use them to fashion weapons. The women are worried that with the trees gone, the birds will go too. These women are locked in cages – some of them for the rest of their lives – and you want to cut off their only connection to nature because you have locked them in there with people with long histories of violence against women.

The women ask us every day for help and for answers about why this is being done to them. We pray to God to protect these women, and for Governor Newsom, Attorney General Bonta, and CDCR Secretary Allison to find the strength and willingness not to ignore their cries for help.



Sincerely,

Amie Ichikawa
Tyrina Griffin
Tiasha Croslin
And hundreds of women still inside who can't safely speak out

## TAKE ACTION IN SUPPORT OF CHANDLER V. CDCR

Sign our petition demanding an end to placing men in women's prisons!

TAKE ACTION

## THANK YOU IN ADVANCE FOR YOUR CONTRIBUTIONS

Funds raised will go to support direct services like stamps for digital communication and traditional mail, and accounts with GTL for our small team that maintains contact with those that are incarcerated in CCWF, CIW, and CCTRP.

To donate funding for our legal advocacy to protect and defend women's human rights, safety, and dignity,

## Donate Now

Help us make a difference

First Name

Last Name

Email *

Donate in the name of

Donate

WOMAN II WOMAN ICELESS Log In Donate Now Take Action Menu

A VOICE FOR THE VOICELESS

# JOIN THE MOVEMENT!

Get the Latest News & Updates

Enter your email here SUBSCRIBE

## Contact Us

First Name

Last Name

Email *

Write a message

Submit

ADDRESS

P.O. Box 465
Harbor City,CA 90710

PHONE

(424)410-2066

EMAIL

womaniiwomaninc@gmail.com

Back to Top

Facebook Twitter Instagram

Copyright © 2022 Woman II Woman Inc. All Rights Reserved.

# EXHIBIT P




# OUR TEAM.



## Amie Ichikawa

Founder

Amie Ichikawa was incarcerated at the Central California Women's Facility in Chowchilla for five years. She is now the founder of Woman II



## Tiasha Croslin

Founder

Tiasha (Tish) Croslin was incarcerated in the California correctional system from ages 15 through 35. She had to fight for the most basic

their advocate.

# JOIN THE MOVEMENT!

Get the Latest News & Updates

Enter your email here

SUBSCRIBE

## Contact Us

First Name

Last Name

Email *

Write a message

Submit

ADDRESS

P.O. Box 465
Harbor City,CA 90710

PHONE

(424)410-2066

EMAIL

womaniiwomaninc@gmail.com

Back to Top

Facebook

Twitter

Instagram

Copyright © 2022 Woman II Woman Inc. All Rights Reserved.

# EXHIBIT Q

WOMAN II WOMAN THE VOICELESS Log In Donate Now Take Action Menu




# ABOUT WOMAN II WOMAN

## OUR MISSION.

"Woman II Woman, Inc. is a community of empowered women previously impacted by incarceration, providing support services and resources for women who are formally and currently incarcerated. We champion the rights and welfare of our sisters through advocacy, services for parole suitability hearings, and their successful re-entry back into the free world.

We welcome women back into the community with dignity and respect through partnership with a team that has lived through the same experiences. We are a voice for the voiceless, and we stand in solidarity with our sisters to love them sisters and to ensure that they are not forgotten.".

## WHAT WE STAND FOR.

### SAFETY AND DIGNITY FOR INCARCERATED WOMEN

### JUSTICE FOR VICTIMS OF STATE ABUSE

recognize the unique needs of our community and ensure that we are not housed in situations that are triggers for us and completely detrimental to our mental health and well being .

lack of guardrails or safety precautions that we needed implemented during the authoring of SB132. We believe everyone should be treated with respect, agency and dignity, but one communities safety cannot come at the cost of another's.




California's SB 132 has legalized gender self ID in California state prisons. According to the LA Times, there have already been 255 men who have requested transfer to women's facilities from men's facilities in California based on this law.

Woman II Woman inc is now suing the state of California on behalf of incarcerated women who have been affected by SB132. You can read more about our lawsuit here.

