SHAWN MEERKAMPER (SBN 296964)
shawn@transgenderlawcenter.org
**TRANSGENDER LAW CENTER**
P.O. Box 70976
Oakland, California 94612
Telephone:    (510) 587-9696

AMANDA C. GOAD (SBN 297131)
agoad@aclusocal.org
**ACLU FOUNDATION OF SOUTHERN
CALIFORNIA**
1313 W. 8th Street, Suite 200
Los Angeles, California 90017
Telephone:    (213) 977-9500

CHRISTINA S. PAEK (SBN 341994)
cpaek@lambdalegal.org
**LAMBDA LEGAL**
4221 Wilshire Boulevard, Suite 280
Los Angeles, California 90010
Telephone:    (213) 382-7600

NORA HUPPERT (SBN 330552)
nhuppert@lambdalegal.org
**LAMBDA LEGAL**
65 E. Wacker Place, Suite 2000
Chicago, Illinois 60601
Telephone:    (312) 663-4413

RICHARD SAENZ *(pro hac vice* forthcoming)
rsaenz@lambdalegal.org
**LAMBDA LEGAL**
120 Wall Street, 19th Floor
New York, New York 10005
Telephone:    (212) 809-8585

DIMITRI D. PORTNOI (SBN 282871)
dportnoi@omm.com
MICHAEL J. SIMEONE (SBN 326844)
msimeone@omm.com
ELIZABETH A. ARIAS (SBN 318283)
earias@omm.com
SHIVANI I. MORRISON (SBN 342874)
smorrison@omm.com
**O'MELVENY & MYERS LLP**
400 South Hope Street, 18th Floor
Los Angeles, California 90071
Telephone:    (213) 430-6000

SHILPI AGARWAL (SBN 270749)
sagarwal@aclunc.org
**ACLU FOUNDATION OF NORTHERN
CALIFORNIA**
39 Drumm Street
San Francisco, California 94111
Telephone: (415) 621-2493

*Attorneys for Proposed Intervenors*

### UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

### FRESNO DIVISION

| | |
|---|---|
| JANINE CHANDLER, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEP'T OF CORRECTIONS AND REHABILITATION, et al.,<br><br>Defendants. | Case No. 1:21-cv-01657-JLT-HBK<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PROPOSED INTERVENORS' MOTION TO INTERVENE**<br><br>Hearing Date:    June 13, 2022<br>Time:            9:00am<br>Judge:           Hon. Jennifer L. Thurston<br>Courtroom:       4, 7th Floor |

1

## TABLE OF CONTENTS

2

| | | | Page |
|---|---|---|---|
| I. | INTRODUCTION | ............................................................................................ | 1 |
| II. | FACTUAL BACKGROUND | ................................................................................ | 3 |
| | A. | California Lawmakers Passed SB 132 to Protect Incarcerated TGI People | ............ 3 |
| | B. | Plaintiffs Challenge SB 132 on Constitutional Grounds by Misrepresenting Gender Identity Issues | ................................................................................ 4 |
| | C. | The Proposed Intervenors Helped to Draft SB 132 and Would Suffer If It Were Invalidated | ............................................................................. 5 |
| | D. | Positions of Other Parties on Intervention | ................................................. 8 |
| III. | ARGUMENT | ..................................................................................................... 8 |
| | A. | The Proposed Intervenors Satisfy the Criteria for Intervention as of Right | ............ 8 |
| | | 1. The Proposed Intervenors' Motion for Intervention Is Timely | .................... 9 |
| | | 2. The Proposed Intervenors Have Significant, Protectable Interests That Will Be Impaired If the Court Denies Intervention | ........................ 10 |
| | | 3. The Existing Parties Do Not Adequately Represent the Proposed Intervenors' Interests | ............................................................... 13 |
| | B. | In the Alternative, the Court Should Permit the Proposed Intervenors' Intervention Under Rule 24(b) | ............................................................. 19 |
| IV. | CONCLUSION | ............................................................................................... 21 |

1

**TABLE OF AUTHORITIES**

2

**Page**

**CASES**

3

4

*April in Paris v. Becerra,*
   No. 2:19-cv-02471, 2020 WL 2404620 (E.D. Cal. May 12, 2020) ................................... 15, 19

5

*Arakaki v. Cayetano,*
   324 F.3d 1078 (9th Cir. 2003) .................................................................................. 14, 17, 18

6

7

*Beckman Indus., Inc. v. Int'l Ins. Co.,*
   966 F.2d 470 (9th Cir. 1992) ............................................................................................ 20

8

*Blum v. Merrill Lynch Pierce Fenner & Smith, Inc.,*
   712 F.3d 1349 (9th Cir. 2013) .......................................................................................... 19

9

10

*Bostock v. Clayton Cnty.,*
   140 S. Ct. 1731 (2020) ...................................................................................................... 4

11

*California ex rel. Lockyer v. United States,*
   450 F.3d 436 (9th Cir. 2006) ......................................................................... 9, 10, 11, 12

12

*California v. HHS,*
   330 F.R.D. 248 (N.D. Cal. 2019) ..................................................................................... 12

13

14

*Californians for Safe & Competitive Dump Truck Transp. v. Mendonca,*
   152 F.3d 1184 (9th Cir. 1998) .......................................................................................... 18

15

*Citizens for Balanced Use v. Mont. Wilderness Ass'n,*
   647 F.3d 893 (9th Cir. 2011) ..................................................................................... 14, 18

16

17

*Cnty. of Fresno v. Andrus,*
   622 F.2d 436 (9th Cir. 1980) ............................................................................................ 11

18

*Edmo v. Corizon, Inc.,*
   935 F.3d 757 (9th Cir. 2019) ............................................................................................. 4

19

*Forest Conservation Council v. U.S. Forest Serv.,*
   66 F.3d 1489 (9th Cir. 1995) ................................................................................. 9, 10, 18

20

21

*Freedom from Religion Found., Inc. v. Geithner,*
   644 F.3d 836 (9th Cir. 2011) ............................................................................................ 19

22

*Greene v. Tilton,*
   No. 2:09-cv-0793, 2012 WL 691704 (E.D. Cal. Mar. 2), *report and
   recommendation adopted*, 2012 WL 1130602 (E.D. Cal. Mar. 29, 2012) ............................ 16

23

24

*Hecox v. Little,*
   479 F. Supp. 3d 930 (D. Idaho 2020) ............................................................................... 19

25

*Idaho Farm Bureau Fed'n v. Babbitt,*
   58 F.3d 1392 (9th Cir. 1995) ............................................................................................ 11

26

27

*Jackson v. Abercrombie,*
   282 F.R.D. 507 (D. Haw. 2012) ........................................................................................ 11

28

**TABLE OF AUTHORITIES**
(continued)

Page

*Kalbers v. U.S. Dep't of Just.*,
  22 F.4th 816 (9th Cir. 2021) ............................................... 10

*Karnoski v. Trump*,
  926 F.3d 1180 (9th Cir. 2019) ............................................. 4

*Kleissler v. U.S. Forest Serv.*,
  157 F.3d 964 (3d Cir. 1998) ............................................... 17

*League of United Latin Am. Citizens v. Wilson*,
  131 F.3d 1297 (9th Cir. 1997) ............................................. 9

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*,
  No. 2:11-cv-02980, 2020 WL 7345673 (E.D. Cal. Oct. 13, 2020) ........... 9

