1  CANDICE JACKSON (SBN 224648)
2  **FREEMAN MATHIS & GARY, LLP**
   1010 B Street, Suite 300
3  San Rafael, California 94901
   Telephone: (415) 352-6434
4  cjackson@fmglaw.com

5  LAUREN ADAMS (*Pro Hac Vice*)
6  **WOMEN'S LIBERATION FRONT**
   1802 Vernon St. NW, #2036
7  Washington, DC 20009
   Telephone: (202) 964-1127
8  legal@womensliberationfront.org

9  *Counsel for Plaintiffs*

10

11            **UNITED STATES DISTRICT COURT**

12     **EASTERN DISTRICT OF CALIFORNIA (FRESNO DIVISION)**

13

14  JANINE CHANDLER, et al.,              Case No. 1:21-cv-01657-JLT-HBK

15            Plaintiffs,                 **PLAINTIFFS' MEMORANDUM OF
                                          POINTS AND AUTHORITIES IN
16        v.                              OPPOSITION TO DEFENDANTS'
                                          MOTION TO DISMISS**
17  CALIFORNIA DEP'T OF CORRECTIONS
    AND REHABILITATION, et al.,
18
            Defendants.
19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

I.      **INTRODUCTION**……………………………………………………………**1**

II.     **ARGUMENT**…………………………………………………………………**2**

    **A. Defendants Attempt To Force Plaintiffs Into A Category Defined By "Gender Identity," Ignoring Plaintiffs' Constitutionally Protected Status Based On Sex……2**

    **B. Plaintiffs And Other Incarcerated Women Are Currently, Continuously Experiencing Physical Violence, Sexual Harms, And Increased Risks By Being Housed With "SB 132-Transferred Men"**……………………………………**…………….3**

    **C. SB 132 Effectively Forecloses PREA-Mandated Risk Assessments For Sexual Vulnerability And Abusiveness By Prohibiting Consideration Of The Factual Cause Of Penetrative Rape And Pregnancy – A Functional Penis With Access To Women.8**

    **D. Plaintiffs Have Standing To Challenge The Constitutionality Of A Statute That Subjects Incarcerated Women To Increased Risk And Daily Fear Of Rape, Sex, And Pregnancy In Prison**……………………………………………………………**10**

    **E. Plaintiffs State Cognizable Claims Under The Eighth Amendment For Knowingly Placing Women At Substantial Risk Of Rape, Sex, And Pregnancy In Prison**……..**13**

    **F. SB 132 Violates The Equal Protection Clause By Subjecting Women, But Not Men, To Risks Of Prison Rape, Sex, And Pregnancy**……………………………...**15**

    **G. SB 132 Facially Violates The First Amendment**…………………………...**16**

        **1. SB 132 Is An Impermissible Prior Restraint On Free Speech And Precludes Plaintiffs From Meaningfully Exercising Their Right To Petition**…………..**16**

        **2. SB 132 Facially Constitutes State Sponsorship, Promotion, And Favoring Of Particular Spiritual Beliefs And Compelled Profession Of Faith, In Violation Of The Establishment Clause**……………………………………**18**

        **3. SB 132 Violates Plaintiffs' Rights To Free Exercise Of Religion**……..…..**22**

    **H. Abstention Is Not Appropriate Because The State Law At Issue Is Not "Unclear"**…………………………………………………………………**24**

III.    **CONCLUSION**………………………………………………………...**25**

1

## **TABLE OF AUTHORITIES**

2

*Constitutional Provisions and Cases*

3

U.S. Constitution, First Amendment…………………………………………...………1, 12, 16-22

4

U.S. Constitution, Eighth Amendment……………………………………….……….2, 12-14

5

U.S. Constitution, Fourteenth Amendment……………………………………………………15

6

*Farmer v. Brennan*, 511 U.S. 825 (1994)……………………………………………12, 13

7

*Flast v. Cohen*, 392 U.S. 83, 99 (1968)…………………………………………………….25

8

*Miss. Univ. for Women v. Hogan*, 485 U.S. 718, 723-24 (1982)………………………...……15

9

*McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987)…………………………………………22

10

*Obergefell v. Hodges*, 576 U.S. 644, 652 (2015)…………………………………………...…..23

11

*San Remo Hotel v. City & Co. of San Francisco*, 145 F.3d 1095, 1104 (9th Cir. 1998)…………24

12

*Walker v. Beard*, 789 F.3d 1125, 1137 (9th Cir. 2015)…………………………………………23

13

14

*Statutes and Regulations*

15

Cal. Pen. Code §§ 2605, 2606 ("SB 132")…………………………………….……………….*passim*

16

Cal. Pen. Code 2605(a)………………………………………………………………………...…18

17

Cal. Pen. Code 2606(c)………………………………………………………………………….9

18

Cal. Pen. Code 2605(d)………………………………………………………………………...16

19

34 USC 30301 *et seq.*, Prison Rape Elimination Act, (PREA)……………………...…………….*passim*

20

28 CFR 115.41…………………………………………………………………………9, 11

21

28 CFR 115.5………………………………………………………………………...…………..9

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Plaintiffs oppose Defendants' Motion to Dismiss, ECF No. 15 (herein, "MTD") and Defendants' memorandum in support of the MTD (ECF No. 15-1, herein "Def. Memo."), as well as the memorandum in support of the MTD filed by Proposed Intervenors, ECF No. 32 (herein, "Int. Memo."). Plaintiffs' Complaint states federal and State constitutional claims of significant public interest and importance, primarily challenging the State of California's: deliberate promotion of cruel and unusual punishment inflicted extrajudicially upon female offenders by allowing male offenders to self-identify into women's facilities; mockery of "equal protection" by creating punitive inequalities that advantage men at the direct expense of women; and imposition of a prison housing system based on internally contradictory, scientifically illiterate spiritual beliefs in violation of inmate First Amendment rights.

The State's directive, contained in legislation colloquially known by its Senate Bill number, "SB 132" and codified at Cal. Pen. Code §§ 2605, 2606 (herein collectively referred to as "SB 132" except when reference is made to specific Penal Code sections), ties Defendants' hands and specifically precludes exercise by Defendants of any discretion that would impact or address the harms caused by SB 132, violating the federal and State constitutional rights of Plaintiffs and all incarcerated women in the State of California. This is demonstrated in part by the ways in which SB 132 requires Defendants to violate the Prison Rape Elimination Act, 34 USC 30301 *et seq.* (PREA), the federal law designed to protect all inmates from precisely the types of harms most inflicted upon women under SB 132. None of the violations or harms alleged by Plaintiffs are speculative; SB 132 has been in effect since January 1, 2021, and to the extent that Defendant CDCR has enforced the law, specific, articulable, legally cognizable harms to women have occurred and continue to occur.

