CANDICE JACKSON (SBN 224648)
**FREEMAN MATHIS & GARY, LLP**
1010 B Street, Suite 300
San Rafael, California 94901
Telephone: (415) 352-6434
cjackson@fmglaw.com

LAUREN ADAMS (*Pro Hac Vice*)
**WOMEN'S LIBERATION FRONT**
1802 Vernon St. NW, #2036
Washington, DC 20009
Telephone: (202) 964-1127
legal@womensliberationfront.org

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA (FRESNO DIVISION)

| | |
|---|---|
| JANINE CHANDLER, et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>CALIFORNIA DEP'T OF CORRECTIONS AND REHABILITATION, et al.,<br><br>  Defendants. | Case No. 1:21-cv-01657-JLT-HBK<br><br>**DECLARATION OF CALLIE BURT IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS** |

The declaration of Callie Burt follows:

///

///

///

I, **Callie Burt**, hereby declare:

1. I make this declaration based on my own personal knowledge. I am over the age of 18 and competent to testify. If called to testify, I could and would do so as follows:

2. I hold a Ph.D., M.A., and B.A. from the University of Georgia in Sociology with a specialization in Crime, Law, and Deviance; Sex, Gender, & Society; and Quantitative Methods. A true and correct copy of my current curriculum vitae is attached hereto as Exhibit A. I make this declaration in support of the Plaintiffs in the instant lawsuit, based upon my professional, academic, and scientific knowledge and expertise.

3. As part of my research in criminology, I have examined sex differences in crime. Males always and everywhere commit more crimes than females.[1] Furthermore, sex disparities in crime are related to the seriousness of criminal offenses, such that the proportion of offenders who are male increases with the seriousness of the offense.[1] Sex disparities are particularly pronounced for homicides and sexual assaults. Upwards of 85% of homicides in the U.S. are committed by males, and more than 95% of rapes are perpetrated by males.[1] The fact throughout history and for all societies for which reliable records are available males commit serious crimes at a much higher rate than do females is one of the few 'brute facts' of criminology.[2]

4. In addition to quantitative differences, there are several notable qualitative sex differences in violent crimes. First, the context and precursors of violence perpetrated by males and females differ. For example, female violence is much more likely to be directed against males who have physically or sexually abused them[2-6]. Research on homicides in the USA indicates that many female-perpetrated homicides are directed against an abusive partner, whereas males are more often driven by rage and jealousy[3,6,7]. Second, the consequences of violence perpetrated by males and females differ. Due to males' greater average size and strength than that of females, females are more likely to be injured in physical conflicts with males[2]. Third, sexual violence, particularly rapes, is overwhelmingly male-perpetrated.[1]

5. Thus, when a female is beaten, raped, or murdered, it is nearly always perpetrated by a male. When a male is beaten, raped, or murdered, it is also nearly always perpetrated by a male. The danger posed by males as a class to both male and female people dwarfs the dangers posed by females to one another. In the prison context, violence that causes severe injuries or even death is a vastly more common occurrence in men's facilities than in women's prison.

6. Available evidence reveals that crime, and especially violence perpetration, tracks sex *not* gender identity. The best evidence, which comes from a robust longitudinal study in Sweden, finds that transwomen (trans-identified males) offend at a rate statistically indistinguishable from non-trans males and significantly higher than that of females.[8] This study found that males who identify as transwomen and transition with hormone treatment and/or genital surgeries offend at a rate *that is no different* from other (non-trans) males and is significantly higher than that of females.

7. While Defendants and Proposed Intervenors have argued that trans-identified males (those who identify as transgender or non-binary) do not pose a threat to females, all available evidence contradicts this claim and no evidence, to my knowledge, supports this claim.

    a) That is, females are no less vulnerable to crime, including violent crime and sexual assaults, perpetrated by trans-identified males (transwomen and non-binary males) than by non-trans males. Furthermore, this claim that trans-identified males pose no greater threat to females than the threat that females pose to females is belied by the criminal records of incarcerated trans-identified males in California and other jurisdictions including the U.K. Public records reveal that incarcerated trans-identified males are equally, if not more likely, to be convicted of sexual offenses.[23]

    b) To not think that predatory, voyeuristic males will use gender identity access to prey upon females in prisons and jails ignores the fact that they already have.[9]

8. Female (sex-separated) protected spaces, such as sex-separated prisons and jails, are rooted in and justified by the greater danger that males pose to females. Not only do males perpetrate most violent and sexual crimes, but also females are uniquely vulnerable to male predation given biological differences, including males' greater size and strength, and female capacity to get pregnant. In addition to sex differences in biology, socialization and experiential differences between the sexes also shape the nature of conflict and patterns of conflict resolution.[10] Where males are much more likely to resort to violence (and physical aggression) in conflicts, females are much less likely to resort to violence or threaten violence in disputes. Instead, females are more likely to engage in 'relational aggression' and other forms of non-physical conflict, which do not involve physical threats or danger, including within prisons.[11]

9. Male presence in women's prisons/jails is harmful to females not only due to the direct harms caused by physical and sexual assault, but more expansively from the *potential threat* of such assault. The presence of males in female prisons, even in the absence of any conflict or direct threats, can undermine the felt psychological security and well-being of females, who now must always be on guard for male predation. Females are socialized from birth to be wary of males given the threat some males pose to them.[9] Importantly, given evidence that transwomen (trans-identified males) pose as great a threat to females as any other male, it would be both unjustified and unwise for females to fear trans-identified males any less than any other male.

