CANDICE JACKSON (SBN 224648)
**FREEMAN MATHIS & GARY, LLP**
1010 B Street, Suite 300
San Rafael, California 94901
Telephone: (415) 352-6434
cjackson@fmglaw.com

LAUREN ADAMS (*Pro Hac Vice*)
**WOMEN'S LIBERATION FRONT**
1802 Vernon St. NW, #2036
Washington, DC 20009
Telephone: (202) 964-1127
legal@womensliberationfront.org

*Counsel for Plaintiffs*

### UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA (FRESNO DIVISION)

| | |
|---|---|
| JANINE CHANDLER, et al., | Case No. 1:21-cv-01657-JLT-HBK |
| Plaintiffs, | **DECLARATION OF LAUREN ADAMS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS** |
| v. | |
| CALIFORNIA DEP'T OF CORRECTIONS AND REHABILITATION, et al., | |
| Defendants. | |

I, Lauren Adams, hereby declare:

1. I make this declaration based on my own personal knowledge. I am over the age of 18 and competent to testify. If called to testify, I could and would do so as follows:

2. I am one of the attorneys representing the Plaintiffs in this case, in my capacity as legal director of Women's Liberation Front (WoLF), and I make this declaration in support of Plaintiffs' Opposition to Defendants' Motion to Dismiss.

3. On August 25, 2021 I testified in front of the California State Senate Rules Committee confirmation hearing for CDCR Undersecretary of Operations Jeffrey Macomber and CDCR Undersecretary of Administration Jennifer Barretto. A true and correct copy of the transcript from this hearing is attached to this declaration as Exhibit A.

4. In testifying about the actual harms of SB 132 implementation at that point in time (August 2021), I stated: "Jonathan Robertson was transferred in June and is already in administrative segregation pending a sexual assault investigation." *See* Exh. A hereto, at p. 62. To my knowledge, he is the only Jonathan Robertson who has been placed or transferred by CDCR into a women's facility. His CDC number is WB1151.

5. Sometime after the May 2022 Alleged Rape, of which Jonathan Roberts is the alleged perpetrator, including directing subsequent threats of rape to several women, he was apparently transferred to the California Institute for Women (CIW) - a lower-security facility.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.

SIGNED IN MILWAUKIE, WISCONSIN ON MAY 31, 2022.

_/s/Lauren Adams_____
Lauren Adams

# Exhibit A

SENATE RULES COMMITTEE

STATE OF CALIFORNIA

**HEARING**

STATE CAPITOL

ROOM 3191

SACRAMENTO, CALIFORNIA

**--o0o--**

WEDNESDAY, AUGUST 25, 2021

1:36 P.M.

**--o0o--**

Reported By:  INA C. LeBLANC
              Certified Shorthand Reporter
              CSR No. 6713

1                          **APPEARANCES**

2                        **MEMBERS PRESENT**

3
    TONI G. ATKINS, Chair
4
    SENATOR PATRICIA C. BATES, Vice Chair
5
    SENATOR SHANNON GROVE
6
    SENATOR SYDNEY KAMLAGER
7
    SENATOR JOHN LAIRD
8

9                          **STAFF PRESENT**

10

11  ERIKA CONTRERAS, Secretary of the Senate

12  CHINOOK SHIN, Committee Assistant

13

14                    **ALSO PRESENT (Remote)**

15

16  JEFFREY D. MACOMBER, Undersecretary of Operations,
    Department of Corrections and Rehabilitation

17  JENNIFER L. BARRETTO, Undersecretary of Administration,
    Department of Corrections and Rehabilitation
18

19                          **--o0o--**

20

21

22

23

24

25

**INDEX**

Page

Proceedings.................................. 1

Governor's Appointees:
(Taken together)

**JEFFREY D. MACOMBER, Undersecretary of
Operations, Department of Corrections and
Rehabilitation............................** 7

**JENNIFER L. BARRETTO, Undersecretary of
Administration, Department of Corrections
and Rehabilitation.........................** 7

**--o0o--**

OPENING STATEMENT BY JEFFREY D. MACOMBER..... 8

OPENING STATEMENT BY JENNIFER L. BARRETTO.... 10

    Questions by SENATOR LAIRD re:

        (To Ms. Barretto):
        Current systems to manage the
        budget........................... 13

        (To Mr. Macomber):
        Issues with regard to COVID...... 15

        Percentage of vaccinated staff... 16

        SB 132........................... 17

    Questions by SENATOR BATES re:

        (To Mr. Macomber):
        Transfer of men to women's
        institutions..................... 19

        Programs......................... 22

////

////

1        Questions by SENATOR BATES re (cont.):

2             (To Ms. Barretto):
               Human Resources Deputy Director
3               position........................    24

4             Jobs/prison closures.............    26

5
         Questions by SENATOR GROVE re:
6
              (To Ms. Barretto):
7               Recruiting.......................    29

8             Application base.................    31

9             Process for applicants...........    32

10            (To Mr. Macomber):
               Vaccine mandates/backup staff....    34
11
              (To both appointees):
12              Fire training facilities.........    35

13            Substitute training..............    37

14
         Questions by SENATOR KAMLAGER re:
15
              (To both appointees):
16              Mission change...................    43

17            AIMS/safety......................    48

18            (To Mr. Macomber):
               Body-worn cameras................    52
19
              Closure of DJJ...................    54
20

21
                         --o0o--
22

23

24

25

1   **Witness in Support of JENNIFER L. BARRETTO:**

2   TODD BLOOMSTINE, Self.......................   58

3

4   **Witness in Support of JEFFREY D. MACOMBER and
JENNIFER L. BARRETTO:**

5   MATTHEW EASLEY, California Correctional
Peace Officers Association...................   59

6

7   **Witness in Opposition to JEFFREY D. MACOMBER:**

8   LAUREN ADAMS, Women's Liberation Front.......   60

9

10                      **--o0o--**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**GOVERNOR'S APPOINTEE(S) SUBJECT TO CONFIRMATION BUT NOT REQUIRED TO APPEAR:**

KENNETH F. EHRMAN, Member, Boating and
Waterways Commission......................... 4

MITCHELL S. LILLIBRIDGE, Member, Commission
on Disability Access......................... 4

GEORGIA PATRICIA (PAT) UREÑA, Member,
Off-Highway Motor Vehicle Recreation
Commission................................... 4

DANNY J. BAKEWELL, Sr., Member, State Park
and Recreation Commission.................... 5

SARA E. BARTH, Member, State Park and
Recreation Commission........................ 5

NICHOLAS S. AVDIS, J.D., Member, Water
Quality Control Board, Central Valley Region. 4

RAJI K. BRAR, Member, Water Quality Control
Board, Central Valley Region................. 4

SEAN YANG, Member, Water Quality Control
Board, Central Valley Region................. 4

BEATRIZ E. GONZALEZ, Member, Water Quality
Control Board, Colorado River Basin Region... 4

VIVIAN E. PEREZ, Member, Water Quality
Control Board, Colorado River Basin Region... 5

ROBERT K. DYAS, Member, Water Quality
Control Board, Lahontan Region............... 4

ESSRA MOSTAFAVI, Member, Water Quality
Control Board, Lahontan Region............... 5

MICHAEL A. MENDÉZ, Ph.D., Member, Water
Quality Control Board, Los Angeles Region.... 5

HAMID D. NAHAI, Member, Water Quality
Control Board, Los Angeles Region............ 5

--oOo--

1                        --o0o--

2   Proceedings Adjourned......................    68

3   Certificate of Reporter....................    69

4   APPENDIX (Agenda and Written Responses
    of Appointees).............................    70

5

6                        --o0o--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1
2          CHAIR ATKINS:  Okay.  I'm going to call the

3    Senate Committee on Rules to order.

4          Good afternoon, everyone.  I'm going to make

5    several announcements today to explain our processes that

6    we've developed to continue our essential work during the

7    pandemic; and for those of you familiar with our process,

8    we appreciate your patience while I go through it again

9    for those that might be tuning in for the first time.  So

10   I'm going to cover the technical side of things for

11   today.

12         In response to the COVID-19 emergency, and to

13   protect the public, Senators, and Senate staff, we must

14   limit nonessential gatherings and adhere to social

15   distancing.  In compliance with state and local orders,

16   the Senate will be holding this essential hearing and has

17   made necessary adjustments to normal practices in order

18   to ensure that the public has access to the legislative

19   process, while conducting the hearing in a way that

20   protects the health and safety of the public and our

21   employees.

22         To allow the public access, we've admitted

23   members of the public to two hearing rooms, to the extent

24   social distancing requirements allow, and we will be

25   using a teleconference service for those individuals who

1    wish to testify today.  For individuals wishing to

2    provide public comment, the participant toll-free number

3    and the access code is posted on our committee website,

4    and it will be displayed on the screen here now and a

5    couple more times throughout the hearing.  Today's

6    participant number is (877) 226-8189, and the access code

7    is 2876059.

8            When we move to public comment, a moderator will

9    identify you individually, will open your line, and at

10   that time you may address the Committee.  Please note

11   that in order for us to hear you clearly and to avoid any

12   feedback, you have to mute the device that you're

13   watching the hearing on prior to giving testimony over

14   the phone.  It's important that we hear from you; so, we

15   thank you for your patience.

16           I will maintain decorum during the hearing, as

17   is customary, and any individuals who are disruptive may

18   be removed from the remote meeting service or have their

19   connections muted.  While every effort has been made to

20   streamline the hearing process and conduct our hearings

21   in as close to the same manner as is customary, there may

22   be some lag times for participants adjusting to the new

23   online tools.  But, yet again, let me say be patient so

24   everyone can be heard, and we will get through it.

25           Also, on behalf of our court reporter, I would

1    ask that all speakers, my colleagues and witnesses alike,

2    to speak slowly and clearly.

3          And as we begin the agenda today, we need to

4    establish a quorum.  And as a reminder to Members, you'll

5    need to turn your mic on before you speak for roll call,

6    and during your comments.

