CANDICE JACKSON (SBN 224648)
**FREEMAN MATHIS & GARY, LLP**
1010 B Street, Suite 300
San Rafael, California 94901
Telephone: (415) 352-6434
cjackson@fmglaw.com

LAUREN ADAMS (*Pro Hac Vice*)
**WOMEN'S LIBERATION FRONT**
1802 Vernon St. NW, #2036
Washington, DC 20009
Telephone: (202) 964-1127
legal@womensliberationfront.org

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA (FRESNO DIVISION)

| | |
|---|---|
| JANINE CHANDLER, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEP'T OF CORRECTIONS AND REHABILITATION, et al.,<br><br>    Defendants. | Case No. 1:21-cv-01657-JLT-HBK<br><br>**DECLARATION OF MICHELLE NORSWORTHY IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS** |

I, Michelle Norsworthy, hereby declare:

1. I make this declaration based on my own personal knowledge. I am over the age of 18 and competent to testify. If called to testify, I could and would do so as follows:

2. I am a 58-year-old post-op transwoman – a person born male who, as a treatment for gender dysphoria, medically transitioned by use of hormones and sex reassignment surgery. I spent 23 years in the transition process and completely transitioned by 2017.

3. I was incarcerated in California from 1987 to 2015 in men's facilities, despite being a transwoman, and from 2018-2022 I was incarcerated in a California women's prison, (post

genital surgery). While incarcerated in men's prison, I was gang-raped by men and subjected to other incidents of violence, which I believe was directly motivated by my status as a transwoman.

4. As a plaintiff in a federal lawsuit suing CDCR for Eighth Amendment constitutional violations for failing to provide me with gender-affirming medical treatment for my diagnosed gender dysphoria, in 2015 I secured judicial relief establishing the rights of transgender prisoners to adequate medical care including sex reassignment surgery. *See Norsworthy v. Beard,* Case No. 14-cv-00695-JST (N.D. Cal.).

5. After being released from men's prison in 2015, and having undergone gender-affirming transition genital surgery while on the outside, when arrested for a parole violation in 2018 CDCR assigned me to women's prison because by that time I had fully transitioned to female, having female genitalia.

6. Based on my own prison experiences and my personal beliefs and convictions, I am committed and dedicated to equal treatment for transgender people and for women. However, as shown by the way CDCR cites in this current lawsuit to my 2015 case, the State is misconstruing my victory for equal treatment for transgender inmates with regard to appropriate medical care and expanding it to defend SB 132, a law that does nothing to further equality for transgender people yet inflicts tremendous damage onto women.

7. I am a credentialed PREA (Prison Rape Elimination Act) peer educator and rape counselor. Based on my training and experience implementing PREA and helping to write prison policies implementing PREA, I know that PREA bestows all inmates with protections against sexual harassment and sexual assault, including all men, women, transwomen, and transmen incarcerated in California. I have helped many men and women throughout my years of incarceration to understand their PREA rights, file PREA complaints, and process the fear of and

aftermath of sexual assault in prison. PREA guidelines include not adding to vulnerability and risk of sexual abuse, assault, or harassment as it concerns any inmate; women are not excluded from those mandated protections.

8. Based on my PREA training, credentials and experience (evidenced by the documents attached hereto as Exhibit A), and my experience living in both men's and women's prison facilities in California, I believe that SB 132 is unnecessarily and unjustifiably overly broad, causing avoidable risks of sexual assault to incarcerated women. SB 132's major flaw is that it is not limited to protection of transwomen; there is no definition that enables CDCR to determine who is a post-op transwoman who might be transferred to a women's facility without presenting risk of sexual assault to incarcerated women. Instead, SB 132 gives the same right of transfer to anyone who "identifies" as "transgender, non-binary, or intersex," and defines those "identities" as a matter of each inmate's subjective feelings.

9. Ignoring the differences between transwomen, and men who simply declare a "transgender, nonbinary, or intersex" identity, violates the goal of PREA, which is to provide all inmates with protection against sexual assault. Instead, SB 132 ignores the substantial risk of sexual assault posed to women by men who desire transfer to a women's facility but who are not transwomen. Absurdly, SB 132 actually prevents CDCR from limiting transfers from men's to women's facilities to transwomen, by specifying that CDCR is precluded from denying a transfer request based on any physical characteristics or anatomy of the requesting inmate.

