1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **EASTERN DISTRICT OF CALIFORNIA**

10

11    JANINE CHANDLER, *et al.*,                    Case No. 1:21-cv-01657-JLT-HBK

12                    Plaintiffs,                     ORDER GRANTING DEFENDANTS'
                                                      MOTION TO DISMISS, DENYING
13         v.                                         DEEFNDANT'S MOTION TO FILE
                                                      REDACTED EXHIBITS AND
14    CALIFORNIA DEPARTMENT OF                        DEFENDANTS' MOTION TO STRIKE,
      CORRECTIONS AND REHABILITATIONS, *et*           AND DENYING AS MOOT
15    *al.*,                                          DEFENDANTS' REQUEST FOR
                                                      JUDICIAL NOTICE
16                    Defendants.
                                                      (Docs. 15, 15-2, 15-6, 38)
17

18         Janine Chandler, Krystal Gonzalez, Tomiekia Johnson, and Nadia Romero are female[1]

19    inmates, incarcerated in one of California's women's prisons.  They bring this facial and as-

20    applied constitutional challenge to California's "Transgender Respect, Agency, and Dignity Act,"

21    added to the California Penal Code by Senate Bill 132 (hereinafter, "S.B. 132").  They seek

22    declaratory and injunctive relief against Defendants California Department of Corrections and

23    Rehabilitation, Secretary of CDCR, Kathleen Allison, and Wardens Michael Pallares and Mona

---

[1] Plaintiffs dispute the use of the word "cisgender" to describe them, stating that it "is not legally defined (or even utilized) by the statute at issue (SB 132), anywhere in the U.S. Constitution or California Constitution, nor in [the Prison Rape Elimination Act]."  (Doc. 36 at 5.)  Even still, the Ninth Circuit has adopted definitions that will assist in making this order clear. "Transgender individuals have a '[g]ender identity'—a deeply felt, inherent sense' of their gender—that does not align with their sex at birth." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 768 (9th Cir. 2020) (footnote and citation omitted).  "At birth, infants are classified as male or female based on visual observation of their external genitalia.  This is a person's 'sex assigned at birth,' but it may not be the person's gender identity." *Id.* at n.3.  Plaintiffs' allegations (Doc. 36 at 5–6) demonstrate that their gender identity corresponds with their sex assigned at birth. For clarity, they are described as cisgender, as that term is defined by the Ninth Circuit. *Cf. Hecox v. Little*, 79 F.4th 1009, 1016 (9th Cir. 2023), *withdrawn*, 2024 WL 1846141 (9th Cir. Apr. 29, 2024).

1   D. Houston.

2       Pending is Defendants' Motion to Dismiss (Doc. 15), Motion to File Redacted Exhibits

3   (Doc. 15-6), and Motion to Strike (Doc. 38).  For the reasons set forth below, Defendants' Motion

4   Dismiss (Doc. 15) is **GRANTED**.  Defendants' Motion to Strike (Doc. 38) is **DENIED**, and

5   Defendants' Motion to File Redacted Exhibits (Doc. 15-6) is **DENIED AS MOOT**.

6   **I.      FACTUAL BACKGROUND**

7           A.  Existing Law Prior to S.B. 132

8       Since at least 2017, Title 15 of the California Code of Regulations § 3269 ("Inmate

9   Housing Assignments") governed the placement of transgender inmates within the California

10  prison system.  *See* CAL. CODE REGS. tit. 15, § 3269 (2017).  The Code of Regulations provided:

11  "Transgender inmates and inmates having symptoms of gender dysphoria as identified and

12  documented in [the Strategic Offender Management System (SOMS)] by medical or mental

13  health personnel within a CDCR institution shall be referred to a classification committee for a

14  determination of appropriate housing at a designated institution."  CAL. CODE REGS. tit. 15, §

15  3269(g) (2017).[2]  For the classification of inmates, "the classification process shall take into

16  consideration the inmate's needs, interests and desires, his/her behavior and placement score in

17  keeping with the Department and institution's/facility's program and security missions and public

18  safety."  CAL. CODE REGS. tit. 15, § 3375(b) (2017) ("Classification Process").[3]

19      In April 2019, the California Senate Committee on Public Safety considered the merits of

20  S.B. 132.  S. COMM. PUB. SAFETY, B. ANALYSIS, S.B. 132 (Cal. Apr. 23, 2019).[4]  In the legislative

21  analysis of S.B. 132, the bill's author, Senator Wiener, acknowledged that "the California Code of

22  Regulations establishes a process by which an incarcerated transgender person is assigned to

23  housing at a designated institution."  *Id.* at 4.  At that time, CDCR's Department Operations

---

24  [2] Since 2022, the Code of Regulations now contains this provision, with the exact language as prior versions, located
25  at § 3269(h), respectively.  *See* CAL. CODE REGS. tit. 15, § 3269(h) (2022–23).

26  [3] This language has not changed since 2017, except for the 2019 added sub-section, requiring an "automated needs
    assessment tool that identifies an inmate's criminogenic needs" to be administered according to § 3375.6.  CAL. CODE
27  REGS. tit. 15, § 3375(b)(1) (2019).

28  [4] The California Senate's legislative analysis can be located at:
    https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201920200SB132.

Manual ("DOM") required "[i]nmates who have been diagnosed as transgender or intersex, as documented on the Medical Classification Chrono" to "be referred to a classification committee for review of all case factors and determination of appropriate institutional placement and housing assignment." *Id.* at 7 (citing DOM § 62080.14); *see also* CAL. CODE REGS. tit. 15, § 3269 (2017) (transgender inmates referred to a classification committee). CDCR specified that the housing of transgender inmates had "to ensure inmate-patients receive the necessary medical care/mental health treatment, transgender or intersex inmate-patients." S. COMM. PUB. SAFETY, B. ANALYSIS at 7 (citing DOM § 62080.14).

However, Senator Wiener determined that this housing-transfer process did not go far enough to protect transgender women from rape and assault. *Id.* at 4. Indeed, the Senator commented, "[t]hese processes and criteria fail[ed] to take into account a person's gender identity and their perception of safety, making them more vulnerable to violence from other incarcerated people and solitary confinement while incarcerated." *Id.* The Senate's analysis of S.B. 132 cited to a study by the University of California, Irvine, which "found that transgender inmates were 13 times more likely to be sexually assaulted in prison than non-transgender inmates," *id.* at 7 (citation omitted), and that to best protect these particularly vulnerable transgender inmates, CDCR "sometimes remove[s] these inmates from the general population." *Id.* Thus, the California Legislature considered the merits of S.B. 132, which aimed in part, "to eliminate the practice of placing transgender inmates in segregated housing units when the inmate does not perceive a risk of violence or victimization if housed in another type of housing, and to require that transgender inmates are housed at a facility consistent with the inmate's gender identity." *Id.* at 11.

B. <u>S.B. 132</u>

On September 26, 2020, California Governor Gavin Newsom signed into law, "The Transgender Respect, Agency, and Dignity Act," Cal. S.B. 132 (2020), *codified at* Cal. Penal Code §§ 2605, 2606 [hereinafter, "S.B. 132"]. Penal Code § 2605 requires CDCR officials to "ask each individual entering into the custody of the department to specify all of the following:" (1) their gender identity of male, female, or nonbinary; (2) whether they identify as transgender,

nonbinary, or intersex; and (3) their gender pronoun and honorific.  Cal. Penal Code § 2605(a)(1)-(3).[5] CDCR may not discipline an inmate who refuses to answer or who fails to disclose complete information.  *Id.* § (b).  Section 2605 requires CDCR facility staff to "promptly repeat the process of offering the individual an opportunity to specify the gender pronoun and honorific most appropriate for staff to use in reference to that individual[.]" *Id.* § (c).  Finally, section 2605 prohibits "[s]taff, contractors, and volunteers of the department" from "consistently fail[ing] to use the gender pronoun and honorific an individual has specified in all verbal and written communications with or regarding the individual that involve use of a pronoun and honorific."  *Id.* § (d).

S.B. 132 added section 2606 to the California Penal Code, which adds in relevant part:

(a)  An individual incarcerated by the Department of Corrections and Rehabilitation who is transgender, nonbinary, or intersex, regardless of anatomy, shall:

(1)  Be addressed in a manner consistent with the incarcerated individual's gender identity.
. . .

(3)  Be housed at a correctional facility designated for men or women based on the individual's preference, including, if eligible, at a residential program for individuals under the jurisdiction of the department . . .