TAKE ACTION

# PARTNERS.



WOMAN II WOMAN THE VOICELESS

Log In Donate Now Take Action Menu

# JOIN THE MOVEMENT!

Get the Latest News & Updates

Enter your email here

SUBSCRIBE

## Contact Us

First Name

Last Name

Email *

Write a message

Submit

ADDRESS

P.O. Box 465

Harbor City,CA 90710

PHONE

(424)410-2066

EMAIL

womaniiwomaninc@gmail.com

Back to Top

Facebook

Twitter

Instagram

Copyright © 2022 Woman II Woman Inc. All Rights Reserved.

# EXHIBIT R

# WOMEN SPEAK: VOICES FROM INSIDE

# PROFILES OF THE WOMEN IN OUR CASE




Woman II Woman is a nonprofit org created by formerly incarcerated women for incarcerated women. It provides

**Woman II Woman**

---

# THE IMPACT OF SB132

The women of California's Department of Corrections are speaking out, telling us how the passa of SB132 has affected them.

# EXHIBIT S

# Senate Bill 132 FAQs

## Housing and Searching Incarcerated People Consistent with their Gender Identify

## Background:

Senate Bill 132, *The Transgender Respect, Agency and Dignity Act*, became effective on January 1, 2021. It allows incarcerated transgender, non-binary and intersex people to request to be housed and searched in a manner consistent with their gender identity.

The California Department of Corrections and Rehabilitation is committed to providing a safe, humane, respectful and rehabilitative environment for all incarcerated people including the incarcerated transgender, non-binary and intersex community, and has worked throughout the year on implementing the law.

CDCR signed a contract with The Moss Group, Inc., a Washington, D.C.-based, nationally renowned criminal justice consulting firm, in October 2021 to provide long-term policy recommendations to help it ensure successful continued implementation of SB 132.

### How many incarcerated transgender, non-binary and intersex people are there in state prison?

As of February 25, 2022, there are 1,430 incarcerated people identified as transgender, non-binary and intersex. (This number is based on incarcerated people who self-identify using the Gender Identity Questionnaire.)

CDCR created a report of the incarcerated population by gender identity. It can be found on CDCR's population reports (https://www.cdcr.ca.gov/research/population-reports-2/) webpage.

### Why is CDCR housing transgender people based on their gender identity?

- State law prohibits discrimination based on gender, including gender identity.
- Senate Bill 132, a new law which took effect Jan. 1, 2021, allows incarcerated transgender, non-binary and intersex people to request to be housed and searched in a manner consistent with their gender identity.
- The federal Prison Rape Elimination Act (PREA) expressly prohibits housing decisions based solely on an incarcerated person's external genitalia.
- PREA standards require correctional agencies to consider on a case-by-case basis incarcerated people's requests to be placed in an institution consistent with their gender identity when different from their sex assigned at birth.
- PREA data from 2015 shows transgender people experience the highest rates of sexual victimization inside prisons and jails. All correctional agencies have a legal obligation to protect the people they incarcerate.

Since transgender, non-binary and intersex people may be singled out for violent attacks by other incarcerated people and are at a higher risk for victimization, CDCR must make every effort to protect this vulnerable population. Housing transgender people according to their gender identity, when safe to do so, increases safety in prisons, upholds CDCR's duty to protect all incarcerated people and promotes successful rehabilitation.

## Who will decide if an incarcerated person can be housed based on their gender identity?

All requests for housing based on gender identity will be reviewed by a multi-disciplinary classification committee chaired by the Warden and made up of custody, medical and mental health care staff, and a PREA Compliance Manager. This committee will review all case factors and the individual's history to make a recommendation for approval or disapproval of the request. If approved, the incarcerated person will be transferred to a male or female Reception Center consistent with their gender identity. If disapproved, notification is given to the incarcerated person who has up to 30 days to grieve the decision. If grieved, it will be referred to the Departmental Review Board for a decision regarding housing in a male or female institution. If there is new information, the request will be reevaluated by the classification committee.