*Pickup v. Brown*,
  No. 2:12-cv-02497, 2012 WL 6024387 (E.D. Cal. Dec. 4, 2012) ........... 17

*Sagebrush Rebellion, Inc. v. Watt*,
  713 F.2d 525 (9th Cir. 1983) ........................................ 13, 20

*Sierra Club v. EPA*,
  995 F.2d 1478 (9th Cir. 1993) ............................................. 9

*Syngenta Seeds, Inc. v. Cnty. of Kauai*,
  No. 14-cv-00014, 2014 WL 1631830 (D. Haw. Apr. 23, 2014) .............. 18

*Trbovich v. United Mine Workers of Am.*,
  404 U.S. 528 (1972) ....................................................... 13

*United States ex rel. Eisenstein v. City of New York*,
  556 U.S. 928 (2009) ........................................................ 8

*United States v. Aerojet Gen. Corp.*,
  606 F.3d 1142 (9th Cir. 2010) ............................................. 8

*United States v. Alisal Water Corp.*,
  370 F.3d 915 (9th Cir. 2004) .............................................. 9

*United States v. Cal. Mobile Home Park Mgmt. Co.*,
  107 F.3d 1374 (9th Cir. 1997) ............................................. 8

*United States v. Carpenter*,
  526 F.3d 1237 (9th Cir. 2008) ........................................... 11

*United States v. City of Los Angeles*,
  288 F.3d 391 (9th Cir. 2002) ..................................... 9, 10, 18

*Wash. State Bldg. & Constr. Trades Council v. Spellman*,
  684 F.2d 627 (9th Cir. 1982) ............................................ 11

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

**STATUTES**

28 U.S.C. § 1331 ................................................................................................ 19

Cal. Penal Code § 2605 ........................................................................................ 4

Cal. Penal Code § 2606 ................................................................................... 4, 16

**OTHER AUTHORITIES**

2020 Cal. Legis. Serv. ch. 182, § 2(g), (h) ......................................................... 1

2020 Cal. Stats. ch. 182 ...................................................................................... 12

7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1917 (3d ed. 2010) ........................................................... 19

CDCR, *Senate Bill 132 FAQs: Housing and Searching Incarcerated People Consistent with their Gender Identify* [sic] ............................................. 16

S. Comm. on Public Safety, 2019-2020 Leg., Regular Sess. (Cal. Apr. 22, 2019) ...................... 12

Transgender Respect, Agency, and Dignity Act, Senate Bill 132 (Jan. 1, 2021) .......................... 1

Valerie Jenness et al., *Violence in California Correctional Facilities: An Empirical Examination of Sexual Assault*, Ctr. for Evidence-Based Corr. (Apr. 26, 2007) ...................... 1

**RULES**

Fed. R. Civ. P. 24 ......................................................................................... *passim*

## I.      INTRODUCTION

Kelli Blackwell, Katie Brown, Tremayne Carroll, and Jennifer Rose are transgender women who have variously been harassed, severely beaten, and sexually assaulted—not only by the men they have been incarcerated with in California prisons, but also by employees of the California Department of Corrections and Rehabilitation ("CDCR").  That same agency is tasked in this case with defending the rights of these women, and others like them, to be housed in women's carceral facilities—a right that CDCR, ignoring its legal obligations, has granted to only two of the four.  These women, along with the advocacy group Transgender, Gender-Variant and Intersex Justice Project ("TGIJP"), are entitled to have their voices heard in this litigation to preserve their rights and the protections afforded under California law.

Ms. Blackwell, Ms. Brown, Ms. Carroll, and Ms. Rose (the "Proposed Individual Intervenors") have spent a combined 88 years incarcerated in California prisons designated for men.  *Infra* at 5–7.  Ms. Rose and Ms. Brown remain in men's prisons today.  *Id*.  All four women have faced ceaseless harassment and violence because they are transgender, both from other incarcerated people and from the state employees charged with their protection.  Ms. Carroll, now housed at a women's facility, endured *more than 30* incidents of sexual violence—including at least two at the hands of CDCR staff—while housed in men's facilities.  And her story is the rule, not the exception: A statewide study found that transgender women who were automatically housed with men in California prisons were *13 times* more likely to be sexually assaulted than men in the same facilities.[1]  And as the California Legislature found, 40% of incarcerated transgender women reported being harassed by other inmates, and 38% reported being harassed by CDCR staff.  2020 Cal. Legis. Serv. ch. 182, § 2(g), (h).

Faced with those sobering statistics, California lawmakers in 2020 enacted Senate Bill No. 132, also known as the Transgender Respect, Agency, and Dignity Act ("SB 132").  Among other things, SB 132 requires CDCR to house each transgender, gender non-conforming, or intersex ("TGI") person at a facility designated for either men or for women, based on the person's own

---

[1] Valerie Jenness et al., *Violence in California Correctional Facilities: An Empirical Examination of Sexual Assault*, Ctr. for Evidence-Based Corr. (Apr. 26, 2007).

1  stated preference and perception of what placement would be safest.  Now, Plaintiffs seek to

2  invalidate SB 132 and lodge a number of constitutional challenges that threaten to undo the law's

3  vital protections for incarcerated TGI people, including the Proposed Individual Intervenors.

4      The Defendants in this case—CDCR and CDCR officials sued in their official

5  capacities—are not likely to defend SB 132 vigorously because it is a law that they not only

6  refuse to fully implement, but regularly violate.  Although SB 132 requires CDCR to act on a TGI

7  person's housing preference unless the agency can articulate specific management or security

8  concerns about the requested placement, CDCR has failed even to acknowledge, much less act

9  on, most of those requests.  Since SB 132 took effect on January 1, 2021, at least 321 TGI people

10  have requested transfers, but CDCR has failed to respond to the vast majority of those requests,

11  granting just 46 and failing to actually transfer people even after approving their requests.  TGIJP

12  Decl. ¶ 19.  By refusing to implement SB 132, CDCR has shown that its interests diverge from

13  those of the incarcerated TGI people the law seeks to protect and that it cannot adequately

14  represent their interests.

15      TGIJP, Ms. Blackwell, Ms. Brown, Ms. Carroll, and Ms. Rose, (collectively, the

16  "Proposed Intervenors") respectfully seek to intervene in this action as party defendants under

17  Federal Rule of Civil Procedure 24(a) or, in the alternative, Rule 24(b), to defend the

18  constitutionality of SB 132.  TGIJP is a nonprofit organization that works on behalf of

19  incarcerated and formerly incarcerated TGI people in California to address housing and safety

20  concerns, among others, at both the individual and statewide levels.  *See infra* at 5.  TGIJP was

21  one of the sponsoring groups that helped draft SB 132 and secure its passage.  *Id*.  It represents

22  the interests of many TGI people incarcerated in CDCR facilities, and its members—transgender,

23  gender-variant, and intersex people inside and outside of detention facilities—directly benefit

24  from SB 132's protections.  *Id.*

25      Ms. Blackwell, Ms. Brown, Ms. Carroll, and Ms. Rose are transgender women who are

26  incarcerated in CDCR facilities.  *See infra* at 5–7.  In 2021, Ms. Blackwell and Ms. Carroll were

27  transferred from men's facilities to Central California Women's Facility ("CCWF").  *See infra* at

28  6–7.  Ms. Brown and Ms. Rose are housed at Salinas Valley State Prison ("SVSP"), a men's

POINTS & AUTHORITIES ISO
MOTION TO INTERVENE
CASE NO. 1:21-CV-01657-JLT-HBK

facility, and have requested to be transferred to women's facilities under SB 132. *See infra* at 5–7. The Proposed Intervenors have direct interests in defeating Plaintiffs' challenge to SB 132, and the Court's resolution of that challenge will directly affect the Proposed Individual Intervenors' personal safety and their protected rights. For these reasons and those more fully explained herein, the Court should permit the Proposed Intervenors to intervene in this action.