For the reasons discussed *infra*, Plaintiffs respectfully request that the Court deny the MTD in its entirety, whether or not the Court first or also grants to the Proposed Intervenors party status or *amici* status. Plaintiffs raise significant questions as to the constitutionality of SB 132. Alternatively, to the extent that the Court is inclined to find that Plaintiffs' Complaint fails to state a claim, Plaintiffs' respectfully request leave to amend their Complaint.

**II. ARGUMENT**

   **A.  Defendants Attempt To Force Plaintiffs Into A Category Defined By "Gender Identity," Ignoring Plaintiffs' Constitutionally Protected Status Based On Sex**

Plaintiffs' lawsuit presents the question of whether Defendants' enforcement of SB 132 subjects Plaintiffs to sex-based harms under the Eighth Amendment and Equal Protection Clause violations on the basis of sex. Yet Defendants' very first sentence in their argument to dismiss this case is: "Plaintiffs, four incarcerated ***cisgender*** women…claim that [SB 132] violates Plaintiffs' federal and California constitutional rights." Def. Memo. (ECF No. 15-1) at 1 (emphasis added). *See also, e.g.,* Int. Memo. (ECF No. 32) at 12 and *passim*.

This term used by Defendants and Proposed Intervenors to describe Plaintiffs ("cisgender") is not legally defined (or even utilized) by the statute at issue (SB 132), nor anywhere in the U.S. Constitution or California Constitution, nor in PREA. "Cisgender" is a neologism that has no objective or stable meaning. Plaintiffs do not refer to themselves as "cisgender" and not all of the Plaintiffs believe that they personally have a "gender identity" or that sex is determined by feelings. *See, e.g.,* Declaration of Janine Chandler ("Chandler Dec.") at Par. 5 ("I respect people's gender identities, but I don't have a gender identity personally and I don't identity as 'cisgender.' I am female based on my physiology."); Declaration of Nadia Romero ("Romero Dec.") at Par. 8 ("I do not believe that a woman is something you can identify as, it is something you are born. I am a woman because I was born with a woman's body.");

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Declaration of Tomiekia Johnson ("Johnson Dec.") at Par. 10 ("My gender identity of female is not based on how I feel, it is based on science…Women don't have penises.").

Defendants' use of "cisgender" is a presumptuous imposition onto the Plaintiffs of a "gender identity" label that Plaintiffs do not use for themselves, in an attempt to force the Court to view Plaintiffs' constitutional claims through the lens of "gender identity" as the pertinent characteristic at issue, evading the fact that Plaintiffs' claims arise as women – members of the female sex.  In doing so, Defendants seek to separate Plaintiffs, and all women, from their constitutionally protected status on the objective basis of sex and to distract from the fundamental reasons why incarcerated women and incarcerated men are housed separately in the first place. *See* Declaration of Colin Wright ("Wright Dec.") at Par. 20; Declaration of Callie Burt ("Burt Dec.") at Par. 8, 30. When California historically housed inmates without regard to sex, women faced extrajudicial imposition of abuse in the form of male-perpetrated physical and sexual assault, intimidation, and coercion. California began housing women in separate wings (in 1925), and then in separate facilities (in 1933),[1] in recognition that material differences between the two sexes result in women being vulnerable to abuse from men and that women have rehabilitation needs that differ from those of men.[2] We segregate women from men in prison not because *all men* sexually or physically victimize women but because some do, and sex disparities in crime, with males committing serious crime at much higher rates than do females, is one of the "brute facts" of criminology. Burt Dec. at Par. 3.

**B. Plaintiffs And Other Incarcerated Women Are Currently, Continuously Experiencing Physical Violence, Sexual Harms, And Increased Risks By Being Housed With "SB 132-Transferred Men"**

---

[1] *See* website maintained by Defendant CDCR: https://www.cdcr.ca.gov/insidecdcr/2020/03/05/photo-timeline-california-institution-for-women/ (last accessed 5/28/22).
[2] *See* "Women In Prison: Issues and Challenges Confronting U.S. Correctional Systems," U.S. General Accounting Office (1999), https://www.gao.gov/assets/ggd-00-22.pdf (last accessed 5/28/22).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Unsurprisingly, SB 132's formula of accepting the self-declared "gender identity" of inmates, while disallowing any gatekeeping (objective criteria to evaluate the safety of housing male criminals with female inmates) is already causing real and substantial harms and risks to women in women's prisons. Burt Dec. at Par. 20. Wherever this flawed policy is implemented, including in California, other U.S. States, and other countries, the risk of sexual assault of women in prison is "not hypothetical" and has "already happened." Burt Dec. at Par. 28. Nor is being raped by men placed into women's facilities the sole harm faced by incarcerated women; the psychological impact of women having to be constantly on guard fearing imminent sexual assaults by men undermines women's "psychological security and well-being" and exacerbates PTSD symptoms for the significant proportion of incarcerated women who have that condition due to prior abuse by men. *Id.* at Par. 9-13.

Plaintiffs and most other women in California's women's prisons are living in constant fear of sexual assault, other sex crimes, physical violence, and intimidation by men housed in women's facilities under SB 132. *See, e.g.,* Declaration of Krystal Gonzalez ("Gonzalez Dec.") at Par. 3. These heightened risks have caused women to suffer mental health deterioration, panic attacks, inability to sleep, and even thoughts of self-harm. *See, e.g.,* Romero Dec. at Par. 2, 4, 6.

Some of the "SB 132-transferred men" have already sexually abused and exacerbated mental health symptoms of Plaintiffs by, e.g.: rubbing a penis on Plaintiff Gonzalez's backside causing her ongoing distress, fear, and embarrassment (Gonzalez Dec. at Par. 3, 6); and Plaintiff Romero being "grabbed hard" by another of the "SB 132-transferred men" who thought she "wasn't listening" to him (Romero Dec. at Par. 4). Plaintiffs and other incarcerated women now live surrounded by "male offenders who have been transferred under SB 132" who do not "respect women at all" or "look[] or act[] like women" (Gonzalez Dec. at Par. 7) and who are "in

sexual relationships with women" raising the threat of any woman being raped or impregnated at any moment (Gonzalez Dec. at Par. 8, 9; Romero Dec. at Par. 6).