10. Importantly, the felt psychological insecurity of females caused by the presence of males in women's prisons is exacerbated by the disproportionately high rate of sexual assault victimization histories and post-traumatic stress disorder (PTSD) experienced by women in prison. Many incarcerated females have extensive and/or traumatic physical and sexual victimization histories perpetrated by males.[5,12] Research suggests that between 40-70% of incarcerated women have experienced attempted or completed sexual assaults.[5] Notably, evidence indicates that one in five incarcerated women suffer from post-traumatic stress disorder (PTSD), a rate that is *eight-fold* higher than the general population rate.[13]

11. The pathophysiology of PTSD can involve regulatory changes to all major body systems, including the neural, endocrine, immune system and others. Overactivation of the Hypothalamic-

Pituitary-Adrenal (HPA) axis plays a key role in PTSD and contributes to felt symptoms, including hyperarousal, paralyzing fear and anxiety, and re-experiencing feelings associated with the trauma in response to cues associated with past traumas.[14] For women experiencing PTSD from male assaults, especially sexual assaults, the presence of males in their intimate spaces can trigger a cascade of PTSD symptoms, which can involve debilitating psychological discomfort and uncontrollable terror.[15] More frequent exposure to such cues, outside of a therapeutic environment, is associated with the worsening of PTSD symptoms, depression and hopelessness, and down regulated immune system functioning.[14]

12. Given the high rate of PTSD from male sexual assault among incarcerated females, the presence of males—regardless of gender identity—could reasonably be expected to trigger females with PTSD and worsen PTSD symptoms, and thereby substantially impairing both the psychological and physical health and well-being of those females, while retarding the healing process.

13. The disproportionate rates of PTSD among incarcerated women from sexual assault combined with the evidence that incarcerated trans-identified males are more, not less, likely than non-trans males to be convicted of sex offenses is a recipe for psychological harm with a real threat of repeat victimization to women who are trapped in the prison environment.

14. Although female-female assaults, including sexual assaults do occur, such assaults are both less common and qualitatively distinct from that of male-female sexual assault, which can involve unwanted penile penetration and the threat of pregnancy. Although often perceived as very unlikely, conservatively, we would expect one in five rapes of women to occur during a woman's 'fertile window' (when she can become pregnant). Thus, as with other violent crimes, males pose a much greater sexual assault risk to females than other females do with more severe and life-altering consequences, including pregnancy.

15. Of note, males, regardless of gender identity, can impregnate females. Indeed, two incarcerated women became pregnant this past year in New Jersey after being housed with a male offender under their gender identity mixed-sex housing policy. No party in this case has challenged the biological fact that vaginal intercourse can and does lead to pregnancy, and that placing bepenised males in housing with females drastically raises the risk of a female inmate becoming pregnant.

16. In addition, the risks of sexually transmitted infections (STI) transmission, especially HIV, are much higher for penetrative sex involving a penis and a vagina or rectum.[16,17] Since females do not have penises, sex between two females does not pose the same inherent health risks as does sex between a male and female.

17. Defendants and Proposed Intervenors can point to empirical evidence about the difficulties faced by trans-identified males (transwomen and non-binary males) housed in the men's prison. This is because government-funded studies on the experiences of trans-identified males in mens' prisons exist.[18] Yet, zero studies have been conducted to examine how females in prison and jails might be affected by allowing males into prisons or jails (or other intimate spaces) on the basis of gender

identity.[9] The physical and psychological wellbeing of these women—who are disproportionately poor and minority and who have experienced high rates of male sexual violence—matter. These studies are needed because the voices of these women are rarely heard and their needs are not being taken into account in the crafting of policies, which attempt to accommodate the needs of trans-identified males without regard for the needs and well-being of females.

18. Notably, robust research on trans-identified males ('transwomen') in California's men's prisons, administered prior to the passage of SB132, indicates that the majority (>65%) of trans-identified males (transwomen) would choose to remain in the men's prison if given the option.[18]

19. To be clear, my point is not that women are particularly endangered by, and should thus fear, trans-identified males (transwomen and non-binary) more so than other males. The point is that females are, in general, vulnerable to males, and females' physical safety, felt psychological insecurity, and well-being are undermined by policies that allow males to access females' formerly protected spaces.

20. The threat that male transfer poses to females in prison is particularly significant given the absence of gatekeeping for male access to the women's prison under SB132. Designed to ameliorate the suffering of trans-identified males and increase their safety without regard to the safety of females, SB132 prohibits the use of common-sense safeguarding in determining male access to the women's prison. Thus, SB132 disallows consideration of obvious risk factors for violence against women in prison, including a history of or conviction for sexual assault or other violence against women. Moreover, SB132 prohibits consideration of whether the male has had so-called 'sex-reassignment surgery'. This is based on the plain text of the bill (and clarified in the state's FAQ website on SB 132). Consequently, under SB132, males with penises who are attracted to females, may impregnate females, and have been convicted of raping females can be transferred to the women's prison. The resulting increased danger and felt insecurity to females as a result of SB132 is glaring and egregious.

21. Sadly, the prohibition of gatekeeping undermines the safety of everyone in women's spaces (females and trans-identified males). For a space to be a protected one, access must be restricted. Under SB132, the women's prison is no longer a protected space from predatory males, which has the effect of undermining the stated justification for moving trans-identified males there (protection).[9,19]

22. SB132's reliance on gender identity, which is only knowable through self-declaration, and lack of reasonable safeguarding is at odds with almost all public policy (and all policies to my knowledge that concern safety). The U.S. is not a society that operates on trust and self-identification, which is why obvious adults have to show government identification to buy a beer and manifestly differently-abled persons have to procure and display a special parking permit to avail themselves of the spaces set aside for them. Importantly, available policy evaluation from other protected spaces suggests clearly that *self-identification does not work*; gatekeeping is necessary for protected provisions.