7          Madam Secretary, will you please call the roll.

8          MS. SHIN:  Grove.

9          SENATOR GROVE:  Here.

10         MS. SHIN:  Grove here.

11         Kamlager.

12         SENATOR KAMLAGER:  Here.

13         MS. SHIN:  Kamlager here.

14         Laird.

15         SENATOR LAIRD:  Here.

16         MS. SHIN:  Laird here.

17         Bates.

18         SENATOR BATES:  Here.

19         MS. SHIN:  Bates here.

20         Atkins.

21         CHAIR ATKINS:  Here.

22         MS. SHIN:  Atkins here.

23         CHAIR ATKINS:  Okay.  Before we go to our

24   appointees required to appear, I want to dispense with

25   some items.  And since there's a long list, I'm going to

```
 1   have two votes, and I'm going to read them off, because
 2   I've been asked to split some votes.
 3          So for item 2, Governor's Appointees Not
 4   Required to Appear, I would entertain a motion that would
 5   include these items:  So it would be 2C, 2D, 2E, and then
 6   we're going to jump down to 2H, I, J, K, M.  And that
 7   would be the first motion.
 8          Let me know if you need me to repeat that.
 9          SENATOR LAIRD:  I would so move.
10          CHAIR ATKINS:  Okay.  Thank you.
11          Madam Secretary, will you call the roll.
12          MS. SHIN:  Grove.
13          SENATOR GROVE:  Aye.
14          MS. SHIN:  Grove aye.
15          Kamlager.
16          SENATOR KAMLAGER:  Aye.
17          MS. SHIN:  Kamlager aye.
18          Laird.
19          SENATOR LAIRD:  Aye.
20          MS. SHIN:  Laird aye.
21          Bates.
22          SENATOR BATES:  Aye.
23          MS. SHIN:  Bates aye.
24          Atkins.
25          CHAIR ATKINS:  Aye.
```

4

1          MS. SHIN:  Atkins aye.

2          Five to zero.

3          CHAIR ATKINS:  Thank you.  Those are out five to

4     zero.

5          Now, the next motion would be on item 2 also,

6     but it would include 2F, G, L, N, O, and P.

7          SENATOR LAIRD:  I would move that.

8          CHAIR ATKINS:  Thank you, Senator Laird.

9     Everybody is with us.

10          Madam Secretary, will you call the roll.

11          MS. SHIN:  Grove.

12          SENATOR GROVE:  Not voting.

13          MS. SHIN:  Grove not voting.

14          Kamlager.

15          SENATOR KAMLAGER:  Aye.

16          MS. SHIN:  Kamlager aye.

17          Laird.

18          SENATOR LAIRD:  Aye.

19          MS. SHIN:  Laird aye.

20          Bates.

21          SENATOR BATES:  Not voting.

22          MS. SHIN:  Bates not voting.

23          Atkins.

24          CHAIR ATKINS:  Aye.

25          MS. SHIN:  Atkins aye.

```
 1              Three to zero.
 2              CHAIR ATKINS:  Thank you.  That's out three to
 3    zero.
 4              And we're -- I would next entertain a motion, if
 5    you're okay with it, on 3, Bill Referrals, and 4, Select
 6    Committee Requests, if people are okay taking both of
 7    those at the same time.
 8              SENATOR LAIRD:  I would move them together, 3
 9    and 4.
10              CHAIR ATKINS:  Thank you, Senator Laird.
11              Madam Secretary.
12              MS. SHIN:  Grove.
13              SENATOR GROVE:  Aye.
14              MS. SHIN:  Grove aye.
15              Kamlager.
16              SENATOR KAMLAGER:  Aye.
17              MS. SHIN:  Kamlager aye.
18              Laird.
19              SENATOR LAIRD:  Aye.
20              MS. SHIN:  Laird aye.
21              Bates.
22              SENATOR BATES:  Aye.
23              MS. SHIN:  Bates aye.
24              Atkins.
25              CHAIR ATKINS:  Aye.
```

1          MS. SHIN:  Atkins aye.

2          Five to zero.

3          CHAIR ATKINS:  Five to zero.  Thank you very

4   much.  That is out.

5          So we will now turn to Governor's Appointees

6   Required to Appear, and that would be for item 1A and B,

7   we will take those up together, and it is two

8   appointments to the Department of Corrections and

9   Rehabilitation.  And they are -- and I'm going to hope I

10  get names correctly, and you will correct me if I am

11  wrong, please -- Mr. Jeffrey Macomber -- thank you -- as

12  Undersecretary of Operations, and Ms. Jennifer Barretto,

13  Undersecretary of Administration.

14         I'm going to say welcome to both of you, thank

15  you for your patience as we got underway.  I would like

16  to do it in order of the file, beginning with

17  Mr. Macomber and then Ms. Barretto.  You can make your

18  introductions or opening comments, feel free to

19  acknowledge anyone that you would like especially to

20  acknowledge, opening comments, and then after both of you

21  have had a chance to do that, we'll go right to the

22  Committee for questions and comments.

23         So I think with that, Mr. Macomber, go ahead and

24  introduce yourself, and we'll go from there.

25         Welcome.

1              MR. MACOMBER:  Thank you, and good afternoon,

2    Madam Chair and Members of the Committee.  I would like

3    to recognize and thank my family, as well as my CDCR

4    family who are supporting me here today.

5              I began my career in CDCR as a student assistant

6    in 1992.  I've held various positions in the Department

7    ranging from correctional officer to the Director of

8    Correction Services at the California Correctional

9    Healthcare Services, which allowed me to experience the

10   correctional system through the perspective of the

11   federal receiver in charge of healthcare.

12             Shortly afterward, I was asked to serve as the

13   Undersecretary of Administration where I made it my

14   priority to advocate for the resources to ensure the

15   Department was able to meet its infrastructure needs, to

16   establish technological management tools to allow for a

17   realtime, data-driven decision-making model, and to

18   enhance staff training for new peace officers within the

19   Department.  These pieces are essential if we are to

20   succeed in our mission.  I continue to believe strongly

21   in this mission.  I have seen it work.

22             This past year and a half, however, we have

23   faced one of the most difficult challenges to our mission

24   that I have experienced in my 28 years with the

25   Department.  The impact to the population living in our

1   facilities, the staff that work there, cannot be

2   overstated.  The COVID-19 pandemic upended all normal

3   departmental operations seemingly overnight, and

4   priorities had to be shifted to focus on outbreak

5   mitigation.

6           During this trying year, I was asked to serve as

7   the Undersecretary of Operations.  At that time, the

8   Department overhauled its operations to confront the

9   difficulties of the COVID-19 pandemic.  We have also been

10  implementing numerous significant initiatives, including

11  pursuing a public health focus/correctional culture

12  change program similar to the Norway model; expanding the

13  incarcerated population's access to technology through

14  personal tablets and laptops; piloting and expanding the

15  use of body-worn cameras in correctional settings;

16  establishing the integrated substance use disorder

17  treatment program to medically and therapeutically

18  address substance dependency in our institutions;

19  graduating the first class of firefighters from the

20  Ventura Training Center; and implementing the earned

21  discharge process for parolees based on behavior and

22  merit.  And not to leave out, transitioning the Division

23  of Juvenile Justice to the counties.

24          Although not without its challenges, CDCR

25  continues to evolve for the better.  I feel grateful to

1   be given the opportunity to be part of this

2   transformation.  I'd like to thank the Governor for

3   appointing me to this critical role within the

4   Department, and the Senate today for considering my

5   appointment.  I appreciate the opportunity to effect

6   change in this new role, and I look forward to your

7   questions.  Thank you.

8           CHAIR ATKINS:  Thank you very much for those

9   comments.

10          Ms. Barretto, go ahead.

11          MS. BARRETTO:  Good afternoon, Madam Pro Tem and

12  Members of the Committee.  My name is Jennifer Barretto,

13  and I would first like to acknowledge my family, my

14  husband Jeff and our two sons Jeffrey and Jace, for their

15  unwavering support and sacrifice.  I must also recognize

16  my CDCR family who have assisted and encouraged me along

17  my career journey.

18          My path to you today is an uncommon one, having

19  started CDCR as entry clerical support in 1997 while

20  putting myself through college.  Through determination

21  and persistence, I was able to work my way up through the

22  administrative ranks, ultimately transitioning to peace

23  officer classifications, including correctional business

24  manager, correctional administrator, chief deputy warden,

25  and warden.  Each position represented a new challenge

1   and an ability to have a bigger impact.

2            I also worked as the Director of Healthcare

3   Policy and Administration for the federal receiver,

4   providing me with new perspective of our prison

5   healthcare system.  The journey was not easy.  I had to

6   work very hard to earn respect and acceptance in many of

7   the positions that I attained.  Despite the challenges, I

8   have found the journey to be deeply rewarding.

9            As Undersecretary of Administration, the areas I

10  oversee provide critical support to our mission of safe

11  rehabilitation of incarcerated persons.  These include

12  facility maintenance and infrastructure, information

13  technology, staff training and development, fiscal

14  management, to name a few.

15           I hope to maximize the benefit of the dollars

16  invested in our staff, in our technology, and our

17  infrastructure.  I am committed to improving the staff

18  misconduct allegation review process and recognize the

19  importance of transparency and collaboration and gaining

20  trust.

21           I recognize the COVID pandemic has caused

22  anxiety and concern for our staff and the incarcerated

23  population.  I'm committed to keeping both safe, ensuring

24  the availability of personal protective equipment and

25  adherence to public health guidelines.

1        I believe investing in staff through employee

2   wellness, upward mobility, succession management,

3   mentorship, quality training, and technology is essential

4   to our success.  And to truly be successful, it requires

5   recruiting, equipping, and retaining a talented workforce

6   with focused attention on equity, equal opportunity, and

7   diversity, to which I'm committed.

8        For our custody staff, reality-based training

9   and implementation of active bystandership for law

10  enforcement will better equip our staff, support their

11  wellness, and benefit continued culture transformation.

12       When I started at CDCR, we were facing

13  continuous budget reductions, severe overcrowding,

14  diminished prison programs, staff training was all but

15  eliminated, and our infrastructure was neglected.  Our

16  technology was also falling behind.

17       I'm proud of what we have accomplished with

18  reduced population, expanded prison programs, investments

19  in our staff, infrastructure, and technology, and I

20  recognize there remains much to do.

21       I'm grateful to the Governor for this

22  appointment, and I want to thank the Committee today for

23  considering.  Thank you, and I'd be happy to answer any

24  questions.

25       CHAIR ATKINS:  Thank you very much.

1           I'm going to go right to Members and ask my

2     colleagues if you intend to direct questions

3     individually, to do so, and if you want both to answer

4     questions at the same time, make that clear as well.