10. Under CDCR policy prior to SB 132, transwomen (myself included) could receive transfers to women's prisons after an individualized placement assessment by CDCR that did consider physical characteristics and anatomy. Many transwomen like myself have, since before SB 132, lived in harmony with incarcerated women because we have taken the physical, medicalized steps to transition to be women, including genital surgery that renders us physically

not capable of raping or impregnating a woman. In my opinion, the feminizing effects of years of hormone therapy, and sex reassignment surgery that removes or renders permanently non-functional the penis, dramatically reduces the risk of physical or sexual threat to women. In my experience, women born female accept post-op transwomen as women appropriately placed into women's facilities.

11. SB 132 purports to protect transwomen who face vulnerability to sexual assault in men's facilities, but this protection of transwomen comes at the cost of allowing men who take no steps to become transwomen also to transfer to women's facilities. Under CDCR policies prior to SB 132, transwomen who pose no threat to women already could receive transfers to women's prisons, after individualized placement assessments by CDCR.

12. Under SB 132, there is no requirement that a male inmate transferring to women's prison even call himself a transwoman, much less meet any objective definition of what it means to be a transwoman, yet receives a legal right to reside in a women's facility. Such a subjective rule irrationally and insultingly equates a self-declaration of "identity" with the lifelong impact of having chosen a sex change from male to woman that fully transitioned transwomen have undergone.

13. The notion that there is no difference between myself, and a man who claims a "transgender identity" but has not undertaken any further efforts much less undergone a sex change, diminishes my existence as a transwoman. Male inmates who might call themselves "transgender women" but who are not post-op transwomen disrupt the female-only environment of a women's prison and pose a serious physical and sexual risk to the women and transwomen residing in the women's facility.

14. Based on my experience as a transwoman inmate in both men's and women's facilities, there are social, cultural, and security differences between men's and women's prisons that stem

- 4 -

DECLARATION OF MICHELLE
NORSWORTHY
1:21-CV-01657-JLT-HBK

from the factual differences between males and females and the differences in risks posed by each group in the aggregate. "Transgender women" who are not post-op transwomen (not to mention the male inmates who don't even claim a woman identity but just claim to be "non-binary") disintegrate the female-only prison environment of a women's prison.

15. This causes negative impacts to women (including post-op transwomen) inmates such as need for increased security measures (more similar to what is needed in men's prisons), and a culture of higher aggression, disrespect, intimidation, and potential for violence, among inmates (more similar to the culture of a men's prison). In addition to the predictable, avoidable risks of sexual assault posed by the presence of male inmates who are not transwomen in women's prisons, women are also denied the right and opportunity to rehabilitate surrounded by women, rather than in an environment permeated by male culture and male-typical behaviors.

16. Transwomen become women precisely because there are significant, undeniable differences between men and women, rooted in biology and physiology; transwomen are people born male who so strongly identify with the female sex that we commit to social and medical transition to appear like, act like, and be accepted as, women, due to a condition described in the current DSM-V as gender dysphoria, diagnosed by a mental health professional, with our social and medical transition monitored, guided, and recommended by one or more mental health professionals before we are fully transitioned to become women. Men who are not transwomen do none of these things, and were thus ineligible for transfer prior to SB 132, yet these men are the ones who have been transferred into women's prison since SB 132 took effect.

17. When the first group of ten male inmates were transferred into women's prison under SB 132, I observed all ten of those "transgender women" behaving in a male-typical manner; most stopped taking hormone therapy (so they could resume physical erections), and right away began to have sex with women. Most of these men had to be placed in administrative segregation

(colloquially known as "solitary confinement") for having sex with women, since even consensual sex is a disciplinary violation in prison.

18.     It is inescapable to me that SB 132 has caused, and continues to cause, PREA violations of the rights of incarcerated women to be free from sexual harassment and assault in prison. Many of the men who obtain transfer to women's prisons under SB 132 might be cross-dressers who experience a desire or sexual thrill from appearing stereotypically female by clothing, wigs or make up, but they are not transwomen, and forcing incarcerated women and post-op transwomen to live with them is cruel and unusual extrajudicial punishment.