(4)  Have their perception of health and safety given serious consideration in any bed assignment, placement, or programming decision within the facility in which they are housed . . . including, but not limited to, granting single-cell status, housing the individual with another incarcerated person of their choice, or removing the individual or individuals who pose a threat from any location where they may have access to the individual who has expressed a safety concern.  If, pursuant to this paragraph, the individual is not granted an alternative based on their perception of health and safety, the department shall document the reasons for that denial and share them with the individual.

(b)  If the Department of Corrections and Rehabilitation has management or security concerns with an incarcerated individual's search preference . . . or preferred housing placement . . . , the Secretary of the Department of Corrections and Rehabilitation, or the secretary's designee, shall, before denying a search preference or housing the incarcerated individual in a manner contrary to the person's preferred housing placement, certify in

---

[5] The term "gender pronoun" is defined as a person's "third-person singular personal pronoun, such as 'he,' 'she,' or 'they,'" and the term "honorific" is defined as "a form of respectful address typically combined with an individual's surname," such as "mister" ("Mr.") or "miss" ("Ms.").  *See* Cal. Penal Code §§ 2605(e)(1)–(2).

writing a specific and articulable basis why the department is unable to accommodate that search or housing preference.

Cal. Penal Code §§ 2606(a)(1)–(3), (b).

### C. Plaintiffs' Complaint

Plaintiffs, who are inmates at the Central California Women's Facility, filed the instant Complaint challenging S.B. 132 on several constitutional grounds.  (*See generally* Doc. 1; *id.* at ¶¶ 69–72.)[6]  Plaintiffs complain that S.B. 132 has created unsafe living conditions for cisgender, female inmates because "men commit the vast majority of violent and sexual offenses, [ ] women are disproportionately victimized by male sexual violence," (*id.* at ¶ 5), and "[r]egardless of the self-declared 'gender identity' of individual men or women, women are placed at heightened risk of sexual violence, sexual harassment, and trauma conditions (such as post-traumatic stress disorder) when forced to share housing quarters with men." (*Id.* at ¶ 8.)

Plaintiffs' Complaint alleges that "[b]y requiring women's correctional facilities to become mixed-sex facilities, S.B. 132 places incarcerated women in significantly increased danger of physical and sexual violence, consequences of consensual or nonconsensual sex with men (such as pregnancy and sexually transmitted disease), infringes upon the dignity of women to bodily security and privacy, and removes the rehabilitative benefits that accrue to women in an exclusively-female correctional facility." (*Id.* at ¶ 12.)  Plaintiffs also allege that "CDCR has been approving transfers of men into women's facilities pursuant to S.B. 132 in a manner not consistent with S.B. 132." (*Id.* at ¶¶ 36(a)–(d) (list of examples Plaintiffs believe are incorrect applications of S.B. 132).)

#### i.  *Effects of S.B. 132 on Plaintiffs*

Since the implementation of S.B. 132, Plaintiffs represent that they "have experienced fear, anxiety, depression, and/or post-traumatic stress disorder, as a direct result of now:"

[S]haring close-quarters housing, showering, dining, and recreation with men; observing that some incarcerated women are now having sexual relations with incarcerated men transferred into CIW and CCWF, creating a risk of pregnancy

---

[6] Plaintiffs also complain about similar conditions allegedly occurring at the California Institution for Women, however, none of the Plaintiffs are currently incarcerated there.  (*See* Doc. 1 at ¶¶ 69–72 (all named plaintiffs stating they are housed at CCWF).)

1   and the health and emotional complications from becoming pregnant while
2   incarcerated, which would not have occurred but for S.B. 132; and observing
    changes to the environment of women's facilities to become more like men's
3   facilities, to the emotional and psychological detriment of incarcerated women.

4   (*Id.* at ¶ 42; *see also id.* at ¶ 47 ("[W]omen in CIW and CCWF experience psychological

5   distress, fear, and anxiety at the constant possibility of additional men being house in the

6   women's facilities.").)

7       Plaintiffs allege that "some incarcerated women sharing a cell with a man, along with

8   other women, now make sleep schedules among the women so that a woman is on watch to try to

9   prevent rape by the male cellmate." (*Id.* at ¶ 43.)  Plaintiffs state that prison staff in these

10  facilities are "now armed with new, stronger pepper spray and riot control measures in

11  anticipation that men are stronger and more violent than women."  (*Id.* at ¶ 44.)  Women's

12  facilities "have procured condoms," "changed contraceptive policy to make them available to all

13  female inmates," and have provided "printed information about pregnancy and sexually

14  transmitted diseases," in anticipation that cisgender and transgender women would be sexually

15  active.  (*Id.* at ¶ 45.)

16      Plaintiffs also fear that "CCF has considered cutting down the only shade trees in the

17  exercise yard, which also attract birds that the women enjoy and appreciate, because incarcerated

18  men might use the trees as weapons and/or because the trees cause visual blind spots that present

19  security risks;" "numerous women suffered psychological distress at the prospect of having the

20  women's only connection to nature stripped away because of the presence of male offenders."

21  (*Id.* at ¶ 46.)

22      Furthermore, Plaintiffs complain that "incarcerated women have filed administrative

23  grievances requesting that CDCR stop transferring men into the women's facilities, [but] CDCR

24  has altered the complaining inmate's statements recounted or summarized in the written

25  complaint forms" by changing the gender identity of "men" to "transgender females" or

26  "transgender women," "thereby altering the complaining inmate's own words, perception, and

27  substance of requested corrective action."  (*Id.* at ¶ 48.)

28  ///

6

*ii.  Plaintiffs' Specific Injuries*

Nadia Romero, Krystal Gonzalez, Janine Chandler, and Tomiekia Johnson have recounted in their Complaint specific injuries they incurred after the implementation of S.B. 132.  (Doc. 1 at 17–18.)  Romero is a cisgender, female offender incarcerated at CCWF.  (*Id.* at ¶ 69.)  She "is a survivor of severe sexual and physical abuse beginning in childhood," "has a history of anxiety, depression, and substance abuse," and claims that "[s]haring a housing unit with men has led to Nadia experiencing panic attacks, insomnia, and self-harm ideation."  (*Id.*)  Romero filed a grievance detailing an incident where "she was grabbed by a man in her unit," thereby "informing the prison of her heightened risk of rape and violence from male offenders," however the prison referred to the "men" in her unit as "transgender females."  (*Id.*)  Romero "does not believe that sex is determined by a person's internal identity."  (*Id.*)  She identifies as a "Catholic whose faith is deeply important to her, and whose religious practice is impaired by being placed in an intimate setting with unrelated [transgender women]."  (*Id.*)

Gonzalez is a female offender incarcerated in CCWF.  (*Id.* at ¶ 70.)  She alleges she was "sexually assaulted by a man transferred to her unit under S.B. 132."  (*Id.*)  Gonzalez "filed a grievance and requested single-sex housing away from men;" the prison allegedly responded by referring to her assault as perpetrated by a "transgender women with a penis."  (*Id.*)  Gonzalez "does not believe that women have penises, and she the [sic] psychological distress caused by her assault is exacerbated by the prison's refusal to acknowledge the sex of the perpetrator."  (*Id.*)

Chandler is a female offender incarcerated at CCWF.  (*Id.* at ¶ 71.)  She is an "observant Muslim whose right to privacy and right to exercise her religion are both violated when she is housed in facilities with [transgender women]."  (*Id.*)  "She is also a survivor of domestic abuse."  (*Id.*)  Johnson is a female offender incarcerated at CCWF.  (*Id.* at ¶ 72.)  She "is a survivor of domestic violence."  (*Id.*)

## II.  PROCEDURAL HISTORY

Plaintiffs filed their Complaint, requesting declaratory and injunctive relief, permanently enjoining CDCR and Defendants from enforcing and implementing S.B. 132, on the basis that it violates several of Plaintiffs' constitutional rights under the First, Eighth, and Fourteenth

Amendments to the United States Constitution, as well as several provisions of the California Constitution.  (*See generally* Doc. 1 at 20–35.)

Before the Court is Defendants' Motion to Dismiss brought under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), attacking, in part, Plaintiffs' basis for establishing Article III standing on their federal constitutional claims.  (*See* Doc. 15-1 at 1–20.) The motion is supported by the Intervenors who also argue that Plaintiffs lack Article III standing.  (Doc. 32 at 18–23.) Plaintiffs oppose the motion.  (Doc. 36.)