## How are gender-based housing requests evaluated?

Gender-based housing requests are part of CDCR's existing case-by-case classification process used for all incarcerated people. It includes a review of an incarcerated person's central file, various reports, and a thorough review of their history prior to and during incarceration; their crime, arrest and criminal history; trial and sentencing documentation; medical and mental health needs; custody level; time to serve; safety concerns and other factors including security and program needs. Medical and mental health care staff members are part of this process. Findings are then presented to the Institutional Classification Committee (ICC) to assist them in determining the incarcerated person's housing, security level, custody requirements and program needs. This process varies with each incarcerated person.

In addition, PREA standards require that all incarcerated people be assessed during intake and when they transfer to another institution, and that this screening information be used in housing assignments. Information documented includes their age, disabilities, gender identity, personal and criminal history, prior incarcerations, prior incidents of victimization either in custody or in the community, and convictions for sex offenses. Based on the information gathered in the PREA Screening Tool, an incarcerated person will be given one of three designations: at risk as a victim, at risk as an abuser, or not identified as being at risk. For example, individuals at risk as a victim cannot be housed in a cell with an individual identified as being at risk as an abuser.

CDCR may deny a housing request based on management or security concerns. However, CDCR must give serious consideration to the perceptions of health and safety of the

person making the request, and under no circumstances can the denial be based on any discriminatory reason, including anatomy, physical characteristics, and sexual orientation.

## Is the placement to an institution in accordance with an incarcerated person’s gender identity automatic upon their request?

No. All placement requests will go through an in-depth review prior to approval or denial. The department may deny a housing request based on management or security concerns. However, CDCR must give serious consideration to the perceptions of health and safety of the person making the request.

## How many people housed in male institutions have requested to be housed in a female institution, how many were approved, and how many were denied?

As of February 25, 2022, 296 people housed in male institutions have requested to be housed in a female institution.

- 43 were approved for transfer
- Nine were denied
- 18 changed their minds

The remaining requests are being reviewed.

## How many people housed in female institutions have requested to be housed in a male institution, how many were approved, and how many were denied?

As of February 25, 2022, 11 individuals housed in a female institution have requested to be housed in a male institution. The requests are under review.

## Will housing transgender women in a female institution put the safety of cisgender women at risk?

CDCR’s duty is to protect everyone within its facilities and it takes that duty very seriously. Part of the review process for transgender, non-binary and intersex people requesting housing based on their gender identity will include an evaluation of the safety of the

person making the request as well as the safety of the people at the facility where the person has asked to be housed. Moreover, any incarcerated person can communicate their safety concerns at any time to staff.

## Have there been assaults by transgender women on cisgender women?

CDCR's reporting mechanisms do not track assaults by gender identity. All staff receive training on Prison Rape Elimination Act (PREA) protocols and PREA (https://www.cdcr.ca.gov/prea/) data is reported; however, the data is tracked by institution and not by gender identity. CDCR's COMPSTAT reports (https://www.cdcr.ca.gov/research/compstat/) include the number of assaults and batteries.

## Could implementing this policy result in pregnancy?

The possibility of pregnancy was considered in the development of this policy. CDCR has existing policies and procedures related to pregnancy. Sexual acts are prohibited in prison and will result in disciplinary and/or legal action. Housing placement will be addressed using the PREA Screening Tool and on a case-by-case basis, taking all case factors into consideration.

## Are condoms provided in female institutions?

Penal Code 6500 (https://gcc02.safelinks.protection.outlook.com/?url=https%3A%2F%2Fcodes.findlaw.com%2Fca%2Fpenal-code%2Fpen-sect-6500.html&data=04%7C01%7CTerry.Thornton%40cdcr.ca.gov%7C56ddebc791e24614497708d95d9ec16c%7C0662477dfa0c4556a8f5c3bc62aa0d9c%7C0%7C0%7C637643758727182213%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&sdata=JPrnompYCOiwDdPVet0WIWqfjQxuvcMulO6gk1NUSbU%3D&reserved=0), which went into effect in 2015, required CDCR to expand the availability of condoms in all state prisons, including female institutions. In female institutions, condoms are made available to the population for family (overnight) visits and to women when they are released from prison after completing their sentences. Per regulations, incarcerated people are strictly forbidden – with the exception of permitted family visiting – from engaging in sexual activity, and may face disciplinary and/or legal action.