## II.     FACTUAL BACKGROUND

### A.     California Lawmakers Passed SB 132 to Protect Incarcerated TGI People

California's SB 132 protects incarcerated TGI people by requiring CDCR to house them in gender-appropriate facilities if that is their request. State Senator Scott Wiener authored SB 132, and a broad coalition of advocates—including co-sponsors TGIJP, TransLatin@ Coalition, Transgender Law Center, Equality California, Lambda Legal, and the ACLUs of California—supported it throughout the legislative process. While drafting the statute, the co-sponsors and Senator Wiener's office gathered feedback from incarcerated TGI people to ensure that the statute would promote their safety and dignity. TGIJP Decl. ¶ 17. The co-sponsors and author took other factors into account, including:

- the federal Prison Rape Elimination Act ("PREA") and its implementing regulations, which already required carceral agencies to consider a TGI person's own views about what housing placement and search protocol would be safest for them;
- the experiences of carceral agencies in Connecticut, Massachusetts, and other jurisdictions that have adopted laws, policies, or regulations for housing TGI people in facilities consistent with their gender identity; and
- the existing framework of constitutional and statutory law protecting the rights of TGI people in prisons and other settings in California.

*Id.* Both houses of the Legislature voted to pass SB 132, and Governor Gavin Newsom signed it into law on September 26, 2020.

SB 132 added two sections to the California Penal Code, both of which were designed to protect the physical safety and personal dignity of incarcerated TGI people. The first, Section 2605, requires CDCR to ask each person entering its custody their gender identity, pronoun (e.g.,

POINTS & AUTHORITIES ISO
MOTION TO INTERVENE
CASE NO. 1:21-CV-01657-JLT-HBK

1  "he," "she," or "they"), and honorific (e.g., "Mr.," "Ms."), and to respect and use each person's

2  specified pronoun and honorific.  Cal. Penal Code § 2605.  The second, Section 2606, requires

3  CDCR to house each TGI person in a facility designated for either men or women, based on the

4  person's preference and perception of personal safety.  *Id*. § 2606.  Section 2606 also requires that

5  CDCR inquire about and honor TGI people's preferences as to the gender of staff who may

6  search them.  *Id.*  SB 132 explicitly states that if CDCR declines to follow a person's housing or

7  search preference, it can do so based only on articulable, non-discriminatory "management or

8  security concerns," and it must provide the requesting person with a written explanation of its

9  reasons for any denial.  *Id.*

10  **B.**    **Plaintiffs Challenge SB 132 on Constitutional Grounds by Misrepresenting**

11  **Gender Identity Issues**

12      Janine Chandler, Krystal Gonzalez, Tomiekia Johnson, Nadia Romero, and the

13  organization Woman II Woman (collectively, "Plaintiffs") challenge SB 132 on various federal

14  and state constitutional grounds.  Plaintiffs seek, among other things, a declaration that SB 132 is

15  unconstitutional, on its face and as applied, under both the California and U.S. Constitutions.

16      Plaintiffs intentionally misrepresent gender identity terminology and reject concepts

17  accepted by the Ninth Circuit Court of Appeals and the U.S. Supreme Court.  For example, the

18  complaint refers to "female prisoner[s] without any gender identity," Compl. ¶ 4(f).  But the

19  Ninth Circuit has recognized that *everyone* has a gender identity—for those who are cisgender,

20  that gender identity simply matches their sex assigned at birth.  *See, e.g.*, *Karnoski v. Trump*, 926

21  F.3d 1180, 1187 n.1 (9th Cir. 2019) (citing Br. of Amici Curiae American Medical Association et

22  al.).  The complaint also refers to "men who claim a 'gender identity of female.'" Compl. ¶ 8.

23  This allegation is offensive and attempts to paint transgender women as "men," contrary to the

24  judicial consensus that such language is improper.  *See, e.g.*, *Bostock v. Clayton Cnty.*, 140 S. Ct.

25  1731, 1738 (2020) (referring to Respondent Aimee Stephens, a transgender woman, as "Ms.

26  Stephens," and "she"); *Edmo v. Corizon, Inc.*, 935 F.3d 757, 771–72 (9th Cir. 2019) (referring to

27  Plaintiff-Appellee Andree Edmo, an incarcerated transgender woman, as "a transgender woman"

28  and "she").

POINTS & AUTHORITIES ISO
MOTION TO INTERVENE
CASE NO. 1:21-CV-01657-JLT-HBK

**C.     The Proposed Intervenors Helped to Draft SB 132 and Would Suffer If It Were Invalidated**

*TGIJP.*  TGIJP is a San Francisco-based nonprofit organization that works with and advocates for incarcerated and formerly incarcerated TGI people.  TGIJP Decl. ¶ 3.  It offers a wide range of services to its members—from fighting to address individual housing and safety concerns to designing policy initiatives—and has long advocated for appropriate housing for incarcerated TGI people in California.  *Id.* ¶ 5.  TGIJP also gathers and shares information about the experiences of incarcerated TGI people, through visits and other communication with its incarcerated members.  *Id.* ¶ 14.  TGIJP played a leading role in shaping and advocating for the passage of SB 132, a vital law that protects the rights, mental health, and physical safety of TGIJP's members and that grew, in part, from the vision of TGIJP leader Miss Janetta Johnson.  *Id.* ¶¶ 10,16.  The organization formally sponsored SB 132 during the legislative process.  *Id.* ¶ 16.

*Katie Brown.*  Ms. Brown is a 37-year-old Black transgender woman who has been incarcerated in CDCR facilities since May 2017.  Brown Decl. ¶¶ 2, 6.  She is currently housed at SVSP, a facility designated for men.  *Id.* ¶ 5.  Ms. Brown does not feel safe in men's prisons.  *Id.* ¶ 10.  At SVSP, because she is a transgender woman, she faces routine harassment from incarcerated men and CDCR staff, including taunts and requests for sexual favors.  *Id.* ¶¶ 10–11.  Staff members consistently and purposefully misgender her—calling her "him," "boy," and "Mr. Brown"—and at least one staff member frequently singles out Ms. Brown and other transgender women for unjustified disciplinary action.  *Id.* ¶¶ 11–12.

On or about January 3, 2021, Ms. Brown formally requested to be transferred to a women's facility under SB 132.  *Id.* ¶ 14.  CDCR staff told her that she would first have to complete a class entitled "Right Person, Right Prison," after which the Institutional Classification Committee ("ICC") would hold a hearing on her transfer request.  *Id.* ¶ 15.  Ms. Brown completed the class in November 2021 and immediately requested an ICC hearing.  *Id.* ¶ 16.  A hearing was scheduled, but SVSP staff prevented Ms. Brown from attending: The correctional officer assigned to take Ms. Brown to the hearing refused to do so because he did not accept that

she is a transgender woman.  *Id.*  Ms. Brown has not yet had an ICC hearing and is still awaiting

transfer to a women's facility.  *Id.* ¶ 17.  CDCR has not given Ms. Brown any reason for its

extended delay in acting on her transfer request.  *Id.* ¶ 18.