Women now have no "privacy or dignity" by way of sex-separation when "changing, showering, sleeping, and using the toilet" (Johnson Dec. at Par. 4). *See also* Ichikawa Dec.at Par. 6-9. Plaintiffs and other incarcerated women are experiencing "many changes to security limiting women's mobility and autonomy, compared to how it was prior to SB 132. The cultural changes that has [*sic*] come from importing whole groups from the men's prisons are significant and not positive." Chandler Dec. at Par. 4.

When a self-described "transgender man" (biological female inmate) "observed one of the SB 132 transfers," a "very 'male-looking'" inmate "about 6'3…with facial tattoos, shoulder length hair, medium build" "peep on a woman in the bathroom multiple times," the declarant reported this sexually inappropriate behavior and "the predator I reported decided to retaliate against me" by "shoulder-check[ing] me…super hard in the kitchen in an effort to bully me and dissuade me from carrying on with the 602 grievance I had filed." Prison staff responded by removing *the reporting inmate* to "solitary," which explains why "[w]omen are already reluctant and scared to speak up, partly because they don't trust the prison to protect them. Knowing that they will not only be unprotected, but also actively punished for reporting, is an effective way for the prison to reduce complaints that they don't want to deal with" leaving women in a "constant state of hypervigilance" where "the threat looms daily and you never know who is next." Declaration of Sagal Sadiq ("Sadiq Dec.") at Par. 4-9. Another declarant writes about an "incident where a woman woke up to a man in her cell fondling her breasts and masturbating his penis. The victim reported it to staff but they told her that if she made an official report she would like[ly] be the one sent to ad seg. They remain housed in the same cell together to this day." Declaration of Mimi Le ("Le Dec.") at Par. 15.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Despite being constantly threatened and scared of retaliation for speaking up, some incidents *are* still reported. Plaintiffs and other incarcerated women feel scared and threatened after observing things like "one of those 132 men" "on the main yard" looking "gigantic, tall, physically scary-looking, non-feminine, bizarre, creepy" who "does not look or act anything like a woman" and who "shoved a transman (biological female)." In late May 2022 one SB 132-transfer, was reported by a female inmate to have acted as the "look-out" while another SB 132-transfer male inmate, Jonathan Robertson, "gave [a woman] victim drugs, took her into the port-a-potty," on the yard, and "raped her." Johnson Dec. at Par. 11. (This alleged rape incident is referred to herein as the "May 2022 Alleged Rape" and declarants refer to Jonathan Robertson by initials or description). Because the "victim and the perpetrators" "live in different buildings, so they only really had access to her on the yard" that "tells me that women don't even need to share cells with men to be at risk of the worst kind of consequences of having to be housed with men." *Id.* at Par. 12. Another declarant saw Jonathan Robertson's alleged rape victim "barely conscious" just minutes after multiple other inmates had reported that the victim had just been raped in the port-a-potty on the yard. Le Dec. at Par. 3. Within an hour the alleged rape victim was found unresponsive by housing staff, leading to a "code 3 medical." *Id.* at Par. 4. This same declarant overheard shouting the next day and was told by another inmate that the alleged rapist had just taunted and spit at a group of women, threatening "Fuck all you bitches. I'll rape you, I'll rape your mama, I'll fuck all you bitches up" and "There is nothing you bitches can do." *Id.* at Par. 7. Multiple other female inmates (including several who identify as transgender) confirmed these rape threats. *Id.* at Par. 8.

This May 2022 Alleged Rape by a male inmate and subsequent threats to rape more women is corroborated by multiple declarants. Johnson Dec. at Par. 11; Declaration of Ayanna Green ("Green Dec.") at Par. 21. The alleged rape victim, known to declarant Ayanna Green, is a

relatively young woman who had been "prostituted and abused by men" before ending up in prison, and "prided herself on not being in a sexual or romantic relationship with anyone for over a year" trying to "focus[] on cleaning up her life and working through her traumas, to get out of prison and be a mother to her child." Green Dec. at Par. 20, 21. "This is just the latest incident that justifies the fears of women living with cross-dressing men in women's prison." *Id.* at Par. 22. Indeed, every known transfer under the auspices of SB 132 has been of "cross-dressing men claiming a 'transgender identity'" many of whom are sex offenders, heterosexual men who "want to be housed with women with vaginas to get penis-in-vagina sex," with no regard for how nearly all incarcerated women have been "the victim of physical or sexual abuse by men while on the outside". *Id.* at Par. 10. "Most women in prison…live in constant fear that these men, who work together in groups or packs, can beat or rape them at any time, maybe when we return to our cell after working at our prison job, or when we go to the shower, or when we are outside on the yard." *Id.* at Par. 13. This May 2022 Alleged Rape, and the confirmed incident of angry threats to rape multiple women, "was very triggering and saddening for everybody. To be threatened by a man with doing a thing he can do, that he is capable of doing, that he may already have done to other women, is terrifying." Le Dec. at Par. 9. "Men like [this alleged rapist who also threatened rape] get to transfer to women's prison because the prison fails to keep them safe from rape by other men in men's prison, and the only option given to them is going to ad seg. But now the prison is protecting a man like [this] by getting him out of the men's prison only to let him terrorize women (including transgender men) with rape and violence threats and our only option is to go to ad seg. That cannot be the right way to protect anyone." *Id.* at Par. 13. The layout of CCWF, including how inmates may be assigned to the same "yard" (A, B, C, or D) sharing common outdoor areas but celled in different buildings within a yard, and inmates assigned to

different yards can communicate with each other through fences that separate the yards, is detailed in Declaration of Amie Ichikawa ("Ichikawa Dec.") at Par. 5-6.

The legislative history of SB 132, introduced into the record by CDCR in its request for judicial notice filed with the MTD, acknowledges that "CDCR has separate institutions for men and women" and that California law "provides that incarcerated people be housed according to their sex…and other criteria which will provide for the safety of the incarcerated people and staff." ECF No. 15-3 at 5. Thus, SB 132 does not purport to do away with sex as a characteristic crucial for prison housing placements, but proceeds to insist that "gender identity" overrides all of the implications of sex. Plaintiffs' Complaint presents the Court with the question of whether the State may constitutionally disregard the objective, legally protected characteristic of sex, in favor of privileging the subjective characteristic of "gender identity."