23. Among the best evidence about the necessity of gatekeeping—and a viable alternative to moving some trans-identified males to the women's prisons – comes from Sharon Dolovich's research on the Los Angeles County Jail's K6G unit.[19,20] The K6G unit (previously K11) is a segregated protected unit in the LA County Jail set aside for vulnerable males (gay men and transwomen) given their susceptibility to male predation in general population. As Dolovich explains, "L.A. County has managed to create a surprisingly safe space for the high-risk populations K6G serves" (p.5).[19] The not-secret success to the K6G unit is its gatekeeping policies (as 'tight control over admission', p.88).[19] Previously, entry into the K6G unit was based on self-ID; however, as administrators learned, self-identification policies without gatekeeping undermined the safety of residents housed there—because predatory males would 'falsely claim to be gay' to gain access to the unit, which defeated the purpose. To be clear, incarcerated males would falsely claim to be gay—a highly stigmatized identity in the extremely masculine prison/jail context—to gain access to and thus prey on gay males and transwomen in the 'protected' unit. Under self-identification policies, the K11 unit, like the segregated unit in New York's Rikers Island, was not actually protective.[19,21]

    On the demise of the Rikers Island Protective Unit, city commissioner Horn noted: "It was the only area of the department where inmates could choose where they wanted to live," irrespective of the security classification each inmate receives upon entering the jail system. "What we ended up with was this housing unit where people were predatory and people were vulnerable. *The very units that should be the most safe, in fact, had become the least safe*").[21] Despite clear and compelling evidence that gatekeeping is necessary for (even defining of) protected spaces, SB132 eliminated sex-based criteria and gatekeeping for the ostensible benefit of trans-identified males, in a manner that increases the vulnerability of both groups.

24. Evidence suggests trans-identified males, like gay and bisexual males, are at higher risk of sexual violence in men's prisons compared to heterosexual non-trans males. As I have noted, enhancing safety for these more vulnerable males does not require that they be moved to the women's prison. Instead, other arrangements, including dedicated units within the men's prison like the K6G unit, have been successful.[19,20]

25. Given evidence that most trans-identified males (transwomen) will opt to remain in the men's prison, under SB132, the physical safety and psychological well-being of incarcerated women may be severely compromised, and the protected nature of women's prisons has been eliminated; yet, the vulnerable situation of most trans-identified males (who would remain housed in the men's prison) remains unchanged.

26. The harms caused by mixed-sex prison housing are specific, non-hypothetical, foreseeable, and preventable. Based on the known sex-based differences in committing assault, rape, and murder, and in light of the significant evidence that a transgender identity does not mitigate a male person's risk of perpetrating violence, the policy places *all* incarcerated women in the state at increased risk of rape, assault, and pregnancy in attempt to reduce potential harm to transwomen (trans-identified males).

27. Despite the significant cost to physical safety and psychological well-being that SB132 would impose on females, as discussed, allowing trans-identified males to transfer to the women's prison does not alleviate the suffering of the majority of trans-identified males, who evidence suggests would remain in the men's prison, and may not increase the safety or psychological well-being of the trans-identified males moved to the women's prison, given that (a) predatory males may opt in, making everyone less safe, and (b) evidence on the psychological and physical safety gains to males transferred to the women's prison does not exist. While I have noted that female violence is significantly less common that than of males, when it does occur it is disproportionately in response to males who are threatening, violent and/or sexually abusive. Transferring males convicted of violent and sexual assault against women, combined with the abovementioned more aggressive methods of conflict resolution among males, can reasonably be expected to, in some cases, pose a threat of female reactive aggression against them.

28. The idea that trans-identified males moved to the women's prison may sexually assault and impregnate females is not, of course, a hypothetical. This has already happened in US jurisdictions and outside the USA, resulting in the reversal of gender identity housing policies in the United Kingdom. Available evidence suggests that some trans-identified males will prey on incarcerated females. This 'some'—whatever the count of harmed females—is unnecessary and thus legally and morally objectionable given alternatives, including special protected units within the men's prison that can protect trans-identified males without undermining the safety and psychological well-being of females and the protected nature of women's prisons.

29. Incarcerated females should not be collateral consequences for policies that are unnecessary (given third spaces), lack sufficient safeguarding, and are self-defeating (given that predatory males can opt into women's prisons).

30. Given the rationale for sex-separated prisons/jails, the available evidence about the risks males pose to females, the absence of gatekeeping, and increased risks such absence poses to those in women's prisons under SB132, I maintain that a full consideration of the potential risks, consequences for females and trans-identified males, and alternatives, would suggest that the most prudent policy would be one of maintaining sex-separation (consistent with the United Nations Policy around the Treatment of Prisoners), and the creation of an alternative, protected ('third') space for trans-identified males (with or without gay males as the K6G unit).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration was executed on May 30, 2022, in Atlanta, Georgia, USA.

*[signature]*
Callie Burt

**References Cited**

(1) Uniform crime reporting handbook: UCR. (2004-2019) [Washington, D.C.: U.S. Dept. of Justice, Federal Bureau of Investigation] [Web.] Retrieved from the Library of Congress, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019.

(2) Belknap, J. (2020). *The invisible woman: Gender, crime, and justice*. SAGE Publications.

(3) Jurik, Nancy C., & Russ Winn. (1990). Gender and Homicide: A Comparison of Men and Women Who Kill. *Violence and Victims* 5:227–42.

(4) Haynie, Dana L., and David P. Armstrong. (2006). "Race- and Gender-disaggregated Homicide Offending Rates: Differences and Similarities by Victim–Offender Relationship across Cities." *Homicide Studies* 10:3–32.