5           So, Senator Laird, I will go ahead and start

6     with you.

7           SENATOR LAIRD:  Thank you very much, Madam

8     Chair.

9           I enjoyed meeting with you both.  It was really

10    helpful.  And I think a lot of my questions were answered

11    in the meeting, but I think I would like to ask a couple

12    of them to just talk about them in public.

13          For Ms. Barretto, I will start with you.  You

14    said in your opening statement that you were there during

15    major cuts and difficult times.  We talked about a time

16    that I was involved with the budget almost 20 years ago

17    when the prison system didn't even set up the books of

18    what the Legislature adopted until six months into the

19    fiscal year, and it caused a problem.  And you gave me a

20    great answer about why that is just not going to happen

21    now.

22          So why don't you talk about current systems you

23    have in place to manage the budget.

24          MS. BARRETTO:  Certainly.  Thank you, Senator.

25          Well, I'm familiar with the budget process and

1  what it looked to be in our history, and where we are

2  today.  And I'm pleased to share that we have made

3  considerable strides from those times long ago, with a

4  great deal of technology, and accountability, and

5  oversight.

6       We have an automated centralized system for our

7  budget functions, for all our fiscal forecasting,

8  projecting, accountability of expenditures.  It is

9  coordinated from our headquarters operation.  Each

10  institution has a trained budget analyst, they have a

11  business manager, and they're responsible for managing

12  those budgets; but it comes with a great deal of

13  oversight and realtime available data to us on

14  expenditures.  We also have the ability to control

15  spending.  We have what is called availability control in

16  our electronic systems where we can turn off and on line

17  items, essentially, as we watch expenditures.  We also

18  have routine meetings.  We meet monthly, looking at those

19  expenditures, looking at anything that's of concern.  And

20  we have annual fiscal reviews as well.

21       So there's a great deal of accountability that's

22  been afforded to us by using technology.

23       SENATOR LAIRD:  Great.  Thank you.  I really

24  appreciate that answer and hearing it from you directly

25  in the hearing.

1             And then I had a couple of questions for

2   Mr. Macomber to follow up.  The first is, is:  Now you're

3   taking over operations, and before you were sort of

4   formally all the way in this position, there were major

5   issues with regard to COVID and the prison system.  Could

6   you speak to sort of how you have worked with those?

7   Because you walked in, and they had already happened,

8   some of the major ones.  How have you addressed that, and

9   how do you think the system is addressing it going

10  forward?

11            MR. MACOMBER:  Thank you.  That's a great

12  question.

13            Early on, we did not know as much about the

14  virus as we do now.  We are fortunate that we have robust

15  testing protocols, we have robust PPE equipment ranging

16  from masks to other items.  We've also been very

17  fortunate with vaccinations.  We have about 74 percent of

18  our incarcerated population that has received the COVID

19  vaccine, and about 53 percent of our staff have received

20  it.  So I think we're in a much better position right now

21  to deal with COVID than we were originally.

22            We've also, of course, reduced our population

23  significantly.  Today we stand just over 99,000 inmates.

24  We're down well over 20,000 incarcerated folks from where

25  we started.

1        So I think those items have significantly helped

2   us.  We have also learned which areas of the institutions

3   are more susceptible for COVID transmission, and we've

4   done our best to move those individuals that are at a

5   higher risk for COVID to safer housing, which typically

6   means behind solid cell fronts.

7        So I think we've made a lot of progress, and we

8   appreciate the support that we've received from external,

9   such as the Department of Public Health, the Legislature,

10  the Department of Finance, and others, in getting us to

11  where we are today.

12       SENATOR LAIRD:  And I have to ask an edgy

13  follow-up question.  You said that 53 percent of the

14  staff have been vaccinated.  Why isn't that number

15  higher?

16       MR. MACOMBER:  Well, we certainly encourage our

17  staff to get vaccinated.  I, myself, got vaccinated early

18  in the process, and continue to advocate for that, as do

19  our partners in healthcare.

20       We are in the process now of implementing the

21  latest Department of Public Health order, which does

22  require vaccinations for our staff that work in

23  healthcare settings, are involved in transportation of

24  the incarcerated population to things like medical

25  appointments, as well as to our facilities that have a

1   primary healthcare mission, that being the California

2   Healthcare Facility, the California Medical Facility, and

3   the Skilled Nursing Facility within our Central

4   California Women's Facility in Chowchilla.

5        So we are looking to expand those numbers of

6   vaccinated staff, and of course we're closely following

7   any additional CDPH guidance that comes out relative to

8   the Pfizer vaccine and other vaccines that are getting

9   FDA approval.

10       SENATOR LAIRD:  Thank you.  And, obviously, we

11   would like to see that number go up.

12       And then the other question -- last question I

13   have has to do with SB 132 and incarcerated individuals

14   that self-identify as transgender, nonbinary, or

15   intersex, and -- you know, and in the process between you

16   and your staff.  We went back and forth, and there were

17   about eight assertions made that were not true.  And I

18   don't want to give life to all the assertions by

19   repeating them, but I think that it would be good if

20   maybe you gave a brief overview about the status of this

21   and where it stands in the system.

22       MR. MACOMBER:  Great.  Yes.  We're in the

23   process of implementing SB 132.  We have faced criticisms

24   from advocates on both sides of the issue.  Some feel

25   that we are moving too slowly, and others feel we're

1   moving too fast.

2          We, as a department, have elected to slow down a

3   little bit in our implementation of SB 132.  We're

4   looking to contract with nationwide experts on this issue

5   to help us navigate a complex issue.

6          I was very fortunate this past Monday to spend

7   some time at Central California Women's Facility where I

8   had an opportunity to sit down with transgender women,

9   transgender men, as well as the cisgender population, to

10  talk about their concerns with SB 132.  And it was really

11  good for me to hear it straight from the folks that are

12  actually living this day to day.

13         So, as a department, as I said, we're slowing

14  down a little bit.  We want to make sure we get this

15  right.  We want to make sure we're providing safe housing

16  for our population, and we get this right.

17         SENATOR LAIRD:  Thank you.  I appreciate that

18  and reserve the right to come back to it if there's an

19  animated discussion.

20         But thank you, Madam Chair.  That completes my

21  questions.

22         CHAIR ATKINS:  Senator, thank you.

23         Madam Vice Chair.

24         SENATOR BATES:  Well, let me congratulate you,

25  Mr. Macomber and Ms. Barretto, for your nomination to

1    these very important positions.  And I was noticing from

2    your bios that the combined service you've provided to

3    the Department of Corrections and Rehabilitation, I think

4    if I added it up right, guys, it's about 52 years in

5    probably one of the most difficult yet should be

6    rewarding assignments, when people enter the prison

7    system, and you have an opportunity to do something so

8    they can reenter society.  So I thank you for that

9    service and for your commitment to it.  You wouldn't have

10   served that long if you don't have a significant

11   commitment and passion about it.

12          There have been problems.  My good colleague

13   mentioned those regarding the concerns that have been

14   covered in news articles, actually, regarding the

15   transfer of men to female institutions, and how that is

16   going.

17          I guess my first question, and maybe my only

18   question on this would be:  Could we avoid some of this

19   information, whether it's accurate or inaccurate, by

20   ensuring that those who are transferred for the need to

21   be -- to have the transformation surgery, be held in a

22   separate area so we didn't have concerns that are actual

23   or, perhaps, not so accurate, but fomented by some what

24   appear to be some previous, you know, information,

25   perhaps from staff, to heighten fear about it amongst the

1   women population?

2          My question is:  Should they be in a separate

3   facility until they actually go through the

4   transformation surgery?  Is there any consideration to do

5   that?

6          MR. MACOMBER:  I'll take first shot at this one.

7          So we evaluate housing for all of our

8   incarcerated population individually, and certain

9   individuals are most appropriate for celled housing, and

10  that could be single cell or double cell.  Other of our

11  facilities, such as Central California Women's Facility,

12  has rooms that hold, you know, four to six individuals,

13  and we review those individuals on a case-by-case basis

14  based on their individual case factors, and the case

15  factors of those individuals they might be living with.

16         So we do a case-by-case analysis on that, and

17  we're always looking at opportunities to improve that

18  process.

19         SENATOR BATES:  And at this point in time, it

20  sounds like it's a work in progress.

21         MR. MACOMBER:  I would say that would be

22  accurate, yes.

23         SENATOR BATES:  Because I think for those of us

24  on the outside looking at what seems to be a very good

25  program, given the issues that had arisen amongst several

1   of the inmates -- I think there are 261 who requested --

2   who are transgender and requested to be moved, and

3   understanding what sort of problems they were facing

4   being -- considering themselves female and being in the

5   male institutions.  That would be horrendous, as we're

6   hearing reports about men coming into the women's -- who

7   are still anatomically men coming into the women's

8   institutions and being in the, you know, the showers

9   together, and all of that.

10          So it will be important, I think going forward,

11  that that is addressed, and it's addressed very upfront

12  so that we aren't in the position, as legislators, to

13  continually deal with what may be accurate or inaccurate

14  information.  Because I think our job, especially with

15  Corrections and Rehabilitation, is to ensure that

16  restorative justice, which we are all very strongly

17  behind, is what is really happening in our facilities,

18  and that is the commitment I think most of us who are

19  here and have been here, coming up to this point in time,

20  want that to be the message.  The mission and the

21  message.

22          Another question I have dovetails on the

23  question about COVID.  I know that during that time, you

24  were not able to have in-person, rehabilitative programs

25  going on, and that was questioned as to whether we're

1    really getting to the heart of the rehabilitation

2    programs that individuals who are incarcerated really

3    need so they can get on the path of recovery and get back

4    into society and opportunities there, to, you know, have

5    a real life.

6         Have you been able to reinstitute -- with the

7    vaccination program, reinstitute the rehabilitation

8    programs in person to person, and being able to assess,

9    analyze what particular area a particular individual

10   would be best suited for?  I'm thinking about those who

11   are in because of substance use, abuse, and what path

12   that put them on, unfortunately; others who may have

13   significant levels of abuse in their life at every level

14   who, you know, need to have a nurturing environment, one

15   that provides the education they didn't receive, should

16   have received, but certainly we failed them on that front

17   also.

18        So give me some thoughts about whether you're

19   able to begin that program, and what is going on in terms

20   of something that we can have results from, and we have

21   measurable results from.