19.     The text of SB 132 supposedly gives the right to choose men's or women's prison to female inmates who are transmen (or to any woman who self-identifies as "transgender, nonbinary, or intersex"). Despite this legal "right," since SB 132's enactment no transman or other female inmate has been transferred to men's prison. While about 300 transfer requests are currently pending from male inmates seeking to go to women's prison, there are only about six requests pending from female inmates seeking to go to men's prison; not one has been granted by CDCR – yet about 50 have been granted for transfers into CCWF and CIW, which to me raises suspicion that SB 132 is being selectively enforced to favor male inmates but not female inmates. While it is understandable and common sense why it would be irresponsible for CDCR to place female inmates or transmen into men's prisons, SB 132 does not allow CDCR the discretion to deny a transfer request based on physical characteristics or anatomy, meaning all of the obvious reasons why women and transmen would be unsafe in men's prison must be ignored under SB 132.

20.     The fact that only "transwomen's" (with no post-op requirement) transfer requests have been granted under SB 132 shows that SB 132 is not about equality for men and women, or equality for transwomen and transmen; it is a law that grants special privilege only to groups of

transgender and cross-dressing men who do not need SB 132 because they are not particularly vulnerable to sexual assault in men's prisons, and whose placement in a women's facility poses physical, sexual, and cultural threats to the safety and dignity of women, and post-op transwomen.

21. It should be noted also that when SB 132 was proposed and presented to the State legislature, it was based entirely on statistics of "victimization" of transgender people. This raises the legitimate question: are those who are being transferred from men's facilities into women's facilities truly victims and survivors of sexual assault in the men's facilities, or is their transfer based only a statistical claim of overall victimization?

22. CDCR has no reason not to grant even one of the half-dozen transfer requests made by transmen, except in tacit acknowledgement that transmen are too vulnerable to male violence and sexual assault to be housed with men, which can only be concluded based on the fact that transmen are born female, and people born female differ in physical characteristics from men in ways that leave transmen vulnerable to men the same way that women and post-op transwomen are vulnerable to men.

23. Clearly, not very many transmen are seeking transfer to men's prisons, and the few who have are not allowed to transfer. But if transmen are the same as any other men (according to the premises of SB 132 that disallows taking physical or physiological characteristics into account regarding "identity" transfers), then CDCR should be granting transmen's transfer requests <u>and</u> placing transmen in men's prisons without waiting for them to request transfer, to protect the right of women and transwomen to live with women, not with men.

24. This obvious contradiction and one-sided application of SB 132 reveals that SB 132 is an ideologically-driven law, not a reasonable way to achieve better protection of vulnerable transgender people without increasing risks to women. But if transmen are not truly men, then

their testosterone treatments should be discontinued because testosterone treatments are masculinizing and pre-treatment to female-to-male gender reassignment surgery. In other words: a man is a man is a man – except when they are not, so goes the illogic behind SB 132.

25. If SB 132 had codified the policy of allowing transwomen to transfer to women's prison on a case by case basis, after individualized assessment for the safety of both the transwoman and incarcerated women, transwomen would be safer from prison sexual assault without a corresponding increase in that risk to women. But SB 132 is not a law to protect transwomen, but to give special rights to cross-dressing men who desire a change of scenery and an easier prison environment, and/or access to women for sexual purposes.

26. Many are heterosexual men who are serving life without parole and take advantage of SB 132's lack of objective standards to speak magic "identity" words to get housed in a facility where they can then have access to sex with women in alignment with their sexual orientation. Many transwomen are bisexual (as I am), and transwomen who are heterosexual have had hormone therapy and sex reassignment surgery such that they are not physically capable of having penetrative vaginal sex with women. I know many homosexual transwomen who choose to remain in men's prison because they desire continued access to sex with men in men's prison and would not wish to live in a female-only environment. In other words, the only people whom SB 132 sends to women's prisons are the men most likely to have sex with, sexually assault, and intimidate, women, and the transwomen like me who gained placement in women's prison under pre-SB 132 policies.

27. Based on my experience as a transwoman living with women in women's prison, incarcerated women like the Plaintiffs in this lawsuit are not "anti-trans" or prejudiced toward transgender women or transgender men. By seeking to enjoin SB 132, Plaintiffs and other incarcerated women are not objecting to living with "trans people" – they just want to feel safe

from male aggression, male behavior, male sexual harassment, and male sexual assault. Males who have made no efforts toward transition other than self-declared "identity" continue to present those harms in a way that is not presented to women by transwomen or by transmen. But the activists who promoted SB 132, and the legislators who passed it, did not consult women, or post-op transwomen, to understand why female inmates need a women's prison for rehabilitation, and what factors distinguish post-op transwomen from male inmates whose presence in women's prison both destroys the women-only environment and subjects women to substantial sex-based harms.