### III.   LEGAL STANDARDS

A.   Rule 12(b)(1)

"Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'"  *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)); *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005).  As such, "[i]t is to be presumed that a cause lies outside this limited jurisdiction. . . and the burden of establishing the contrary rests upon the party asserting jurisdiction."  *Kokkonen*, 511 U.S. at 377 (internal citations omitted); *Advanced Integrative Med. Sci. Inst., PLLC v. Garland*, 24 F.4th 1249, 1256 (9th Cir. 2022) (same).

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, a party may challenge a claim for relief for lack of subject-matter jurisdiction. FED. R. CIV. P. 12(b)(1).  It is well-established that Article III "[s]tanding is a constitutional requirement for the exercise of subject matter jurisdiction over disputes in federal court." *Tailford v. Experian Info. Sols., Inc.*, 26 F.4th 1092, 1099 (9th Cir. 2022) (citing *Spokeo v. Robins*, 578 U.S. 330, 339 (2016)).  Thus, even where the defendant fails to raise or challenge a claim or Complaint for lack of standing, "federal courts have a duty to raise, sua sponte, questions of standing before addressing the merits" of any claim.  *Iten v. Los Angeles*, 81 F.4th 979, 984 (9th Cir. 2023) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)); *Jones v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1058 (9th Cir. 2023) ("[A] jurisdictional issue such as Article III standing may be raised *sua sponte* by the court at any time.") (citation omitted); *see also* Fed. R. Civ. P. 12(h)(3) (requiring that "the court must dismiss the action" if it "determines at any time that it lacks

1  subject-matter jurisdiction.").

2       Article III of the Constitution limits the Court's authority to resolving "Cases" or

3  "Controversies." U.S. CONST., art. III, § 2. "The doctrine of standing, among others, implements

4  this limit on [the Court's] authority." *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023)

5  (internal quotation marks and citation omitted). The Supreme Court "has established that the

6  irreducible constitutional minimum of standing contains three elements that a plaintiff must plead

7  and—ultimately—prove." *Id.* (internal quotation marks and citation omitted). "First, the plaintiff

8  must have suffered an injury in fact that is both concrete and particularized and actual or

9  imminent, not conjectural or hypothetical." *Id.* (internal quotation marks and citation omitted).

10  "Second, the plaintiff's injury must be fairly traceable to the challenged action of the defendant,

11  meaning that there must be a causal connection between the injury and the conduct complained

12  of." *Id.* (internal quotation marks and citation omitted). "Third, it must be likely, as opposed to

13  merely speculative, that the injury will be redressed by a favorable decision." *Id.* (internal

14  quotation marks and citation omitted).

15       "'The party invoking federal jurisdiction bears the burden of establishing' the [three]

16  elements of standing, and 'each element must be supported in the same way as any other manner

17  on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence

18  required at the successive stages of the litigation.'" *Meland v. WEBER*, 2 F.4th 838, 843 (9th Cir.

19  2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). "If at least one plaintiff has

20  standing, the suit may proceed." *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023) (citing

21  *Rumsfeld v. F. for Acad. and Inst. Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006)). "And standing is not

22  dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and

23  for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion*

24  *LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021) (parenthetical in original) (citations omitted).

25  *i. Facial Attack vs. Factual Attack*

26       "Rule 12(b)(1) jurisdictional attacks can be either facial or factual." *San Diego Cnty.*

27  *Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1028 (9th Cir. 2023) (citation

28  omitted), *cert. denied*, 144 S. Ct. 190 (2023). "In a facial attack, the challenger asserts that the

allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Edison v. United States*, 822 F.3d 510, 517 (9th Cir. 2016) (quoting *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)).  The movant determines whether an attack is facial or factual, such as by introducing evidence outside the pleadings.  *Compare San Diego Cnty. Credit Union*, 65 F.4th at 1028 ("CEFCU made the strategic decision to assert a factual jurisdictional attack in its motion to dismiss.") *with Mecinas v. Hobbs*, 30 F.4th 890, 896 (9th Cir. 2022) ("Here, the Secretary's motion was based solely on the allegations in Plaintiffs' amended complaint.  It thus did not convert the motion to dismiss into a factual motion.").

  B.  Rule 12(b)(6)

  Pursuant to Rule 12(b)(6), a defendant may move to dismiss a claim in the plaintiff's complaint if the allegation "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

  "At the pleading stage, all allegations of material fact are taken as true and construed in the light most favorable to the non-moving party." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  As such, the plausibility standard is a "context-specific task that requires the reviewing court to [1] draw on its judicial experience and common sense," *Iqbal*, 556 U.S. at 679, and [2] to "'draw all reasonable inferences in favor of the nonmoving party.'" *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022) (quoting *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014)). "Ultimately, dismissal is proper under Rule 12(b)(6) if it appears beyond doubt that the non-movant can prove no set of facts to support its claims." *Boquist*, 32 F.4th at 773–74 (internal

1   citation and quotation marks omitted) (cleaned up).

2          Finally, though resolution of a motion to dismiss under Rule 12(b)(6) is normally confined

3   to the allegations stated in the complaint, the Court "may also 'consider [1] materials that are

4   submitted with and attached to the complaint'; [2] judicial notice of matters of public record'; and

5   [3] unattached evidence on which the complaint necessarily relies if: [a] the complaint refers to

6   the document; [b] the document is central to the plaintiff's claim; and [c] no party questions the

7   authenticity of the document.'" *Beverly Oaks Physicians Surgical Ctr., LLC v. Blue Cross &*

8   *Blue Shield of Ill.*, 983 F.3d 435, 439 (9th Cir. 2020) (quoting *United States v. Corinthian Colls.*,

9   655 F.3d 984, 998–99 (9th Cir. 2011)). The Court may review such material without converting a

10  motion to dismiss into a motion for summary judgment. *Harris v. Cnty. of Orange*, 17 F.4th 849,

11  865 (9th Cir. 2021); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

12  **IV. DISCUSSION**

13          A. Motion to Strike (Doc. 38)

14          In their Opposition to Defendants' Motion to Dismiss, Plaintiffs attached declarations

15  from the named Plaintiffs in this suit (Docs. 36-1–36-3, 36-12), current and former California

16  inmates (Docs. 36-6–36-9, 36-11), two experts (Docs. 36-4, 36-5), and (4) counsel for Plaintiffs

17  (Doc. 36-10). Defendants object to the declarations, asserting that (1) they are "immaterial" and

18  "wholly irrelevant" to the Court's evaluation of the pending motion to dismiss, and (2) that they

19  are extrinsic evidence that the Court may not rely on when evaluating Defendants' motion

20  because they were not attached to Plaintiffs' Complaint nor incorporated by reference in the

21  Complaint. (Doc. 38 at 3–5.)[7]

22          Plaintiffs argue that Defendants' motion to dismiss "relied upon a substantial amount of

23  extrinsic evidence (314 pages) to factually 'attack' Plaintiffs' standing to pursue claims and to

24  argue that Plaintiffs fail to state claims upon which relief may be granted." (Doc. 41 at 4.)

25  Consequently, they argue that, on this basis, they may introduce evidence too. The extent to

26  which they are correct depends upon the nature of the attack.

27                              *i. Facial Attack*

28  
_____
[7] From this point forward, the Court refers to CM/ECF pagination, or, where unavailable, the parties' PDF pages.

"Ordinarily, a court may look only at the face of the complaint to decide a motion to dismiss." *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002).  There are, of course, three well-known exceptions to this general rule: (1) materials attached to the Complaint; (2) judicial notice of matters of public record; and (3) unattached evidence incorporated into the complaint, for which it necessarily relies.  *Beverly Oaks Physicians*, 983 F.3d at 439 (citation omitted).  This means that when ruling on a 12(b)(6) motion to dismiss, "the Court may not consider any declaration[s] [nor] exhibits that Plaintiff[s] [have] attached to [their] opposition, nor may the Court consider the facts that Plaintiff[s] assert[] in [their] opposition." *Bd. of Trs. of the Bay Area Roofers Health & Welfare Tr. Fund v. Gudgel Yancey Roofing Inc.*, 225 F. Supp. 3d 1106, 1114 (N.D. Cal. 2016) (citation omitted).  This situation changes when a party raises a factual attack for lack of subject-matter jurisdiction under Rule 12(b)(1).  *San Diego Cnty. Credit Union*, 65 F.4th at 1028; *Mecinas*, 30 F.4th at 896.