## Is there a risk that cisgender men will falsely claim to be transgender women in order to be housed with women?

CDCR has a multi-disciplinary team of staff in place to review all gender-based housing preference requests. Custody, medical and mental health staff as well as a PREA Compliance Manager will be involved in every assessment of a request to be housed in a facility that matches a person's gender identity. CDCR has the ability to deny a request based on management or security concerns.

## How does CDCR determine if an incarcerated person is transgender?

CDCR does not determine an incarcerated person's gender identity. Every incarcerated person self-identifies. When a person first arrives to a CDCR institution or upon transfer, pursuant to SB 132, the individual will be asked if they identify as transgender, non-binary or intersex. This self-identification will guide the process of requesting to be searched and/or housed according to gender identity.

## Does a transgender person have to have gender-affirming surgery to be housed at an institution that matches their gender identity?

No. All housing for incarcerated people is evaluated on a case-by-case basis, which includes their criminal history, behavior, rehabilitation opportunities, medical and psychiatric needs, program needs as well as their safety and security. If an incarcerated person requests housing different from their current assignment (e.g. a transgender woman requesting housing in a female institution), they can make that request to their assigned correctional counselor. That request will be considered as part of CDCR's classification process.

## Are transgender people required to be on hormones if they want to be housed in an institution that corresponds with their gender identity?

No. The decision whether or not to take hormones does not impact eligibility to be housed according to one's gender identity.

## Why can't CDCR designate a facility specifically for transgender people?

Establishing a facility solely for housing transgender people would be a violation of the national Prison Rape Elimination Act (PREA) Standard, 28 Code of Federal Regulations (CFR), Section 115.42(g), which states in part, "The agency shall not place lesbian, gay, bisexual, transgender, or intersex inmates in dedicated facilities, units, or wings solely on the basis of such identification or status …"

## Will a transgender person be housed in a cell with a cisgender person? -

Transgender and cisgender people are currently being housed together and will continue to be housed together when appropriate. Housing decisions are always made on a case-by-case basis, using screening criteria and taking into consideration all case factors.

## What accommodations will a non-binary incarcerated person be given? -

Incarcerated non-binary people receive the same accommodations as transgender people.

## Once an incarcerated person is approved for housing based on gender identity, can that approval be rescinded? -

Yes, like any other housing decision, an incarcerated person who was previously approved for housing based on gender identity can have that approval rescinded if staff believe management or security concerns require a different housing placement. Any recommendation to rescind an approval for housing based on gender identity is reviewed by a classification committee. A decision by the classification committee can be appealed by the incarcerated person. If grieved, it will be referred to the Departmental Review Board for a final decision regarding housing in a male or female institution.

## What if an incarcerated person who was previously approved for housing based on gender identity changes their mind? -

After an incarcerated person has been assigned permanent housing at an institution consistent with their gender identity, they may find this change is not what they expected or is creating other concerns for them. If that person no longer wants to be housed based on their gender identity, they will submit their request according to policy and their case will be reviewed by a classification committee.

## Can an incarcerated person, housed at an institution that does not match their gender identity, be searched by staff of a different gender?

Yes. All incarcerated people who are transgender, non-binary or intersex can request to be searched in a manner consistent with their gender identity or according to the existing search policies of the gender designation of the facility where they are housed. In exigent circumstances, any staff member may conduct a clothed search of any incarcerated person consistent with the gender designation of the facility. However, based on the transgender person's approved search preference, CDCR will accommodate the request. If the incarcerated individual's preference or gender identity cannot be determined, the search is to be conducted according to the gender designation of the facility where they are housed.

## Is CDCR the first prison system to allow incarcerated people to be housed based on their gender identify?

No, California is not the first prison system to house incarcerated people based on their gender identity. There are federal, state, and local correctional agencies housing individuals based on their gender identity. CDCR consulted with other agencies and reviewed their policies and procedures in the development of its policy.

***Usage tip:*** *click FAQ titles to expand content. Any content that is expanded can be printed.*

Note: Numbers will be updated monthly.