      ***Kelli Blackwell.***  Ms. Blackwell is a 55-year-old Black transgender woman who has been

incarcerated in CDCR facilities since 1990.  Blackwell Decl. ¶¶ 2, 6.  Before her April 2021

transfer to a facility designated for women, Ms. Blackwell survived multiple instances of serious

physical violence because she is transgender.  *Id.* ¶¶ 5, 17.  In 2001, while housed in a men's

facility known as New Folsom, Ms. Blackwell was attacked by multiple other incarcerated people

who broke bones in her jaw and neck.  *Id.* ¶ 17.  And in 2008, while housed at SVSP,

Ms. Blackwell was attacked by another incarcerated person and lost eight teeth.  *Id.*  When

housed with men, Ms. Blackwell worried constantly about her safety.  *Id.* ¶ 19.

      A longtime advocate for transgender and LGBTQ communities, Ms. Blackwell was aware

of SB 132 before it became law and requested a transfer to a women's facility in January 2021,

immediately after SB 132 took effect.  *Id.* ¶¶ 7–10.  While her transfer request was pending,

CDCR staff discouraged Ms. Blackwell from transferring to a women's facility.  *Id.* ¶ 14.  In

early April 2021, Ms. Blackwell was transferred to CCWF.  *Id.* ¶¶ 5, 12.  While Ms. Blackwell

has had mostly positive experiences with the incarcerated women at CCWF, she has not felt

welcomed by the CDCR staff there, who she believes mete out disproportionate discipline to

transgender women and try to create conflict between the cisgender and transgender incarcerated

populations.  *Id.* ¶¶ 21–24.  The CCWF warden, a defendant in this case, has also personally

threatened to send Ms. Blackwell back to a men's facility against her will.  *Id.* ¶ 22.  Still,

Ms. Blackwell feels physically safer at CCWF.  *Id.* ¶ 20.  She fears that if Plaintiffs' lawsuit

succeeds, she will be sent back to a men's facility, where she will again be subject to severe

harassment and violence.  *Id.* ¶ 26.

      ***Tremayne Carroll.***  Ms. Carroll is a 49-year-old Black transgender woman who has been

incarcerated in CDCR facilities since 1999.  Carroll Decl. ¶¶ 2, 4.  She was transferred to a

women's facility in August 2021.  *Id.* ¶ 6.  While in men's facilities, she was sexually assaulted at

least 30 times—at least twice by CDCR staff.  *Id.* ¶¶ 7, 9.  She filed multiple PREA complaints

1    about these incidents.  *Id.* ¶¶ 7, 9, 11.  In 2019 at Richard J. Donovan Correctional Facility

2    ("RJD"), Ms. Carroll was placed in solitary confinement because she was concerned that she

3    could not be housed safely anywhere else in that facility.  *Id.* ¶¶ 9–10.  CDCR staff at RJD then

4    intentionally left Ms. Carroll unattended in solitary confinement—in her wheelchair, with her

5    hands handcuffed behind her back—for more than 48 hours.  *Id.* ¶ 11.  CDCR staff members were

6    required to check on Ms. Carroll every 30 minutes but refused to do so.  *Id.* ¶ 12.  And in

7    response to Ms. Carroll's repeated pleas for help over those two days, CDCR staff either ignored

8    her, told her they did not "want to get involved," or told her that she should not file PREA

9    reports.  *Id.*  Ms. Carroll understood this treatment to be in retaliation for PREA complaints she

10   had filed against staff at RJD.  *Id.* ¶ 11. In another incident, CDCR staff members stomped on

11   Ms. Carroll's ankles and wrists while she was unconscious.  *Id.* ¶ 15.

12   Eventually, Ms. Carroll was transferred to Mule Creek State Prison, another men's

13   facility, for her safety in July 2020.  *Id.* ¶ 18.  Her treatment there was little better.  *Id.*  In August

14   2021, Ms. Carroll finally transferred to CCWF.  *Id.* ¶ 20.

15   ***Jennifer Rose.***  Ms. Rose is a 52-year-old transgender woman who has been incarcerated

16   in CDCR facilities since 1991.  Rose Decl. ¶¶ 2, 5.  She is currently housed at SVSP, a men's

17   facility.  *Id.* ¶ 4.  Ms. Rose does not feel safe in men's prisons.  *Id.* ¶¶ 8–9.  While incarcerated in

18   men's facilities, Ms. Rose has been sexually assaulted twice, including one incident in which

19   CDCR staff members placed her in a cell with a man with a known history of inflicting sexual

20   violence on others.  *Id.* ¶¶ 10–11.  Ms. Rose has also been physically assaulted, including by

21   CDCR staff members.  *Id.* ¶¶ 9, 12.  Ms. Rose is also aware of several transgender women who

22   were murdered while incarcerated in men's facilities.  *Id.* ¶ 19.

23   Ms. Rose has advocated for CDCR to comply with SB 132 and believes that CDCR staff

24   members have targeted her because of those efforts.  *Id.* ¶ 15.  Within two days of SB 132 taking

25   effect, Ms. Brown requested to be transferred to a women's facility.  *Id.* ¶ 17.  Now, over 15

26   months later, she remains housed in a men's facility and has received no formal response to her

27   transfer request.  *Id.*  Ms. Brown also expressed her search preference, but CDCR staff have not

28   consistently respected that preference as SB 132 requires.  *Id.* ¶ 18.

### D. Positions of Other Parties on Intervention

Counsel for the Proposed Intervenors met and conferred with counsel for Plaintiffs on April 15, 2022, and they do not oppose this motion.  Meerkamper Decl. ¶ 6.  Counsel met and conferred with counsel for Defendants on April 29, 2022; Defendants declined to take a position on this motion.  *Id.* at ¶ 14.  Proposed Intervenors' meet-and-confer efforts are further described in the attached Declaration of Shawn Thomas Meerkamper.

## III. ARGUMENT

Allowing the Proposed Intervenors to become parties to this case is the only way for the Court to ensure that those who have the most at stake in this litigation—the TGI people whose safety and dignity SB 132 seeks to protect—are fully represented.  And it is the Court's best opportunity to understand fully the perspectives of incarcerated TGI people in deciding questions that are matters of life and death for them.

Federal Rule of Civil Procedure 24 allows a nonparty to intervene in and become a party to a lawsuit and is the only procedural mechanism available to a nonparty wishing to join a lawsuit.  *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 933 (2009).  When a party intervenes, it takes on all of the rights and responsibilities that the original parties have.  *United States v. Cal. Mobile Home Park Mgmt. Co.*, 107 F.3d 1374, 1378 (9th Cir. 1997).  Guided by equity and pragmatism, courts liberally construe Rule 24 in favor of intervention.  *United States v. Aerojet Gen. Corp.*, 606 F.3d 1142, 1148 (9th Cir. 2010).