**C. SB 132 Effectively Forecloses PREA-Mandated Risk Assessments For Sexual Vulnerability And Abusiveness By Prohibiting Consideration Of The Factual Cause Of Penetrative Rape And Pregnancy – A Functional Penis With Access To Women**

SB 132's legislative history concedes that "In the case of transgender people, the California Code of Regulations establishes a process by which an incarcerated transgender person is assigned to housing at a designated institution" but contends, "These processes and criteria fail to take into account a person's gender identity and their perception of safety, making them more vulnerable to violence from other incarcerated people[.]" *Id.* Notably absent is recognition that (i) female inmates who identify as "transgender" are *not* less safe housed with members of their sex (as opposed to in alignment with their "gender identity"); and (ii) males who identify as "transgender" may be less safe *when housed with men* but not *when housed with women*. In other words, safety in prison is sex-based, not "gender identity"-based, with male violence causing the most harm for both men and women.

SB 132's legislative history also omits reference to the fact that PREA already provides for objective assessment for placement and housing that takes into account every inmate's "own perception of vulnerability" and "gender identity." *See* 28 CFR 115.41(a), (d); 28 CFR 115.5. SB 132 fails to explain why pre-existing federal and State processes were insufficient to address the safety of "transgender" inmates when PREA and CDCR regulations were already: taking into account an inmate's mental health diagnosis of gender dysphoria and any medical needs arising from treatments of that condition (*see* ECF No. 15-3 at 7); specifying that an inmate's status or perceived status as "transgender" is a factor to be evaluated in a safety assessment; directing that placement of "transgender" inmates into men's or women's facilities must be done on a "case-by-case" basis; and giving the "transgender" inmate's "own views" of their safety and vulnerability "serious consideration." 28 CFR 115.42(c), (e).

Ostensibly to protect inmates who self-declare a "gender identity" that conflicts with their sex, SB 132 takes off the table all of the factors that objectively create the risk of male physical and sexual abuse of women and thus makes PREA-mandated risk assessments of *each inmate's* risk of sexual victimization and abusiveness, impossible. Specifically, SB 132 expressly precludes consideration of: gender dysphoria diagnosis and need for medical treatment in the form of "transition" that physically feminizes a male body; any other physical or mental health diagnosis; and anatomy including genitalia or other physical characteristics. *See* ECF No. 15-3 at 11; Cal. Pen. Code 2606(c)(1). SB 132 thus goes to great lengths to ensure that men *with functioning penises*, male-typical sex drives, and no "dysphoric" feelings about using their penises for sex, who are indistinguishable from any other men but for their "inner sense" of "gender identity," are housed with women, optimizing opportunity and likelihood for women to be sexually victimized. Burt Dec. at Par. 4; Green Dec. at Par. 4, 17. SB 132 forbids taking into account whether an individual male inmate retains physical characteristics normal and typical of

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

the male sex. Wright Dec. at Par. 9, 14-16; Burt Dec. at Par. 4-5. This means that SB 132 entirely

omits from the equation whether a male inmate poses a threat *of* sexual abusiveness *to* a

population of women – the flip side of the assessment coin that PREA requires for the sexual

safety of all inmates.

In challenging the facial unconstitutionality of SB 132, Plaintiffs do not need to prove

(and need not even dispute) that the men being housed in women's facilities because of SB 132

are, or are not, vulnerable to sexual abuse *in men's facilities*; women need only demonstrate that

such men, when housed *in women's facilities*, present a risk of sexual abuse *to women* – even if

the same men would have been *at risk* of sexual abuse *from men.* Incarcerated women need only

prove that unfettered access by male inmates to women's facilities cruelly and unusually

endangers women (which goes to Plaintiffs' Eighth Amendment claims) *because of* their

membership in the female sex class (which goes to Plaintiffs' Equal Protection claims).

### D. Plaintiffs Have Standing To Challenge The Constitutionality Of A Statute That Subjects Incarcerated Women To Increased Risk And Daily Fear Of Rape, Sex, And Pregnancy In Prison

Defendants argue that Plaintiffs lack Article III standing based on the Complaint's

allegations and on a "factual attack" against standing. Def. Memo. (ECF 15-1) at 1. Defendants'

attempt to convince the Court that forcibly housing women with men with working penises

presents no actual or even substantially likely risk of harm, would be risible if it was not so

gravely unrealistic and unjust. Defendants argue that until and unless a Plaintiff is personally

raped by an SB 132-placed male inmate, living in close quarters with male criminals who have

functional penises and whom CDCR is legally precluded from risk screening for sexual

abusiveness *toward women* presents no harm to Plaintiffs – even in light of incidents such as the

May 2022 Alleged Rape detailed *supra* in Section II.B. This illogic would negate the need for any

sexual victimization or sexual abusiveness screenings to inform housing placements, since until

and unless victimization occurs, no "inmate [has] caus[ed] some harm at a CDCR facility" and no "CDCR employee [has] fail[ed] their duty to protect." Def. Memo. (ECF 15-1) at 7. PREA begs to differ with this approach, insisting that risk screenings be done initially during intake, and upon transfer to another facility, and upon receipt of any "additional information that bears on the inmate's risk of sexual victimization or abusiveness." 28 CFR 115.41(a), (g). The operative word is "risk" – not "wait until sexual abuse has occurred and then do an assessment."

Defendants, and the text and legislative history of SB 132, note that "security or management concerns" might still justify CDCR refusing to house an inmate other than according to the inmate's sex (*see* Def. Memo. (ECF No. 15-1) at 3; ECF 15-3 at 10). But SB 132 calls "discriminatory" any "factor present among other people incarcerated at the preferred type of facility." Cal. Pen. Code 2606(c)(3). There is no inmate-specific security level, conviction history, or prison discipline history, that is not a "factor present" in a women's prison (especially after CDCR has *already* changed the population composition of women's facilities by adding numerous men). Yet again, SB 132 overrides PREA, which specifies that risk screening *for sexual abusiveness* "shall consider prior acts of sexual abuse, prior convictions for violent offenses, and history of institutional violence or sexual abuse," (28 CFR 115.41(e)) to ensure that note even a male criminal's convictions for rape or violence, or violence or sexual abuse committed in prison, prevent assignment to women's prison to live with women who have experienced forced prostitution, human sex trafficking, rape, and domestic violence, by men. This reading of SB 132 is shared by Proposed Intervenors. *See* Int. Memo. (ECF No. 32) at 13.