(5) Belknap, Joanne, Dora-Lee Larson, Margaret L. Abrams, Christine Garcia, and Kelly Anderson-Block. (2012). Types of Intimate Partner Homicides Committed by Women: Self-defense, Proxy/Retaliation, and Sexual Proprietariness. *Homicide Studies* 16:359–79.

(6) Eckhardt, Krista, and William Alex Pridemore. (2009). "Differences in Female and Male Involvement in Lethal Violence in Russia." *Journal of Criminal Justice* 37:55–64.

(7) Yourstone, Jenny, Torun Lindholm, and Marianne Kristiansson. (2008). Women Who Kill: A Comparison of the Psychological Background of Female and Male Perpetrators." *International Journal of Law and Psychiatry* 31:374–83.

(8) Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A. L., Långström, N., & Landén, M. (2011). Long-term follow-up of transsexual persons undergoing sex reassignment surgery: cohort study in Sweden. *PloS one*, *6*(2), e16885.

(9) Burt, C. H. (2020). Scrutinizing the US Equality Act 2019: A feminist examination of definitional changes and sociolegal ramifications. *Feminist Criminology*, *15*(4), 363-409.

(10) Crick, N. R., Ostrov, J. M., & Kawabata, Y. (2007). Relational aggression and gender: An overview.

(11) Trammell, R. (2009). Relational violence in women's prison: How women describe interpersonal violence and gender. *Women & Criminal Justice*, *19*(4), 267-285.

(12) Siegel, J. A., & Williams, L. M. (2003). The relationship between child sexual abuse and female delinquency and crime: A prospective study. *Journal of Research in Crime & Delinquency*, *40*, 71–94.

(13) Baranyi, G., Cassidy, M., Fazel, S., Priebe, S., & Mundt, A. P. (2018). Prevalence of posttraumatic stress disorder in prisoners. *Epidemiologic Reviews*, *40*(1), 134–145.

(14) Chivers-Wilson K. A. (2006). Sexual assault and posttraumatic stress disorder: a review of the biological, psychological and sociological factors and treatments. *McGill journal of medicine: MJM : an international forum for the advancement of medical sciences by students*, *9*(2), 111–118.

(15) Ullman, S. E., Filipas, H. H., Townsend, S. M., & Starzynski, L. L. (2007). Psychosocial correlates of PTSD symptom severity in sexual assault survivors. *Journal of traumatic stress*, *20*(5), 821-831.

(16) Patel, P., Borkowf, C. B., Brooks, J. T., Lasry, A., Lansky, A., & Mermin, J. (2014). Estimating per-act HIV transmission risk: a systematic review. *AIDS (London, England)*, *28*(10), 1509.

(17) Scully EP. Sex Differences in HIV Infection. *Curr HIV/AIDS Rep*. 2018;15(2):136-146. doi:10.1007/s11904-018-0383-2

(18) Jenness, Valerie, Lori Sexton, and Jennifer Sumner. "Sexual victimization against transgender women in prison: Consent and coercion in context." *Criminology* 57, no. 4 (2019): 603-631.

(19) Burt, C.H. (2022). Discounting Females, Denying Sex, and Disregarding Dangers from Self-ID: A Reply and a Comment on Open Debate. *Journal of Controversial Ideas*, 2(1): 15.

(20) Dolovich, S. (2011). Strategic segregation in the modern prison. *Am. Crim. L. Rev.*, *48*, 1.

(21) Dolovich, S. (2012). Two models of the prison: Accidental humanity and hypermasculinity in the LA County Jail. *J. Crim. L. & Criminology*, *102*, 965.

(22) von Zielbauer, P. (2005). *City Prepares to Close Rikers Housing for Gays*, N.Y. TIMES, Dec. 30.

(23) Fair Play for Women. (2017, November 9). *Half of all transgender prisoners are sex offenders or dangerous category A inmates* [Weblog post]. https://fairplayforwomen.com/transgender-prisoners/

# Exhibit A

# CALLIE H. BURT
### DEPARTMENT OF CRIMINAL JUSTICE & CRIMINOLOGY
### GEORGIA STATE UNIVERSITY

**CONTACT INFORMATION**  LAST UPDATED MAY 2022
Email: cburt@gsu.edu
Website: www.callieburt.org
Google Scholar Page Link

## PROFESSIONAL APPOINTMENTS

|  | |
|---|---|
| | GEORGIA STATE UNIVERSITY |
| 2019 – | Associate Professor, Department of CJ & Criminology |
| | Faculty Affiliate, Center of Research on Interpersonal Violence (CRIV) |
| | UNIVERSITY OF WASHINGTON |
| 2015 – 2019 | Assistant to Associate Professor, Department of Sociology |
| | ARIZONA STATE UNIVERSITY |
| 2011 – 2015 | Assistant Professor, School of Criminology and Criminal Justice |
| | UNIVERSITY OF MASSACHUSETTS, AMHERST |
| 2009 – 2011 | Assistant Professor, Department of Sociology |

## PROFESSIONAL AFFILIATIONS

2015 –  UNIVERSITY OF WASHINGTON
  Faculty Affiliate, Center for Statistics in the Social Sciences (CSSS)
  Faculty Affiliate, Center for Studies in Demography and Ecology (CSDE)
  Faculty Affiliate, West Coast Poverty Center (WCPC)

2011 – 2015  ARIZONA STATE UNIVERSITY
  Faculty Affiliate, Women and Gender Studies Program
  Faculty Affiliate, School of Social Transformation

2009 – 2011  UNIVERSITY OF MASSACHUSETTS, AMHERST
  Faculty Associate, Social and Demographic Research Institute (SADRI)
  Faculty Affiliate, The Center for Research on Families (CRF)

## EDUCATION*
Ph.D. Sociology, University of Georgia, 2009
M.A.  Sociology, University of Georgia, 2004
B.A.  Sociology, University of Georgia, *magna cum laude*, 2002
  **See last page for continuing education*

## PUBLICATIONS IN REFEREED SCHOLARLY JOURNALS
*Denotes graduate student
†Denotes equal contribution to paper

**Burt, Callie H.** Forthcoming. Challenging the Utility of Polygenic Scores for Social Science: Environmental Confounding, Downward Causation, and Unknown Biology. *Behavioral and Brain Sciences*.