22        MR. MACOMBER:  Great question.

23        Yes, we are following what we call a roadmap to

24   reopening, which is a phased approach.  As COVID cases

25   involving our incarcerated population go down, we

1    increase our programming level.  So those facilities that
2    are at phase three are able to resume full programming,
3    with the caveat that in certain areas, such as education
4    classrooms, we have to follow social distancing
5    requirements.  So in those areas, we will address that by
6    having classes on different days of the week.  We also
7    substitute in-class work for what we call packet
8    programming.
9            I know you had also referenced substance abuse.
10   We do have just over 10,000 of our population that are
11   now in medicated-assisted therapy.  And we have just over
12   6,000 attending cognitive behavioral therapy tied to
13   substance use disorder.  We're really hoping to resume
14   full, in-person programming, full, in-person visiting, as
15   soon as the guidance from CDPH and Centers for Disease
16   Control allow us to go back to our full capacity levels,
17   because we share the same concerns of ensuring our
18   population, when they leave our facilities, are prepared
19   with the right education, the right job skills, and
20   substance free.
21           SENATOR BATES:  Thank you, and I think for those
22   of us in the Legislature, it would be great to have some
23   of those numbers when they start to appear.  Good news
24   stories are really, really important, as we look at the
25   budget and we replace those resources, especially in the

1    Department of Corrections and Rehabilitation.

2           Thank you for those responses.  There's still a

3    lot that has to be, I think, rectified in terms of the

4    messages that are out there.  So I applaud you heartily

5    for your commitment to this particular agency and its

6    mission.

7           I will be abstaining today until we have some

8    more -- a substantive report on addressing these

9    concerns, especially with the safety of women and how

10   they're feeling, because some of those are pretty graphic

11   in terms of the concerns they have.  But, again, know

12   that I feel, after reading your resumé and seeing the

13   years of service, very, very impressed, and will just

14   reserve my vote and my judgment for a little while

15   longer.

16          I would like to go to Ms. Barretto now.  And

17   what I noticed on the org chart here, Ms. Barretto --

18   and, again, congratulations to you.  Again, you know how

19   I feel about what the two of you have done in this very

20   important mission, and I applaud you.

21          But I notice that under your administration

22   responsibilities in this box -- my goodness, you have a

23   lot of things to oversee, but one that caught my eyes was

24   human resources deputy director is vacant.  Is that

25   accurate at this moment in time?  The issues that have

1   come out are really about human resources, and whether

2   they are effective in the prison system with inmates and

3   staff, and some of the -- what we call the toxic work and

4   living environment.  That's what it seems to be all

5   about.  So is that accurate, and is that falling on your

6   shoulders, or do you have someone you're working with at

7   the moment to address that issue?

8         MS. BARRETTO:  Thank you, Senator.  We do have

9   our Deputy Director of Human Resources position.  It is

10  now filled.

11        In partnership with Human Resources and our

12  Office of Training and Professional Development, our

13  Office of Civil Rights, we have a full committee that's

14  been working on various training initiatives to address

15  the stress environment that our peace officers encounter

16  as members of law enforcement, as well as addressing

17  diversity, equity, and inclusion for all of our staff.

18  We have a very robust training program that has a number

19  of building blocks that addresses wellness, it address

20  upward mobility, things such as our desert waters that

21  provides training for our staff on stressors that occur

22  in the work environment, and how best to hope and address

23  those, as well as address resiliency.  Really excited

24  that we're moving forward with active bystandership for

25  law enforcement as a training that will really help our

1    law enforcement professionals with deescalation
2    techniques, how to defuse potentially unwarranted
3    encounters, and overall wellness for the staff.

4           All of our staff in Corrections receive training
5    on diversity.  We've also been doing implicit bias
6    training.  So we've really been looking at all the
7    different avenues between human resources, wellness,
8    training, civil rights, to have a really well-developed,
9    wraparound training approach for our staff.

10          SENATOR BATES:  Very good.  Well, it is
11   important in terms of the next question, the workforce
12   recruitment, because we know that with the prison
13   closures, that perhaps the jobs that are currently there
14   will be challenged, and, certainly, recruiting new folks
15   to that will be an issue.

16          I know the prison closure issue will most likely
17   be addressed by another one of my colleagues.  But what
18   are you doing in terms of protecting the jobs that are
19   there on the potential closures, and how do you recruit
20   new folks when you are basically laying off existing
21   staff?  Because that would be critical in terms of the
22   programs that are so essential for rehabilitation, and
23   then addressing some of these issues between inmates and
24   staff.

25          MS. BARRETTO:  For our staff with the prison

1   closures, we have worked very closely with the staff and

2   the management of those locations.  Our goal is to help

3   all of the employees find continued employment with us.

4   Unfortunately, in many situations, there may not be

5   enough of the same job classification for all of those

6   employees in the same county, but we do have a vacancy

7   for all staff outside of their counties, understanding

8   that that would then mean that they are, perhaps, moving

9   from their communities.  But it is our goal to help them

10  with finding employment.  We've been successful doing

11  that, working with our labor organizations and with the

12  staff, and we're committed to continuing to do that.

13        At the same time, we are constantly recruiting

14  for various positions.  Our department spans the entire

15  state.  We have nearly every bargaining unit.  We have

16  nearly every trade and classification, and we're often

17  faced with recruitment challenges for certain locations

18  and certain jobs.

19        The way we mitigate that is, we have a very

20  robust recruitment team.  Each institution has trained

21  recruiters.  We have recruitment through our headquarters

22  as well.  We do focused recruitments for both peace

23  officer and non-peace officer classifications.  We're

24  using social media platforms.  We're partnering with

25  community colleges.  We've updated all of our

1    communication strategies with our Internet web pages.

2    And we also do a lot of focus on diversity recruitment.

3    We're doing focused recruitment for veterans, for women,

4    for LGBTQI communities, and really partnering with all

5    the different diversity that our state represents, and

6    doing our best to recruit for all of those various

7    classifications.

8              I think the biggest thing is sharing that we are

9    a department that is -- that's supportive of staff, is

10   supportive of training and upward mobility, and really

11   getting that continued word out as we have been.

12             SENATOR BATES:  Well, I think bottom line on all

13   of this is the communities that rely on the prisons being

14   an economic resource to the community as a whole is

15   something that really needs to be dealt with in a very

16   sensitive manner.  To undermine an entire community of

17   economic well-being is of great concern when it happens

18   without adequate notice and planning.  So bear that in

19   mind.  That's something that we're looking at very

20   carefully and probably were quite disappointed with the

21   last closure, which, I guess, has been intercepted by the

22   legal system.

23             With that, again, thank you absolutely from the

24   bottom of my heart for your commitment to this.  You look

25   like you might have started when you were 10, because you

1    are so -- so beautiful, frankly.  So, anyway -- and Zoom

2    doesn't always do the best for folks who are under the

3    pressure of one of these interviews.  But congratulations

4    again for your nomination, and I will be withholding at

5    this point in time, because some of these need a deeper

6    dive and maybe more conversation, and I apologize because

7    I didn't have time in my schedule to do that prior to our

8    meeting today.

9            So thank you again, and wishing you the very

10   best as you go forward with your plans to make a change.

11   Thank you.

12           MS. BARRETTO:   Thank you.

13           CHAIR ATKINS:   Thank you, Madam Vice Chair.

14           Senator Grove.

15           SENATOR GROVE:   Thank you, Madam Pro Tem.

16           Thank you both for being here today.  I

17   apologize that I didn't get a chance to talk to either of

18   you before today; but I read a lot about you, and I think

19   both of you are very qualified for this position.  And I

20   appreciate you accepting this challenging position that

21   you guys both find yourselves in.  I think there's been a

22   lot of Rules appointments where -- I can speak for the

23   dais -- where we're, like, *Wow!  We would never want that*

24   *job.*  So -- but -- So I thank you guys for that.

25           I do have a couple of questions.  You know, in

29

1   the real world, I'm a business owner.  We do a lot of

2   recruiting.  Ms. Barretto, you mentioned that you're

3   doing recruiting on social media, (unintelligible)

4   focused recruiting, all those things.  How is that going?

5         MS. BARRETTO:  Thank you for the question, and

6   always interested in any additional tips and support from

7   professionals with recruiting, Senator.  So thank you.

8         We're seeing a good presence there.  We're

9   getting good response; we're getting good interest.  We

10   know that social media platforms is really the next step

11   for the next generation of the workforce; so, we're

12   ensuring that in our recruitments, we're using those new

13   methods of recruiting, along with the traditional, so we

14   can maximize the full workforce.

15         We're seeing steady progress.  It's new.  We're

16   continuing to evolve with it.  We're continuing to look

17   at the best practices in that space, and we are eager to

18   do more.

19         SENATOR GROVE:  When you combine what you're

20   doing with social media -- thank you for answering that

21   as well.

22         When you combine what you're doing with new

23   technology and social media, and how we recruit -- I

24   don't want to say the younger generation, but, obviously,

25   younger than I am.  You know, people don't look at the

1    newspaper anymore, and those kinds of things.

2         Do you find -- Do you find fewer applicants than

3    you did in, say, 2019?  The only reason I ask that is we

4    did a briefing last week, or when we were off -- a couple

5    weeks ago when we were off, in 2019 we were averaging

6    about -- I'm just giving you an example -- 285

7    applications a week; 2020, it went to 12 applicants a

8    week; and now it's 40 applicants a week, 46 applicants a

9    week.  And out of that, when you think about the

10   requirements that we have and the requirements that I

11   think you would have, you would lose a tremendous amount

12   of that percentage rate, because, you know, drug testing,

13   valid driver's license, criminal history, just any

14   background checks that you do to be a CDCR officer.

15        Do you -- Do you find your application base is

16   lower than it has previously been?

17        MS. BARRETTO:  Well, our application base

18   overall -- It depends on the classification, but as I

19   understand your question as it relates to peace officer

20   classifications, we did see a slight decline this past

21   year, similar to what other law enforcement agencies have

22   been reporting.  But we've been able to mitigate that by

23   doing additional recruitments.  We're partnering with DMV

24   and EDD, and doing additional recruitments with them.

25   We've got billboard marketing.  We're looking at all of

1   the different areas in which we need to recruit and what

2   the best approach is for the particular geographic

3   location.

4          For our other classifications, we do see some

5   areas where we're having an increase in applicants and

6   other areas where we're having a decrease, similar to

7   what is happening in the workforce overall.