28.     While in my opinion the CDCR policies governing transfer of transwomen to women's prison prior to SB 132 were reasonable ways to protect transwomen without increasing harms to women, a law could improve those policies, for example by setting forth uniform standards defining transwomen as male-born people diagnosed with gender dysphoria and fully transitioned socially and medically per guidelines set forth in the current World Professional Association of Transgender Health (WPATH) Standard of Care (SOC) Volume 7 (WPATH SOC 7) as medical treatment to relieve gender dysphoria.

29.     Such specifications would ensure better medical and mental health services for transwomen while providing a rational reason to believe that transwomen housed with women do not increase women's risks of physical or sexual harms. Such a law could further specify that while undergoing the gender transition process (which per WPATH SOC 7 should involve one year of living as one's desired sex, and then undergoing medical transition, a process that can take many months or even years), transwomen have the right to be housed in a medical facility, so that they are not endangered by violence and sexual assault in men's prison while transitioning, and then may apply for transfer to a women's prison upon full transition.

30. Requiring reasonable, objective criteria for a person born male to be incarcerated with women is the only way to keep women safe while allowing any exceptions to the general policy of having sex-separated prisons. Recognizing the needs of transwomen, and recognizing the real physical effects of our sex change transition, is not a denial of the sincerity of some men who self-declare a "transgender" or "nonbinary" identity – it is simply taking into account the inescapable, relevant factors that affect the feasibility of people born male living in close quarters with women in an environment of state-coerced incarceration.

31. Accommodation for the condition of gender dysphoria is not only compassionate, but sometimes required in order to provide equal rights to people who suffer from that mental health condition. But it is not reasonable to grant the same accommodation to men who either do not suffer from gender dysphoria, and/or for whom full medical transition is not a medical necessity, because if the premise is equality for everyone then a fair and just law cannot improve the conditions for some people (such as men who are not transwomen) at the direct expense of other people (that is, women forced to live with such men).

32. For these reasons, I support the Plaintiffs in this lawsuit, with the hope that the Court will enjoin SB 132 and that the legislature will replace it with a law that protects transwomen without harming women.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.

SIGNED IN SUISUN CITY, CALIFORNIA ON MAY 26, 2022.

*/s/ Michelle Norsworthy*

# Exhibit A

# Certificate of Completion

*Michelle-Lael Norsworthy*

Has successfully completed training for the position of

**PREA PEER EDUCATOR**

at the California Correctional Institution of Tehachapi on this 9th day of November, in the year 2010.

_____
Linda McFarlane, LCSW
Deputy Executive Director
Just Detention International

_____
Lovisa Stannow
Executive Director
Just Detention International

3325 WILSHIRE BOULEVARD SUITE 340 LOS ANGELES CA 90010
P 213.384.1400  F 213.384.1411  www.JUSTDETENTION.org

JUST DETENTION
INTERNATIONAL

July 13, 2021

Board of Parole Hearings
Post Office Box 4036
Sacramento, California 95812-4036

RE: Michelle-Lael Norsworthy #WB1122

Dear Honorable Members of the Parole Board,

I am writing regarding Michelle-Lael Norsworthy to support her request for parole. I am the Executive Director of Just Detention International (JDI), a health and human rights organization whose mission is to eliminate sexual abuse in all forms of detention.

I have known Ms. Norsworthy for more than a decade, in several capacities. I first met Ms. Norsworthy when she was incarcerated in a California Department of Corrections and Rehabilitation (CDCR) facility and I was her supervisor as she worked on a pilot peer education program related to the federal Prison Rape Elimination Act (PREA). Ms. Norsworthy became one of the first PREA Peer Educators in the country and helped to develop a curriculum and program that was studied by the U.S. Department of Justice and then replicated across the nation.

Because of her work with JDI while still incarcerated — and her courage in sharing her story of being a survivor of sexual abuse in detention — JDI invited Ms. Norsworthy to join our Survivor Council. JDI's Survivor Council is a volunteer advisory and speaker's board, the members of which consult on programs, program materials, and speak about sexual abuse in detention with the public, corrections officials, and advocates. Ms. Norsworthy has been an active and productive member of the Council for several years. It is notable that, despite being incarcerated again due to a parole violation, she has not wavered in her support of and work on the survivor council, responding quickly to every request for input we have sent her way.