Defendants bring a facial challenge to Plaintiffs' Eighth Amendment allegations, Free Exercise and Establishment Clause allegations under the First Amendment, and Equal Protection Clause allegations under the Fourteenth Amendment.  (*See* Doc. 15-1 at 6 ("In asserting an Eighth Amendment claim[] the Plaintiffs' *allegations* depend upon five assumptions that are generously described as speculative . . .") (emphasis added); *id.* at 8 ("Plaintiffs also *do not allege* any harm resulting from the *alleged* free exercise and establishment claims.") (emphases added); *id.* at 9 ("Plaintiffs' free exercise and establishment claims *depend upon allegations of harm* shared by the general public that cannot serve as the basis for standing.") (emphasis added); *id.* ("Plaintiffs' equal protection claim *fails to allege* any harm.") (emphasis added).)  In each instance, Defendants attack Plaintiffs' *allegations*, making Defendants' challenges to Plaintiffs' Article III standing *only* a facial attack for these claims.  *Edison*, 822 F.3d at 517 ("In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction.").  Indeed, in each section of their motion, Defendants cite only to paragraphs set forth in Plaintiffs' Complaint.  (Doc. 15-1 at 6 (citing Doc. 1 at ¶¶ 42–48 and p. 21:13–17), 8 (citing to Doc. 1 at 10, 22–23), 9 (citing Doc. 1 at 25).)  Thus, the Court will not entertain any evidence as to these claims, except that which is permitted under Rule 12(b)(6).

*ii.  Factual Attack*

As to Plaintiffs' First Amendment free expression claim, Defendants challenge the alleged facts that "CDCR's responses to [their] grievances have referred to transgender inmates differently than identified in the grievance [citation] and then that CDCR has rejected their grievances unless they use the pronouns of transgender inmates." (Doc. 15-1 at 17–18, citing Doc. 1 at 17–18, 22–23).)  Defendants contend that this "claim is demonstrably false," and in support, attach the Declaration of J. Thissen in support of their argument.  (*Id.* at 17–18; Decl. of Thissen, Doc. 15-4.)  Thus, Defendants bring a factual challenge to this claim.  Indeed, footnote three of Defendants' motion acknowledges that regarding this claim, they launch a factual attack on standing.  (Doc. 15-1 at 8 n.3 ("The Court can review extrinsic evidence when evaluating a factual attack on Plaintiffs' standing.") (citation omitted).)

In launching a factual attack on standing, the Ninth Circuit has clearly and explicitly forbidden a review of extrinsic evidence "when the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits of an action."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (internal quotation marks and citation omitted). "The question of jurisdiction and the merits of an action are intertwined where a [federal law] provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief."  *Id.* (internal quotation marks and citation omitted); *see also id.* at 1040 ("[T]he jurisdictional issue and substantive issue in this case are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits.").  Thus, a factual attack on standing is appropriate in cases where the defendant argues the plaintiff's federal claim is "immaterial, made solely for the purpose of obtaining federal jurisdiction, or wholly insubstantial and frivolous."  *Id.* (internal quotation marks and citation omitted).

As such, Defendants' factual challenge of Plaintiffs' standing regarding their free expression claim is inappropriate for the Court at this time.  Defendants do not challenge that Plaintiffs' alleged free expression injuries are immaterial, or brought solely for the purpose of bringing that claim, but rather challenge the actual *merits* as to whether CDCR rejected and

altered their internal grievances.  (Doc. 15-1 at 7–8.)  This clearly intertwines the inquiry regarding the Court's jurisdiction for this claim, and the substantive merits of Plaintiffs' free expression claim, and is therefore inappropriate.  Accordingly, the Court will neither review Defendants' Motion to Strike (Doc. 38) nor Plaintiffs' attached declarations to their Opposition in response to Defendants' factual challenge of standing.

Therefore, Defendants' Motion to Strike Plaintiffs' Declarations (Doc. 38), which this Court treats as Objections to Plaintiffs' Declarations, is **DENIED**.  Because Defendant's Motion to File Redacted Exhibits to Thissen Declaration (Doc. 15-6) is a motion regarding documents related to Defendant's factual attack on standing, this motion is **DENIED AS MOOT**.

B.  Defendants' Motion to Dismiss (Doc. 15)

i.  *Redundant Defendants*

Defendants argue that the Court should dismiss defendants Houston, Allison, and Pallares "because their state-entity employer is a named defendant."  (Doc. 15-1 at 26 (capitalizations and emphasis omitted).)  Indeed, the complaint sues each of the defendants in their official capacities while, at the same time, naming the CDCR.  (Doc. 1 at 19-20.)  However, Plaintiffs' only requested relief in this case is for declaratory and injunctive relief, not monetary damages.  (*Id.* at 34–35.)

When a plaintiff sues a state official for monetary damages in her official capacity, it "is not a suit against the official but rather is a suit against the official's office," and "[a]s such, it is no different from a suit against the State itself."  *Will v. Mich. Dep't of State Police*, 591 U.S. 58, 71 (1989) (collecting cases); *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) ("[A] plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.") (footnote omitted).  A state official sued in their official capacity for injunctive relief is considered a "person" under § 1983 and "official-capacity actions for prospective relief are not treated as actions against the State."  *Will*, 591 U.S. at 71 n.10 (internal quotation marks and citations omitted); *see also Cornel v. Hawaii*, 37 F.4th 527, 531 (9th Cir. 2022) ("[S]tate officials are 'persons' under §1983 when sued for prospective injunctive relief.") (citation omitted).

14

1    Accordingly, because Plaintiffs have sued CDCR state officials, Allison, Pallares, and

2    Houston for only prospective relief, in their official capacities, the Court cannot determine that

3    they are redundant defendants.  Defendants' motion is denied on this ground.

4              *ii.   Abandoned Claims*

5    Defendants argue that "[t]he Eleventh Amendment bars this Court from hearing Plaintiffs'

6    California constitutional claims."  (Doc. 15-1 at 22.)  Defendants request that the Court dismiss

7    Plaintiffs' California constitutional claims against both the state official defendants and the

8    CDCR,[8] citing to *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) and

9    Ninth Circuit authority in support of this proposition.  (*Id.*)  Perhaps recognizing the futility of

10   disagreement, Plaintiffs do not address this portion of the motion.  (*See generally* Doc. 36.)

11   The Court deems their claims waived as to the California State Constitutional claims.  *See*

12   *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 881 (9th Cir. 2022); *Est. of Sumner v.*

13   *Cal. Dep't of Corr. and Rehab.*, No. 2:22-cv-01638-JAM-DB, 2023 WL 3304233, at *2 (E.D.

14   Cal. May 8, 2023) (holding, in part, that Plaintiff's "failure to address CDCR's Eleventh

15   Amendment argument" constituted waiver of that argument).  This action shall proceed against

16   Defendants based only on Plaintiffs' federal claims.

17             *iii.   Eleventh Amendment Immunity*

18   Though neither the Defendants nor Intervenors raised Eleventh Amendment immunity

19   regarding Plaintiffs' *federal* causes of action, the Court may *sua sponte* address state sovereign

20   immunity issues, as the doctrine implicates this Court's subject-matter jurisdiction.  *Seminole*

21   *Tribe v. Florida*, 517 U.S. 44, 54 (1996) ("For over a century we have reaffirmed that federal

22   jurisdiction over suits against unconsenting States was not contemplated by the Constitution when

23   establishing the judicial power of the United States.") (internal quotation marks and citation

24   omitted); *Seven Up Pete Venture v. Schweitzer*, 523 F.3d 948, 952 (9th Cir. 2008) ("The Eleventh

25   _____

26   [8] Plaintiffs' California constitutional claims do not explicitly state whether they are brought against some or all of the defendants to this action.  (*See generally* Doc. 1 at 26–33 (state constitutional causes of action).)  The Court infers from Defendants' citations and broad language in argument, that Defendants raised Eleventh Amendment immunity for both

27   the state officials and the CDCR.  (*See* Doc. 15-1 at 22 (citing *Vasquez v. Rauckauckas*, 734 F.3d 1025, 1041 (9th Cir. 2013) for the proposition that "state officials" are immune from federal courts instructing them on state law, and *S.B. v. Cal. Dep't of Educ.*, 327 F. Supp. 3d 1218, 1235 (E.D. Cal. 2018)—a case where the Court afforded a state agency

28   and state officials immunity from suit under the Eleventh Amendment).)