### A. The Proposed Intervenors Satisfy the Criteria for Intervention as of Right

The Proposed Intervenors have an undeniable interest in this action and stand to lose fundamental rights if CDCR, which has proved to be indifferent or even hostile to the interests of incarcerated TGI people, does not adequately represent their interests.  Those facts demand that the Proposed Intervenors be allowed to intervene here.  Federal Rule of Civil Procedure 24(a)(2) requires that courts permit a party to intervene when that party "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  Fed. R. Civ. P. 24(a)(2).  Courts

1   liberally construe this rule to favor intervention.  *See California ex rel. Lockyer v. United States*,

2   450 F.3d 436, 440 (9th Cir. 2006); *United States v. City of Los Angeles*, 288 F.3d 391, 397 (9th

3   Cir. 2002).  As the Ninth Circuit has explained, intervention allows courts to resolve issues more

4   efficiently: "By allowing parties with a practical interest in the outcome of a particular case to

5   intervene, we often prevent or simplify future litigation involving related issues; at the same time,

6   we allow an additional interested party to express its views before the court." *Forest*

7   *Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1496 n.8 (9th Cir. 1995).[2]

8        A potential intervenor has the right to intervene if (1) they file a timely application;

9   (2) they have a "significantly protectable" interest in the subject matter of the litigation;

10   (3) disposition of the action may impair their ability to protect their interests; and (4) the existing

11   parties inadequately represent the intervenors' interests.  *See Sierra Club v. EPA*, 995 F.2d 1478,

12   1481 (9th Cir. 1993).  The Proposed Intervenors satisfy each of these elements.

13        **1.    The Proposed Intervenors' Motion for Intervention Is Timely**

14        The Proposed Intervenors file this motion at the earliest stage of this litigation: before

15   discovery, before a single hearing, and before Plaintiffs have responded to Defendant's motion to

16   dismiss.  So, the motion is timely.  Timeliness is "the threshold requirement" for intervention as

17   of right.  *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1302 (9th Cir. 1997).  It

18   is a flexible concept whose determination is left to the Court's discretion.  *United States v. Alisal*

19   *Water Corp.*, 370 F.3d 915, 921 (9th Cir. 2004).  In assessing timeliness, courts consider the

20   totality of the circumstances facing would-be intervenors, with a focus on three factors: (1) the

21   stage of the proceeding at which an applicant seeks to intervene, (2) the potential prejudice to

22   other parties, and (3) the reason for and length of any delay in applying.  *Id.*  Prejudice to existing

23   parties is "the most important consideration in deciding whether a motion for intervention is

24   untimely." *United States v. Oregon*, 745 F.2d 550, 552 (9th Cir. 1984).

25        Here, the Proposed Intervenors' motion is timely because it comes before any significant

26   progress in the case and well before "a stage late in the game" at which intervention might

27   conceivably prejudice the existing parties. *Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*,

28   _____
    [2] Unless otherwise noted, all internal citations and quotations are omitted.

1    No. 2:11-cv-02980, 2020 WL 7345673, at *2 (E.D. Cal. Oct. 13, 2020).  Courts routinely permit

2    intervention where, as here, a lawsuit is in its infancy and there can be no prejudice.  *See, e.g.*,

3    *Kalbers v. U.S. Dep't of Just.*, 22 F.4th 816, 826 (9th Cir. 2021) (reversing district court's denial

4    of intervention motion on timeliness grounds where motion was made nearly one year after case

5    was filed, existing defendant had answered complaint, and court had issued a discovery order and

6    held settlement conference).  Any perceived delay in bringing this motion would be excusable

7    because of the extensive pandemic-related barriers that the individual intervenors, who are

8    incarcerated, faced in communicating with counsel.  And the parties' stipulation to the briefing

9    schedule related to this Motion and Defendants' pending Motion to Dismiss demonstrates the

10   absence of any prejudice to the existing parties—this Motion will not prevent this case from

11   proceeding apace.  *See* Dkt. No. 18.

12          **2.       The Proposed Intervenors Have Significant, Protectable Interests That
                         Will Be Impaired If the Court Denies Intervention**
13

14          The Proposed Intervenors' interests here are clear and vital: they fought for the protections

15   that SB 132 contains, their experiences demonstrate the need for those protections, and they will

16   lose those protections if Plaintiffs succeed.  "An applicant has a significant protectable interest in

17   an action if (1) it asserts an interest that is protected under some law, and (2) there is a

18   relationship between its legally protected interest and the plaintiff's claims."  *Lockyer*, 450 F.3d at

19   441.  "The relationship requirement is met if the resolution of the plaintiff's claims actually will

20   affect the applicant."  *City of Los Angeles*, 288 F.3d at 398.  Requiring intervenors to show an

21   "interest relating to the property or transaction" is "primarily a practical guide to disposing of

22   lawsuits by involving as many apparently concerned persons as is compatible with efficiency and

23   due process."  *Id.* at 397–98.

24          Once a "significant protectable interest" is shown, courts next consider whether the

25   proposed intervenor "is so situated that disposing of the action may as a practical matter impair or

26   impede the movant's ability to protect its interest[.]"  Fed. R. Civ. P. 24(a)(2).  This analysis "is

27   not limited to consequences of a strictly legal nature."  *Forest Conservation Council*, 66 F.3d at

28   1498.  Rather, courts should grant intervention if a proposed intervenor "would be substantially

1   affected in a practical sense by" the action's outcome.  *Lockyer*, 450 F.3d at 442.  Once courts

2   determine that a potential intervenor has a protectable interest, they "have little difficulty

3   concluding that the disposition of the case may affect such interest."  *Jackson v. Abercrombie*,

4   282 F.R.D. 507, 517 (D. Haw. 2012).  Here, the outcome of this case implicates clear interests of

5   the Proposed Intervenors.

6       ***TGIJP's Interests.***  TGIJP played a key role in shaping and advocating for SB 132 and so

7   has a significant protectable interest in upholding the law—an interest that could be impaired by

8   the outcome of this litigation.  The Ninth Circuit has repeatedly recognized that a "public interest

9   group is entitled as a matter of right to intervene in an action challenging the legality of a measure

10  it has supported."  *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir. 1995); *see*

11  *Wash. State Bldg. & Constr. Trades Council v. Spellman*, 684 F.2d 627, 630 (9th Cir. 1982)

12  (reversing denial of public interest group's intervention motion in suit challenging

13  constitutionality of statute it had sponsored).  As one of the sponsors of SB 132, TGIJP has a

14  significant protectable interest in defeating Plaintiffs' challenge to the law.

15      Another reason TGIJP has a protectable interest in this litigation is that SB 132 was

16  enacted to protect its members, many of whom are incarcerated TGI people.  *See Cnty. of Fresno*

17  *v. Andrus*, 622 F.2d 436, 438 (9th Cir. 1980) (holding that proposed intervenor organization had a

18  protectable interest because the law at issue was enacted to benefit its members); *see also United*

19  *States v. Carpenter*, 526 F.3d 1237, 1240 (9th Cir. 2008) (affirming order permitting intervention

20  as of right for environmental groups whose interest in quiet-title action was derivative of their

21  members' interest in preserving the land).  SB 132 was meant to address the dangerous and

22  unconstitutional conditions that incarcerated TGI people, including TGIJP members, have faced:

23  harassment, sexual assault, other forms of physical violence, misgendering, and other threats and

24  indignities.  *See supra* at 5–7.  As a steward of its members' interests, TGIJP shares their interest

25  in ensuring that SB 132 remains in effect.

26      These protectable interests will be impaired if Plaintiffs successfully invalidate SB 132

27  and thereby dismantle the vital protections SB 132 affords to incarcerated TGI people.  *Supra* at

28  5–7; *infra* at 12–13.  Therefore, under Rule 24(a)(2), TGIJP is entitled to intervene in SB 132's

11

1  defense.