Nowhere has CDCR, SB 132 or its legislative history described or even illustrated what circumstances might present the "management or security concerns" that could form the "specific, articulable basis" required for CDCR to deny an inmate's housing preference for reasons not either (i) considered "discriminatory" under SB 132 or (ii) irrelevant to the risk of

women being sexually abused.[3] CDCR's evidence that it has denied "nine requests for transfer from male to female institutions as of February 25, 2022" (Def. Memo. (ECF 15-1) at 29) only begs the question of whether CDCR relied on factors that SB 132 forbids.

Defendants correctly state the proposition that Article III standing requires a party to show (i) an injury in fact, (ii) traceable to the challenged action of the Defendant, and (iii) redressability. *See* Def. Memo. (ECF 15-1) at 5. Contrary to Defendants' assertions, Plaintiffs are suffering both actual and imminent injuries in fact on a daily and continuous basis in violation of the Eighth Amendment, Equal Protection Clause, and First Amendment; these injuries are traceable to the Defendants' actions (following SB 132); and these injuries are redressable by a favorable decision for Plaintiffs (restoring pre-SB 132 status quo).

As a preliminary matter, when examining the claims stated by Plaintiffs, the facts and circumstances of this case differ from those involved in any of the precedential cases cited to by Defendants. For instance, case law offered by Defendants deals with a binary framework (categories for men and women, and the questions are under what circumstances might a man be treated as a woman), whereas SB 132 allows men who do not even identify as women to access women's facilities. Further, most of Defendant's case law references health care, not housing, of "transgender" individuals, and even when it deals with housing there are objective criteria such as genitalia and anatomy that factor into whether men can access housing reserved for women. Moreover, cases that discuss individualized risk are distinguished in the instant case because SB 132 undercuts any individualized risk assessments (including PREA-mandated screenings). Finally, cases that allow men to be treated as women in certain contexts on a rationale that "it only happens in very small numbers" are distinguished from the instant case because SB 132

---

[3] Proposed Intervenors warn CDCR that any denial without "run[ning] afoul of the non-discrimination provision" will be extraordinarily difficult. *See* Int. Memo. (ECF No. 32) at 13.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

anticipates, is designed to promote, and is causing, large numbers of males legally qualified to be housed with women who would not have been placed there before SB 132.

### E. Plaintiffs State Cognizable Claims Under The Eighth Amendment For Knowingly Placing Women At Substantial Risk Of Rape, Sex, And Pregnancy In Prison

Defendants correctly present *Farmer v. Brennan*, 511 U.S. 825 (1994) as precedent applicable to Plaintiffs' Eighth Amendment claims. Under *Farmer*, Plaintiffs have raised precisely the kind of known, substantial risk of physical and sexual harms that "serve[] no legitimate penological objective" and which Defendants are obligated to prevent or respond to if Plaintiffs show they are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 833, 834. For the reasons detailed *supra*, SB 132 prevents Defendants from taking any actions that reasonably prevent or respond to subjecting incarcerated women to specific, significant actual and imminent risk of sexual harms. The law at issue (SB 132) mandates institutional blindness to substantial risks of obvious, serious harms to women, and thus requires that CDCR staff members and officials *who follow SB 132* act and fail to act with "knowledge of a substantial risk of serious harm." *Id.* at 842. *See also* Int. Memo. (ECF No. 32) at 13 (arguing that Defendants have no discretion to craft policies that would take into account a "transgender" inmate's anatomy or violence history).

Defendants narrowly focus on whether Plaintiffs themselves have yet experienced rape, sex, or pregnancy due to being housed with male inmates under SB 132. But Plaintiffs and all women in prison have broader protection than that. The "question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial risk of serious damage to his future health…and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk" *Id.* at 844 (internal citation and quotation marks omitted).

Here, Defendants received actual knowledge in August of last year that some of the particular SB 132 transfers - including Jonathan Robertson, the alleged perpetrator of the May 2022 Alleged Rape - had already been accused or were under investigation for sexual assault or physical violence directed at women in CCWF. Declaration of Lauren Adams at Par. 3-4 and Exhibit A thereto. CDCR allowed Robertson to remain at CCWF until the May 2022 Alleged Rape, at which point they responded to the clear danger he poses to women not by removing him back to a men's facility, but instead playing "musical beds" and sending him to California Institute for Women (CIW), with access to a new victim pool of women in an even lower-security setting. *Id.* at Par. 4-5; *see also* Sadiq Dec. at Par. 11 ("The administration is doing nothing meaningful to protect women from being preyed upon. They play musical beds with the inmates, just moving them from yard to yard with a new set of victims. They even put them in 508, which houses the developmentally disabled inmates. Why would you put a sex offender – who has the means and the motive to rape – in with these defenseless women?"). SB 132 demands such facial Eighth Amendment violations.

Defendants ask the Court to dismiss biological realities, sociological evidence, and common sense by insisting that housing men with functioning penises, with women, in prison, does not cause a significantly higher risk of incarcerated women being raped, having sex, or becoming pregnant. Wright Dec. at Par. 5-9; Burt Dec. at Par. 4. Separation of inmates based on sex is the objective, rational way to prevent foreseeable risks of women being physically and sexually abused by men and/or being impregnated by fellow inmates, and to significantly reduce the risk of women contracting sexually transmitted infections in prison. Wright Dec. at Par. 17, 19; Burt Dec. at Par. 15, 16. As demonstrated by Plaintiffs' and other declarants via direct observation and perception of the current environment, incarcerated women are subjected to, and live in fear of further: sexual abuse and pregnancy, prison sex between men and women inmates

that is happening and on-going, threats of rape directed at groups of women inmates by "SB 132 men." Multiple incidents of alleged male-on-female rape having already occurred, victimizing not only the individual women assaulted but placing most other women in reasonable fear of similar assault, and failure of prison staff to reasonably protect women who have reported specific rapes or rape threats (instead punishing such women), raise serious questions of whether CDCR and its officials are in continuous violation of the Eighth Amendment *by virtue of following SB 132*.