**Burt, Callie H**. 2022. Discounting Females, Denying Sex, and Disregarding Dangers from Self-ID: A Reply and a Comment on Open Debate. *Journal of Controversial Ideas*, 2(1): 15.

**Burt, Callie H**. 2022. Irreducibly Social: Why Biocriminology's Ontoepistemology is Incompatible with the Social Reality of Crime. *Theoretical Criminology*. doi 13624806211073695.

**Burt, Callie H**. *Forthcoming,* 2022. Cultural Evolutionary Theory is Not Enough: Ambiguous Culture, Neglect of Structure, and the Absence of Theory in Behavior Genetics. *Behavioral & Brain Sciences*.

**Burt, Callie H**. & Brian B. Boutwell. *Forthcoming,* 2022. Experimental Studies of Bias: Imperfect, but neither Useless nor Unique. *Behavioral and Brain Sciences*.

**Burt, Callie H**., & Marcus Munafò. 2021. Has GWAS lost its status as a paragon of open science? *PLOS Biology* https://doi.org/10.1371/journal.pbio.3001242

**Burt, Callie H**. 2020. Scrutinizing the US Equality Act 2019: A Feminist Examination of Definitional Changes and Sociolegal Ramifications. *Feminist Criminology* 15(4): 363–409.

**Burt, Callie H**. 2020. Self-Control and Crime: Beyond Gottfredson & Hirschi's Theory. *Annual Review of Criminology* 3: 43-73.

**Burt, Callie H**. 2018. Racial Discrimination and Cultural Adaptations: An Evolutionary Developmental Approach. *Advances in Criminological Theory: Building a Black Criminology* 24: 207-252.

**Burt, Callie H**., Man Kit Lei, & Ronald L. Simons. 2017. Racial Discrimination, Racial Socialization, and Crime over Time: A Social Schematic Theory Model. *Criminology* 55(4): 938-979.

**Burt, Callie H**., Man Kit Lei, & Ronald L. Simons. 2017. Racial Discrimination, Racial Socialization, and Crime: Understanding Mechanisms of Resilience. *Social Problems* 64(3): 414-438.

Berg, Mark, **Callie H. Burt**, Man Kit Lei, Leslie G. Simons, Eric A. Stewart, & Ronald L. Simons. 2016. *Social Forces* 94(4): 1823-1846.

**Burt, Callie H**., & Carter Rees. Behavioral Heterogeneity in Adolescent Friendship Networks. 2015. *Justice Quarterly* 32(5): 872-899.

**Burt, Callie H**. 2015. Heritability Studies: Methodological Flaws, Invalidated Dogmas, and Changing Paradigms. *Advances in Medical Sociology: Vol. 16 Genetics, Health, And Society*: 3-44.

*Moule, Richard K. Jr., **Callie H. Burt**, Eric A. Stewart, & Ronald L. Simons. 2015. Developmental Trajectories of Individuals' Code of the Street Beliefs through Emerging Adulthood. *Journal of Research in Crime and Delinquency* 52(3): 342-372.

**Burt, Callie H**., & Ronald L. Simons. 2015. Interpersonal Racial Discrimination, Ethnic-Racial Socialization, and Offending: Risk and Resilience among African American Females. *Justice Quarterly* 32(3): 532-570.

**Burt, Callie H**., & Ronald L. Simons. Heritability Studies in the Postgenomic Era: The 'Fatal Flaw' is Conceptual. 2015. *Criminology* 53(1): 103-112.

Simons, Ronald L.[†], **Callie H. Burt**[†], Ashley Barr*, Man Kit Lei*, & Eric A. Stewart. 2014. Incorporating Routine Activities, Activity Spaces, and Situational Definitions into the Social Schematic Theory of Crime. *Criminology*: 52(4): 655-687.

**Burt, Callie H**., Gary Sweeten, & Ronald L. Simons. 2014. Self-Control through Emerging Adulthood: Instability, Multidimensionality, and Criminological Significance. *Criminology* 52(3): 450-487.

**Burt, Callie H**., & Ronald L. Simons. 2014. Pulling Back the Curtain on Heritability Studies: Biosocial Criminology in the Postgenomic Era. *Criminology* 52(2): 223-262.

**Burt, Callie H**., & Ronald L. Simons. 2013. Self-Control, Thrill Seeking, and Crime: Motivation Matters. *Criminal Justice and Behavior*. 40(11): 1326-1348.

Simons, Leslie Gordon, **Callie Harbin Burt**, & Rachel B. Tambling*. 2013. Identifying Mediators of the Influence of Family Factors on Risky Sexual Behavior. *Journal of Child and Family Studies*. 22(4): 460-470.

Meldrum, Ryan C., Jacob T.N. Young, **Callie Harbin Burt**, & Alex R. Piquero. 2013. Maternal Versus Adolescent Reports of Self-Control: Implications for Testing the General Theory of Crime. *Journal of Criminal Justice* 41(1): 24-32.