8          SENATOR GROVE:  Thank you.  And once this

9   applicant is approved or applies, what's the process?  I

10  mean, I know that -- Does CDCR have the similar process

11  like regular police officers?  Do they go through some

12  type of academy, some type of training program?  Is there

13  a process, and what's the length of that process?

14         MS. BARRETTO:  Yes, we do have a process for law

15  enforcement positions.  There's a written examination;

16  there's a physical fitness test; there's a thorough

17  background, psychological evaluation.  And upon

18  successful completion of those components, then there's

19  our basic correctional officer academy, followed by

20  on-site mentorship that we're really excited is starting

21  off this year -- I appreciate the support of the

22  Legislature in that regard -- where our new officers

23  arrive at an institution, and they're assigned to a

24  mentor that continues with that training to ensure their

25  success.

1          SENATOR GROVE:  So I'd like to switch, if I

2   could, to -- to Mr. Macomber.  Do you pronounce the "B,"

3   sir?  I apologize.

4          MR. MACOMBER:  Muh-COM-ber.

5          SENATOR GROVE:  Macomber.  Sorry.  I apologize

6   for that.

7          Thank you, Ms. Barretto for answering those

8   questions.

9          Based on the information that I just got from

10  Ms. Barretto, my curiosity piqued me.  These were not in

11  my line of questions.  I was not going to ask these

12  questions until the former Secretary asked a specific

13  question which made me think about this process, only

14  because in the private world, it's kind of like right up

15  my alley, if that makes sense.

16         So based on all that, in your recruitment time,

17  especially for the peace officer portion, which I'm

18  assuming is the guards, for layman's term guards, people

19  that actually actually do the protection, or the guards,

20  in the system.  You had said earlier that 53 percent of

21  the staff, including the guards, are vaccinated -- or

22  not -- are vaccinated.  53 percent.  My colleague that

23  used to be the former Secretary would like that number to

24  be higher.

25         My question is, is that -- I'm just going to be

33

1    honest.  I got people calling me left and right, and

2    several of them are firefighters, teachers, nurses, and a

3    lot of them are CDCR guards.  What happens if -- I mean,

4    do you have enough backup that have already been through

5    the training academy, skilled, trained professional

6    people that could take these positions if mandates are

7    required and you lose staff?

8              (Overlapping speakers.)

9              MR. MACOMBER:  I'm sorry.  I interrupted you

10   Senator.  I apologize.

11             SENATOR GROVE:  No.  That's okay.  Totally fine.

12   I shouldn't have spoke over you.  I apologize.

13             MR. MACOMBER:  To answer the question, if we're

14   faced with a situation where we have insufficient staff,

15   we have staffing plans for each institution to run at

16   reduced levels, sometimes called *First Watch Plans*; so,

17   we're able to still run essential services to the

18   population, meaning things like feeding, and healthcare,

19   showers, and things along those lines.

20             You know, right now, vaccines are not mandatory

21   throughout the prison system, and so there is the ability

22   right now for us to work within that current California

23   Department of Public Health order.  But we do maintain

24   plans and are prepared, should we need to implement those

25   plans.

1          SENATOR GROVE:  Thank you.  That's good to know.

2    I'd like to make sure there's not additional prison

3    closures because we can't find individuals to work in the

4    prisons that choose not to get vaccinated.  So that's a

5    separate question.  I wasn't even going to ask that

6    question until it was brought up earlier.

7          I do have questions about prison closures, and

8    I'm not particular about who answers it.  Either one of

9    you can take a shot at it, or both of you.

10          Based on count from CAL FIRE today, there are 18

11   fires in the State of California.  One of them has

12   consumed over 500,000 acres, the Dixie Fire in Northern

13   California.  How many fire camps that are associated with

14   CDCR, fire training facilities, fire camps -- I don't

15   know what the legal term is called.  How about we start

16   there.  What's the legal term for fire training

17   facilities for inmates?

18          MR. MACOMBER:  *Conservation camps, inmate fire*

19   *camps,* are some of the terms we utilize.

20          SENATOR GROVE:  Okay.  So how many of those

21   conservation camps have closed or are up for closure?

22          MR. MACOMBER:  So approximately, I think, a

23   little over a year ago, we closed -- I believe it was

24   five firefighting camps due to the declining eligible

25   incarcerated population.  We were struggling to get the

1    numbers we once did, so we're running a tremendous number

2    of vacancies.

3            As a result of the potential closure of the

4    California Correctional Center, the camps that are tied

5    to that facility will all be transferred to Sierra

6    Conservation Center.  So we do not plan on closing camps

7    as a result of the California Correctional Center

8    closure, if that makes sense.

9            SENATOR GROVE:  Okay.  I ask that for two

10   reasons.  Number one, there's so many fires in the State

11   of California, and I can tell you that -- you know, our

12   family owns a (unintelligible) ranch property.  And I got

13   a text from my husband one day, and he goes, *There's a*

14   *fire at the ranch.*  About 30 minutes later he said, *The*

15   *ranch is on fire.*

16           I left Sacramento and I went there, and when I

17   got there it was really amazing to me how -- again, I

18   don't know the legal term for them, but the inmate crews

19   or the crews that came from CDCR which -- you know, with

20   the shovel, the pick, you know, the breaking line at

21   night, how they worked so well with CAL FIRE and the fire

22   department there, as a cohesive team, to eliminate the

23   fire.  I saw it firsthand, being there, obviously,

24   because of the property.

25           And then I talked to some of 'em -- of course

1   I'm going to start talking to a lot of 'em.  And I talked

2   to 'em, and I asked 'em if they had heard -- you know,

3   *Why did you take this class?  Why do you want to be here?*

4   They talked about how it's beneficial in reduction of

5   sentence time, and they also talked about the skill set

6   they would have when they leave so that they could

7   actually have skills to help them stay out of prison, to

8   help them to have a job to provide for their families,

9   because, in reality, that's all they really want to do

10  when they get out, a lot of them.

11          So what are you doing, or what's the facility or

12  CDCR doing if these training conservation camps, which

13  would get these individuals the training -- obviously,

14  it's hard work -- but training to be able to work in this

15  type of environment, and, you know, be able to provide

16  for their families.  So what's the substitute?  If we're

17  not going to train them to fight fires when we need

18  firefighters, obviously, everybody is on the Legislature

19  about resources, and there's not enough (unintelligible),

20  there's not enough firefighters, there's enough anything.

21  That's why they can't put -- the containment on these

22  fires is so low.

23          What's the substitute training so that -- you

24  know, you can't train them to flip burgers.  They can't

25  raise their family on that.  So what's the substitute

1   training that you're offering for individuals to help

2   reduce recidivism, if that's a -- That's a long question,

3   but I hope you get the gist.

4           MR. MACOMBER:  That's a great question, because

5   we -- I have the same concern.  We always want to ensure

6   individuals that are releasing back to the community are

7   equipped with the resources to be productive.  Usually

8   that means we want to make sure you have a high school

9   diploma or a GED.  We do have a large number of our

10  incarcerated population now enrolled in community

11  college, and we actually have some pilot programs where

12  we recently saw -- I think about ten of our population

13  got B.A. degrees from Cal State Los Angeles, which we

14  were very pleased about.

15          So we look to do not only education, but we have

16  career technical education courses that run the whole

17  gamut.  It could be auto body repair; it could be

18  automotive mechanics; it could be the suite of Microsoft

19  products and learning that computer process.

20          So we look at the jobs that people in the real

21  world are going to need, and we try to target our

22  education classes to line up with those needs so when

23  they release, they actually have -- are releasing with a

24  skill.

25          I know you also brought up not training as many

1    firefighters, which our camp population is down, but I do

2    want to recognize that we are in the process and have

3    implemented Assembly Bill 2147, which actually allows

4    some of our incarcerated population that's doing that

5    great firefighter work to go back and have their record

6    expunged, which will allow them to apply for firefighting

7    jobs in the community.  So we think that's a great step

8    in the right direction.

9         SENATOR GROVE:  That's very good.  Thank you for

10   that response.

11         Because of something that was just said, I want

12   to go back to the vaccine question.  You said 70 -- when

13   you were speaking, Mr. Macomber -- 70-what percent of the

14   inmates are vaccinated?

15         MR. MACOMBER:  I believe it's 74 percent.

16         SENATOR GROVE:  74 percent?  So -- how about I

17   just skip that question.  I'll skip that question.

18   Sorry.  I'll skip that question.

19         Well, I really am glad that you have an

20   alternative program to be able to, you know, help people

21   succeed outside of the prison system.  I think the most

22   important thing that -- I think the best solution to

23   poverty is a job, the best solution of poverty, best

24   solution to self-respect, dignity, providing for your

25   family is a job.  My huge concern is that without this

1    training, there will be minimal jobs available for

2    individuals who are -- will be previously incarcerated.

3    But I do thank you for explaining to me that you do have

4    additional training so that they can be successful

5    outside of the prison system.  So thank you very much.

6           Thank you both for answering my questions.  I

7    really do appreciate it.  And, again, thank you for being

8    willing to take on this position, especially during a

9    COVID situation where you have limited -- you know, I

10   mean, basically you just have limited facility space.

11   And when rules go into place about social distancing and

12   things like that, which, you know, are necessary to keep

13   people safe, I think that may be very difficult.  I mean,

14   it was difficult for us here in the Senate, I guess you

15   would say.  You know, we have limited space.  We had to,

16   you know, put things in place.  So it is -- it is very

17   difficult, and I thank you guys for being willing to

18   pursue this position in this career in these troubling

19   times, or trying times that we have.  So thank you for

20   letting me ask those questions, and I wish you both the

21   very best.

22           MR. MACOMBER:  Thank you.

23           MS. BARRETTO:  Thank you.

24           CHAIR ATKINS:  Thank you, Senator Grove.

25           Senator Kamlager.

1          SENATOR KAMLAGER:  Thank you, Madam Chair.  And

2   thank you -- I do like going last, because folks ask so

3   many of the questions that I had listed.

4          I want to thank you both for spending time out

5   of your day yesterday to talk with me.  And I thought we

6   had some very good discussions, very honest, which I

7   always appreciate.  And I have to say, to echo the

8   comments made by our Vice Chair, I have incredible

9   respect for those who commit the kind of time and years

10  that you have both committed to this profession and to

11  this system.  It has -- You have probably seen

12  herky-jerkiness of all sorts.  So the fact that you all

13  have stayed the course I think speaks volumes to the

14  change that you're trying to see happen.