I kept in close contact with Ms. Norsworthy, offering support and counsel, while she was out on parole. Leaving prison after three decades while coping with the effects of severe and complex Post-Traumatic Stress Disorder is no easy task. Although Ms. Norsworthy struggled with adjustment and with symptoms of PTSD, and certainly made some missteps, she continued to reach out for help and was able to accomplish a tremendous amount in the time she was out of prison. She completed the transitional program to which she was released, continued to work in JDI's Survivor Council, established a 501(c)3 organization called Joan's House to support reentering women and transgender people; received ham radio operator and drone pilot's licenses, secured a job at University of California at San Francisco, got married and owns a home with her husband, and opened a small business to do aerial photography.

RAPE IS NOT PART OF THE PENALTY

Ms. Norsworthy continued to reach out for and accept support when she was arrested and was placed in jail and then ultimately transferred to Central California Women's Facility. I observed her going through a difficult, and understandable, struggle to accept that she would be held on the parole violation, and ultimately returned to a CDCR facility. During the time she has been at CCWF, Ms. Norsworthy has shared with me, and shared certificates to back it up, that she has participated in multiple educational and supportive programs. Even as the pandemic made participating in programs more difficult, Ms. Norsworthy appears to have kept up with programs whenever possible, such as a weekly health and wellness program with nursing staff. She has also embarked on self-improvement programs, including a workbook on criminal and addictive thinking, Beyond Trauma, regular in-cell exercise, and a plan for a book about the Torah and faith. She has worked on her sobriety and found support through Alcoholics Anonymous and Narcotics Anonymous and through her faith. Ms. Norsworthy also volunteered her services as a PREA Peer Educator and worked with staff at the prison to revise and implement their PREA inmate education program. Ms. Norsworthy has continued to contribute to JDI publications and educational materials for corrections officials and community rape crisis advocates while she has been incarcerated.

I have communicated with Ms. Norsworthy at length about the incident during which she violated her parole and she is remorseful and takes responsibility for the infraction. In many ways, the sequestering due to the pandemic gave Ms. Norsworthy an opportunity to be even more thoughtful about how and why she went down a path that harmed others and resulted in her being incarcerated again. She has also written to that the experience, and her deep exploration of it, has given her a new understanding of her addiction and her sobriety journey and how behaviors and triggers that might not seem to be related to addiction are related. I am certain that this genuine engagement in her recovery is the reason that she was recently voted the Secretary of her Alcoholics Anonymous meeting.

I have faith that, if Ms. Norsworthy is given the opportunity to return home, she will be a valuable and productive member of the community. I have no qualms in asserting that Ms. Norsworthy is committed to her sobriety, her family, and her career and will make every effort to be successful. I can also commit that JDI and I will be here to support her in that journey.

I thank you for your time and attention to this important matter.


Sincerely,

*[signature]*

Linda McFarlane, LCSW
Deputy Executive Director

Cc:   Tracy Lum, Attorney at Law
      Michelle-Lael Norsworthy

| STATE OF CALIFORNIA | | DEPARTMENT OF CORRECTRIONS |
|---|---|---|
| NAME and NUMBER | NORSWORTHY   WB1122   503-107-01L | CDC-128-B /Rev. 8/87 |

This chrono is to acknowledge Inmate **NORSWORTHY, WB1122, 503-107-01L** for her voluntary service as a certified PREA Peer Educator from October 29, 2019 to the present date in presenting and educating new inmate arrivals at Central California Women's Facility (CCWF) regarding PREA (Prison Rape and Elimination Act). By utilizing the approved Just Detention International PREA video, Inmate **NORSWORTHY** ensures that the participants understand;

1. Sexual Abuse (sexual contact, sexual harassment, sexual assault and voyeurism)
2. Harm Reduction and how to avoid sexual abuse
3. The participant's right to medical examination & treatment and mental health assessment
4. How to report an incident

Inmate **NORSWORTHY** is to be commended for volunteering her time and services in assisting the PREA Staff to fulfill their responsibility of ensuring that every inmate has knowledge of their rights and responsibilities regarding this federally mandated program.