1   Amendment has been authoritatively construed to deprive federal courts of jurisdiction over suits

2   by private parties against unconsenting States.") (footnote omitted) (citing *Seminole Tribe v.*

3   *Florida*, 517 U.S. 44, 54 (1996)); *In re Jackson*, 184 F.3d 1046, 1048 (9th Cir. 1999) ("Eleventh

4   Amendment sovereign immunity limits the jurisdiction of the federal courts and can be raised by

5   a party at any time during judicial proceedings or by the court sua sponte.") (citations omitted);

6   *Charley's Taxi Radio Dispatch Corp. v. SIDA of Haw., Inc.*, 810 F.2d 869, 873 n.2 (9th Cir.

7   1987) ("Like a jurisdictional bar and unlike a traditional immunity, however, the effect of the

8   Eleventh Amendment must be considered *sua sponte* by federal courts.") (citation omitted).

9          The Eleventh Amendment immunizes states from suit in federal court "by citizens and

10   noncitizens alike," and "extends not just to suits in which the state itself is a named party but also

11   to those against an arm of the state." *Kohn v. State Bar of Cal.*, 87 F.4th 1021, 1025–26 (9th Cir.

12   2023) (collecting cases) (cleaned up) (internal quotation marks omitted); *e.g.*, *Munoz v. Sup. Ct.*

13   *of L.A. Cnty.*, 91 F.4th 977, 980 (9th Cir. 2024) (holding Superior Court of State of California

14   immune from suit under the Eleventh Amendment because it is an arm of the state).  However, a

15   state "may choose to waive its immunity in federal court at its pleasure," but its waiver and

16   consent "must be unequivocally expressed" and "may not be implied." *Chicken Ranch Rancheria*

17   *of Me-Wuk Indians v. California*, 65 F.4th 1145, 1148 (9th Cir. 2023) (internal quotation marks

18   and citations omitted); *Doe v. Regents of Univ. of Cal.*, 891 F.3d 1147, 1152–53 (9th Cir. 2018).

19          As a state agency, it is a long-established principle that the California Department of

20   Corrections and Rehabilitation is immune from suit in federal court under the Eleventh

21   Amendment.  *Brown v. Cal. Dep't of Corr.*, 554 F.3d 747, 752 (9th Cir. 2009) ("The district court

22   correctly held that the California Department of Corrections and the California Board of Prison

23   Terms were entitled to Eleventh Amendment immunity.") (citation omitted); *see also Stevenson*

24   *v. Cal. Dep't of Corr. and Rehab.*, No. 23-55090, 2023 WL 6879351, at *1 (9th Cir. Oct. 18,

25   2023); *Sands v. Cal. Dep't of Corr. and Rehab.*, 683 F. App'x 559, 559 (9th Cir. 2017) ("The

26   district court properly dismissed Sands' action because the California Department of Corrections

27   and Rehabilitation, as a state agency, is immune from suit under the Eleventh Amendment[.]")

28   (citations omitted); *Est. of Sumner*, 2023 WL 3304233, at *2 ("In turn, the Eleventh Amendment

1    unequivocally precludes Plaintiffs['] claims against CDCR.").

2          While not fully briefed by CDCR,[9] the Court cannot conclude that CDCR has

3    unequivocally waived immunity and consented to federal jurisdiction.  Though CDCR has

4    appeared and defended this action through the filing of a motion to dismiss, these actions do not

5    constitute unequivocally expressing a waiver of immunity or consent to suit.  *See, e.g.*, *Demshki*

6    *v. Monteith*, 255 F.3d 986, 989 (9th Cir. 2001) ("[Plaintiff] also argues that [defendant] waived its

7    Eleventh Amendment immunity by defending the case on the merits and by supposedly failing to

8    raise immunity in a timely manner.  This contention is without merit."); *see also Regents*, 891

9    F.3d at 1152–53 (noting that defendants' failure to raise Eleventh Amendment immunity on first

10   motion to dismiss did not unequivocally express waiving immunity defense asserted in second

11   motion to dismiss). Accordingly, the Court must **DISMISS** Plaintiffs' action against CDCR on

12   this basis alone.

13                     *iv.   Article III Redressability*

14         On the other hand, the Court notes that Plaintiffs have failed to show that it is "likely, as

15   opposed to merely speculative, that the[ir] injur[ies] will be redressed by a favorable decision."

16   *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023). Plaintiffs have the burden to show that they

17   have Article III standing for each claim pressed and for each of form of requested relief sought.

18   *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021); *Meland v. WEBER*, 2 F.4th 838, 843

19   (9th Cir. 2021).  This requirement does not change in either the declaratory judgment or

20   permanent injunction context.  *See Haaland v. Brackeen*, 599 U.S. 255, 292–93 (2023) (analyzing

21   standing for plaintiffs' requests for declaratory and injunctive relief); *Clapper v. Amnesty Int'l,*

22   *USA*, 568 U.S. 398, 407–10 (2013) (analyzing standing for plaintiffs' requests for a declaratory

23   judgment and permanent injunction); *San Diego Cnty. Credit Union v. Citizens Equity First*

24   *Credit Union*, 65 F.4th 1012, 1022 (9th Cir. 2023) (Article III standing requirement "is not

25   relaxed in the declaratory judgment context.") (internal quotation marks and citation omitted).

26         The last element—redressability—"requires that the court be able to afford relief *through*

27

28   _____

[9] CDCR did, at least in part, raise Eleventh Amendment immunity in the body of its motion.  (*See supra*; Doc. 15-1 at 22.)

*the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." *Haaland*, 599 U.S. at 294 (emphases in original) (citations omitted). "To establish Article III redressability, the plaintiffs must show that the relief they seek is both (1) substantially likely to redress their injuries; and (2) within the district court's power to award." *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020). "To determine whether an injury is redressable, a court will consider the relationship between the judicial relief requested and the injury suffered." *California v. Texas*, 593 U.S. 659, 671 (2021) (internal quotation marks and citation omitted).

In their Complaint, Plaintiffs have alleged the following injuries:

(1) Experiencing "fear, anxiety, depression, and/or post-traumatic stress disorder, as a direct result of":
    a. "[S]haring close-quarters housing, showering, dining, and recreation with [transgender women]";
    b. Observing that some incarcerated women are having sexual relations with some incarcerated transgender women; and
    c. "[O]bserving changes to the environment of women's facilities to become more like men's facilities";

(2) "[S]ome incarcerated women . . . now make sleep schedules" to prevent the alleged rape by transgender inmates;[10]

(3) Prison staff are armed with new, stronger pepper spray and riot control measures in anticipation that transgender women are allegedly "stronger and more violent";[11]

(4) Women's facilities have new contraceptive policies;[12]

(5) CCWF "has considered cutting down the only shade trees in the exercise yard" because transgender women may "use the trees as weapons and/or because the trees cause visual blind spots" that pose security risks. "[N]umerous women suffered psychological distress at the prospect of having [their] only connection to nature stripped

---

[10] As this alleged injury relates only to "some incarcerated women" and not the named Plaintiffs to this lawsuit, this injury is not sufficiently particularized to state a cognizable Article III injury. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) ("For an injury to be 'particularized,' it must affect the plaintiff in a personal and individual way.") (internal quotation marks omitted) (collecting cases).

[11] Similarly, this injury has no relation to the Plaintiffs. Instead, it merely complains about additional alleged burdens incurred by CDCR *staff—not* the Plaintiffs to this suit. *Spokeo*, 578 U.S. at 339. Even if the suggestion is that these more forceful responses will be used against Plaintiffs in the event their conduct gives rise to the need for the use force, officers may only use that amount of force consistent with the Fourth Amendment.

[12] Plaintiffs have failed to allege how this constitutes an alleged injury that is particularized to them, especially because the facilities have "changed contraceptive policy to make them available to *all* females." (Doc. 1 at ¶ 45 (emphasis added).)

away";[13]

    (6) The "statutory directive" imposes cruel and unusual punishment "by subjecting [Plaintiffs] to substantially increased risk of sexual harassment, sexual assault, rape, and physical violence, and to psychological fear of such harms" because there is a "known substantial risk or probability that such violence will occur";[14]

---

[13] "Article III requires a 'certainly impending' injury or, at the very least, a 'substantial risk that the harm will occur[.]" *Lake v. Fontes*, 83 F.4th 1199, 1204 (9th Cir. 2023) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).  Regarding this allegation that CCWF "has considered cutting down" shade trees, "Plaintiffs simply have not plausibly alleged a 'real and immediate threat of' future injury."  *Id.* (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983)).  "Such 'some day' intentions" of cutting down shade trees in the exercise yard— "without any description of concrete plans, or indeed any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that [the Supreme Court's] cases require."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) (emphasis in original).