2       ***Individual Intervenors' Interests.***  The Proposed Individual Intervenors have protectable

3  interests in this litigation because they are among those SB 132 was designed to protect.  In

4  passing SB 132, the California Legislature recognized "a very real problem facing incarcerated

5  transgender people": specifically, the "significant risk of violence" caused by housing them

6  "according to their birth-assigned gender, not their gender identity or their perception of safety."

7  S. Comm. on Public Safety, 2019-2020 Leg., Regular Sess., at 4 (Cal. Apr. 22, 2019) (committee

8  report prior to hearing on SB 132).  The Legislature enacted SB 132 to address, among other

9  things, the disproportionately high rates of sexual assault and harassment that TGI people face

10  while incarcerated.  *Supra* 3–4; 2020 Cal. Stats. ch. 182.  "The question of whether a proposed

11  intervenor has a significant protectable interest is a practical, threshold inquiry."  *California v.*

12  *HHS*, 330 F.R.D. 248, 253 (N.D. Cal. 2019).  Where, as here, the proposed intervenors are

13  members of the group protected by the challenged law, courts routinely find that they have a

14  significant protectable interest in the litigation.  *See, e.g.*, *Lockyer*, 450 F.3d at 441–42 (holding

15  that proposed intervenor healthcare providers had protectable interest where challenged law

16  protected their choice not to pay for abortion coverage); *see also Andrus*, 622 F.2d at 438

17  (holding that proposed intervenor organization had protectable interest in the litigation because its

18  members were the intended beneficiaries of the law at issue).

19       An adverse decision in this case would harm the Proposed Individual Intervenors by

20  eliminating crucial protections that the Legislature put in place for their safety and well-being.

21  *Supra* at 3–4.  As the Legislature recognized in passing SB 132, these protections are a matter of

22  life and death for incarcerated TGI people.  *Id.*  Indeed, the Proposed Individual Intervenors'

23  personal experiences demonstrate the verbal, physical, and sexual abuse that they and other

24  incarcerated TGI people have faced; SB 132 aims to address precisely these issues.

25       Ms. Carroll and Ms. Blackwell, who have been transferred to women's facility CCWF

26  since SB 132's enactment, feared for their safety when housed at men's facilities.  *Supra* at 5–7.

27  Before her transfer to CCWF, Ms. Blackwell survived multiple attacks by incarcerated men,

28  including two brutal beatings that resulted in broken bones in her jaw and neck and the loss of

eight teeth.  *Supra* at 6.  While incarcerated in men's facilities, Ms. Carroll faced repeated harassment and was sexually assaulted more than 30 times.  *Supra* at 6–7.  Both women sought transfers to women's facilities, where they believed they would be safer.  *Id*.  And both fear that if SB 132 is overturned or its protections limited, they would be sent back to a men's facility to once again face the violence and harassment that they believed they had escaped.  *Id*.

Ms. Brown and Ms. Rose are awaiting transfer under SB 132, and an adverse outcome in this case would threaten their interest in obtaining safe housing, among other interests.  Despite requesting transfers to a women's facility under SB 132 many months ago, Ms. Brown and Ms. Rose remain housed at SVSP.  *Supra* at 5–7.  Ms. Brown and Ms. Rose have endured a range of harms that SB 132 is meant to prevent, from quotidian indignities to life-threatening attacks.  Ms. Rose has been sexually assaulted twice and physically assaulted on other occasions, including by CDCR staff.  *Id*.  And Ms. Brown faces persistent harassment, including taunting, name-calling, and requests for sexual favors.  *Id*.  Those harms will continue if Plaintiffs succeed in invalidating SB 132.

California lawmakers enacted SB 132 to provide protections for incarcerated TGI people, in addition to existing rights, and in order to grant them a measure of safety and dignity.  The routine violence and abuse that the Proposed Individual Intervenors have faced while in CDCR custody demonstrate the law's necessity.  Without SB 132's protections, the Proposed Individual Intervenors will continue to face persistent physical, sexual, and emotional abuse.

### 3.    The Existing Parties Do Not Adequately Represent the Proposed Intervenors' Interests

As incarcerated people who rely on SB 132 for essential protections and a group that represents their interests, the Proposed Intervenors have necessarily different, broader, and more immediate interests in defending SB 132 than Defendants—state carceral officials who are tasked with implementing those protections but who have often failed to do so.  To demonstrate inadequate representation, the Proposed Intervenors need only show that their interests are sufficiently different from the existing parties', and the Proposed Intervenors here more than meet that burden.  *See Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972);

1  *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 528 (9th Cir. 1983).

2        In assessing adequacy of representation, the Ninth Circuit weighs three factors:

3  (1) whether the interest of a present party is such that it will undoubtedly make all of a proposed

4  intervenor's arguments; (2) whether the present party is capable and willing to make such

5  arguments; and (3) whether a proposed intervenor would offer any necessary elements to the

6  proceeding that other parties would neglect.  *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir.

7  2003).  Although the Proposed Intervenors seek to intervene on the same side as Defendants, their

8  interests are not adequately represented for several reasons.  First, Defendants have demonstrated

9  through their failures to implement SB 132 that they are reluctant or unwilling to defend this case

10  vigorously.  Second, the Proposed Intervenors are likely to advocate for a broader interpretation

11  of SB 132 than Defendants and are therefore likely to make arguments that Defendants will not.

12  And third, the Proposed Intervenors are uniquely able to present the perspective of incarcerated

13  TGI people, which the existing parties have actively ignored.

14        ***CDCR's Failure to Implement SB 132.***  CDCR cannot be expected to vigorously defend

15  SB 132 because it has so far refused to even implement it.  *See Citizens for Balanced Use v.*

16  *Mont. Wilderness Ass'n*, 647 F.3d 893, 900 (9th Cir. 2011) (holding that Forest Service did not

17  adequately represent environmental group in part because of its reluctant defense of regulation at

18  issue).  Since SB 132 took effect in January 2021, CDCR has repeatedly delayed and otherwise

19  stonewalled requests from incarcerated TGI people seeking transfer under the statute.  TGIJP

20  Decl. ¶ 19.  TGIJP's members and constituents report waiting many months, without any

21  explanation, for hearings on their transfer requests; having their requests dropped; receiving

22  denials of transfer without the statutorily required explanations; and experiencing persistent

23  misgendering and gender-based harassment from CDCR staff, in direct violation of SB 132—the

24  law CDCR now purports to defend.  *Id*.  Plaintiffs' complaint even attempts to weaponize

25  CDCR's failure to fully implement SB 132 against CDCR and against SB 132's constitutionality.

26  *See* Compl. ¶¶ 36–38.  While Plaintiffs' allegations to that effect have nothing to do with SB

27  132's constitutionality, they do demonstrate that CDCR is unwilling to implement SB 132 as

28  written and that the Proposed Intervenors have a greater interest in the full implementation of SB

POINTS & AUTHORITIES ISO
MOTION TO INTERVENE
CASE NO. 1:21-CV-01657-JLT-HBK

1    132 than any existing party.

2         Ms. Rose, for example, first requested a transfer in January 2021, immediately after SB

3    132 took effect.  *Supra* at 7.  Now, *over 15 months later*, she still has received no formal response

4    from CDCR to her transfer request.  *Id*.  And although Ms. Rose has expressed her preference

5    under SB 132 to be searched by female staff, CDCR staff routinely fail to honor that preference.

6    *Id*.  Ms. Brown has endured a similar, months-long delay in her quest for a transfer.  *Supra* at 5.