**F. SB 132 Violates The Equal Protection Clause By Subjecting Women, But Not Men, To Risks Of Prison Rape, Sex, And Pregnancy**

As demonstrated *supra*, the risks of prison rape, sex, and pregnancy caused by SB 132 are entirely suffered by women – members of the female sex – and not at all by men because men living with women does not create for men any significant risk of being raped by fellow inmates or any risk at all of becoming pregnant in prison. This discrepancy of the statute's impact on only one sex (females) raises an Equal Protection Clause challenge. The State is intentionally discriminating against women, based on sex, by (1) housing male inmates with penises in women's facilities based on the subjective "gender identity" of the male inmates (knowing the obvious truth that women are vulnerable to penile rape by men and that only women can become pregnant), while (2) refusing to house any female inmates in men's facilities, despite the subjective "gender identity" of any female inmates. The common denominator in which type of inmates are either burdened and harmed, or do not receive the purported benefits of the statute despite being in the statute's intended beneficiaries, is being of the female sex. The legislative history of SB 132 quietly concedes the one-sided concern for the safety of male inmates; the statistics it points to about the vulnerability of "transgender inmates" to sexual violence in prison apply *only* to violence that occurs *in men's prisons*. "Transgender" inmates who are females, housed in women's prison, face no unique sexual violence by being housed with their own sex.

Intentionally harming and burdening the female sex unilaterally is a sex-based action that must survive intermediate scrutiny to pass constitutional muster under the Equal Protection Clause of the Fourteenth Amendment. To the extent that SB 132 is viewed from the perspective of a government interest in protecting incarcerated men from sexual harms and increased risks of harms in men's facilities, SB 132 is not a policy "substantially related" to that interest when numerous safe, fair alternatives exist to protect everyone. *See* Romero Dec. at Par. 8; Burt Dec. at Par. 30; Declaration of Michelle Norsworthy ("Norsworthy Dec.") at Par. 29; Green Dec. at Par. 25, 27. In the face of Plaintiffs' *sex-based* challenges, SB 132 must reveal an "exceedingly persuasive justification" that "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Miss. Univ. for Women v. Hogan*, 485 U.S. 718, 723-24 (1982) (internal citations and quotation marks omitted). Here, there is no significant (let alone "exceedingly persuasive") government interest in subjecting *only* incarcerated women to sexual harms and increased risks of harms.

## G. SB 132 Facially Violates The First Amendment

### 1. SB 132 Is An Impermissible Prior Restraint On Free Speech And Precludes Plaintiffs From Meaningfully Exercising Their Right To Petition

Defendants contend that Cal. Pen. Code 2605(d), requiring "Staff, contractors, and volunteers of the department" to use an inmate's "gender pronoun and honorific "does not apply to Plaintiffs. Def. Memo. (ECF No. 15-1) at 29. However, at least one Plaintiff is a prison worker and is under the impression that this legal requirement does apply to her. *See* Johnson Dec. at Par. 9 ("It is my understanding that because of my work for CDCR as an inmate, that I fall under SB 132's requirement to use so-called 'preferred pronouns.' Requiring me to call men 'she or her' violates my right to use common sense language to describe what I see and to speak freely about the problems I see happening from housing men with women."). Notably, Defendants also accuse Plaintiffs of "willful misgendering of transgender inmates" (Def. Memo. (ECF No. 15-1) at 17);

but if refusal to use a fellow inmate's "gender pronouns" does not violate SB 132, Defendants fail

to explain why they accuse Plaintiffs of something that sounds like an "offense" of some kind as

opposed to simply a different choice of words Plaintiff use to describe the male inmates who are

placing Plaintiffs at risk of sexual harms. Apparently, even if Cal. Pen. Code 2605(d) applies

"only" to prison staff and contractors, Plaintiffs are compelled to use the same "gender pronouns"

(that contradict plan facts) in raising to prison staff any of Plaintiff's concerns, reports, or

complaints regarding "SB 132-transferred men" or risk being accused of the offense of "willful

misgendering" instead of simply having staff respond to Plaintiffs' concerns.

Plaintiffs' reasonable fears that they may be punished for describing their factual

experiences and observations about the conditions imposed by SB 132 also limit Plaintiffs' access

to their right under the First Amendment to "petition the government for redress of grievances."

The administrative grievance process employed by CDCR (the "602 process" from the colloquial

name of the grievance form) is one such form of petition and in fact under the Prison Litigation

Reform Act ("PLRA") acts as a "gatekeeper" to other - more robust - forms of petition, including

42 U.S.C. 1983 claims. Plaintiffs used the 602 process to make an appeal to Defendants about the

dangers (ongoing) and the harms (including those that had already occurred) of being housed in a

mixed-sex environment. In several of the responses, Defendants refused to acknowledge the

objective reality that there are male inmates in CCWF, gutting the meaningfulness of the entire

process. When Plaintiff Gonzalez says that a man rubbed his penis on her and that as a result she

wants to be housed away from men, and CCWF denies her request by insisting she alleges assault

by a "woman with a penis," it is akin to not acknowledging the grievance at all, denying her

complaint under false pretenses. Gonzalez Dec. at 5 ("This man violated me, and when the prison

tries to tell me it was a woman I feel violated again.").

**2. SB 132 Facially Constitutes State Sponsorship, Promotion, And Favoring Of Particular Spiritual Beliefs And Compelled Profession Of Faith, In Violation Of The Establishment Clause**

SB 132 is based on equating "dignity" with being housed and addressed according to one's "gender identity." SB 132 fails to define "gender identity" (or "gender") yet its definitions of what the umbrella terms used in the statute ("transgender" and "nonbinary") mean,[4] reveal that whatever a "gender identity" is, it necessarily, definitionally requires reference to one's sex and that an "identity" of "transgender" or "nonbinary" means a belief that one is not actually the male or female person one was at birth. The spiritual nature of SB 132 is highlighted by the way that "transgender" is stated to include (without limitation) "two-spirit" and "māhū" – "identities" lifted out of certain Native American cultures that reflect certain spiritual beliefs and religious practices unique to those cultures and traditions (and it is disrespectful for State law to legally sanction appropriation of these cultures by inmates to gain legal privileges). Further, Cal. Pen. Code 2605(a)(1) requires CDCR to ask of every inmate "[t]he individual's gender identity of female, male, or nonbinary." But if these are the only three options for answering "what is your gender identity" then it makes no sense for "transgender" to include "all gender identities different from the gender a person was assigned at birth…" *See fn. 4 supra*. SB 132 itself is so internally contradictory that in one section "gender identity" is either male, female, or "nonbinary" while in another "transgender" can mean anything different from sex, indistinguishable from what the statute says "nonbinary" means.

---

[4] Cal. Pen. Code 2605 Annotated Notes reads: "(a) The term "transgender" is broad and inclusive of all gender identities different from the gender a person was assigned at birth including, but not limited to, transsexual, two-spirit, and māhū. "Nonbinary" is an inclusive term used to describe individuals who may experience a gender identity that is neither exclusively male nor female or is in between or beyond both of those genders, including, but not limited to, gender fluid, agender or without gender, third gender, genderqueer, gender variant, and gender nonconforming. The term "intersex" is a broad and inclusive term referring to people whose anatomy, hormones, or chromosomes fall outside the strict male and female binary."