**Burt, Callie Harbin**, Ronald L. Simons, & Frederick X. Gibbons. 2012. Racial Discrimination, Ethnic-Racial Socialization, and Crime: A Micro-Sociological Model of Risk and Resilience. *American Sociological Review* 77(4): 648-677.

Simons, Ronald L., & **Callie Harbin Burt**. 2011. Learning to Be Bad: Adverse Social Conditions, Social Schemas, and Crime. *Criminology* 49(2): 553-598.

Simons, Leslie G., **Callie Harbin Burt**, & F. Ryan Peterson. 2009. The Effect of Religion on Risky Sexual Behavior among College Students. *Deviant Behavior* 30(5): 467-485.

Cooney, Mark, & **Callie Harbin Burt**. 2008. Less Crime, More Punishment. *American Journal of Sociology* 114(2): 491-527.

Simons, Leslie G., **Callie Harbin Burt**, & Ronald L. Simons. 2008. A Test of Explanations for the Effect of Harsh Parenting on the Perpetration of Dating Violence and Sexual Coercion among College Males. *Violence & Victims* 23(1): 66-82.

Simons, Ronald L., Leslie Simons, **Callie Harbin Burt**, Holli Drummond, Eric Stewart, Gene Brody, Frederick Gibbons, & Carolyn Cutrona. 2006. Supportive Parenting Moderates the Effect of Discrimination upon Anger, Hostile View of Relationships, and Violence among African American Boys. *Journal of Health and Social Behavior* 47(December): 373-389.

**Burt, Callie Harbin**, Ronald L. Simons, & Leslie G. Simons. 2006. A Longitudinal Test of the Effects of Parenting and the Stability of Self-control: Negative Evidence for the General Theory of Crime. *Criminology,* 44(2): 353-396.

> *Reprinted* in Social Control and Self-Control Theories of Crime and Deviance, edited by Joseph H. Rankin and Edward Wells. London: Ashgate Publishing, 2011, 2017.

Simons, Ronald L., Leslie Simons, **Callie Harbin Burt**, Gene Brody, & Carolyn Cutrona. 2005. Collective Efficacy, Parenting Practices, and Delinquency: A Longitudinal Test of a Model Integrating Community- and Family-level Processes. *Criminology* 43(4): 989-1029.

Clay-Warner, Jody, & **Callie Harbin Burt**. 2005. Reporting Rape: Have Things Really Changed? *Violence Against Women* 11(2): 3-27.

### PUBLICATIONS: BOOKS, MONOGRAPHS, AND REPORTS

**Burt, Callie H**. *Forthcoming, 2022*. Sex, Gender, and the US Equality Act: Confusion, Conflict, and Consequences. In A. Sullivan & S. Todd (Eds.), *Sex and Gender Identity: A Reader*. Routledge.

**Burt, Callie H**. 2014. Self-Control and Crime: A Sociological Perspective. In K. Beaver, J.C Barnes, & B. Boutwell, *The Nurture versus Biosocial Debate in Criminology*. (Pp. 143-171). Sage Publishers.

### PUBLICATIONS: NON–REFEREED SCHOLARLY

**Burt, Callie H**. 2022. The Challenges of 'Bias Free' Language Codes. *The Criminologist*. 47(3) pp. 7-9.

**Burt, Callie H**. 2020. Doing Better Science. Improving Review & Publication Protocols to Enhance the Quality of Criminological Evidence. (Lead article) *The Criminologist*. 45(July/August): pp.1, 3-6.

**Burt, Callie H**. 2019. Response to "Why Longitudinal Research Is Hurting Criminology" (March/April) Misguided Culprit: Blame Bad Practices Not Longitudinal Data. *The Criminologist* 44(4): 13-14.

**Burt Callie H**. 2012. *Gottfredson and Hirschi's Conceptualization of Self-Control*: *A Critique of Measures and Proposals for Change*. https://www.researchgate.net/publication/278679704 (>7k reads).

### SELECTED INVITED PRESENTATIONS

Burt, Callie H. "Scrutinizing the US Equality Act: Context, Conflict, and Consequences." University College London, Online, March 18, 2021, (online recording available).

Burt, Callie H. "Scrutinizing the US Equality Act." Feminist in Struggle (FIST) Panel on the US Equality Act, Online, November 14, 2020, (online recording available).

Burt, Callie H. "Social Disadvantage, Cognitive Schemas, and Violence: An Evolutionary Developmental Perspective." CSDE Panel on Violence, University of Washington, 2018.

Burt, Callie H. "Racialized Experiences and Crime over Time: A Micro-Sociological Model of Risk and Resilience." SUNY-Albany, School of Criminal Justice, 2018.

Burt, Callie H. "Racial Stratification and Crime: Investigating Risk Pathways." University of Colorado-Boulder, Dept. of Sociology, 2017.

Burt, Callie H. "Inequality, Stress, and Social Genomics" School of Social Work. University of Washington, 2017.

Burt, Callie H. "Racial Discrimination, Racial Socialization, and Crime:  A Social Schematic Theory of Risk and Resilience across the Life Course" West Coast Poverty Center. Seattle, WA.

Burt, Callie H. "Embodied Risk and Resilience: Adolescent Social Experiences, Risk Behaviors, and the Epigenome." Biomarker Working Group, University of Washington, May 2016.

Burt, Callie H. "Interpersonal Racial Discrimination and Crime over the Life-Course: A Microsociological Theory of Cumulative Cognitive and Social Disadvantage" Deviance Seminar, University of Washington, October 2015.