15         I also believe that both work and punishment --

16  that neither should be bereft of humanity or dignity, and

17  I think oftentimes with the questions that we ask in

18  Rules related to CDCR positions, it's, you know, how to

19  find and how to get assurances that folks are thinking

20  about ways to run an incredibly complicated and large

21  system, and making sure that we are inserting humanity

22  and dignity in both how incarcerated folks are treated,

23  but then also how folks are treated who are actually

24  going there every day to do the work.

25         I have questions for both of you.  I'm going to

1    ask a question, and I think both of you all can answer

2    it.  And it would be great if you could just answer it

3    based on your jurisdiction and the -- your

4    responsibility.

5            And I know for Mr. Macomber, because you're

6    going from admin to administration you probably -- from

7    admin to operations, you probably have all sorts of

8    perspectives that you could share.  But I think -- it's

9    like A and B, nice little thing.

10           So the mission statement for CDCR, which you

11   kind of never really read the mission statements for

12   these departments, but I did, and I had to come back to

13   it, because each of you, in your responses, kind of

14   talked about how culture change is hard, and how there

15   are some folks that really don't believe in

16   rehabilitation, in the *Rehabilitation* in CDCR.  You both

17   also mentioned that there are a lot of really good

18   committed people that are working and doing their best in

19   the system.  And of course that number is not

20   100 percent.  To be fair, that number is not 100 percent

21   anywhere.  But just wanted to hear from you, because I

22   also believe that training doesn't work without buy-in,

23   without modeling, and you both did talk about training.

24           So just would love to hear your thoughts again

25   about how does the mission change get activated when

1    there are dissenters that are in the ranks that are on

2    the ground, given the really complicated and dangerous

3    tasks in some instances that you all are forced to

4    manage.  It's a slow process, I've been told.  It can be

5    a painful process, I am told, but ultimately it's still

6    really important.  The feds tell us we have to make

7    change.  Legislators tell you you have to make change,

8    and probably within your own internal sessions you know

9    about the change you need to see to keep your employees

10   safe and happy, to retain them, to recruit new folks into

11   the system who are going to help make the system active

12   and, ultimately, to do right by what the charge is.

13           So can you both sort of talk about it from your

14   own perspectives, how you activate the mission, given the

15   fact that you do have folks that are not really

16   interested in it.

17           MS. BARRETTO:  Certainly.  I can start this one,

18   Jeff.

19           Senator, you're absolutely right.  Each time we

20   make a change, each time that we're moving forward, there

21   are always going to be some staff that are not on board,

22   and there will also be staff that are early adopters and

23   who help us make the change happen rather swiftly.  We've

24   seen that in our history.  We've seen that in recent

25   history.  I, myself, have seen it personally.

1          I was in the Department -- I've been here for

2     some time, but was here when we made the switch from CDC

3     to CDCR.  And at that time, there were staff that were

4     absolutely on board and eager to see our transformation

5     happen, and there were some that were, quite frankly, not

6     on board.

7          We have staff that have been with us for many

8     years.  We have staff that sometimes have difficulty with

9     change.  But what I have found is the majority of our

10    staff are eager for the additional changes.  They see

11    great value in what we're doing.  It gives them great

12    hope in what we're doing by rehabilitating the population

13    and helping them to succeed.

14         I think staff are really supportive of all the

15    training and wellness initiatives that we're doing, and

16    we can see that by their support by joining us as

17    ambassadors for our Government Alliance of Race and

18    Equity teams that are at each institution.  We have over

19    100 staff that have volunteered to help us communicate

20    with their peers what we're doing with diversity, equity,

21    and inclusion.  We can see it by the ambassador program

22    for the integrated substance use disorder treatment

23    medicated-assisted therapy program, where we have staff,

24    over a thousand of them now, who are out there

25    campaigning for that program.

1          So the best way for us to make a culture shift
2   is leadership, and that is happening with various
3   leadership trainings.  We have a leadership development
4   training program that we have contracted out with
5   experts.  We're using our U.C. systems and our college
6   systems to help us with facilitating various trainings in
7   that space, and also using the staff, the folks that are
8   doing the day-to-day work, having them on board with
9   where we're headed, and communicating that to their
10  peers, as well as having a message from central office
11  and from local leadership of why are we doing this.
12          I think that's an important thing that we've
13  really been focusing on in recent years, is explaining
14  why it's important; why are we doing rehabilitation; why
15  are we focused on your wellness?  We're doing these
16  things because it's going to help California to be safer;
17  it's going to help those that are going back to their
18  communities to be productive citizens; and it, quite
19  honestly, helps us to be a better employer.
20          So with that, I'll turn it over to my colleague.
21          MR. MACOMBER:  Jen, you had some great comments
22  there.  And I think I may have talked to you about this
23  when we had our conversation, Senator, but I'll tell a
24  story.
25          When I was a warden, I used to meet with our

1    in-service training classes each week, and often one of
2    the first things I would bring up is rehabilitative
3    programs, whether we should expand or not.  Usually I had
4    one individual that would tell me, *No, we should not*
5    *expand,* and I would ask why, and it's -- *Well, more*
6    *people out is concerning.*
7           And then I would ask the question:  How many
8    incidents do we see in our classrooms and our career
9    technical education classrooms?
10          We had a computer classroom, we had a Prison
11   Industry Authority laundry facility.  And I knew the
12   answer, of course.  We had none in the last year;
13   whereas, the folks that may have not had their turn come
14   up to be in an education slot, who spent the day on the
15   yard, we were having incidents every day.
16          So I like rehab programs, number one, because it
17   gives the population something constructive to do.  We
18   want folks to -- and the vast majority of our population
19   releases at some point.  We want them to release with the
20   tools to be successful.  We do not want folks coming back
21   with a higher recidivism rate, you know, going back to
22   the community and cycling in and out of prison.  Our job
23   should be to fix those individuals.
24          I think you had a good point about how do you
25   get staff to buy in.  And I did have the opportunity to

1    go to Valley State Prison this past Monday, and I talked

2    to some of those individuals, and one of the individuals

3    is one of the counselors that's coordinating some of our

4    youthful offender program, and where we're kind of

5    targeting our primary Norway model initially is at that

6    facility.  I asked him, I said, you know, *Did you always*

7    *have a passion for this, to push youth to better*

8    *themselves and understand the benefits to you and others*

9    *of the program?*

10          He said, *No, I didn't.  I had to go to a class,*

11   *and I saw what was possible and took it back to this*

12   *institution, and I started implementing it.*

13          It resulted in not only the inmate population

14   de-stressing, but it also resulted in the staff's stress

15   level coming down, which is part of the key component of

16   that Norway model.  It's not just about, you know, the

17   incarcerated population, but it's how the staff interact

18   and can do so in a less stressful environment, and maybe

19   more friendly but not overfamiliar environment.

20          So we need to make sure staff understand that

21   they can benefit from some of these programs as well.  We

22   need to do a good job of getting that message down to

23   make sure it's not watered down as it comes down from

24   myself, from Ms. Barretto, until it gets down to that

25   line correctional officer.  We need to make sure that

1    message, like I said, doesn't get watered down and is a

2    strong message.

3            SENATOR KAMLAGER:   Yeah.   Thank you for that,

4    and thank you for talking about staff and what they need

5    to hear, because my next question kind of relates to

6    that, and it's about AIMS, the AIMS process.

7            And from what I've been reading, folks don't

8    have a lot of confidence in the process right now.   It's

9    kind of a cluster.   But that's a problem, because it's

10   really hard for you to have stalwart allies when people

11   read in the news about staff committing suicide, around

12   sort of bullying and intimidation by staff to other

13   staff.   It's hard when you hear about the sexual assaults

14   that are happening.

15           You know, I'm deeply concerned about not only

16   our LGBTQ communities that are incarcerated, and the

17   safety of them, but also the staff and folks who are

18   heterosexual.   There's an uptick in male rape that's

19   happening, not just in our prisons but also in our jails.

20   And it's really hard when staff and folks who are

21   incarcerated feel like a complaint process is not really

22   designed to solve problems to deescalate the challenges

23   that you face.   So lots of challenges, lots of

24   shortfalls.

25           In your opinion, from each of your perspectives,

1   how do we improve upon this system or -- I don't want to

2   say scrap it and develop a new one, but how is it that we

3   can have a system that engenders some trust and

4   confidence from all of its users?  Because if people

5   don't use it, it's not going to work.  And if people feel

6   like it's Swiss cheese, they're not going to use it and

7   it's not going to work.  And then you're going to have to

8   come up in front of us again, and people are going to get

9   saltier and saltier about why things aren't working.  But

10  you all have been here for a really long time, so I have

11  to believe you have some ideas.

12          MS. BARRETTO:  Senator, thank you for this

13  question.  You bring up some valid points.

14          With our staff -- First to talk about our staff,

15  we have a zero-tolerance policy for any discrimination,

16  retaliation, or bullying; and we have a well-developed

17  system of informing staff of that requirement.  They're

18  trained on it annually.  The supervisors are trained on

19  their obligation to report, and we have trained EEO

20  counselors and coordinators throughout every institution.

21  Staff know who they are.  There's picture boards

22  available to know who they are, who to go to if you're

23  encountering those situations.  Staff are made aware of

24  how they can file within the Department or outside the

25  Department with Equal Employment Opportunity Commission

1    or Department of Fair Employment and Housing.  So we do a

2    lot in that area to make sure that our staff are safe.

3            As it relates to AIMS, it was not our intent to

4    build a system that needed improvement.  We are finding

5    there's a number of areas that require improvement in

6    that system.  We're committed to doing so.  We took in

7    all of the information from the Office of Inspector

8    General report.  We took in all of the comments made by

9    other stakeholders, including the Legislature and

10   plaintiffs with some of our class-action lawsuits.  We've

11   taken a hard look at that, and we've started making some

12   immediate adjustments.  Those include --

13           We're in the process of implementing all

14   allegations made by the incarcerated population that are

15   related to any type of use-of-force, or PREA.  They will

16   leave the institution and go to our Office of Internal

17   Affairs allegation inquiry management section.  That's

18   something that was supported in the budget process, and

19   we appreciate that support.  And we're gearing up to

20   implement that change this fall.