Orig:   Inmate
cc:     E- File

C. HENDERSON, OT
PREA Coordinator

DATE:   February 3, 2020        LAUDATORY CHRONO   CCWF        **GENERAL CHRONO**

3325 WILSHIRE BOULEVARD, SUITE 340   LOS ANGELES, CA 90010
213.384.1400     213.384.1411     www.JUSTDETENTION.org



April 14, 2020

Board of Parole Hearings
Post Office Box 4036
Sacramento, California 95812-4036

RE: Michelle-Lael Norsworthy #WB1122

Dear Honorable Members of the Parole Board,

I am writing regarding Michelle-Lael Norsworthy to support her request for parole. I am the Deputy Executive Director of Just Detention International (JDI), a health and human rights organization whose mission is to eliminate sexual abuse in all forms of detention.

I have known Ms. Norsworthy for nearly a decade, in several capacities. I first met Ms. Norsworthy when she was incarcerated in a California Department of Corrections and Rehabilitation facility and she volunteered to work on a pilot, peer education program related to the federal Prison Rape Elimination Act (PREA). Ms. Norsworthy became one of the first PREA Peer Educators in the country and helped to develop a curriculum and program that has since been replicated across the nation.

Because of her work with JDI while still incarcerated — and her incredible courage in sharing her story of the horrific abuse she suffered while in prison — JDI invited Ms. Norsworthy to join our Survivor Council. JDI's Survivor Council is a volunteer advisory and speaker's board, the members of which consult on program materials and planning and educate about sexual abuse in detention by speaking to the public and the media. Ms. Norsworthy was an active member of the Council during her previous incarceration and continued to be a productive and extremely valuable member of the council while she was out on parole. It is notable that, despite being incarcerated again due to her parole violation, she has not wavered in her support of and work on the survivor council, responding quickly to every request for input we have sent her way.

I kept in close contact with Ms. Norsworthy while she was out on parole. Despite the challenges she faced, I was very impressed with all that she accomplished. Leaving prison after three decades while coping with the effects of severe and complex Post-Traumatic Stress Disorder is no easy task. Although Ms. Norsworthy struggled with adjustment and with symptoms of PTSD, and certainly made some missteps, she continued to reach out for help and was able to accomplish a tremendous amount in the time she was out of prison. To name some of her accomplishments, she: completed a transitional program; continued to work in JDI's Survivor Council, including filming an educational video that has been viewed by thousands of corrections and mental health professionals; established a 501(c)3 organization called Joan's House to support reentering women and transgender people; received both ham radio operator and drone pilot's licenses; secured a job at University of California at San Francisco; got married

RAPE IS NOT PART OF THE PENALTY

and owns a home with her husband; and opened a small business to do aerial photography.

Ms. Norsworthy continued to reach out for and accept support when she was arrested and was placed in jail and then in Central California Women's Facility. I observed her going through a difficult, and understandable, struggle to accept that she was indeed back in a corrections facility and would be held on the parole violation, and ultimately returned to a CDCR facility. During the time she has been at CCWF, Ms. Norsworthy has maintained her intention to use her time productively and to continue to better herself and help others. Ms. Norsworthy has shared with me, and shared certificates to back it up, that she has participated in every educational and supportive program that she could. She has described working hard on sobriety and that she has found Alcoholics Anonymous and Narcotics Anonymous meetings to be invaluable. Ms. Norsworthy also volunteered her services as a PREA Peer Educator and has been working with Central California Women's Facility to revise and run their critical education program. Ms. Norsworthy has also continued to contribute to JDI publications and has provided input on videos, featuring footage that was taken of her while she was out on parole, that are used to train corrections officials and community rape crisis advocates while she has been incarcerated.

I have communicated with Ms. Norsworthy at length about the incident during which she violated her parole and she is remorseful and takes full responsibility for the infraction. Indeed, it is my observation that this experience has given her a new understanding of her addiction and her sobriety journey. I have faith that, if she is returned home, she will be a valuable and productive member of the community. In fact, given the current public health crisis, Ms. Norsworthy is needed at home to care for her husband, and where should would have greater access to online support such as virtual counseling sessions and AA and NA meetings. I have complete faith that Ms. Norsworthy is committed to her sobriety, her family, and her career and will make every effort to be successful.

I thank you for your time and attention to this important matter.

Sincerely,

*Linda McFarlane*

Linda McFarlane, LCSW
Deputy Executive Director