Furthermore, "[t]he Supreme Court has repeatedly reiterated that . . . allegations of possible future injury are not sufficient."  *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 476 (9th Cir. 2022) (citing *Clapper*, 568 U.S. at 409) (internal quotation marks omitted).  Thus, the "prospect" that CDCR may cut down shade trees at women's facilities cannot suffice as a proper Article III injury in fact allegation.  *Id.*

[14] On this Eighth Amendment claim, Plaintiffs alleged injuries fail to establish probabilistic standing.  *Lake*, 83 F.4th at 1204.  The allegation that there is a "substantially increased risk of sexual" harassment and assault, is a conclusion, unsupported by factual allegations.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (disregarding "conclusory allegations" of standing affidavit); *Daniel v. Nat'l Park Serv.*, 891 F.3d 762, 765 (9th Cir. 2018) ("Daniel lacks standing because her complaint makes only conclusory allegations . . ."); *Carrico v. City and Cnty. of S.F.*, 656 F.3d 1002, 1006 (9th Cir. 2011) ("This conclusory allegation is insufficient to establish standing.") (citation omitted).  The Court therefore gives no weight to Plaintiffs' Eighth Amendment allegations of alleged future harm of rape and assault.  *Daniel*, 891 F.3d at 767 (holding threadbare and "naked assertions fail our edict that a plaintiff may not rely on a bare legal conclusion to assert injury-in-fact[.]") (internal quotation marks and citation omitted).

Also, Plaintiffs may not base their claim for injunctive relief on past harms of alleged rape and assault without more.  *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 680–81 (9th Cir. 2023) ("To bring a claim for prospective injunctive relief, the plaintiff must demonstrate that he has suffered or is threatened with a concrete and particularized legal harm, coupled with *a sufficient likelihood* that he will again be wronged in a similar way.") (emphasis added) (internal quotation marks and citation omitted).  Plaintiffs have not tied their past harms to a written policy, id., nor expressed that the harms of rape and assault are *ongoing* to each or any plaintiff.  *Phillips v. U.S. Customs and Border Prot.*, 74 F.4th 986, 991 (9th Cir. 2023).

The ongoing nature of such harassment, assault, and violence is necessary, particularly to Plaintiffs' claims against state officials to fall under the *Ex parte Young* exception.  *Va. Off. for Prot. and Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) ("[I]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.") (internal quotation marks and citation omitted); *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 80 F.4th 943, 955 (9th Cir. 2023) ("*Ex Parte Young* allows suits seeking prospective relief against a state official who has a fairly direct connection to an ongoing violation of federal law.") (internal quotation marks and citations omitted).

Finally, this allegation—on its face—does not contest the alleged unlawful activity of *Defendant CDCR*, but instead, surmises about the independent conduct of third parties—incarcerated transgender women.  "[W]here a causal relation between injury and challenged action depends upon the decision of an independent third party . . . standing is not precluded, but it is ordinarily substantially more difficult to establish."  *California v. Texas*, 593 U.S. 659, 675 (2021) (cleaned up) (internal quotation marks and citations omitted).  "To satisfy that burden, the plaintiff must show at the least that third parties will likely react in predictable ways," *id.* (internal quotation marks and citation omitted), and "that the injury was not the result of the *independent* action of some third party," but that "the government's

(7) Plaintiffs have filed administrative grievances requesting CDCR stop transferring transgender women into their facilities, but CDCR has allegedly altered their statements by changing the gender identity of "men" to "transgender females" or "transgender women";

(8) S.B. 132 allegedly compels CDCR inmates to use transgender inmates' preferred gender pronouns;[15]

_____

unlawful conduct is *at least a substantial factor motivating the third parties' actions*." *Mendia v. Garcia*, 768 F.3d 1009, 1013 (9th Cir. 2014) (first emphasis in original, second emphasis added).

Plaintiffs cannot plausibly allege that CDCR has *motivated*—nor is currently motivating—incarcerated, transgender individuals to sexually harass and assault Plaintiffs, nor that CDCR is substantially likely to motivate these individuals in the future. Such an allegation is not only absent in Plaintiffs' Complaint but is untethered from S.B. 132. This claim therefore also fails on Article III traceability grounds.

[15] Here, because Defendants factually attack Plaintiffs' free expression claim, the Court may review the standing declarations brought by Romero, Johnson, and Gonzalez, as discussed in the section denying Defendants' Motion to Strike above. Only Tomiekia Johnson's declaration pertains to Plaintiffs' free expression claim, wherein she states that: "It is my understanding that because of my work for CDCR as an inmate, that I fall under SB 132's requirements to use so-called 'preferred pronouns.' Requiring me to call men 'she or her' violates my right to use common sense language to describe what I see and to speak freely about the problems I see happening from housing men with women." (Ex. C, Johnson Decl., Doc. 36-3 at ¶ 9.)

First, Plaintiffs have failed to establish that merely working during their imprisonment means that they are bound by the requirements of Penal Code section 2606. Indeed, such a conclusion leads to absurd results. For example, they are not entitled to determine the housing of inmates, to search them, to evaluate their health needs or determine their management or security needs. Thus, the suggestion that complying with Penal Code section 2700, which "requires every able-bodied prisoner imprisoned in any state prison" to work entitles the inmates to the privileges or imposes on them the obligations of the regulations imposed on the CDCR and its employees is unsupported by law or factual allegations, rather than mere conclusions or suppositions.

In any event, it is well-established that "[t]he self-censorship door to standing does not open for every plaintiff," *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003), and "self-censorship alone is insufficient to show injury." *Lopez*, 630 F.3d at 792 (citations omitted). "Mere allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Id.* (cleaned up) (internal quotation marks and citation omitted). Instead, the Court's inquiry focuses on "the credibility of the threat that the challenged law will be enforced against" the plaintiff. *Id.* (citation omitted).

"Where a plaintiff has refrained from engaging in expressive activity for fear of prosecution under the challenged [regulation], such self-censorship is a constitutionally sufficient injury as long as it is based on an actual and well-founded fear that the challenged statute will be enforced." *Porter v. Martinez*, 68 F.4th 429, 437 (9th Cir. 2023). In assessing a claimed threat of enforcement, the Court looks to three factors: "(1) whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, (2) whether the prosecuting authorities have communicated a specific warning or threat to initiate enforcement proceedings, and (3) the history of past prosecution or enforcement under the challenged [regulation]." *Id.* (cleaned up) (footnote and citation omitted). "Bare allegations that a plaintiff's speech has been chilled by the challenged statute are insufficient to establish a reasonable fear of prosecution." *Wolfson v. Brammer*, 616 F.3d 1045, 1062 (9th Cir. 2010) (citation omitted).

The difficulty in assessing Johnson's alleged self-censorship injury lies in the fact that she has not alleged nor declared that CDCR has in fact compelled her speech, nor threatens to do so. Furthermore, while Plaintiffs' Complaint alleges that Plaintiffs "are all compelled by S.B. 132 to use words and language in a manner that suggests adherence to beliefs the speaker may not share," (Doc. 1 at ¶ 115), the Court may disregard allegations contradicted by Johnson's own declaration. *Sprewell v. Golden Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

Thus, it appears that Plaintiffs lack a "concrete plan" to make the same or similar remarks regarding gender pronouns

(9) S.B. 132 has violated the Establishment Clause of the First Amendment "by requiring prison housing placements between men's and women's facilities to be made," and by imposing a "faith-based belief system," which "compel[s] [Plaintiffs] to profess adherence";[16]

(10) Romero and Chandler both allege their rights to religious exercise are violated by sharing housing with transgender women; and

(11) "S.B. 132 [ ] treats inmates differently on the basis of 'gender identity' or 'transgender status' causing disadvantage to inmates who have no 'gender identity' or whose 'gender identity' is not one of the identities favored under the statute," in alleged violation of the Equal Protection Clause.  This is because "S.B. 132 converts women's correctional facilities into mixed-sex facilities, with no corresponding conversion of men's facilities, imposing on women on the basis of sex a significant disadvantage and burden in the form of serving prison time without the benefit of rehabilitating in a single-sex environment."[17]

---

and identity in the future, CDCR has not allegedly compelled Johnson's speech, nor punished her for restraining from using inmates' preferred gender pronouns, Johnson has not expressed that she intends to violate the law, CDCR has not threatened punishment, and Plaintiffs have not provided "the enforcement history of [S.B. 132] [to] corroborate[] a genuine threat."  *Wolfson*, 616 F.3d at 1062 (citation omitted).  Like *Wolfson*, then, Johnson "can have no well-founded fear that [s]he will be prosecuted for violating" S.B. 132.  *Id.* at 1063.