7    When she completed CDCR's "Right Person, Right Prison" class and CDCR scheduled a hearing

8    on her transfer request, an SVSP staff member refused to take her to the hearing because he

9    refused to accept that she is a transgender woman.  *Id*.  To this day, Ms. Brown has not had her

10   hearing.  *Id*.  Ms. Brown and Ms. Rose continue to reside in a men's facility, facing harassment

11   and fearing the same physical assaults they have experienced all too often.  CDCR's obstinacy

12   has thus caused them—and scores of others—precisely the sorts of harm that SB 132 was

13   designed to prevent.  Given CDCR's hostility to fully implementing SB 132, there is no reason to

14   believe that the agency will adequately represent the Proposed Intervenors' interests in defending

15   that law.  *Cf. April in Paris v. Becerra*, No. 2:19-cv-02471, 2020 WL 2404620, at *4 (E.D. Cal.

16   May 12, 2020) (holding that intervenors did not overcome the presumption of adequate

17   representation because "the executive agencies tasked with [the law's] enforcement [had] not

18   shown particular incentives not to do so").

19        ***CDCR's Overstatement of Its Constitutional Discretion.***  The Proposed Intervenors will

20   argue that CDCR's discretion in housing decisions is limited; to the extent it exercises discretion

21   in implementing SB 132, CDCR still may not violate the Proposed Intervenors' constitutional

22   rights.  Furthermore, Plaintiffs' alleged equal protection claims should be dismissed.

23        In their motion-to-dismiss briefing, Defendants rely heavily on CDCR's purported

24   "discretion" to implement SB 132.  *See* Mem. of P. & A. in Supp. of Mot. to Dismiss, Dkt. No.

25   15-1 ("MTD") at 13, 16–17.  First, CDCR overstates the discretion it may exercise over housing

26   placements and decisions under the U.S. Constitution, arguing that it is "entitled to discretion

27   when creating and implementing housing decisions and policies" because of separation-of-powers

28   concerns and under the Due Process Clause.  MTD at 16–17.  But in fact, CDCR's constitutional

1    discretion does not allow it to escape the Equal Protection Clause's commands.  *See, e.g.*, *Greene*

2    *v. Tilton*, No. 2:09-cv-0793, 2012 WL 691704, at *8 (E.D. Cal. Mar. 2, 2012), *report and*

3    *recommendation adopted*, 2012 WL 1130602 (E.D. Cal. Mar. 29, 2012) (holding that deference

4    to CDCR prison administration did not preclude equal protection gender discrimination claims).

5         As the Proposed Intervenors seek to discuss in further briefing, Plaintiffs' claims fail not

6    because CDCR is immune from judicial review of its housing decisions, but because it does not

7    violate the Constitution to house transgender women in women's facilities.  In fact, as the

8    Proposed Intervenors are requesting the right to demonstrate, the Constitution often *requires* it.

9         ***CDCR's Narrow Reading of SB 132.***  CDCR also argues that SB 132 grants it broad

10   statutory discretion to deny transfers for a host of reasons, and to "slow[] down implementation to

11   consult with national experts on how best to implement" the law.  MTD at 3, 18.  The MTD is not

12   the only place CDCR has made this baseless assertion.  For example, in a "Frequently Asked

13   Questions" page posted to its website after the initiation of this lawsuit, CDCR claims that it may

14   "rescind" a decision to assign an incarcerated TGI person to that person's preferred facility if

15   post-transfer "management or security concerns" arise.  CDCR, *Senate Bill 132 FAQs: Housing*

16   *and Searching Incarcerated People Consistent with their Gender Identify* [sic],

17   https://www.cdcr.ca.gov/prea/sb-132-faqs/ (last visited May 5, 2022).  Because no cisgender

18   person would be subjected to such punishment, sending a TGI person back to a facility that does

19   not match their gender identity against that person's wishes is impermissible under the non-

20   discrimination provisions of SB 132.

21        In fact, as the Proposed Intervenors will demonstrate, SB 132 places crucial limits on

22   CDCR's authority to deny a transfer in several key ways.  It cannot deny a transfer based on any

23   discriminatory reason, which the statute explicitly states includes anatomy and sexual orientation

24   of a transgender person.  Cal. Penal Code § 2606(c).  Importantly, the statute specifically

25   prohibits CDCR from denying a transfer based on any "factor present among other people

26   incarcerated at the preferred type of facility," meaning that CDCR violates SB 132 when it denies

27   a transfer request based on conviction or carceral histories if people incarcerated in the

28   destination facility have analogous histories.  *Id.*  And CDCR cannot deny *any* transfer without a

POINTS & AUTHORITIES ISO
MOTION TO INTERVENE
CASE NO. 1:21-CV-01657-JLT-HBK

"specific and articulable basis" rooted in legitimate security and management concerns. *Id.* § 2606(b). And as explained above, CDCR has failed to respond promptly to most transfer requests, indicating that it believes that it has discretion to respond to requests as it sees fit—if at all. Defendants have misinterpreted SB 132's instructions in order to grant themselves additional discretion and authority where there is none. SB 132 went into effect with full force of law on January 1, 2021, and nothing in its text permits CDCR to slow-roll its implementation.

Because Defendants erroneously believe that they have broad discretion to implement SB 132 and such discretion is relevant to this litigation, they will not "make all of [the Proposed Intervenors'] arguments"—far from it. *Arakaki*, 324 F.3d at 1086. The Proposed Intervenors are the only prospective parties who will defend SB 132 as written and intended. Defendants therefore do not adequately represent the Proposed Intervenors' interests.

***The Proposed Intervenors' Unique and Vital Perspective.*** TGIJP and the Proposed Individual Intervenors are uniquely situated to provide an essential perspective that the current parties in this case cannot help but neglect: the lived experiences of incarcerated TGI people and the harms they will suffer if Plaintiffs succeed. Courts have recognized the importance of intervenors' perspectives in similar cases for precisely this reason. *Pickup v. Brown*, for example, involved a challenge to legislation banning the harmful practice of conversion therapy for LGBTQ+ youth. No. 2:12-cv-02497, 2012 WL 6024387, at *1–2 (E.D. Cal. Dec. 4, 2012). A court in this District permitted LGBTQ+ advocacy organization Equality California to intervene in defense of the legislation at issue, concluding that the group would "aid the court in resolving plaintiffs' claims fully and fairly" by providing "a helpful, alternative viewpoint"—that of LGBTQ+ adults who underwent conversion therapy. *Id.* at *4. Just so here: the Proposed Intervenors are those whom SB 132 is designed to protect and an organization that both sponsored the bill and represents the interests of its intended beneficiaries. Neither Defendants nor Plaintiffs can attest to the realities of being an incarcerated TGI person, so permitting the Proposed Intervenors to intervene would vindicate "a major premise of intervention—the protection of third parties affected by pending litigation." *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 971 (3d Cir. 1998). The Proposed Intervenors' perspectives can and will aid this Court in

POINTS & AUTHORITIES ISO
MOTION TO INTERVENE
CASE NO. 1:21-CV-01657-JLT-HBK

1  assessing SB 132's constitutionality.  And the stakes for those who benefit from SB 132 are too

2  high to allow this lawsuit to be decided without the Proposed Individual Intervenors' active

3  participation.