18

Similarly, SB 132's vague, poetic language to describe a "nonbinary" identity evokes New Age-ish spirituality: "individuals who may experience a gender identity that is neither exclusively male nor female or is in between or beyond both of those genders, including…gender fluid, agender or without gender, third gender, genderqueer, gender variant, and gender nonconforming." The internal contradictions and lack of objective basis in this "description" reveal how faith-based these concepts are, being either counter-factual (akin to "miraculous" phenomena) or unprovable (akin to the mysteries and paradoxes integral to many religions).

With no provided definition of "gender" it is difficult to discern how SB 132 is using that word; on the one hand the law refers to "male" and "female" as "genders" around which the concept of being "nonbinary" is based (an identity "neither exclusively male nor female or is in between or beyond both of those genders"), suggesting that in that context "gender" is synonymous with "sex" – the characteristic genetically determined prior to one's birth of being male, or female. On the other hand, "gender" is apparently not synonymous with sex, because under the spirituality of "gender identity" beliefs one might be "third gender" (but there is no equivalent "third sex," *see* Wright Dec. at Par. 10). Under SB 132's doctrine, one might also be "nonbinary" by virtue of being "agender or without gender," but again this cannot be a use of "gender" to mean sex because no human being is without a sex, neither male nor female. *See* Wright Dec. at Par. 3, 4 ,6, 10, 11. To the extent that SB 132 uses "gender" as some inner concept distinct and separate from one's sex, expressed as an "identity" or feeling, neologisms like "genderqueer" or "gender fluid" have absolutely no bearing whatsoever on what sex one is (Wright Dec. at Par. 11), and convey little to nothing even about the actual feelings of the person who claims such a label regarding their sex.

In using the term "gender nonconforming," SB 132 attempts to use "gender" in yet a third way, by evoking reference to sex-based stereotypes imposed socially upon men and upon women,

for example by expecting "femininity" from women and "masculinity" from men in terms of conduct such as personal traits, mannerisms, clothing and hair styles, and personal appearance (such as wearing of make up and jewelry). Such sex-stereotyped notions of what men or women "usually do" or "should do" are not what make a person a man or women. *See* Wright Dec. at Par. 12. Furthermore, many people are "gender nonconforming" – defying or resisting the sex-based stereotypes applied socially to their sex – yet do not question their sex or wish to be their opposite sex (or to be sexless). It is therefore difficult to view a State law that deems "gender nonconforming" people to be "nonbinary" as anything other than the government foisting spiritual, faith-based tenets (that many people consider to include regressive, unnecessary sex-based stereotypes) upon everyone subject to the law regardless of whether people believe in the faith tenets of "gender identity" or are atheistic or agnostic toward them.

SB 132 codifies, but never defines or even explains, what "identity" means in the context of a "gender identity." Generally in a psychological context a person develops an "identity" comprised of personal and social elements, for instance personal beliefs, and social associations. However, also within psychology, usually when a person's personal belief or claimed social association has no basis in material reality and flatly contradicts objective reality, the person's "identity" claim is pathological, and depending on how intrusive the counter-factual belief or claim is, may impede the person from living a functional life. Alternatively, a person's personal belief might be acknowledged as a religious or spiritual one, which is not inherently pathological, but also does not exempt the person from understanding he or she is not actually unconstrained by objective reality or by the laws of a secular government. The description of "gender identity" as a deep inner sense of self knowable only to the individual, that might vary from the reality of one's body, sounds very similar to the religious concept of having a "soul" that exists eternally and separately from one's material, temporal body.

While there is no doubt that some people believe they have an "inner sense" or "identity" or "gender soul" that determines, or is more important than, what sex the person actually is, such feelings have no effect on one's actual sex. *See* Wright Dec. at Par. 11. Further, there is no factual or objective basis for government laws treating one's feelings about being male or female as more important than one's factual characteristic of being male or female. *See* Wright Dec. at Par. 17-20; Burt Dec. at Par. 6 (crime and especially perpetration of violence "tracks sex, not gender identity"); *id.* at Par. 7-9, 19, 20, 22. SB 132's privileging of one's "gender soul" over one's sexed reality is no more constitutionally permissible than would be a State law privileging one's "eternal soul" over one's sexed reality.

Such a set of beliefs is not even held by all people who claim "transgender" status; some such people understand that sex is binary (male or female), and some people suffer dysphoria (distress) due to their sex and treat the dysphoria via social and medical "transition" to emulate opposite sex characteristics. For such "transsexuals," believing a person might be neither male nor female, or that wishing or feeling like the opposite sex makes that a reality, is absurd and even insulting, as it implies that "transgender" people are disconnected from the realities of evolutionary biology and essentially believe that magic or faith can dictate material reality. *See, e.g.,* Norsworthy Dec. at Par. 9-13.

A law predicated on (i) belief that "gender identity" is a material phenomenon experienced or possessed by all humans and (ii) conviction that "gender identity' provides a basis for exempting individuals from generally applicable laws that involve classification by sex, without any reference to factors grounded in physical, material reality, constitutes the State government promoting and establishing a favored faith, a spiritual metaphysics. SB 132 attempts to foist upon all Californians who interact with the prison system (as inmates, staff, or contractors) a law that erases sex as a legally recognized, objective characteristic that certain rules

(such as prison housing of inmates) are based upon, replaced by faith that subjective feelings determine, affect, or are otherwise more important than, the reality of sex.

Regardless of how sincerely held, a set of spiritual beliefs unmoored from material reality does not comport with the First Amendment's Establishment Clause prohibiting a State from establishing a state religion or officially favoring one religion over others. The attempted compulsion by the State of adherence to a spiritual belief system is sufficient constitutional reason to invalidate SB 132; that such a law is imposed by the State in the context of prison housing, subjecting vulnerable women to threat of rape, sex and pregnancy at the hands (and genitals) of men in prison because the law pretends that a spiritual belief overrides physical realities, compounds the constitutional defects of SB 132.