Burt, Callie H. "Beyond self-control theory: Impulsivity and sensation seeking from an evolutionary-neurodevelopmental perspective." Andrew Young School's Department of Criminal Justice & Criminology, Georgia State University, June 2014.

**SELECT CONFERENCE PRESENTATIONS**

Burt, Callie H., & Kara Hannula. Developmental changes in Impulsivity and Sensation Seeking from Late Childhood to Adulthood: Investigating the Effects of Social Adversity and Sex/Gender. Annual Meeting of the American Society of Criminology, November 2019, San Francisco, CA.

Burt, Callie H. "Racial Discrimination, Racial Socialization, and Crime: Investigating Resilience Mechanisms." Annual meeting of the American Society of Criminology, Nov. 2014, San Francisco, CA.

Burt, Callie H., & Man Kit Lei. "Changes in Impulsivity and Sensation Seeking across Adolescence: A Dual Systems Approach." Annual meeting of the American Society of Criminology, Nov. 2013, Atlanta, GA.

Granberg, Ellen, Callie Harbin Burt, & Ronald L. Simons. "Depressive symptom trajectories: Factors predicting mental health risk and resilience in African American adolescents." Annual Meeting of the Southern Sociological Society, April 2009, New Orleans, LA.

Simons, Ronald L., & Callie Harbin Burt. "Gender differences in the cognitive schemas associated with verbal and physical abuse of romantic partners." Annual Meeting of the American Society of Criminology, November 2008, St. Louis, MO.

Burt, Callie Harbin. "Sex differences in the causes and consequences of commitment to the code of the street." Annual Meeting of the American Society of Criminology, November 2007, Atlanta, GA.

Clay-Warner, Jody, Callie Harbin Burt, & Jennifer McMahon. "Reporting Rape: Testing Black's theory of the behavior of law." Annual Meeting of the American Society of Criminology, November 2005, Toronto, Canada.

Burt, Callie Harbin, & Jody Clay-Warner. "Not just 'rogue males': Gender identity in general strain theory." Annual Meeting of the American Society of Criminology, November 2004, Nashville, TN.

Clay-Warner, Jody & Callie Harbin Burt. "Reporting rape: Have things really changed?" Annual Meeting of the American Society of Criminology, November 2002, Chicago, IL.

**RESEARCH GRANTS AND FELLOWSHIPS**

Social Inequality and Disparities in Health-Risk Behavior (K01, MRSDA). National Institutes of Health. National Institute of Child and Human Development. Principle Investigator, 2018 - 2023. $615,772. Funded.

Racial Discrimination, Racial Socialization, Gender, and Crime: Understanding Mechanisms and Developmental Pathways. W.E.B. Du Bois Fellowship at the National Institute of Justice. Primary Investigator, 2014-2015: $98,120. Funded

Community Context and Violence: African American Youth Transitioning to Adulthood. Center for Disease Control. Co-Investigator. 2009-2011: $1,049,991. Funded.

Phelps-Stokes Graduate Fellowship: Graduate School: University of Georgia, 2007-2008. Funded.

**HONORS AND AWARDS**

UW Distinguished Teaching Award Nomination, 2018.

Ruth Shonle Cavan Young Scholar Award, American Society of Criminology, 2014.

Excellence in Research by a Graduate Student Award: Humanities and Social Sciences: Graduate School, University of Georgia, 2010. (*One award given annually from each of five areas across the university*).

Certificate of Excellence as a Graduate Student: Dept. of Sociology: University of Georgia, 2006.

Best Student Paper Award: ASA: Crime, Law and Deviance Section, "A Longitudinal Test of the General Theory of Crime's Predictions Regarding the Effects of Parenting and the Stability of Self-Control," 2005.

Gene Carte Student Paper Award, Second Place: American Society of Criminology for "A Longitudinal Test of Low-Self Control Theory with an African-American Sample," 2005.

B. O. Williams Research Award: University of Georgia, Department of Sociology, 2005.

Best Student Paper Award: American Society of Criminology: Division of Women and Crime for "Not Just Rogue Males: Gender Identity in General Strain Theory," 2004.

(Undergraduate) Research Recognition Award: University of Georgia, Department of Sociology, 2002.

(Undergraduate) Academic Achievement Award: University of Georgia, Department of Sociology, 2002.

## TEACHING ACTIVITIES

§Indicates a course that I developed anew.

| **Courses Taught** | **Institution:** |
|---|---|
| <u>Graduate (Ph.D.)</u> | |
| *Developmental & Life-Course Criminology*§ | GSU |
| *Criminological Theory* | ASU |
| *Deviance and Social Control* | UW |
| *Contemporary Criminological Theory*§ | UW |
| *Inequality, Institutions, and Desistance*§ | UW |
| | |
| <u>Undergraduate</u> | |
| *Advanced Criminological Theory*§ | ASU |
| *Criminological Theory* | GSU |
| *Criminology* | UMass, ASU, UW |
| *Introduction to Deviance and Social Control* | UW |
| *Social Problems* | UMass |
| *Foundations of Sociological Inquiry* | UW |

## <u>Editorial Board Work</u>

*Criminology*, Editorial Board, 2015-2017; 2018-2020; 2021-present
*Feminist Criminology*, Editorial Board, 2018-2021
*Dignity: A Journal of Analysis of Exploitation and Violence*, Editorial Board 2021-present
*Open Criminology,* Advisory Board

## <u>Manuscript Reviewer</u>

**Sociology**. *American Journal of Sociology, American Sociological Review, Journal of Health and Social Behavior, Social Forces, Sociological Forum, Sociological Spectrum, The Sociological Quarterly, Social Science Research, Race & Justice, City & Community, Race and Social Problems, Social Currents, Sociology of Education.*