21           We're also implementing a centralized screening

22   team.  We recognize the need for it to be an independent

23   review of each grievance that's submitted at the local

24   level at the institution, but it needs to leave the

25   institution purview and go to a centralized independent

1   office to evaluate it for any allegations of staff

2   misconduct so that it can be properly assigned so that we

3   can track it, so we can have data and metrics to identify

4   any hotspots.  And we are working towards the goal of

5   having that implement beginning as soon as January this

6   year.

7          These are some of our initial steps that we're

8   taking.  We're also implementing a staff allegation

9   tracking system that will allow us to have a

10  technology-based solution for us to have an automated

11  tracking system.  So start to finish with a staff

12  misconduct complaint, we can track all of the different

13  components to it, again, for us to help -- to better

14  evaluate any hotspots to evaluate any trends, and with

15  the overall goal of keeping the population safe and the

16  staff accountable.

17         Not all of our staff make bad decisions, but

18  when staff do make a bad decision or violate a policy, it

19  is absolutely our requirement and our expectation that

20  they're held accountable to that.

21         MR. MACOMBER:  I'll jump on as well.  I think

22  Ms. Barretto gave a great, comprehensive answer, so I

23  won't repeat what she's already said.

24         I will add a little PREA components.  We do have

25  a robust staff training plan relative to PREA and the

1   reporting requirements and their requirements.  We're

2   also very encouraged about recent funding we received to

3   put in not only fixed cameras, but also implement

4   body-worn cameras at six institutions, which I think will

5   definitely help in this arena.  We also have a robust

6   auditing process where actually other states come to

7   California and audit our PREA process.

8           So I think we have the right tools in place, and

9   I think we're going to continue to advocate for more

10  cameras.  I think that's a big piece.  We did see

11  decreases in PREA complaints when we did install cameras

12  at Central California Women's Facility; so, I think

13  that's a big piece of that puzzle.

14          SENATOR KAMLAGER:  Thank you for that.  Thank

15  you both for that.

16          I want to follow up with you, Mr. Macomber.  You

17  mentioned the body cameras.  So how do you ensure that

18  they're not turned off during key exchanges?  I mean, how

19  does that work, because my understanding is that the --

20  reviewing the footage is complaint driven.

21          MR. MACOMBER:  That's correct.

22          SENATOR KAMLAGER:  So, like, if I know I'm going

23  to have a jump-off, I might turn the camera off, you

24  know.

25          MR. MACOMBER:  That's a great question.

1          When staff turn the camera off, they should be

2     stating the reason why, and staff at those facilities

3     that have implemented body-worn cams have all received

4     training on when it's appropriate to turn a camera off.

5     Obviously, things like using a restroom, while they're

6     doing a healthcare appointment -- escorting a healthcare

7     appointment for a member of the incarcerated population;

8     if they're doing an unclothed body search of an

9     incarcerated individual, that would be a time when you

10    turn it off.

11         And the incarcerated population knows when those

12    cameras are on or off, because there's a light that shows

13    whether it's on or not.  So it would be a red flag,

14    clearly, if there was an incident and that officer did

15    not have their body-worn camera activated, which is why I

16    think it's important not only that we have the body-worn

17    cams, but we have those fixed cameras as well that help

18    give us the full picture of what's going on.  So I think

19    that's a great question.

20         SENATOR KAMLAGER:  Thank you for that.

21         I just have one final question, and I --

22    Ms. Barretto mentioned we want to prevent people from

23    making bad decisions.  I think bad decisions happen all

24    the time.  It's just a part of life.  How we learn from

25    them is the thing, which I believe that's what you are

1    also sort of suggesting.  So it's not necessarily the bad

2    decisions that I'm interested in.  It's some of the

3    predatory decisions.

4             The reason why I stay focussed on this issue is

5    because a friend of mine, his son was a correctional

6    officer.  And, you know, it's deeper than him not feeling

7    safe, because he's not with us anymore, and that's really

8    important to me because he was a young man with a family

9    and a bright future.  And then I also know someone who is

10   incarcerated who was recently sodomized multiple times

11   just in one day.  So while he is incarcerated because of

12   a crime he committed, he certainly doesn't need to be

13   treated like that.  So I think about those people when

14   I'm before you or anyone else asking questions as it

15   relates to CDCR.

16            My last question is really for Mr. Macomber.  We

17   chatted about this in the closure of DJJ.  I just wanted

18   to know if you could share your thoughts on how that is

19   going, and also how we can be partners with you and CDCR

20   in making sure that this happens in a way that is

21   productive, constructive, and ultimately successful,

22   because it's a huge endeavor, right?  There are 58

23   counties.  You did share that there's a plan in place,

24   but, you know, plans on paper are very different from

25   what's going on in the real world, and we certainly, you

1    know, want this to come out okay.

2           Is there anything you can share with us, sort of

3    what you're seeing, and how we can be partners with this?

4           MR. MACOMBER:  Of course.  We're actively

5    working with the counties and CPOC as well on this

6    transition.

7           As you mentioned, we have 58 different counties

8    that may have 58 different ideas on how to implement --

9    excuse me -- this transition.  We are committed to having

10   a plan in place to how we're going to safely and fairly

11   go through this transition.  I believe the deadline for

12   that is January.  That was a report that was due to the

13   Legislature.

14          We're also very much struggling right now.  You

15   have not only staff, but you have the youth that are

16   aware that facility is closing; so, there's a lot of

17   confusion and uncertainty for those folks.

18          I'll start with staff.  Knowing that DJJ is

19   slated to officially close in June 2023, a lot of staff

20   are right now looking for the next opportunity.  They

21   don't want to face layoff.  They don't want to be at the

22   end of the line when it comes to finding a new job; so,

23   we're seeing folks being proactive.  So we're trying some

24   creative options to do some early transfer processes

25   where we will guarantee a spot in an adult prison for

1   those correctional peace officers, and we're looking at a
2   similar process for other staff within DJJ.
3           I think most importantly is the youth.  We want
4   to make sure that we're still able, through the closure
5   date, to provide services for those youth, that we're not
6   losing teachers and, you know, healthcare workers, and
7   correctional staff that won't allow DJJ to continue its
8   mission until it closes.  We will obviously have to
9   slowly start lowering that population down.  You
10  mentioned -- A comment on the plan you made I thought was
11  a good one, and that plan is going to have to be
12  flexible, because we may lose staff at a rate that we
13  don't anticipate, or we may not.  So we are going to have
14  to be able to adjust as we go.  We have, right now, four
15  DJJ sites, and we look forward to producing a plan, and
16  we look forward to partnering with the Legislature and
17  our other stakeholders to ensure this is successful.
18          SENATOR KAMLAGER:  Great.  Thank you for that.
19          I know my colleague from Kern had a question and
20  she said she wasn't going to ask the question about the
21  COVID.  Also, I said that was my last question.  That
22  will be my last question, but I do just want to leave
23  you, since I know this was -- a number of questions
24  around COVID and vaccinations were asked by my
25  colleagues.  There was an article in the news this week,

1    and the headline reads:  *Correctional Officers Are*
2    *Driving the Pandemic in Prison.*
3          So I hope that you encourage folks to be safe,
4    to get vaccinated, if they can, because you are in
5    facilities where the ventilation is not so hot, where
6    there still is congregate care, and where staff are at
7    risk.
8          I just hope that we're able to do the things
9    that we need to do to get in front of these kinds of
10   articles that are coming out in the news, because you
11   have so much other important stuff to do.  We don't want
12   that progress to be derailed by additional outbreaks.
13         So, you know, I want to thank you both for your
14   time and your service, and today in Rules I will be
15   supporting.
16         MS. BARRETTO:  Thank you.
17         CHAIR ATKINS:  Thank you, Senator.
18         And to echo you, going last-last is -- Really,
19   all of those important questions that have been asked, I
20   appreciate.
21         So with that I'm going to go ahead and move to
22   members of the public who would like to testify today.
23   So we will start with anyone wanting to testify in
24   support.  And we're going to start right here in Room
25   3191, but a reminder, of course, for witnesses -- I'll go

1    ahead and put this up on the screen -- that may wish to

2    provide comment via phone, the participant toll-free

3    number again is (877) 226-8189, and that access code is

4    2876059.

5           With that, we will start, again, as I said, in

6    Room 3191 to see if there is anyone that would like to

7    testify in support.  Okay.  There's no one in 3191.  I

8    would make the assumption there's probably no one in

9    Room 112, but I'm looking at the room now via computer,

10   and there's no one in Room 112.

11          So with that, I'm going to move to the

12   teleconference and welcome our moderator.  As I do so, I

13   want to remind witnesses that we ask when you speak, to

14   please provide your name, the organization you represent,

15   if any, and the position on the appointment.  And, of

16   course, again, on behalf of our court reporter, if you

17   would speak slowly and clearly, we would appreciate it.

18          With that, welcome Moderator.

19          THE MODERATOR:  Thank you.

20          (Instructions by the moderator.)

21          (Pause.)

22          MR. BLOOMSTINE:  Thank you, Madam Pro Tem.  I'm

23   Todd Bloomstine, speaking in support of Mrs. Jennifer

24   Barretto.

25          I've been a California registered lobbyist since

1   2001, working primarily in the construction and public

2   policy fields.  I've personally known Mrs. Barretto

3   outside the Capitol for the past four years through a

4   volunteer youth sports program serving about 170 youth in

5   our community.

6          Through my time with Mrs. Barretto, she's

7   demonstrated a strong grasp of collaboration in a

8   leadership setting and genuinely has a servant's heart.

9   I feel blessed to have her in our volunteer program, and

10  the people of California are blessed to have her serve in

11  a leadership capacity for the State.  I support her

12  confirmation and ask for your *aye* vote.  Thank you.

13          CHAIR ATKINS:  Thank you.

14          Next witness, please.

15          (Instructions by the moderator.)

16          MR. EASLEY:  Thank you, Madam Chair and Members.

17  I'm Matthew Easley representing the California

18  Correctional Peace Officers Association.

19          Today I'm here to express our support for the

20  confirmation of Jeffrey Macomber and Jennifer Barretto.

21  They've maintained an open-door policy for our

22  organization and consistently followed through in regards

23  to our needs, especially through the pandemic.  They've

24  been fair and responsive to our membership.  So we thank

25  you for your time.