[16] Plaintiffs complain that S.B. 132 incorporates in the definition of "transgender," those who identify as "two-spirit and mahu."  (Doc. 1 at ¶ 23.)  However, Plaintiffs also complain that S.B. 132 "does not define 'men,' 'women,' 'male,' 'female,' 'gender,' or 'gender identity,' yet uses all of those terms in tautological attempts to define other terms such as 'transgender[.]'" (Doc. 1 at ¶ 22.)  To the contrary, the basis of Plaintiffs' Complaint is *not* the text of S.B. 132, but instead, the California Legislative Counsel's Digest.  *See* CAL. LEGIS. COUNSEL'S DIGEST, 2020 Cal. Legis. Serv. Ch. 182 (S.B. 132) (Cal. Sept. 26, 2020).

To begin, it is now well-established that a plaintiff may not complain about a government-sponsored event or law that contains a religious theme.  *City of Ocala v. Rojas*, 143 S. Ct. 764, 764 (2023) (Gorsuch, J.) *in approval of denying cert.* ("This Court has never endorsed the notion that an 'offended observer' may bring an Establishment Clause claim."); *id.* at 765 ("Moving forward, I expect lower courts will recognize that offended observer standing has no more foundation in the law than the *Lemon* test that inspired it."); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022) ("Nor does the Clause compel the government to purge from the public sphere anything an objective observer could reasonably infer endorses or partakes of the religious.") (internal quotation marks and citation omitted).  At least one Justice views the "offended observer" injury as a part of Article III standing.  *Rojas*, 143 S. Ct. at 764–65.

Thus, Plaintiffs cannot complain that S.B. 132's legislative history took into account "two-spirit" and "mahu" individuals because it makes them uncomfortable.  And, as a matter of law, the Court cannot plausibly determine that transgenderism is a religion, *Edmo v. Corizon, Inc.*, 935 F.3d 757, 768 (9th Cir. 2020), nor have Plaintiffs alleged that "two spirit" and "mahu" are religions.  (Doc. 1 at ¶ 23.)  Therefore, as a matter of both subject-matter jurisdiction, and for the purposes of plausibly alleging a claim, this injury and cause of action have no merit.

[17] Like many of Plaintiffs' aforementioned allegations, this allegation rests on the alleged unlawfulness of S.B. 132 *itself*, and not on the alleged unlawful conduct performed by *Defendant*.  *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) ("Second, the plaintiff's injury must *be fairly traceable to the challenged action of the defendant*, meaning that there must be a causal connection between the injury *and the conduct complained of*.") (emphases added); *O'Handley v. Weber*, 62 F.4th 1145, 1161 (9th Cir. 2023) (alleged injury must be "fairly traceable *to the challenged conduct* of the defendant") (emphasis added).

1

2 (Doc. 1 at ¶¶ 4, 42–48, 69–72, 82–84, 90, 95, 100, 103.)

3     For each federal constitutional claim, Plaintiffs request a declaratory judgment that S.B.

4 132 violates the Eighth, First, and Fourteenth Amendments to the U.S. Constitution.  (Doc. 1 at

5 20–26.)  Plaintiffs also request the Court issue a permanent injunction to "enjoin[] Defendants

6 from enforcing or implementing S.B. 132."  (*Id.* at ¶ 141.)  In their opposition to the motion to

7 dismiss, Plaintiffs state that their injuries are redressable via "restoring pre-SB 132 status quo[.]"

8 (Doc. 36 at 15 (parentheticals omitted).)  Similarly, in their opposition to the motion to strike,

9 Plaintiffs reiterate that their injuries would be redressed through their "requested relief" of

10 "return[ing] to status quo prior to SB 132, where male inmates were housed in women's prisons

11 only on a case-by-case basis involving objective factors relevant to women's safety, which factors

12 are 'off the table' under SB 132."  (Doc. 41 at 7.)

13     There are several issues plaguing the Court's ability to redress Plaintiffs' grievances.  To

14 begin, the Court's issuance of a declaration that the government is violating the Constitution

15 "alone is not substantially likely to mitigate the plaintiffs' asserted concrete injuries.  A

16 declaration, although undoubtedly likely to benefit the plaintiffs psychologically, is unlikely by

17 itself to remediate their alleged injuries absent further court action."  *Juliana*, 947 F.3d at 1170

18 (citations omitted); *see also Haaland*, 599 U.S. at 294 ("It is a federal court's judgment, not its

19 opinion, that remedies an injury; thus it is the judgment, not the opinion, that demonstrates

20 redressability."). The crux of Plaintiffs' requested remedy is a permanent injunction enjoining

21 CDCR and its officials from further implementing and enforcing S.B. 132—*i.e.*, prohibiting

22 CDCR staff and inmates from addressing incarcerated individuals who are "transgender,

23 ─────────────────

24 Regardless, Plaintiffs still fail to adequately allege an equal protection injury.  S.B. 132, Cal. Penal Code § 2606(a) allows "individual[s] incarcerated by [CDCR] who [are] transgender, nonbinary, or intersex, regardless of anatomy, shall . . . [to] [b]e housed at a correctional facility designated for men or women based on the individual's

25 preference[.]"  Cal. Penal Code § 2606(a)(3).  While "[u]neven enforcement can pose an equal protection issue," *O'Handley*, 62 F.4th at 1164 (citation omitted), the crux of Plaintiffs' alleged equal protection injuries—that

26 cisgender, male correctional facilities have not received as many transgender inmates as women's facilities—does not plausibly allege an equal protection injury incurred *at the hands of CDCR*.  Not only is this absent in Plaintiffs'

27 Complaint for the purposes of standing, but as a matter of law, it is also implausible when the plain text of S.B. 132 places that decision at the hands of inmates themselves—*not* the Government.  That the law is "susceptible to uneven

28 enforcement" is insufficient to confer standing.  *Kumar v. Koester*, No. 2:22-cv-07550-RGK-MAA, 2023 WL 4781492, at *3 (C.D. Cal. July 25, 2023) (awaiting publication).

1  nonbinary, or intersex . . . in a manner consistent with the incarcerated individual's gender

2  identity," and prohibiting CDCR from housing such individuals in correctional facilities based on

3  their preference.  Cal. Penal Code §§ 2606(a)(1), (3).

4          There are two fatal flaws concerning this requested injunction.  First, it would require the

5  Court to order CDCR officials to identify, locate, and remove potentially over two dozen[18]

6  transgender, intersex, and nonbinary individuals from California prisons (Doc. 1 at ¶ 39).

7  Not only is it "beyond the power of an Article III court to order, design, supervise, or implement

8  the plaintiffs' [suggested] remedial plan," which would inevitably "require a host of complex

9  policy decisions entrusted, for better or worse, to the wisdom and discretion of the executive and

10 legislative branches," *Juliana*, 947 F.3d at 1171, but this is also not what Plaintiffs' Complaint

11 requests.  They request the Court enjoin CDCR and its officials from *further* enforcing or

12 implementing S.B. 132.  (*See* Doc. 1 at ¶ 141.)  Even if the Court granted this relief, it would only

13 stop further inflow of gender-nonconforming incarcerated individuals; those who CDCR has

14 already housed in CCWF would remain.  (Doc. 32 at 18 ("An injunction against implementing the

15 specific policy contained in SB 132 would do nothing to change CDCR's obligations to maintain

16 a similar policy . . . and thus would do nothing to remedy Plaintiff[s'] alleged injuries.").)

17         Moreover, the Court is not convinced that life in these prisons "pre-SB 132" would

18 redress Plaintiffs' complaints.  As Plaintiffs admit, California Code of Regulations, Title 15,

19 § 3269 (2017) allowed transgender inmates and inmates with symptoms of gender dysphoria to be

20 referred to a classification committee for a determination of appropriate housing at a designated

21 institution.  CAL. CODE REGS. tit. 15, § 3269(g) (2017); (Doc. 41 at 7.)  This regulation existed at

22 least three years prior to the enactment of S.B. 132 and allowed for transgender inmates to be

23 housed with cisgender, female inmates.  *Id.* at §§ 3269(g), 3375(b) (2017).