4         While some courts have applied a presumption of adequacy when an absentee seeks to

5  intervene on the same side as a government party, this presumption applies only where the

6  government "is acting on behalf of a constituency that it represents," *Arakaki*, 324 F.3d at 1086,

7  and is "charged by law with representing the interests of the absentee." *City of Los Angeles*, 288

8  F.3d at 401.  That is not the case here, where the government Defendants represent only the

9  interests of state carceral officials who have worked *against* the Proposed Intervenors' interests,

10  and an obvious tension exists between the interests of the Proposed Intervenors and those of the

11  agency holding them captive.  Thus, the presumption of adequacy does not apply.  Even if it did

12  apply, a presumption of adequacy can be overcome in a variety of circumstances, including

13  where, as here, proposed intervenors have special, narrow interests and where the government

14  likely will not mount a vigorous defense.  The Ninth Circuit in *Forest Conservation Council*

15  found that the presumption can be overcome where the intervenors have "more narrow, parochial

16  interests" than the existing party, or where "the applicant asserts a personal interest that does not

17  belong to the general public." *Forest Conservation Council*, 66 F.3d at 1499; *see also*

18  *Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1190 (9th

19  Cir. 1998) (affirming grant of intervention motion despite presence of state agency defendants

20  because interests of proposed intervenors "were potentially more narrow and parochial than the

21  interests of the public at large"); *Syngenta Seeds, Inc. v. Cnty. of Kauai*, No. 14-cv-00014, 2014

22  WL 1631830, at *7 (D. Haw. Apr. 23, 2014) (granting Rule 24(a)(2) motion where proposed

23  intervenors' "interests in upholding the law [were] decidedly more palpable than [government

24  defendant's] generalized interest").  Likewise, courts have found that the presumption of

25  adequacy does not apply—and that intervention is warranted—where the government party is

26  reluctant, unwilling, or unable to vigorously defend its case.  *See Citizens for Balanced Use*, 647

27  F.3d at 895–96, 900 (permitting intervention where U.S. Forest Service defended land

28  management plan adopted under court order while simultaneously appealing order requiring

POINTS & AUTHORITIES ISO
MOTION TO INTERVENE
CASE NO. 1:21-CV-01657-JLT-HBK

1   plan's issuance).  A defendant-intervenor can also demonstrate that it is not adequately

2   represented if the existing defendants argue for a different or narrower construction of the

3   challenged statute than the proposed intervenor does.  *See April in Paris*, 2020 WL 2404620, at

4   *4 (holding that because defendants relied on a "strained and limited reading in an attempt to save

5   the statute," they did not adequately represent proposed intervenors); *see also Hecox v. Little*, 479

6   F. Supp. 3d 930, 955 (D. Idaho 2020) (holding that defendant's cramped reading of statute as

7   argued in motion-to-dismiss briefing did not adequately represent proposed intervenor's interest).

8   The same reasons why Defendants do not adequately represent the Proposed Intervenors'

9   interests, therefore, more than rebut any presumption of adequacy that might apply.

10         **B.      In the Alternative, the Court Should Permit the Proposed Intervenors'
                      Intervention Under Rule 24(b)**

11

12         The Proposed Intervenors also satisfy the requirements of Rule 24(b), so the Court should

13   grant their application on permissive-intervention grounds even if it concludes that they are not

14   entitled to intervention of right.  The requirements for permissive intervention under Rule 24(b)

15   are: (1) independent grounds for jurisdiction, (2) timeliness, and (3) common issues of law and

16   fact shared between the movant's claim or defense and the main action.  *Freedom from Religion*

17   *Found., Inc. v. Geithner*, 644 F.3d 836, 843 (9th Cir. 2011).  "In exercising its discretion, the

18   court must consider whether the intervention will unduly delay or prejudice the adjudication of

19   the original parties' rights."  Fed. R. Civ. P. 24(b)(3).  When an intervention motion is timely,

20   undue delay and prejudice are less likely.  *Blum v. Merrill Lynch Pierce Fenner & Smith, Inc.*,

21   712 F.3d 1349, 1354 (9th Cir. 2013).

22         The first two requirements are easily met.  The Court has federal-question jurisdiction

23   over this case, *see* 28 U.S.C. § 1331, and the Proposed Intervenors do not raise any counterclaims

24   or crossclaims.  Where, as here, "the proposed intervenor in a federal-question case brings no new

25   claims, the jurisdictional concern drops away."  *Geithner*, 644 F.3d at 844; *see* 7C Charles Alan

26   Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1917 (3d ed. 2010)

27   ("In federal-question cases there should be no problem of jurisdiction with regard to an

28   intervening defendant[.]").  And this motion is timely—as explained above, it has been filed at

1   the earliest stage of the litigation, before any substantive rulings, and long before any discovery

2   has been conducted or a trial date set.  *Supra* at 9–10.

3          On the third requirement, the Proposed Intervenors' defense of this action shares common

4   questions of law and fact with the main action.  This requirement is satisfied where parties seek

5   resolution of a common question by, for example, asking the court to interpret the same law,

6   policy, or documents.  *See Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 474 (9th Cir.

7   1992).  Here, Plaintiffs argue that SB 132 violates both the California and the United States

8   Constitutions.  *See* Compl. ¶ 1.  The Proposed Intervenors will make the opposite arguments: that

9   among Plaintiffs' hodgepodge of constitutional claims, each is either jurisdictionally flawed or

10  legally unfounded and, rather, Plaintiffs' proposed ban on TGI people in California's women's

11  prisons would violate the Proposed Intervenors' constitutional rights.  Plaintiffs' claims and the

12  Proposed Intervenors' defenses will thus turn on the Court's interpretation of the same law and

13  finding of facts related to the law's implementation.

14         Again, intervention at this early stage would create neither undue delay nor prejudice.

15  *Supra* at 9–10.  On the contrary, intervention would *assist* the Court because the Proposed

16  Intervenors can offer the Court a unique and crucial perspective currently unrepresented by the

17  existing parties.  *See Sagebrush*, 713 F.2d at 528.  Defendants' perspective is limited to their

18  status as government entities and agents, so their defense of SB 132 necessarily lacks the

19  perspective of the incarcerated TGI people who directly benefit from the law.  TGIJP has

20  represented the interests of the TGI community for years, and the Proposed Individual Intervenors

21  have been subjected to years of harassment and violence because of their gender identity and

22  transgender status, often finding themselves at odds with Defendants while advocating for their

23  right to be housed in accordance with their gender identity and safety concerns.  None of the

24  existing parties can attest to these lived experiences in the same way that the Proposed

25  Intervenors can.

26         The Proposed Intervenors' motion satisfies the permissive-intervention requirements,

27  raises no issue of prejudice or delay, and would permit the Court to hear a critical perspective that

28  is currently absent from the case.  They should be permitted to intervene.

1

**IV.    CONCLUSION**

2

      For the foregoing reasons, the Court should grant the Proposed Intervenors' motion.

3

Dated:  May 9, 2022

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully Submitted,


By:      s/ *Dimitri D. Portnoi*
DIMITRI D. PORTNOI
MICHAEL J. SIMEONE
ELIZABETH A. ARIAS
SHIVANI I. MORRISON
**O'MELVENY & MYERS LLP**

SHAWN MEERKAMPER
**TRANSGENDER LAW CENTER**

AMANDA C. GOAD
**ACLU FOUNDATION OF SOUTHERN CALIFORNIA**

SHILPI AGARWAL
**ACLU FOUNDATION OF NORTHERN CALIFORNIA**

RICHARD SAENZ
NORA HUPPERT
CHRISTINA S. PAEK
**LAMBDA LEGAL**

*Counsel for Proposed Intervenors*