### 3.   SB 132 Violates Plaintiffs' Rights To Free Exercise Of Religion

Plaintiffs have a First Amendment right to exercise the religion of their choice, or no religion at all, without the State compelling profession of faith they do not hold and without the State unreasonably burdening exercise of their own religious faith. Plaintiff Nadia Romero is Catholic and believes that being a woman is not "something you can identify as, it is something you are born." Romero Dec. at Par. 8. Plaintiff Janine Chandler is "an observant Muslim and as part of my faith, I am not supposed to be housed with men who not in my immediate family. SB 132 violates my faith because the prison can transfer any male with a transgender or nonbinary identity into CCWF." Chandler Dec. at Par. 3. Plaintiff Krystal Gonzalez: "The housing rule is you cannot refuse to live with a man, or they will send you to jail." Gonzalez Dec.at Par. 10.

Defendants' correctly state the proposition that free exercise of religion is necessarily limited by the fact of incarceration and may be curtailed to achieve "legitimate correctional goals or to maintain prison security." Def. Memo. (ECF No. 15-1) at 32, citing *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987). However, the State's determination to house male inmates in

women's prisons is not a "legitimate correctional goal" nor done "to maintain security." Neither Defendants nor Proposed Intervenors, for instance, even attempt to argue that housing male and female inmates together *improves* penological or security management issues; at most they argue that SB 132 will not result in *increased* security problems. Of its own two stated goals (safety, and dignity, for "transgender" inmates), the first could be achieved without the security complications and sexual victimization risks to women caused by SB 132. *See* Romero Dec. at Par. 8 ("I still want them [male inmates] to be safe in prison, and if they do not feel safe in the men's prison, I think the state should step up and give them a separate facility for all 300 of them. That is the safest for women and for everybody."); Burt Dec. at Par. 30; Norsworthy Dec. at Par. 29; Green Dec. at Par. 25, 27. The second goal, of "dignity," is only tied to "prison housing preference" for people who adhere to the spiritual notion of "gender identity" from which the idea flows that it is "undignified" to be treated according to an objective characteristic (sex).

Defendants' position on separation of men and women as a religious exercise issue attempts to equate sex separation with racial segregation (see, e.g., Def. Memo. (ECF. No. 15-1) at 25) by doggedly maintaining, in the face of biological realities,[5] that a "transgender woman" is just like "any other woman." *Id.* (citing to *Walker v. Beard*, 789 F.3d 1125, 1137 (9th Cir. 2015)) (*Walker*, of course, related to a prisoner who raised religious objection to being housed with a prisoner *of the same sex* but of a different race, and the Court determined that the State's interest in racial integration outweighed the prisoner's religious belief in racial segregation). If Defendants wish to equate the reality of immutable differences between the two sexes with prejudicial belief that humans should be separated from each other based on skin color, that repugnant position is not one that has ever been endorsed by the Constitution, where legal

---

[5] Of course, if a "transgender woman" actually did not differ in physical, material ways from a woman *in ways that directly affect* women's risk of sexual harms, there would (i) be no need to designate the person as "transgender" and (ii) SB 132 would not need to forbid CDCR from evaluating anatomy, genitalia, and other physical characteristics.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

distinctions based on race are nearly always disallowed under strict scrutiny, while legal distinctions based on sex only must pass intermediate scrutiny. Defendants raise the similarly unfounded and insulting argument that men have the right to be housed with women in prison for the sake of "human dignity" on par with the right of *same-sex* adults to marry each other. Def. Memo. (ECF No. 15-1) at 30-31(citing to *Obergefell v. Hodges*, 576 U.S. 644, 652 (2015)). The Court should reject wholesale the fallacious argument that women (of all races and sexual orientations) who feel threatened by being incarcerated with men (of all races and sexual orientations) is analogous to bigoted disapproval of racial integration or same-sex marriages.

**H. Abstention Is Not Appropriate Because The State Law At Issue Is Not "Unclear"**

Defendants argue that the Court should refrain from hearing Plaintiffs' claims under the doctrine of abstention until CDCR has issued "final policies" enforcing SB 132 and/or until State courts have adjudicated SB 132. Def. Memo. (ECF No. 15-1) at 23. But while Defendants correctly cite the factors appropriate to a federal court's discretion to abstain from hearing a challenge to a State law under the U.S. Constitution (*see id.*, citing to *San Remo Hotel v. City & Co. of San Francisco*, 145 F.3d 1095, 1104 (9th Cir. 1998)), Defendants gloss over the factor that weighs heavily in favor of federal court scrutiny of this State law (whether the "determinative issue of state law is unclear"). SB 132, affecting the safety and constitutional rights of every prisoner in California, could not be more clear. SB 132's goals and directives are crystal clear: CDCR must ignore all of the ways that housing incarcerated men and women together is dangerous for women, and assess placements for male inmates into women's facilities solely with regard for the safety and dignity of the male inmates who prefer such placement. Defendants concede that SB 132 is sweeping in its one-sided orientation and directives concerned exclusively with the safety of "transgender" inmates (but as argued *supra* particularly in Section II. F, only benefitting *male* inmates claiming "transgender" identity), yet argues that perhaps, somehow,

eventually, California courts will "rewrite the substance of the law." Def. Memo. (ECF No. 15-1) at 23. Women incarcerated in California cannot wait for that uncertain, unlikely possibility.

Plaintiffs' constitutional challenges to SB 132 should be aired now, while the Court has the benefit of active involvement of proponents of SB 132 (Proposed Intervenors) and opponents of SB 132 (Plaintiffs), with Defendants arguably in the "middle," advocating that the statute passes constitutional muster, but also claiming authority that Plaintiffs *and* Proposed Intervenors insist is not given to CDCR under the statute. This lawsuit presents the "concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Flast v. Cohen*, 392 U.S. 83, 99 (1968).

## III. CONCLUSION

Plaintiffs respectfully request that the Court deny the MTD in its entirety and allow this case to proceed on its merits for further factual and legal analysis of whether SB 132 is anathema to critical constitutional rights (as Plaintiffs contend) or consistent with them (as Defendants and Proposed Intervenors contend). Alternatively, Plaintiffs ask for leave to amend their Complaint to address any deficiencies the Court is inclined to view as a barrier to judicial scrutiny of this law that affects every single prisoner incarcerated in California.

RESPECTFULLY SUBMITTED,

DATED: May 31, 2022                    FREEMAN, MATHIS & GARY, LLP
                                       ____/s Candice Jackson_____
                                       Candice Jackson (SBN 224468)

DATED: May 31, 2022                    WOMEN'S LIBERATION FRONT
                                       ____s/ Lauren Adams_____
                                       Lauren Adams (*Pro Hac Vice*)

                                       *Counsel for Plaintiffs*