**Criminology**. *Criminology, Journal of Research in Crime and Delinquency, Crime & Delinquency, Journal of Quantitative Criminology, Justice Quarterly, Criminology & Public Policy, Criminal Justice and Behavior, Violence Against Women, Journal of Criminal Justice; Journal of Developmental and Life-Course Criminology, Criminal Justice Studies.*

**Other disciplines**. *PLoS ONE, Journal of Adolescence, International Journal of Behavioral Development, Social Development, Health Services Research, Cultural Diversity and Ethnic Minority Psychology, Developmental Review, Journal of Controversial Ideas, Dignity, Behavior Genetics*

**Book Reviews**: Routledge

**Professional Service**
Member, NIH Review Panel, W.E.B. DuBois Program of Research on Reducing Racial and Ethnic Disparities in the Justice System, 2022.
Member, ASC Meeting Program Committee 2022, Area Chair for Perspectives on Crime
Member, ASC Sutherland Award Committee, 2022
Reviewer, NSF Law & Society Program, 2021.
Chair, ASC Ruth Shonle Cavan Award Committee, American Society of Criminology 2021.
Reviewer, NIH Directors Early Independence Award [DP5], 2020
Member, Ad Hoc Committee on Data Disclosure, American Society of Criminology, 2020.
Chair, ASC Ruth Shonle Cavan Award Committee, American Society of Criminology 2020.
Member, NIH Social Sciences and Population Study Section A [SSPA] Review Panel, May 2019
Member, ASC Ruth Shonle Cavan Committee, American Society of Criminology 2019.
Session Organizer, ASC Annual Conference, Developmental and Life-Course Criminology, 2019
Session Organizer for the PAA, Risky Behaviors and Adolescent Well-Being, 2018.
Member, ASC Reiss Award Committee, American Society of Criminology 2017.
Session Organizer, ASA Conference, Crime, Law, and Deviance Section, Micro-Sociological Criminology, 2016
Area Chair, ASC Annual Meeting, Roundtable Sessions, 2013.
Discussant, ASC Annual Meeting, 2015
Discussant, ASC Annual Meeting, 2014

**Professional Memberships & Affiliations**
American Sociological Association (ASA)
American Society of Criminology (ASC)
National Prevention Science Coalition to Improve Lives (NPSC)
National Institute of Drug Abuse (NIDA) Diversity Scholars Network (NSDN)

**Ongoing Scholarly Training and Non-degree Coursework**
2021 Short Course: Genetic Epidemiology, University of Bristol, Bristol UK.
2021 Short Course: Advanced Epigenetic Epidemiology, University of Bristol, Bristol UK.
2021 Short Course: Epigenetic Epidemiology, University of Bristol, Bristol UK.
2020 Workshops: Summer Institute for Statistical Genetics, University of Washington, Seattle, WA.
   <u>Modules</u>: • *Gene Expression Profiling*   • *Genetic Epidemiology*   • *Association Mapping: GWAS & Sequencing Data*
       • *Computational Pipeline for Whole Genome Sequence Data*
2018-2020: Coursework at the University of Washington, Seattle
   *Courses*: • *Biology*   • *Introduction to Genetics*   • *Genetics & Genomics*   • *Biostatistics* • *Statistical Genetics I & II*
       • *Social, Legal, and Ethical Implications of Public Health Genetics*
2019 Workshops: Summer Institute for Statistical Genetics, University of Washington, Seattle, WA.
   <u>Modules</u>: • *Population Genetics*     • *Quantitative Genetics*     • *Statistical Genetics*
2015 Workshop: "Longitudinal Data Analysis Using SEM." Instructor: Paul Allison. Los Angeles, CA.

2010 Workshop: "Longitudinal Data Analysis Using Stata." Instructor: Paul Allison. Washington, DC.
2010 Workshop: "ICPSR Summer Training Program in Quantitative Methods of Social Research, Categorical Data Analysis Using Stata." Instructor: Simon Cheng, Amherst, MA.
2007 Workshop: "Advances in Latent Variable Modeling Using MPLUS. Short Course." Instructor: Bengt Muthen. ENAR International Biometric Society Meeting. Atlanta, GA.
2007 Workshop: "Causal Inference Using Propensity Scores." American Society of Criminology. Atlanta, GA.
2004 ICPSR Summer Training Program in Quantitative Methods of Social Research: "LISREL" models: An introduction. Instructor: Kenneth Bollen. Ann Arbor, MI.

**RECENT PUBLIC-INTEREST PIECES**

'The Inequality of the Equality Act: Good Intentions are Not Enough', One Woman's Take, March 2021.

'What Biden's Executive Order 13988 Means for Women and Girls: One Woman's Take', UK Women's Place, February 7, 2021.

"HB112 is 'pro-female', not 'anti-trans' Billings Gazette", February 3, 2021.

"Biological Sex and the Legal Protection of LGBT Individuals" (with Alex Byrne). *Aero Magazine*, August 20, 2020.

"Idaho HB 500: Pro-female, not anti-trans" Idaho Post Register, May 17, 2020.

"Idaho's HB500 is Pro-Female not Anti-Trans." *Idaho Statesman*, April, 21, 2020.

"Sex is Not Gender & Sports are Sex Separated." *Medium*, December 9, 2019.

"Why We Stay Silent." Op-Ed, *Seattle Times*, September 22, 2018.

"Sex Isn't Binary, But Sports Competition Is: A Defense of IAAF's Policy." *Conatus News*, May 17, 2018:

"Better Gun Regulation, Fewer Gun Deaths (and maybe more freedom)." *The UW Daily*, March 30 2018.