1          CHAIR ATKINS:  Thank you very much.

2          Next witness.

3          (Instructions by the moderator.)

4          THE MODERATOR:  There are no further lines in

5     queue for support.

6          CHAIR ATKINS:  Thank you, Mr. Moderator.  We

7     will be back with you in a moment.

8               So we will now turn to members of the public who

9     may be in opposition, and I will again start right here

10    in Room 3191, if there are people who wish to speak in

11    opposition.  And there is -- There are no members of the

12    public here to speak in opposition, it seems, so checking

13    out Room 112 again -- and no one there.

14              So, Mr. Moderator, I'm going to come back to you

15    for witnesses who may wish to speak in opposition.

16         THE MODERATOR:  Thank you.

17         (Instructions by the moderator.)

18         (Pause.)

19         THE MODERATOR:  We have one line in queue for

20    opposition.

21         MS. ADAMS:  Hi.  My name is Lauren Adams, and I

22    am the legal director of Women's Liberation Front, a

23    progressive feminist organization fighting for the rights

24    of women and girls.  Part of our work is advocacy for

25    single-sex prisons, and I am here to testify in

1    opposition today.

2           Some quick facts.  86 percent of incarcerated

3    women are victims of abuse, and they are

4    disproportionately women of color, disproportionately

5    grew up in poverty.  Compared to men, they're vastly less

6    likely to be violent criminals, and only 4 percent of

7    female inmates are sex offenders.  By contrast, 20

8    percent of trans-identified male inmates are sex

9    offenders, according to U.C. Irvine.  Some of these men

10   are now being housed with women under the stewardship of

11   CDCR.  Just a handful of them include:  Shawn Gustafson,

12   who molested a six-year-old and an eight-year-old, and he

13   is being housed in CIW, fully intact male genitals.

14          Jason Hahn is on Death Row for murdering two

15   infants.  He is being housed in the same facility as his

16   victims' mother.

17          Anthony Lipsey is serving life for murder.  He

18   assaulted his female cell mate and spent a brief period

19   in ad. seg. before being dumped on a different yard

20   without restrictions.

21          Christian Ramirez is under investigation for

22   sexual assault.  His victim disclosed immediately to a

23   staff member who told her that if she wanted to be

24   separated from him, she would need to go to

25   administrative segregation.

1          Jonathan Robertson was transferred in June and
2    is already in administrative segregation pending a sexual
3    assault investigation.
4          And Patrick White, who is a convicted rapist and
5    a member of the Aryan Brotherhood.
6          So those are just a handful of the dozens of men
7    who are now being housed there.
8          I'm very deeply concerned about the information
9    disconnect between central CDCR and the women's
10   facilities.  There have been a number of times in recent
11   months where they have been unaware of things going on.
12   And just during this hearing, Mr. Macomber said body cams
13   are turned off during strip searches, and he also said
14   it's appropriate to do so.  But, actually, official
15   policy at CIW is that officers must keep their body cams
16   on during strip searches, and the footage is being saved
17   in the cloud.
18         According to one correctional officer, this
19   policy is in place because male offenders who are being
20   housed in women's facilities are getting erections during
21   strip searches, and making sexual comments to female
22   staff.
23         This was discussed at a July Inmate Advisory
24   Council meeting due to concerns raised by the women
25   regarding this issue.  Many of these women have been

1    sexually abused, and now they are required to be strip
2    searched, videotaped naked, and they know that the
3    footage is being saved in the cloud.  This is causing
4    them severe emotional distress.  I have a quote from an
5    inmate who wanted to read this, said, *This is the most*
6    *malicious way to tell an abused woman what we went*
7    *through wasn't important.  Despite our trauma, we are*
8    *forced to live, shower, and coexist with our pain by*
9    *bringing men in to our only way of living safe to be able*
10   *to rehabilitate.  Tell me how is that in any way humane.*
11   *It's not.  You are sacrificing our safety to keep a few*
12   *men quiet.  I'm disgusted by the actions of those in*
13   *power.  I hope this letter reaches a honestly caring*
14   *hand.*
15            We've received hundreds of letters and messages
16   from women who are at CCWF and CIW who are terrified and
17   angry.  They are humiliated.
18            Mr. Macomber also mentioned that CCWF cells fit
19   four to six people.  Actually, they were built for four
20   people and they are housing up to eight of them in there.
21   And the showers and the toilets are in there as well.
22            CDCR needs leaders who will maintain the safety,
23   privacy, and dignity of incarcerated women in their care.
24   If nationwide experts are being consulted on the
25   implementation of SB 132, we urge them to seek input from

1  women's rights advocates.  And I would define *women* as

2  female people.  So if you have a women's rights group

3  that's advocating for the male offenders, then that's not

4  a women's rights group.  So I would urge a diversity of

5  perspective in implementation.

6       I also request that the Committee ask the

7  Inspector General to investigate the conditions in the

8  women's facilities that are resulting from mixed-sex

9  prison housing on the basis of gender identity, and in

10 particular make sure that the conditions on the ground

11 are made -- that CDCR leaders are aware of conditions on

12 the ground, that they understand these things before the

13 public does.

14       So I really appreciate the opportunity to be

15 here and testify today, and I would thank you again.

16       CHAIR ATKINS:  Thank you very much for your

17 testimony.

18       Mr. Moderator, can I ask if we have more

19 witnesses?

20       (Instructions by the moderator.)

21       THE MODERATOR:  We have no further lines in

22 queue.

23       CHAIR ATKINS:  Let me thank you for your

24 assistance today, as always, Mr. Moderator.

25       Colleagues, I will make just a referral for

1  staff, thank you, to make sure that this is an issue that
2  we forward appropriately, particularly.  I did let the
3  witness go on a little longer, because she had a number
4  of items, obviously, that she wanted to get on the
5  record, and I would suggest we forward that as part of
6  our ongoing communication with CDCR in terms of the
7  advisory body's representation and other issues.  So I
8  want to make sure that goes through a proper channel of
9  communication with CDCR that we've established.  And I
10  see my staff nodding her head.  So thank you.
11          With that, I will go to Senator Laird.
12          SENATOR LAIRD:  And a brief comment, and then I
13  have a motion.
14          CHAIR ATKINS:  Okay.
15          SENATOR LAIRD:  And the comment is, I think it's
16  totally appropriate to do what the Chair just did, and
17  all of those should be vetted.  But I want to say, this
18  was brought to my attention, and that's what I was
19  referring to in my comments, that I went through a lot of
20  the concerns and was satisfied issue by issue that they
21  were adequately addressed by the Department.
22          So I didn't feel the need to raise them and then
23  go through them in the comments that I said earlier, but
24  I just want to make sure I indicate that that was
25  discussed with the Department.

1          Now, I would move them together.  I will move
2    the two nominees for confirmation.
3          CHAIR ATKINS:  Thank you, Senator.  If
4    there's --
5          Madam Vice Chair.
6          SENATOR BATES:  Just a final comment, because I
7    did bring it up in my questions regarding the separation
8    at this point in time.
9          I understand from their very in-depth responses
10   to our questions, that January is a date certain that a
11   lot of these changes are going to be implemented after
12   looking at the data that's there, and, obviously, the
13   complaints that are coming in.
14         But I would just say that this is urgent, and it
15   should be dealt urgently and not another several months
16   going by so that more and more start to come out.  It's a
17   black mark that it's probably not justified when you see
18   that we have such competent people that have been working
19   a long time; but it is their responsibility to address it
20   immediately, I believe.  And I just want that on the
21   record.  Thank you.
22         CHAIR ATKINS:  Thank you, Madam Vice Chair.
23         Let me ask:  Is there a request to separate
24   these, or if we can take them together --
25         (Inaudible.)

```
 1              CHAIR ATKINS:  Okay.  Seeing that the motion is
 2   in order, Madam Secretary, will you please call the roll.
 3              MS. SHIN:  Grove.
 4              SENATOR GROVE:  Not voting.
 5              MS. SHIN:  Grove not voting.
 6              Kamlager.
 7              SENATOR KAMLAGER:  Aye.
 8              MS. SHIN:  Kamlager aye.
 9              Laird.
10              SENATOR LAIRD:  Aye.
11              MS. SHIN:  Laird aye.
12              Bates.
13              SENATOR BATES:  Not voting.
14              MS. SHIN:  Bates not voting.
15              Atkins.
16              CHAIR ATKINS:  Aye.
17              MS. SHIN:  Atkins aye.
18              Three to zero.
19              CHAIR ATKINS:  That is three to zero.  Your
20   confirmation will move on to the Senate Floor.  And let
21   me join my colleagues, each and every one who thanked you
22   for your service, and also let me say congratulations
23   also on your appointment by the Governor.
24              We will move these to the Senate Floor.  Thank
25   you for your time today, and congratulations.
```

1           MR. MACOMBER:   Thank you.

2           MS. BARRETTO:   Thank you.

3           CHAIR ATKINS:   Okay.   This concludes today's

4    public portion of the agenda.

5           So I want to say thank you to the individuals

6    who participated in the public testimony today.   If you

7    weren't able to testify, you can submit your comments or

8    suggestions in writing to the Rules Committee, or visit

9    our website for instructions.   Your comments and

10   suggestions are important to us, and we want to include

11   your testimony in the official hearing records.

12          So with that, thank you, everyone, for your

13   patience and cooperation.   Our Senate Committee on Rules

14   will now move to executive session.   Thank you.   Bye-bye.

15          (Thereupon, the Senate Rules Committee hearing

16   adjourned at 3:07 p.m.)

17

18

19                           --o0o--

20

21

22

23

24

25

1                        --o0o--

2          I, INA C. LeBLANC, a Certified Shorthand

3    Reporter of the State of California, do hereby certify

4    that I am a disinterested person herein; that the

5    foregoing transcript of the Senate Rules Committee

6    hearing was reported verbatim in shorthand by me,

7    INA C. LeBLANC, a Certified Shorthand Reporter of the

8    State of California, and thereafter transcribed into

9    typewriting.

10         I further certify that I am not of counsel or

11   attorney for any of the parties to said hearing, nor in

12   any way interested in the outcome of said hearing.

13         IN WITNESS WHEREOF, I have hereunto set my hand

14   this _____ day of _____, 2021.

15

16

17                    _____

18                    INA C. LeBLANC
                      CSR No. 6713
19

20                        --o0o--

21

22

23

24

25

69

1

**APPENDIX**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25