24         In other words, the remedial scheme laid out in §§ 3269(g) and 3375(b)[19] directly

---

[18] At the time Plaintiffs filed their opposition brief, they represented that there were at least two dozen of such transfers into CIW and CCWF.  (Doc. 1 at ¶ 39.)  In their Opposition, however, Plaintiffs represent that there are at least 300 of such individuals housed in women's correctional facilities.  (Doc. 36 at 26.)  Regardless, the number of incarcerated gender non-conforming individuals is certainly high.

[19] Now located at CAL. CODE REGS. tit. 15, § 3269(h) (2022–23) and § 3375, respectively.

23

1  undermines Plaintiffs' arguments that by restoring California's women's correctional facilities to

2  their housing arrangements pre-S.B. 132, cisgender and transgender inmates would live in

3  separate housing facilities.  Indeed, Plaintiffs do not seek to enjoin *these* provisions of the

4  California Code of Regulations, and such regulations would still exist if the Court issued

5  Plaintiffs their requested injunction.  Thus, Defendants correctly point out that "regardless of the

6  outcome of this suit, transgender women will continue to be housed in women's facilities."  (Doc.

7  15-1 at 19.)

8      Furthermore, it is entirely unclear how either a declaration or permanent injunction would

9  redress Plaintiffs complaint regarding CDCR's alleged responses to their administrative

10  grievances.  Even if the Court granted Plaintiffs' request for a declaration and injunction, the

11  Court lacks power to oversee and prohibit CDCR officials, staff, or even Plaintiffs from referring

12  to gender-nonconforming individuals by their preferred gender identity, if they so choose.

13  *Juliana*, 947 F.3d at 1171–72.[20] "[E]ven under such a scenario, the plaintiffs' request for a

14  remedial plan would subsequently require the judiciary to pass judgment on the sufficiency of the

15  government's response to the order, which necessarily would entail a broad range of

16  policymaking.  And inevitably, this kind of plan will demand action not only by the Executive,

17  but also by Congress."  *Id.* at 1172.

18      Accordingly, the Court determines that it cannot likely redress Plaintiffs' asserted injuries,

19  even in the face of a favorable outcome.  Such requested relief exceeds the power of an Article III

20  court, invades the province of the other branches of government, and in the face of pre-existing

21  California Code of Regulations provisions, would not guarantee that gender non-conforming

22  individuals live separate and apart from cisgender, female inmates, as Plaintiffs request.  Also,

23  CDCR staff, Plaintiffs, and other prisoners may still choose to call such individuals by their

24  preferred gender pronouns, honorifics, and gender identities.[21]  For this reason, in addition to

25
26  [20] Alternatively, the Court *could* enjoin CDCR officials from requiring inmates refer to each other by their preferred gender pronouns, but as footnote 15 explains, Plaintiffs have not proffered a ripe injury of self-censorship.

27  [21] Indeed, such a ruling from this Court could constitute a prior restraint on speech.  *Twitter, Inc. v. Garland*, 61 F.4th 686, 702–03 (9th Cir. 2023) ("In First Amendment law, a prior restraint is an order forbidding certain

28  communications when issued in advance of the time that such communications are occur.") (internal quotation marks

1    issues of abandonment and immunity, the Court must **GRANT** Defendants' motion to dismiss.

2    Defendants' Request for Judicial Notice (Doc. 15-2) is accordingly **DENIED AS MOOT**.

3                                    *v.   42 U.S.C. § 1983*

4           Finally, the Court notes that it must grant Defendants' motion to dismiss for failure to

5    state a claim because Plaintiffs have failed to bring their claims pursuant to 42 U.S.C. § 1983.

6    (*See generally* Doc. 1.) As recited throughout this order, Plaintiffs are state prisoners who have

7    sued state officials and a state agency *directly* for alleged federal and state constitutional

8    violations.  In *Nettles v. Grounds*, 830 F.3d 922, 927 (9th Cir. 2016), however, the Ninth Circuit

9    held "that a § 1983 action *is the exclusive vehicle* for claims brought by state prisoners that are

10   not within the core of habeas corpus."  (emphasis added); *id.* at 930 ("§ 1983 is the exclusive

11   remedy for state prisoner claims that do not lie at the core of habeas.").  By failing to bring their

12   constitutional claims against Defendants pursuant to 42 U.S.C. § 1983, Plaintiffs have improperly

13   brought this civil rights action.  This serves as yet another basis to grant Defendants' motion.

14       C.   Leave to Amend

15          Courts have broad discretion to grant leave to amend a complaint.  *Nguyen v. Endologix,*

16   *Inc.*, 962 F.3d 405, 420 (9th Cir. 2020).  In determining whether a plaintiff should be granted

17   leave to amend, courts consider "the presence or absence of undue delay, bad faith, dilatory

18   motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the

19   opposing party and futility of the proposed amendment."  *Kroessler v. CVS Health Corp.*, 977

20   F.3d 803, 814–15 (9th Cir. 2020) (internal quotation marks and citation omitted).  Generally, Rule

21   15 advises that "[t]he court should freely give leave when justice so requires."  Fed. R. Civ. P.

22   15(a)(2).  Indeed, "[i]t is the black-letter law that a district court must give plaintiffs at least one

23   chance to amend a deficient complaint," unless there is "a clear showing that amendment would

24   be futile."  *Barke v. Banks*, 25 F.4th 714, 721 (9th Cir. 2022) (internal quotation marks and

25   citation omitted).

26          Granting leave to amend is futile, however, when the defendant enjoys sovereign

27

28   and citation omitted).  "[T]he government usually may not impose [such] prior restraints on speech," *Hous. Cmty.*
     *Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (citation omitted), as all restraints on speech are presumptively
     unconstitutional.  *Twitter*, 61 F.4th at 703.

immunity.  *See Ctr. for Biological Diversity v. U.S. Forest Serv.*, 80 F.4th 943, 955–56 (9th Cir. 2023) ("As the *Ex parte Young* exception does not apply, any amendment would be futile."); *Portnoy v. California*, 821 F. App'x 848, 848 (9th Cir. 2020) (amendment affirmed as futile because defendant enjoyed Eleventh Amendment immunity).  Similarly, amendment is futile when the Court cannot redress Plaintiff's claims.  *See Temple of 1001 Buddhas v. City of Fremont*, 588 F. Supp. 3d 1010, 1020 (N.D. Cal. 2022) (denying leave to amend claims where Plaintiff's injury was not redressable); *see also Huang v. Small Bus. Admin.*, No. 22-cv-03363-BLF, 2023 WL 3028087, at *5 (N.D. Cal. Apr. 19, 2023) (denying leave to amend, in part, because of "the fact that the lack of redressability could not be cured").  For claims that the plaintiff may redress, the Court must grant the plaintiff leave to amend if it dismisses the first complaint for lack of Article III standing.  *Bolden-Harge v. Office of Cal. State Controller*, 63 F.4th 1215, 1221 n.1 (9th Cir. 2023).

Here, the Court determines not only that CDCR enjoys immunity under the Eleventh Amendment, but also that most of Plaintiffs' claims are not redressable under the bounds of Article III.  As such, the Court **DENIES** Plaintiffs leave to amend their Complaint against CDCR, and for claims that the Court cannot redress.  In light of this opinion, Plaintiffs may file an amended Complaint against only the state official defendants.

## VI.   CONCLUSION

Based upon the foregoing, the Court **ORDERS**:

(1)   Defendants' Motion to Strike Plaintiffs' Declarations (Doc. 38), which the Court treats as an Objection to Plaintiffs' Exhibits, is **DENIED**.

(2)   Defendants' Motion to File Redacted Exhibits to Thissen Declaration (Doc. 15-6) is **DENIED AS MOOT**.

(3)   Defendants' Motion to Dismiss (Doc. 15) is **GRANTED with leave to amend** as to only the individual defendants and **without leave to amend** as to the California Department of Corrections and Rehabilitations.

(4)   Defendants' Request for Judicial Notice of Matters and Records in Support of Motion to Dismiss (Doc. 15-2) is **DENIED AS MOOT**.

(5)    **Within 21 days**, Plaintiffs may file an amended complaint or a notice of dismissal. Failure to timely file either document will result in dismissal of Plaintiffs' case with prejudice pursuant to Rule 41(b).[22]

IT IS SO ORDERED.

Dated:    **May 14, 2024**

UNITED STATES DISTRICT JUDGE

---

[22] *See Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1063–65 (9th Cir. 2004) (stating that a plaintiff's failure to take any action in response to a court's ultimatum to the plaintiff to either amend their complaint or to indicate to the court that it will not do so "is properly met with the sanction of a Rule 41(b) dismissal").

27