1  HARMEET K. DHILLON (SBN: 207873)
   harmeet@dhillonlaw.com
2  MARK P. MEUSER (SBN: 231335)
   mmeuser@dhillonlaw.com
3  **DHILLON LAW GROUP INC.**
   177 Post Street, Suite 700
4  San Francisco, CA 94108
   Telephone: (415) 433-1700
5  Facsimile: (415) 520-6593
6
7  MATTHEW HOESLY (SBN: 289593)
   mhoesly@dhillonlaw.com
8  **DHILLON LAW GROUP INC.**
   4675 MacArthur Court, Suite 1410
9  Newport Beach, CA 92660
   Telephone: (415) 433-1700
10 Facsimile: (415) 520-6593
11
12 *Attorneys for Plaintiffs*
13              **UNITED STATES DISTRICT COURT**
14     **EASTERN DISTRICT OF CALIFORNIA (FRESNO DIVISION)**
15
16 JANINE CHANDLER, et al.                | **Case No.:** 1:21-cv-01657-JLT-HBK
17              Plaintiffs,
18        v.                              | **PLAINTIFFS' OPPOSITION TO
19 JEFFREY MACOMBER, et al.               | DEFENDANTS' AND INTERVENORS'
                                          | MOTION TO DISMISS**
20              Defendants.
21
22
23
24
25
26
27
28

---



Plaintiffs' Opposition to Motion to Dismiss                    Case Number: 1:21-cv-01657-JLT-HBK

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

STATEMENT OF FACTS ...........................................................................................2

LEGAL STANDARD...................................................................................................3

ARGUMENT................................................................................................................4

I.     Preservation Of Facial Challenge To S.B. 132 For Appeal......................................4

II.    Plaintiffs Have Standing Because They Have Been Harmed By Defendants' Implementation of S.B. 132 And Are Likely To Have Their Ongoing Injuries Redressed By A Return to the Pre-S.B. 132 Procedural Protections. ...............................................................................................4

A.     Plaintiffs have alleged concrete and particularized injuries under the First, Eighth and Fourteenth Amendments.................................................................................................4

   1.     Plaintiffs have concrete and particularized Eighth Amendment injuries............................4

   2.     Plaintiffs have concrete and particularized First Amendment injuries based on Free Exercise of Religion, Freedom of Speech, and First Amendment Retaliation. ...........................7

      i.     Plaintiffs have Standing for their Free Exercise Claims...................................7

      ii.    Plaintiffs have Standing for their Free Speech Claims ....................................8

      iii.   Plaintiffs have Standing for their First Amendment Retaliation Claims ....................8

   3.     Plaintiffs have concrete and particularized Fourteenth Amendment injuries.....................9

B.     S.B. 132 caused Plaintiffs' injuries because the CDCR is now mandated to accede to trans-identifying biological males' wishes to be housed in a female facility regardless of the risks it creates for biological female inmates. .........................................................................10

   1.     There is a direct causal connection between Defendants' actions and Plaintiffs' First and Fourteenth Amendment injuries. ..............................................................................10

   2.     Defendants caused Plaintiffs' Eighth Amendment injuries by exposing Plaintiffs to a substantial risk of serious harm and disregarding that risk...........................................11

C.     Plaintiffs' injuries are likely to be redressed by a favorable decision for Plaintiffs. .........11

III.   S.B. 132's Policies As Applied to Plaintiffs Violate the Constitution............................12

A.     Plaintiffs state plausible claims for Eighth Amendment violations.................................12



B.      Plaintiffs state a plausible claim that Defendants violate their First Amendment Free Exercise Rights. ................................................................................................................16

C.      Plaintiffs state a plausible claim that Defendants violate their First Amendment Free Speech Rights............................................................................................................................17

D.      Plaintiffs state a plausible claim of First Amendment Retaliation. ...................................20

E.      Plaintiffs state a plausible claim for violations of their Fourteenth Amendment rights. ...22

        1.      Plaintiffs allege a Gender Based Equal Protection Claim .........................................23

        2.      In the alternative, Plaintiffs allege a viable Rational Basis Equal Protection Claim .24

CONCLUSION.................................................................................................................................25



## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*abrogated in part on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*,

   572 U.S. 118 (2014)...................................................................................................9

*Allen v. Wright*,

   468 U.S. 737, 755 (1984)...........................................................................................9

*Ariz. Dream Act Coal. v. Brewer*,

   757 F.3d 1053, 1064 (9th Cir. 2014) ......................................................................22

*Arizona Students' Association v. Arizona Board of Regents*,

   824 F.3d 858, 867 (9th Cir. 2016) ............................................................................8

*Ashcroft v. Iqbal*,

   556 U.S. 662, 678 (2009)...........................................................................................4

*Bell v. Wolfish*,

   441 U.S. 520, 547 (1979)..........................................................................................23

*Berger v. City of Seattle*,

   569 F.3d 1029, 1051 (9th Cir. 2009) ......................................................................18

*Brodheim v. Cry*,

   584 F.3d 1262, 1272 (9th Cir. 2009) ................................................................19, 20

*Bruce v. Ylst*,

   351 F.3d 1283, 1289 (9th Cir. 2003) ......................................................................21

*Byrd v. Maricopa County Sheriff's Dept.*,

   629 F.3d 1135, 1140 (9th Cir. 2011) ......................................................................23

*California Pro-Life Council, Inc. v. Getman*,

   328 F.3d 1088, 1094 (9th Cir. 2003) ........................................................................7

*City of Cleburne v. Cleburne Living Ctr.*,

   473 U.S. 432, 439 (1985)..........................................................................................22

*Clem v. Lomeli*,

   566 F.3d 1177, 1182 (9th Cir. 2009) ......................................................................10



*Coakley v. Murphy*,

   884 F.2d 1218, 1221–22 (9th Cir. 1989) ............................................................................23

*Connick v. Myers*,

   461 U.S. 138, 145 (1983)....................................................................................................17

*Emp. Div., Dep't of Human Res. of Ore. v. Smith*,

   494 U.S. 872, 877 (1990)......................................................................................................7

*Farmer v. Brennan*,

   511 U.S. 825, 833 (1994)............................................................................10, 12, 13, 15

*Fleming v. Strong*,

   F.Supp.3d --- No. 4:21cv325-MW/MJF, 2024 WL 431531, at *1, *1-*2 (N.D. Fla. Sept. 19, 2024)

   ............................................................................................................................16

*Forde v. Baird*,

   720 F.Supp.2d 170, 176 (D. Conn. 2010) .........................................................................16

*Fortner v. Thomas*,

   983 F.2d 1024, 1030 (11th Cir. 1993) ..............................................................................16

*Gallinger v. Becerra*,

   898 F.3d 1012, 1016 (9th Cir. 2018) ................................................................................22

*Helling v. McKinney*,

   509 U.S. 25, 33 (1993)....................................................................................................4, 12

*Howard v. Foster*,

   208 F.Supp.3d 1152, 11__ (D. Nev. 2016).................................................................16, 20

*Jett v. Penner*,

   439 F.3d 1091, 1096 (9th Cir. 2006) .................................................................................12

*Jolly v. Coughlin*,

   76 F.3d 468, 477 (2d Cir. 1996).........................................................................................16

*Jones v. Slade*,

   23 F.4th 1124, 1134 (9th Cir. 2022) .................................................................................25



Plaintiffs' Opposition to Motion to Dismiss           Case Number: 1:21-cv-01657-JLT-HBK

*Jordan v. Gardner,*
 986 F.2d 1521, 1525, 1528 (9th Cir. 1993) ....................................................................13

*Kennedy v. Bremerton Sch. Dist.,*
 597 U.S. 507, 524 (2022)................................................................................................7

*Lee v. Downs,*
 641 F.2d 1117, 1119 (4th Cir. 1981) .............................................................................16

*Lee v. State of Oregon,*
 107 F.3d 1382, 1391 (9th Cir. 1997) ...............................................................................7

*Lopez v. Candaele,*
 630 F.3d 775, 778 (9th Cir. 2010) ...................................................................................8

*Lujan v. Defenders of Wildlife,*
 504 U.S. 555, 560 (1992)..........................................................................................3, 4, 8

*Matsumoto v. Labrador,*
 701 F.Supp.3d 1032, 1055 (D. Idaho 2023) ...................................................................8

*Mollett v. Netflix, Inc.,*
 795 F.3d 1062, 1065 (9th Cir. 2015) ...............................................................................3

*Plyler v. Doe,*
 457 U.S. 202, 216 (1982)...............................................................................................22

*Pratt v. Rowland,*
 65 F.3d 802, 806 & n. 4 (9th Cir.1995) .........................................................................20

*Prison Legal News v. Ryan,*
 39 F.4th 1121, 1132 (9th Cir. 2022) ..............................................................................25

*Reed v. Town of Gilbert, Ariz.,*
 576 U.S. 155, 161 (2015)...............................................................................................18

*Republican Party of Minn. v. White,*
 536 U.S. 765, 774–75 (2002)..........................................................................................17

*Rhodes v. Robinson,*
 408 F.3d 559, 568 (9th Cir.2005) ..................................................................................20



Plaintiffs' Opposition to Motion to Dismiss                Case Number: 1:21-cv-01657-JLT-HBK

1   *Richey v. Dahne*,

2       733 Fed.App'x 881, 884 (9th Cir. 2018) .......................................................................19

3   *Robino v. Iranon*,

4       145 F.3d 1109, 1110-11 (9th Cir. 1998) ...................................................................15

5   *Sch. Dist. of Abington Twp., Pa. v. Schempp*,

6       374 U.S. 203, 224 n.9 (1963)........................................................................................7

7   *Schroeder v. McDonald*,

8       55 F.3d 454, 461 (9th Cir.1995) .................................................................................20

9   *Shakur v. Schriro*,

10      514 F.3d 878, 884–85 (9th Cir. 2008) ......................................................................16

11  *Susan B. Anthony List v. Driehaus*,

12      573 U.S. 149, 162 (2014)..............................................................................................8

13  *Taking Offense v. State*,

14      66 Cal.App.5th 696, 725 (Cal.3d. 2021)..............................................................18, 23

15  *Tingley v. Ferguson*,

16      47 F.4th 1055, 1066–67 (2022) ...............................................................................7, 8

17  *Torres v. Wisconsin Dept. of Health and Soc. Servs.*,

18      859 F.2d 1523, 1530 (7th Cir. 1988) ........................................................................16

19  *TransUnion LLC v. Ramirez*,

20      594 U.S. 413, 423 (2021)..............................................................................................3

21  *Turner v. Safley*,

22      482 U.S. 78, 89 (1987).........................................................................................16, 25

23  *U.S. v. Virginia*,

24      518 U.S. 515, 531 (1996).............................................................................................23

25  *United States v. Skrmetti*,

26      144 S.Ct. 2679 (2024)..................................................................................................23

27  *Watison v. Carter*,

28      668 F.3d 1108, 1114 (9th Cir. 2012) .........................................................................20



*Whitley v. Albers*,

    475 U.S. 312, 319 (1986)...................................................................................................................13

*Wilk v. Neven*,

    956 F.3d 1143, 1150 (9th Cir. 2020) ..............................................................................................12

*Williams v. McKay*,

    2023 WL 2744097 (D. Idaho 2023)................................................................................................19

*Wood v. Beauclair*,

    692 F.3d 1041, 1051 (9th Cir. 2012) ..............................................................................................20

**<u>Statutes</u>**

Cal. Penal Code § 2664(a)-(b) ...........................................................................................................15

Cal. Penal Code §2506...........................................................................................................................18

Cal. Penal Code §2606...........................................................................................................................18

**<u>Rules</u>**

Federal Rule of Civil Procedure 12(b)(1) ...........................................................................................3

Federal Rule of Civil Procedure 12(b)(6) ...........................................................................................3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Plaintiffs' Opposition to Motion to Dismiss            Case Number: 1:21-cv-01657-JLT-HBK

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Plaintiffs submit the below points and authorities in opposition to Defendants and Intervenors' Motion to Dismiss.

## INTRODUCTION

Plaintiffs are incarcerated biological females suffering the ill effects of California's misguided and unconstitutional injection of gender politics into the California Department of Corrections and Rehabilitation ("CDCR"). S.B. 132 created a tiered preference system within the CDCR which, on paper, primarily benefits trans-identifying biological males. In practice, S.B. 132's policies are being exploited by biological males who claim to be transgender only on a piece of paper to gain carte blanche access to female facilities. In the pre-S.B. 132 regime, these individuals' claimed rights to reside in a female facility would have had to be considered alongside the rights and concerns of female prisoners in the facilities they would inhabit. Now, they are given housing preference, and their desires trump all concerns over the safety, health, and well-being of biological females in the prisons the trans-identifying biological males seek to inhabit. The detrimental effects to Plaintiffs' health and safety have been staggering from this ill-judged influx of unvetted biological men, many of whom are registered sex offenders with a history of abuse of women. Yet when Plaintiffs raised the alarm, they, rather than their abusers, were punished for not staying silent. Plaintiffs have plausibly alleged injuries and violations of their constitutional rights that would likely be cured by a return to the pre-S.B. 132 system.

Defendants' and Intervenors' Motions (the "Motions") are primarily grounded in a fundamental misunderstanding or mischaracterization of this action. Defendants and Intervenors incorrectly characterize the relief sought by Plaintiffs as an outright ban on transgender identifying inmates from being placed in a women's facility, creating out of thin air the concept that "[t]he only remedy that could cure the 'harms' identified by Plaintiffs in their Amended Complaint is an injunction barring anyone who was not assigned female at birth from women's correctional facilities." Defendants Memorandum of Points and Authorities (Dkt 118-1) ("D. MPA") at 4. Defendants' Motion continues incorrectly to argue that the relief sought in this case would be the creation of "[a] policy excluding transgender women from women's facilities" altogether. D. MPA at 5. This is simply incorrect. As stated in the Complaint and as explained in detail below, Plaintiffs simply seek an injunction against the enforcement

of S.B. 132—for all the reasons outlined herein—and a return to the regime before its enactment, which provided for inclusion of trans-identifying biological males in women's facilities under the process provided for in the Prison Rape and Elimination Act of 2003. If for no other reason, the Motions should be denied because Defendants and Intervenors fail to address the real relief Plaintiffs seek and all their arguments are premised on this fundamental misunderstanding. The Motions should be denied.

## STATEMENT OF FACTS

The Prison Rape Elimination Act of 2003 ("PREA") created standards for inmate screenings to reduce the risk of victimization and abuse. Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief ("FAC") ¶ 20. PREA sought to protect trans-identifying inmates and others by ensuring there would be individual consideration of facility placement based on prisoner vulnerability and not solely on sexual orientation, genital status, or gender identity. *Id.*

In 2020, California Governor Gavin Newsom signed into law S.B. 132, *The Transgender Respect, Agency and Dignity Act*; it became effective on January 1, 2021 ("S.B. 132"). FAC ¶ 23. S.B. 132 fundamentally changed the way California treated inmates claiming to be transgender. In contrast to the individualized assessment and placement process from PREA, S.B. 132 prohibited the CDCR from denying housing placement on the "anatomy or sexual orientation" of an inmate, "or a factor present among other people incarcerated at their preferred type of institution." FAC ¶ 24. Now, any individual may sign a declaration self-identifying as the opposite gender and be placed in the housing facility of their choice. FAC ¶ 30–32. This is regardless of whether that self-identifying individual could pose a risk of victimization and abuse to others in the facility. *Id.* Additionally, inmates need not take *any* accompanying actions to further their purported transgender identity. *Id.* There is no requirement that a self-identified transgender female present as female, use female pronouns, use a female name, be pursuing medical transition, or be diagnosed with gender dysphoria; a declaration alone, without any accompanying evidence, gains them entrance into facilities of the opposite sex. *Id.* Even more concerning, S.B. 132's mandates do not give the CDCR discretion to deny a transfer request for those with histories of abuse or sexual violence. FAC ¶ 38.

Plaintiffs Janine Chandler, Krystal Gonzalez, Tomiekia Johnson, Nadia Romero, Channel Johnson, and Catherine Quinn (together "Plaintiffs"), are biological females incarcerated in Central

California Women's Facility ("CCWF") and California Institution for Women ("CIW"). FAC ¶¶ 10–15. Plaintiffs have been victims of sexual abuse and assault, from which they have lasting traumatic injuries including PTSD, panic attacks, anxiety, and autoimmune diseases. FAC ¶¶ 10–15, 56–57. The long-term effects of their abuse have been exacerbated by the dramatic uptick in trans-identifying biological males placed in their prisons since the passage of S.B. 132. *Id.* Plaintiffs have been assaulted, sexually harassed, and have witnessed attempted rapes and rapes at the hands of trans-identifying biological males. FAC ¶¶ 10–15, 58–82. Defendants have retaliated against Plaintiffs for "misgendering" and filing grievances pointing out the abuse of trans-identifying biological males. FAC ¶¶ 83–93. The retaliatory actions of Defendants include having meritorious grievances denied, being placed in solitary confinement, being transferred to another prison, and even having parole revoked or denied. *Id.* S.B. 132's policies have also made it impossible for Plaintiffs to follow their religious consciences and put them in unreasonable physical danger. FAC ¶¶ 10–15, 58–82. For this, they seek relief from this Court.

## LEGAL STANDARD

### Federal Rule of Civil Procedure 12(b)(1)

To satisfy Article III's case or controversy requirement, plaintiff must establish that she has standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). She "must show (i) that [s]he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). When reviewing a motion made under Federal Rule of Civil Procedure 12(b)(1), courts must accept as true all material allegations of the complaint and construe the complaint in favor of plaintiff. *Id.*

### Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a claim may be dismissed because of plaintiff's "failure to state a claim upon which relief can be granted" when a plaintiff lacks a cognizable legal theory or insufficient facts to support a cognizable legal theory. *See Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015). All well-pleaded allegations of material fact are taken as true and construed in the light most favorable to the non-moving party. *Id.* Complaints must "contain sufficient factual



matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Plausibility" means "more than a sheer possibility," but less than a probability. *Id.*

## ARGUMENT

### I.  PRESERVATION OF FACIAL CHALLENGE TO S.B. 132 FOR APPEAL.

Plaintiffs agree that the Court's Order Granting Defendants Motion To Dismiss ("Order") (ECF no. 67) does not leave open the possibility of amendment as to their facial challenges to S.B. 132. Plaintiffs do not seek to revive those claims here but preserve the issue for appeal as the drastic changes wrought by S.B. 132 have put all female inmates at risk. FAC ¶ 30–32. The Order did expressly grant leave to amend as to the individual Defendants, and, as demonstrated below, the Court has the power to redress Plaintiffs' injuries and does not need to reconsider its prior Order to do so.

### II.  PLAINTIFFS HAVE STANDING BECAUSE THEY HAVE BEEN HARMED BY DEFENDANTS' IMPLEMENTATION OF S.B. 132 AND ARE LIKELY TO HAVE THEIR ONGOING INJURIES REDRESSED BY A RETURN TO THE PRE-S.B. 132 PROCEDURAL PROTECTIONS.

To establish Article III standing, plaintiff must show: (a) an injury-in-fact which is concrete and particularized as well as actual or imminent; (b) causation between the injury and defendant's alleged misconduct; and (c) that the injury is likely to be redressed by a favorable decision for plaintiff. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

#### A.  Plaintiffs have alleged concrete and particularized injuries under the First, Eighth and Fourteenth Amendments.

##### 1.  Plaintiffs have concrete and particularized Eighth Amendment injuries.

Under the Eighth Amendment, unsafe prison conditions constitute a concrete injury, even if further resulting harm has yet to occur. *See, e.g.*, *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (observing that "it would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them"). Plaintiffs have plausibly alleged S.B. 132's policies have both injured them and created unsafe conditions.

S.B. 132 requires that inmates who self-identify as transgender be housed according to their gender preference. FAC ¶¶ 23, 29–32. No accompanying actions or evidence that the self-identification is true

is required before placing trans-identified inmates in opposite gender facilities. *Id.* S.B. 132 forbids vetting claims regarding transgender identity or suitability for being housed with female prisoners. *Id.* This led the CDCR to ask for significant budget increases for S.B. 132's implementation. FAC ¶ 34. Post S.B. 132, the number of trans-identifying inmates increased. FAC ¶ 34. The CDCR admitted that S.B. 132's new policies posed a safety risk, stating "the department anticipates a transition period within its institutions that may result in safety concerns and inmate complaints." FAC ¶ 37. The August 2022 Inspector General report noted the significant risks S.B. 132 posed to biological women ("IG Report"). FAC ¶ 39. The IG Report stated that, even if an inmate had a history of raping women, S.B. 132's "broad language limiting the bases to deny a transfer request" appeared to require the CDCR to put that rapist in a female facility. *Id.* The IG Report stated that S.B. 132's mandates made it difficult if not impossible for the CDCR to "accurately access a prospective transferee's sincerity in self-identifying their gender or their true intentions in requesting a transfer under the Act." *Id.* It also included observations that "[t]here are a lot of men who are now all of a sudden transgender," and that biological males were seeking transfers to "have sexual relations with incarcerated people who were designated female at birth." *Id.*

Under S.B. 132's mandates, CDCR is prevented from denying transgender transfer requests, even for inmates with a violent history of abuse towards women. And the statistics demonstrate, Plaintiffs' fears for their safety are well founded. In July 2024, the DOJ's Sexual Victimization Report by the Adult Correctional Authorities showed that of the 26.2% of female inmates who were victims of inmate-on-inmate violence nearly 18% of the assaults were perpetrated by trans-identifying biological males—an overwhelmingly disproportionate percentage compared to the overall number of trans-identifying biological male inmates. FAC ¶ 40. 33.8% of potential trans-identifying biological males are registered sex offenders. FAC ¶ 47. As of December 2021, the Bureau of Federal Prisons reported that approximately 48% of trans identifying biological male inmates had committed sex offenses, compared to 11.6% of the general male inmate population. FAC ¶ 48.[1]

---

[1] These disproportionate numbers are reflected internationally as well. A Canada study examining data from 2017 to 2020 reported that 64% of trans identifying biological male inmates had a "current sex offense" conviction, and nearly 88% had a past sexual offense conviction. FAC ¶ 49. A 2019 United Kingdom study reported that 58.9% of trans-identifying biological male inmates committed sex offenses. FAC ¶ 50.



1    It is then no surprise that Defendants ignore the statistics and information reflected above showing

2    biological female inmates have a dramatic increased safety risk since the passage of S.B. 132.

3    Defendants falsely claim that S.B. 132 didn't make any changes that could have caused Plaintiffs'

4    injuries without addressing the CDCR's own expressed safety concerns, the IG reports problematic

5    findings, and the data proving that biologically female prisoners are more at risk from trans identifying

6    biological male inmates. To read Defendants' brief, one would think that S.B. 132 was merely a

7    codification of prior policies. What they do not tell you is, while there were trans-identifying biological

8    males housed in female facilities prior to S.B. 132's passage, those individuals were individually vetted

9    to consider the potential ramifications for the entire prison population. FAC ¶ 20. S.B. 132 changed

10   what was before a neutral analysis. It now mandates accommodation of all transgender transfer requests,

11   regardless of potential danger to biological females. FAC ¶¶ 34, 39. Moreover, under the new

12   requirements that mandate transfer regardless of the circumstances of incarceration or history of abuse,

13   there has been a sharp increase in male prisoners suddenly self-identifying as transgender.

14   Plaintiffs have been sexually abused or otherwise suffered violence from biological males which

15   has a long-lasting psychological effect on their health and wellbeing. Because S.B. 132 led to unvetted

16   biological males being housed without consideration as to their criminal history or whether they were

17   transgender on anything but a declaration,[2] Plaintiffs have suffered flashbacks, anxiety, panic attacks,

18   despair, depression, and other PTSD symptoms. FAC ¶¶ 58–82. Post S.B. 132, the numbers of biological

19   males placed in Plaintiffs' facilities have risen. FAC ¶ 39. Biological males now reside in their prisons

20   who do not present themselves as women, FAC ¶¶ 58, 65, 67; intimidate, sexually harass, and sexually

21   assault female prisoners, FAC ¶¶ 65, 67–71, 76, 84, 85; and exhibit extreme violent behavior, FAC ¶¶

22   66–70.[3] Defendants baulk that only one Plaintiff shared a cell with a biological male, as if prisoners

23   never interact with other inmates besides in their cells. D. MPA at 8. The allegations of Plaintiffs'

24

25   _____

     [2] To the extent there was any confusion in Plaintiffs' allegations, all of Plaintiffs' complaints about
26   specific interactions with the biological male inmates now housed in their prisons arise from inmates
     transferred under and due to the new policies mandated by S.B. 132. Should that be a cause for concern
27   for the Court, Plaintiffs would gladly clarify the allegations of the complaint to reflect that.
     [3] Several of the Plaintiffs were targeted by a biological male inmate named Michael Contreras who was
28   in prison for murder. He never attempted to present as a female, attempted to rape a female inmate, and
     strangled an elderly female inmate. FAC ¶¶ 67–69, 76–77, 85–86, 88–89.



Plaintiffs' Opposition to Motion to Dismiss                           Case Number: 1:21-cv-01657-JLT-HBK

complaint show regular interactions with trans-identifying biological males at Plaintiffs' work assignments, in showers, and in bathrooms. FAC ¶¶ 58–82. Defendants gaslight this court with their suggestion that Plaintiffs have not claimed any injuries, when Plaintiffs provided several direct examples of injuries they have suffered at the hands of biological males placed in their prisons under S.B. 132's transgender preference policies. FAC ¶¶ 58–82.

S.B. 132's policies require transferring biological male inmates even if they are only transgender women when signing a declaration, and even when they are a known safety risk to female inmates. As a result, Plaintiffs have been abused, assaulted, and harmed, and are at risk to continue to suffer these injuries. They have sufficiently alleged injuries for standing under the Eighth Amendment.

### 2. Plaintiffs have concrete and particularized First Amendment injuries based on Free Exercise of Religion, Freedom of Speech, and First Amendment Retaliation. [4]

#### i. Plaintiffs have Standing for their Free Exercise Claims

"The [Free Exercise] Clause protects not only the right to harbor religious beliefs inwardly and secretly. It does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (quoting *Emp. Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 877 (1990)). Modern Supreme Court jurisprudence "has dispensed with rigid standing requirements" for First Amendment free speech and free exercise claims. *Tingley v. Ferguson*, 47 F.4th 1055, 1066–67 (2022) (quoting *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003)). To pursue a Free Exercise claim, plaintiff need only show that there is some conflict between one of her religious convictions and a challenged governmental action. *See Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 224 n.9 (1963) (holding "the requirements for standing to challenge state action under ... the Free Exercise Clause ... include[s] proof that particular religious freedoms are infringed").

---

[4] Defendants mislead the Court by suggesting that, under *Lee v. State of Oregon*, 107 F.3d 1382, 1391 (9th Cir. 1997), as amended (Apr. 16, 1997), Plaintiffs lack standing for First Amendment challenges unless the challenged statute provides for criminal or civil penalties. See Defendants Memorandum of Points and Authorities (Dkt 118-1) ("D. MPA") at 5. The *Lee* court determined that the plaintiffs lacked standing in that case because they had no "concrete and particularized" injury; it did not create a different injury threshold for standing for the First Amendment requiring civil or criminal penalties. *Id.*

1    The CDCR's application of S.B. 132's policies prevent Plaintiffs Janine Chandler and Nadia

2    Romero from freely exercising their religion. Chandler is Muslim. FAC ¶ 125.  Her faith requires that

3    her whole body besides her face and hands be covered in front of unrelated members of the opposite

4    sex. *Id.* The increase of trans-identifying biological males in her facility means that she has had to violate

5    her religion by being unclothed with unrelated biological males. *Id.* There is a conflict between her

6    religion's requirements and the CDCR's policies, meaning she has adequately alleged an injury-in-fact.

7    Romero is Catholic. FAC ¶ 73–74. She believes it is sinful to live with or undress in front of an

8    unrelated male, and that it is perpetuating a lie to call someone by pronouns that do not reflect their

9    biological sex. *Id.* S.B. 132's policies that force her to undress and use the bathroom in front of trans-

10   identifying biological males and use preferred pronouns conflict with her religious beliefs. FAC ¶ 110;

11   Cal. Pen. Code § 2606(a)(1).

12                  ii.    Plaintiffs have Standing for their Free Speech Claims

13   Injuries-in-fact that satisfy standing requirements for free speech claims, *see Tingley*, 47 F.4th at

14   1067, include: a credible threat of enforcement, *Lopez v. Candaele*, 630 F.3d 775, 778 (9th Cir. 2010);

15   self-censorship, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014); concrete plans that would

16   cause injury, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992); and past and future conduct,

17   *Matsumoto v. Labrador*, 701 F.Supp.3d 1032, 1055 (D. Idaho 2023).  S.B. 132 requires Plaintiffs

18   Romero and Gonzalez to use inmates' preferred pronouns under threat of punishment, and they have

19   been punished for "misgendering." FAC ¶¶ 83, 84, 110; § 2606(a)(1).

20                  iii.   Plaintiffs have Standing for their First Amendment Retaliation Claims

21    A concrete and particularized injury for standing in a First Amendment retaliation claim involves

22   defendant taking action against plaintiff that would chill a person of ordinary firmness from continuing

23   to engage in protected activity. *Arizona Students' Association v. Arizona Board of Regents*, 824 F.3d

24   858, 867 (9th Cir. 2016).

25   Romero suffered an injury-in-fact when prison officials retaliated against her by not protecting her

26   in response to a grievance because Defendants claimed she had been touched by a "transgender

27   woman," not a biological male. FAC ¶¶ 73, 83. Romero further reasonably believes prison officials

28   continue to retaliate against her by ignoring her grievances related to trans-identifying biological males



if she exercises her speech rights by using the pronouns of an individual's biological sex. *Id.* Gonzalez suffered an injury-in-fact when Defendants retaliated by accusing her of harassment for "misgendering" her sexual abuser. FAC ¶ 84. Tomiekia Johnson suffered an injury-in-fact when Defendants ignored, disregarded, and suppressed her complaints against trans-identifying biological males, and then punished her for reporting abuse. FAC ¶¶ 85–87. Tomiekia Johnson was also injured when she was denied parole for speaking out about the abuse she and others have suffered at the hands of trans-identifying biological males. *Id.* Quinn suffered an injury-in-fact when Defendants punished her for reporting the abuse of a trans-identifying biological male and kept her from being released because she reported that abuse. FAC ¶¶ 88–91. Channel Johnson suffered an injury-in-fact when Defendants retaliated by putting her in solitary confinement and moving her to another facility after she reported a trans-identifying biological male's threats to her family. FAC ¶ 93. Plaintiffs have provided ample facts showing the retaliatory actions taken against them for their speech.

### 3. Plaintiffs have concrete and particularized Fourteenth Amendment injuries.

Government conduct creates an injury-in-fact sufficient to confer standing for Equal Protection when someone is "personally denied equal treatment by the challenged discriminatory conduct." *Allen v. Wright*, 468 U.S. 737, 755 (1984), *abrogated in part on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). S.B. 132 requires that biological males claiming a transgender identity receive preferential housing assignments over biological women who do not claim a transgender identity. S.B. 132 requires trans-identifying biological males have their "perception of health and safety" be given consideration for "any bed assignments, placement, or programming decision." FAC ¶ 29. This includes giving them priority for single-cell housing and housing with "another incarcerated person of their choice." *Id.* Trans-identifying biological males also are allowed to have their preferences prioritized for the removal of any other inmate that "poses a threat from any location they may have access to." *Id.*

As shown above, Plaintiffs suffer from PTSD which is exasperated by interactions with biological males. Plaintiffs have been assaulted by trans-identifying biological male inmates, touched by them without consent, and cannot freely exercise their religion under S.B. 132's policies. Despite this victimization, trans-identifying biological males' housing requests are prioritized over Plaintiffs based



1  on the biological males' "perception of health and safety." Yet Plaintiffs' legitimate concerns for their

2  own health and safety are ignored, their housing concerns are not prioritized, they are not permitted to

3  order other inmates to be transferred if they feel threatened or unsafe, and they do not have the

4  opportunity to be housed with the roommate of their choice. *See* Sections A and B supra. Plaintiffs

5  plausibly allege Equal Protection injuries-in-fact due to S.B. 132.

6  **B. S.B. 132 caused Plaintiffs' injuries because the CDCR is now mandated to accede to
   trans-identifying biological males' wishes to be housed in a female facility regardless

7  of the risks it creates for biological female inmates.**

8  The general rule for causation for standing purposes requires a causal connection between the

9  injury and defendant's alleged misconduct that is fairly traceable to defendant's actions and not the

10  result of independent action of some third party. *Lujan*, 504 U.S. at 560. But in the context of prisons

11  and Eighth Amendment claims, prison officials may be held liable when they expose prisoners to a

12  substantial risk of serious harm and disregard that risk by failing to take reasonable abatement measures.

13  *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994). "[D]irect causation by affirmative action is not

14  necessary." *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) (citing *Farmer*, 511 U.S. at 847).

15  **1. There is a direct causal connection between Defendants' actions and Plaintiffs'
   First and Fourteenth Amendment injuries.**

16

17  Defendants' implementation of S.B. 132 directly caused Plaintiffs' First Amendment injuries.

18  As the CDCR anticipated, there has been an influx of trans-identifying biological males placed in female

19  prisons since implementing S.B. 132. FAC ¶ 34. This uptick coupled with the lack of screening to

20  protect biological females' safety has led to assaults and harassment from trans-identifying biological

21  males who do not present as women, are not medically transitioning, are registered sex offenders, and

22  have a history of violent crime against women. FAC ¶¶ 33–39. As described above, Defendants have

23  retaliated against Plaintiffs for reporting the abuse they witness which is directly attributable to S.B.

24  132. FAC ¶¶ 33–39. Due to the influx of trans-identifying biological males in their facilities, Chandler

25  and Romero have been forced to unclothe themselves in the presence of trans-identifying biological

26  males contrary to their deeply held religious beliefs. Plaintiffs are under threat of punishment and have

27  been punished for "misgendering." *See* Section II B Supra. All these injuries are attributable to

28  Defendants' actions and policies, as are Plaintiffs' Fourteenth Amendment injuries. Defendants treat

1  Plaintiffs differently than the similarly situated trans-identifying biological males housed in the same

2  facilities who receive preferential housing considerations due to S.B. 132.

3          **2.   Defendants caused Plaintiffs' Eighth Amendment injuries by exposing Plaintiffs to**

4              **a substantial risk of serious harm and disregarding that risk.**

5          Plaintiffs have alleged injuries stemming from Defendants' exposing Plaintiffs to serious harm.

6  S.B. 132 requires that prisoners' housing placement be based solely and exclusively on their self-

7  identification and declaration that they identify as transgender. FAC ¶ 24. Trans-identifying biological

8  males receive preferential treatment in housing over biological females. FAC ¶ 25. As noted in the

9  CDCR's Inspector General report, S.B. 132 restricted CDCR's ability to deny a transfer request so

10 radically that the CDCR is prohibited from preventing someone with a history of raping women to

11 transfer to a facility. FAC ¶ 39. S.B. 132's mandates prevent the CDCR from "accurately assess[ing] a

12 prospective transferee's sincerity in self-identifying their gender identities or their true intentions in

13 requesting a transfer." *Id.* This has put women, including Plaintiffs, at significant risk of harm. Further,

14 Defendants have failed to abate that harm. They have ignored or shamed Plaintiffs for filing grievances

15 against trans-identifying biological males, and they have punished Plaintiffs instead of their abusers.

16 *See* Section II A-C Supra. There is ample evidence Defendants were aware of the dangers posed by

17 implementation of S.B. 132's policies, yet they have chosen to attack the biological females who suffer

18 from these policies instead of sounding the alarm on the serious problem S.B. 132 caused within

19 California's prisons.

20        **C.  Plaintiffs' injuries are likely to be redressed by a favorable decision for Plaintiffs.**

21     The significant increase in prisoners claiming a transgender identity post S.B. 132 is not a

22 coincidence. The guardrails have been removed, putting female prisoners at risk from predatory

23 biological males exploiting the system to prey on vulnerable women. Both Plaintiffs and the IG's report

24 present evidence that S.B. 132 is being manipulated by violent offenders and those with no real

25 inclination to foster a transgender identity. FAC ¶ 39. A return to the pre-S.B. 132 standards would

26 protect Plaintiffs from those exploiting state created loopholes that put women at risk.

27        Plaintiffs' harms can be remedied by a return to the tailored, pre-S.B. 132 process which

28 examines a variety of important factors—including sincerity of the declaration, suitability for placement

1  in a given facility, history of violence and abuse towards women, and other safety concerns—in deciding

2  whether to place a trans-identifying biological male in a female facility. Additionally, a return to the

3  pre-S.B. 132  policies would once again treat biological females who identify with their birth sex on an

4  equal and level playing field in housing and placement preferences as trans-identifying biological males

5  in those same facilities. It would also ensure that Plaintiffs would not be forced to use an inmate's

6  preferred pronouns under threat of punishment.

7  **III.     S.B. 132's Policies As Applied to Plaintiffs Violate the Constitution.**

8         **A.  Plaintiffs state plausible claims for Eighth Amendment violations.**

9         "[W]hen the State takes a person into its custody and holds him there against his
       will, the Constitution imposes upon it a corresponding duty to assume some

10      responsibility for his safety and general well being.... The rationale for this principle
       is simple enough: when the State by the affirmative exercise of its power so

11      restrains an individual's liberty that it renders him unable to care for himself, and at
       the same time fails to provide for his basic human needs—*e.g.*, food, clothing,

12      shelter, medical care, and reasonable safety—it transgresses the substantive limits
       on state action set by the Eighth Amendment.

13

14  *Helling v. McKinney*, 509 U.S. 25, 32 (1993). "[P]rison officials have a duty ... to protect prisoners from

15  violence at the hands of other prisoners," *Farmer v. Brennan*, 511 U.S. 825, 828 (1994), and inmates

16  have the "right to be protected from violence at the hands of other inmates." *Wilk v. Neven*, 956 F.3d

17  1143, 1150 (9th Cir. 2020).

18      Additionally, "[p]rison officials must ensure that inmates receive adequate food, clothing,

19  shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates."

20  *Id.* (cleaned up). Eighth Amendment protections extend to "condition[s] of confinement that [are] sure

21  or very likely to cause serious illness and needless suffering" in the future. *Helling*, 509 U.S. at 33.

22  Prison officials may not "ignore a condition of confinement that is sure or very likely to cause serious

23  illness and needless suffering the next week or month or year." *Id.* For instance, the Supreme Court has

24  held that exposing inmates to "infectious maladies" and secondhand tobacco smoke can form the basis

25  of an Eighth Amendment claim. *Id.* at 33, 35. A medical need is serious when the failure to treat it could

26  result in significant injury or the unnecessary and wanton infliction of pain. *Jett v. Penner*, 439 F.3d

27  1091, 1096 (9th Cir. 2006). And in determining whether prison conditions amount to "unnecessary and

28  wanton infliction of pain," courts can be informed by the "psychological trauma" carried by a particular



incarcerated population. *See Jordan v. Gardner*, 986 F.2d 1521, 1525, 1528 (9th Cir. 1993) (*quoting Whitley v. Albers*, 475 U.S. 312, 319 (1986)).[5]

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer*, 511 U.S. at 834. Deliberate indifference may be established through an "inference from circumstantial evidence" or "from the very fact that the risk was obvious." *Id.* at 842. To prove deliberate indifference, a prisoner first must establish an objective element: that the prisoner "is incarcerated under conditions posing a substantial risk of serious harm." *Id.* at 834. The prisoner must next establish a subjective element: that the government official subjectively "knew of and disregarded an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. "[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. The Supreme Court has stated that:

> [I]f an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

*Id.* at 842–43. The prisoner must lastly show that the official failed to "respond[ ] reasonably to the risk." Id. at 844.

A prisoner who believes she is being subjected to substantial risk of serious injury due to officials' failure to protect her from harm is not required to wait for a "tragic event" before obtaining relief. *Id.* She may bring an action seeking an injunction based on her claim that officials are knowingly and unreasonably disregarding an objectively intolerable risk of harm and will continue to do so. *Id.* This inquiry "is a question of fact, and as such must be decided by a jury if there is any room for doubt." *Lemire*, 726 F.3d at 1075–76.

Plaintiffs have shown that they are incarcerated under conditions that pose a substantial risk of

---

[5] In *Jordan*, the Ninth Circuit held that a prison policy requiring male guards to conduct clothed searches on female prisoners inflicted "pain" for Eighth Amendment purposes because many female inmates had been sexually abused prior to their incarceration, and the unwanted intimate touching by men was likely to cause "psychological injury and emotional pain and suffering." *Jordan*, 986 F.2d at 1525.

serious harm and that their concerning medical needs are not being addressed. 33.8% of potential trans-identifying biological male inmates seeking to transfer under S.B. 132 are registered sex offenders. FAC ¶ 47. As of December 2021, approximately 49% of trans identifying biological male inmates have committed sex offenses, compared to 11.6% of the general male inmate population. FAC ¶ 48. A study of Canada's trans identifying biological males showed that 64% had a current sexual offense conviction and nearly 88% had a past sexual offense conviction. FAC ¶ 49. 85% of trans identifying biological males were convicted of violent crimes that caused either "serious harm" or death. *Id.* A 2019 United Kingdom study found that 58.9% of trans-identifying biological male inmates committed sex offenses, with 29% having committed rape and 18% having committed attempted rape. FAC ¶ 50. And these are just a few examples confirming what is established in numerous international studies—that trans-identifying biological male inmates pose a significant safety risk to female inmates. FAC ¶ 55.

The CDCR was well aware of the safety risks to biological females by S.B. 132's new placement policies. FAC ¶ 35. The CDCR expected the number of people claiming to be transgender to increase. FAC ¶¶ 34–35, 37. CDCR also knew there was going to be "an increase in safety concerns and inmate complaints." FAC ¶ 37. Because of this, the CDCR requested budget increases of $2.8M for FY 22, $1.8M for FY 23, and $1.2M for FY 24 to brace for these consequences. FAC ¶ 33. They also began to distributing condoms and other birth control in women's facilities. FAC ¶ 36. They did not appear to do so in men's prisons, which shows they anticipated unique dangers associated with biological males entering women's prisons.

As admitted by the Inspector General, under S.B. 132 even an inmate with a history of raping women can not be prevented from transferring to a female facility upon request. FAC ¶ 39. This is because officials are prohibited from assessing a "prospective transferee's sincerity in self-identifying their gender identities or their true intentions," even when those requesting to transfer have histories of abuse *Id.* This has, predictably, led to "a lot of men who are now all of a sudden transgender," *Id.*, as well as a dramatic increase in assaults in female prisons from trans-identifying biological males. Of the 26.2% of female inmates who were victims of inmate-on-inmate violence, nearly 19% of assaults were perpetrated by trans-identifying biological males. FAC ¶ 40. This is an overwhelmingly disproportionate percentage compared to the overall number of trans-identifying biological male

1  inmates. *Id.*

2       Because S.B. 132 gives transgender-inmates the ability to choose their cellmate, a preference

3  not provided to biological females identifying as their birth sex, trans-identifying biological males have

4  their choice of female inmates to prey upon. FAC ¶ 44. And in addition to living in reasonable fear of

5  future abuse at the hands of trans-identifying biological males, Plaintiffs have already been victimized,

6  repeatedly, including being sexually assaulted, harassed, threatened, stalked, touched without consent,

7  and had their private body parts viewed without consent. *See Robino v. Iranon*, 145 F.3d 1109, 1110-

8  11 (9th Cir. 1998) ("a person's interest in not being viewed unclothed by member of the opposite sex

9  survives incarceration."). Male guards do not even have permission to view female inmates unclothed

10  or pat them down unless there is an emergency, yet Plaintiffs have been punished for seeking those

11  same protections from other inmates. Cal. Penal Code § 2664(a)-(b). Plaintiffs have also witnessed

12  trans-identifying biological males attack, rape, and attempt to rape other inmates. FAC ¶¶ 58–82. Yet

13  for their reporting—which showed Defendants' knowledge of these dangers even if the CDCR had not

14  already admitted it—Defendants have punished and retaliated against Plaintiffs. They have even kept

15  certain Plaintiffs from being paroled as discipline for Plaintiffs' exposing these injustices. FAC ¶¶ 83–

16  93. While circumstantial evidence would be enough to establish "deliberate indifference," *In re Von

17  Staich*, (2020) 56 Cal.App.5th 53, 69 [270 Cal.Rptr.3d 128], *review granted and cause transferred on

18  other grounds* (citing *Farmer*, 511 U.S. at 842), here the danger is obvious and Plaintiffs' records of

19  grievances, coupled with CDCR's records of implementation precautions, show that Defendants

20  understood this danger.

21       At the same time, 53% of incarcerated women suffer from PTSD, including multiple Plaintiffs.

22  FAC ¶ 52. All Plaintiffs have been victims of sexual abuse or assault and suffer from mental distress,

23  fear, anxiety, hyper vigilance, panic attacks, and autoimmune disease due to living with trans-

24  identifying biological male inmates. FAC ¶ 57. Plaintiffs' current conditions of confinement in close

25  proximity to trans-identifying biological males—a high proportion of whom are incarcerated for violent

26  crimes or sex offenses—are causing them serious health problems. *Id.* Providing these women with safe

27  living conditions away from individuals who trigger damaging mental and physical health effects is a

28  medical need, and Defendants' failure to provide for this need is causing Plaintiffs unnecessary and

wanton infliction of pain. *Id.*; *see also Torres v. Wisconsin Dept. of Health and Soc. Servs.*, 859 F.2d 1523, 1530 (7th Cir. 1988) (upholding a women's prison's exclusion of males from hiring for close-contact guard positions for the sake of inmates' rehabilitative interests). Defendants are aware of these effects, both because they know that most women prisoners suffer from PTSD, and because Plaintiffs have made them aware through written grievances and this lawsuit. Despite this, Defendants still refuse to act to protect Plaintiffs. Defendants' failures to protect Plaintiffs from abuse and to address their demonstrated health concerns constitute cruel and unusual punishment.

**B.   Plaintiffs state a plausible claim that Defendants violate their First Amendment Free Exercise Rights.**

Inmates have a "constitutional right to bodily privacy while incarcerated." *Fleming v. Strong*, --- F.Supp.3d --- No. 4:21cv325-MW/MJF, 2024 WL 431531, at *1, *1-*2 (N.D. Fla. Sept. 19, 2024) (denying defendant prison's motion for summary judgment because plaintiff inmate presented evidence creating a genuine dispute of material fact about whether she had to expose her naked body to biologically male inmates housed in her facility). "[I]nvoluntary exposure" of the body's intimate areas to opposite-sexed people "may be especially demeaning and humiliating." *Id.* at *1 (*quoting Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) (*quoting Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981)).

Multiple religions, including Islam and Catholicism, do not allow women to be naked in front of unrelated men.  "To raise a viable claim under the Free Exercise Clause" pursuant to nudity in view of the opposite sex, "a prisoner must . . . show[] that Defendant [prison] has burdened" her "sincerely held and rooted" religious beliefs. *Howard v. Foster,* 208 F.Supp.3d 1152, 1160 (D. Nev. 2016) (quoting *Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008)). This "burden" manifests "where the state 'puts substantial pressure on a[] [prisoner] to modify h[er] behavior and to violate h[er] beliefs." *Forde v. Baird*, 720 F.Supp.2d 170, 176 (D. Conn. 2010) (holding Muslim female inmate's free exercise rights were "substantially burdened by the absence of any viable choice" not to be patted down *while still clothed* by male guards) (quoting *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996)). The only way a prison that burdens an inmate's religious beliefs may avoid liability is if its action or regulation "is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).

Whether a prison's action or practiced regulation is reasonably related to legitimate penological interests is determined by four factors set out in *Turner*. Courts must examine (1) "whether there is a valid, rational connection between the regulation and a legitimate and neutral governmental interest put forward to justify it[;]" (2) whether there are alternative means of exercising the asserted constitutional right that remain[s] open to inmates[;]" (3) "whether and the extent to which accommodation of the asserted right will have an impact on prison staff, on inmates' liberty, and on the allocation of limited prison resources[;] and" (4) "whether the regulation represents an exaggerated response to prison concerns," and there is "a ready alternative that fully accommodates the prisoner's rights at *de minimis* costs to valid penological interests[.]"

S.B. 132 violates Plaintiffs Chandler and Romero's First Amendment right to the free exercise of their sincerely held Muslim and Catholic beliefs, respectively. FAC ¶¶ 58–61, 71–75. Their religions require that they not expose private body parts in front of unrelated members of the opposite sex, and there is no legitimate penological interest in forcing them to expose themselves to trans-identifying biological males. *Id.* Chandler and Romero have no alternative means of exercising their constitutional rights that remain open as they cannot move elsewhere or use other bathroom and showering facilities. Accommodating their religious beliefs would have a minimal impact on prison staff or other inmates' liberty and the allocation of prison resources; it would be a small matter to protect their bodily privacy since the prison system already takes steps to keep inmates from having to expose themselves to prison guards of the opposite sex. And finally, S.B. 132 presents an exaggerated response to prison concerns. The pre-S.B. 132 regime already accommodated prisoners' rights at deminimis costs, yet it was discarded for political expediency. Plaintiffs Chandler and Romero have plausibly alleged facts establishing a violation of their Free Exercise rights.

### C. Plaintiffs state a plausible claim that Defendants violate their First Amendment Free Speech Rights.

"[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983). Content-based restrictions on speech are subject to strict scrutiny. *Republican Party of Minn. v. White*, 536 U.S. 765, 774–75 (2002). Content-based laws that target speech based on its communicative content are

17

1  presumptively unconstitutional and may be justified only if the government proves that they are

2  "narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155,

3  161 (2015). "Government regulation of speech is content based if a law applies to particular speech

4  because of the topic discussed or the idea or message expressed." *Id*; *Berger v. City of Seattle*, 569 F.3d

5  1029, 1051 (9th Cir. 2009) (*en banc*) (holding a restriction "is content-based if either the underlying

6  purpose of the regulation is to suppress particular ideas or if the regulation, by its very terms, singles

7  out particular content for differential treatment.").

8      California law requires that inmates "[b]e addressed in a manner consistent with the incarcerated

9  individual's gender identity." Cal. Penal Code § 2506 ("§ 2506"); *see also* § 2505 ("§ 2505") ("Staff,

10  contractors, and volunteers of the department shall not consistently fail to use the gender pronoun and

11  honorific an individual has specified …"). The subject of gender identity and whether people should be

12  addressed by pronouns other than those consistent with their natal sex is a contentious public issue. §

13  2506 prohibits Plaintiffs from addressing other inmates with pronouns inconsistent from their chosen

14  gender identity under threat of punishment. While Defendants suggest using a pronoun inconsistent

15  with someone's gender identity is per se "offensive" and "harassing," when Plaintiffs Romero and

16  Gonzalez were punished for "misgendering," there was no suggestion that either intended to offend or

17  harass anyone. FAC ¶¶ 84–85, 110.  Nor was there any indication the comments for which they were

18  punished were directed to transgender individuals. *Id.* Despite this, Plaintiffs were punished for this

19  speech. *See* Section II A 2 (ii). It is not the use of pronouns that is prohibited by § 2506, but the use of

20  pronouns in a certain context—when an inmate wishes to be addressed as the opposite. The prohibition

21  only applies because of the topic discussed or the idea expressed—the adoption or rejection of a

22  transgender identity. *See Reed*, 576 U.S. at 163. Thus, § 2506 is presumptively unconstitutional, and

23  cannot overcome the requirement that it be narrowly tailored to serve a compelling government interest.

24      Shortly after S.B. 132 took effect, a California appellate court determined a similar pronoun

25  provision violated the First Amendment. *See Taking Offense v. State*, 66 Cal.App.5th 696, 725 (Cal.3d.

26  2021) (holding a pronoun provision unconstitutional because it restricted more speech than necessary

27  to achieve the government's compelling interest in eliminating discrimination, including harassment,

28  on the basis of sex.). In *Taking Offense*, the Attorney General claimed that the pronoun requirements

served a compelling government interest of "eliminating discrimination on the basis of sex." *Id.* at 717. After examining the interests at stake, the court determined that "the pronoun provision [was] not narrowly tailored to achieve a compelling government objective because it burden[ed] more speech than is required to achieve the State's compelling objective." *Id.* at 707. The court described the pronoun provision as "a government message" which plaintiffs could not be compelled to parrot. *Id.* It also determined that the pronoun provision was "content based on its face because it draws a distinction between what is and what is not permissible based on the content of what is said." *Id.* at 710. Under strict scrutiny, the pronoun provision failed. *Id.* at 720.

Here too, Plaintiffs should not be forced to parrot the government's message regarding gender identity. There are other ways to achieve the government's goals besides infringing on Plaintiffs First Amendment rights by forcing them to use preferred pronouns.

Defendants do not deny that §§ 2505 and 2506 restrict Plaintiffs' speech rights. Instead, they claim that these speech restrictions are permissible because "[i]nmates generally lack a First Amendment right to speak in a manner that is an 'open expression of disrespect or any disrespectful communication between prisoner and guard or between prisoner and prisoner.'" MPA 20. In support of this proposition, Defendants mischaracterize the Ninth Circuit's opinion in *Brodheim v. Cry*, 584 F.3d 1262, 1272 (9th Cir. 2009). Far from suggesting that inmates don't have a right to speak in a disrespectful manner, *Brodheim* reaffirmed a long line of cases holding that "disrespectful language in a prisoner's grievance is itself protected activity under the First Amendment." *Id.* at 1271. *Brodheim* further stated that the district court's determination that there was a "legitimate penological goal of 'prohibiting disrespectful language'" was "contrary to our established precedent." *Id.* at 1272.[6]

Plaintiffs' grievances were denied and ignored because they refused to use preferred pronouns, putting their factual scenario squarely within *Brodheim*'s core holding. FAC ¶¶ 83–84, 110. They were

---

[6] Defendants again erroneously cite an unpublished and non-precedential decision, *Richey v. Dahne*, 733 Fed.App'x 881, 884 (9th Cir. 2018) in an attempt to buoy their false claims about *Brodheim*, suggesting that *Richey* "found that courts have recognized that prisoners do not have a First Amendment right" to use "disrespectful language." MPA 20. That was not *Richey*'s holding and *Richey* did not point to a single case wherein that position was adopted. Plaintiffs were not able to find a published Ninth Circuit opinion supporting that claim. Moreover, *Richey* has been criticized for its "many flaws in reasoning and [its] lack of analysis." *Williams v. McKay*, 2023 WL 2744097 (D. Idaho 2023).

---

    

also reprimanded for not using preferred pronouns as required by §§ 2505 and 2506, a content-based restriction on their speech. *Id.* Defendants violated Plaintiffs' First Amendment rights by punishing Plaintiffs for their complaints and forcing them to use preferred pronouns. ¶¶ 110

### D.  Plaintiffs state a plausible claim of First Amendment Retaliation.

A retaliation claim within the prison context has five elements. *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012). First, plaintiff must allege that the retaliated-against conduct is protected. *Id.* Grievances and litigation are both protected conduct. *Rhodes v. Robinson,* 408 F.3d 559, 568 (9th Cir.2005); *Schroeder v. McDonald,* 55 F.3d 454, 461 (9th Cir.1995).

Second, plaintiff must claim defendant took adverse action against plaintiff. *Watison*, 668 F.3d at 1114. Retaliatory actions taken against a prisoner for having exercised her rights are clearly established and violate the Constitution. *See, e.g., Pratt v. Rowland,* 65 F.3d 802, 806 & n. 4 (9th Cir.1995). The adverse action need not be an independent constitutional violation. *Pratt v. Rowland,* 65 F.3d 802, 806 (9th Cir.1995). Acts such as filing false disciplinary charges, placing an inmate in administrative segregation, making false statements that result in the denial of parole, and transferring or reassigning an inmate to another prison have been found to constitute adverse actions. *Id.*; *Watison v. Carter* 668 F.3d 1108, 1114 (9th Cir. 2012); *Howard v. Foster*, 208 F.Supp.3d 1152. "[T]he mere *threat* of harm can [also] be an adverse action...." *Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009); *Wood v. Beauclair*, 692 F.3d 1041, 1051 (9th Cir. 2012).

Third, plaintiff "must allege a causal connection between the adverse action and the protected conduct." *Watison*, 668 F.3d at 1114. "An allegation of a chronology of events from which retaliation can be inferred is sufficient to survive dismissal." *Id.*; *see Pratt,* 65 F.3d at 808 ("timing can properly be considered as circumstantial evidence of retaliatory intent.")

Fourth, plaintiff must allege that the "official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Watison*, 668 F.3d at 1114. "[A] plaintiff who fails to allege a chilling effect may still state a claim if he alleges he suffered some other harm" that is "more than minimal." *Id.* (cleaned up). That the conduct did not deter plaintiff from filing a lawsuit does not defeat the retaliation claim at the motion to dismiss stage. *Id.*

Finally, plaintiff must allege "that the prison authorities' retaliatory action did not advance legitimate

1   goals of the correctional institution" by alleging defendants' actions were arbitrary and capricious or

2   unnecessary to the maintenance and order of the institution." *Id.* at 1114–1115 (cleaned up). Even if a

3   defendant articulates a general justification for a neutral process, whether that justification was the true

4   purpose of their acts is a question reserved for the jury. *See Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir.

5   2003) ("[P]rison officials may not defeat a retaliation claim on summary judgment simply by

6   articulating a general justification for a neutral process, when there is a genuine issue of material fact

7   as to whether the action was taken in retaliation for the exercise of a constitutional right.").

8       Plaintiffs Romero, Gonzalez, T. Johnson, Quinn, and C. Johnson engaged in protected speech and

9   conduct by filing grievances or otherwise reporting incidents of wrongdoing by trans-identifying

10  biological males. FAC ¶¶ 58–93. Plaintiffs Romero and Gonzalez also exercised their freedom of speech

11  by refusing to use preferred pronouns. FAC ¶¶ 73–74, 84.

12      Defendants retaliated against above listed Plaintiffs and that retaliation was because of their speech.

13  Defendants retaliated against Romero by refusing to separate and protect her from a trans-identifying

14  biological male after she filed grievances and even though her safety was at risk. FAC ¶ 83. Defendants

15  retaliated against Gonzalez by refusing to protect her in response to her grievances, refusing to

16  investigate her grievances unless she referred to her perpetrator as a "trans-woman" instead of a male,

17  and instead accusing her of wrongdoing for "misgendering" another inmate. FAC ¶¶ 72–74, 84.

18  Defendants retaliated against T. Johnson by putting her in solitary confinement after she reported a

19  trans-identifying biological male's sexual harassment and claiming that she "falsely reported" the abuse

20  she witnessed. FAC ¶¶ 85–87. Defendants have also prevented T. Johnson from being paroled for

21  "political reasons" because she reported abuse at the hands of trans-identifying biological males. *Id.*

22  Like T. Johnson, Defendants retaliated against Quinn for reporting the abuse perpetrated by a trans-

23  identifying biological male and issued a Rules Violation Report against her while she was awaiting

24  parole, thereby vacating her release decision. FAC ¶¶ 88–92.  Quinn appealed her violation and was

25  found not guilty, which should have allowed her release. *Id.* Instead, due to Quinn's truth telling about

26  the abuse of a trans-identifying biological male, Quinn was again denied parole, and the Commissioner

27  overseeing her parole hearing admitted that if Quinn had "been quiet" about her "victimization," she

28  could have gone home. *Id.* Defendants retaliated against C. Johnson by putting her in solitary

1  confinement and transferring her to another prison against her wishes after she reported the violent

2  threats made by a trans-identifying biological male inmate. FAC ¶ 93.

3      Defendants' actions, as described above, would chill or silence a person of ordinary firmness from

4  future First Amendment activities. Defendants' retaliation put Plaintiffs in greater danger, caused them

5  to endure harsher punishment, worse living conditions, and sometimes kept them in jail when they

6  should have been freed. And finally, Defendants' retaliatory actions did not advance the legitimate goals

7  of the correctional institution. Women are suffering increased occurrences of rape, assault, and

8  harassment at the hands of trans-identifying biological males who identify as women only on paper.

9  FAC ¶¶ 28–39. Women who dare to speak up against this abuse are penalized to be silenced. Prison

10 officials are prohibited from preventing sex offenders, violent criminals, or those with a history of abuse

11 of women from being housed in female prisons. FAC ¶¶ 29, 39. Thus, women are harmed by this policy,

12 and this harm is known and incontrovertible. FAC ¶¶ 40-46. There is no legitimate penological purpose

13 for this policy decision; it is purely politics that makes the safety and security of biological females

14 subservient to the desires of trans-identifying biological males, many of whom manipulate the system

15 to prey on vulnerable victims. FAC ¶ 39.

16      **E.  Plaintiffs state a plausible claim for violations of their Fourteenth Amendment rights.**

17      "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to

18 any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that

19 all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473

20 U.S. 432, 439 (1985) (*quoting Plyler v. Doe*, 457 U.S. 202, 216 (1982)). With equal protection the "first

21 step ... is to identify the state's classification of groups" and then "look for a control group ... composed

22 of individuals who are similarly situated to those in the classified group in respects that are relevant to

23 the state's challenged policy." *Gallinger v. Becerra*, 898 F.3d 1012, 1016 (9th Cir. 2018) (cleaned up);

24 *see also Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1064 (9th Cir. 2014) ("The groups need not

25 be similar in all respects, but they must be similar in those respects relevant to the Defendants' policy.").

26      At the outset, Plaintiffs note Intervenors' Equal Protection argument relies heavily on the idea that

27 transgender status is a protected class under the Equal Protection Clause, such that heightened scrutiny

28 should be applied. D. MPA at 5-7. But that question is far from settled. *See*, *L.W. v Skrmetti*, 83 F.4th

460, 486-89 (holding that transgender status is not a suspect class, such that rational basis review applies to Equal Protection claims involving transgender individuals). In fact, it is currently before the United States Supreme Court in *United States v. Skrmetti*, 144 S.Ct. 2679 (2024), scheduled for oral argument December 4, 2024. Plaintiffs proceed below under the Ninth Circuit's current understanding of such claims but will notify the Court if the Supreme Court's ruling in *Skrmetti* changes the analysis.

Under current Ninth Circuit law, gender-based equal protection claims are subject to intermediate scrutiny, meaning that the policies must be substantially related to the achievement of important government objectives. *Byrd v. Maricopa County Sheriff's Dept.*, 629 F.3d 1135, 1140 (9th Cir. 2011). When a plaintiff does not allege a violation of a fundamental right or the existence of a suspect classification, prison officials need only show that their policies bear a rational relation to a legitimate penological interest to satisfy the equal protection clause. *Coakley v. Murphy*, 884 F.2d 1218, 1221–22 (9th Cir. 1989). For policies examined under rational basis review, courts should accord wide-ranging deference to prison administrators "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). While Defendants' policies should be examined under intermediate scrutiny due to the policies' basis on gender, whether viewed under intermediate scrutiny or rational basis review, S.B. 132's policies do not pass muster.[7]

### 1. Plaintiffs allege a Gender Based Equal Protection Claim

State governments act incompatibly with equal protection principles when a law or official policy denies women equal protection of the laws because they are women. *See U.S. v. Virginia*, 518 U.S. 515, 531 (1996). Trans-identifying male inmates in women's prisons are similarly situated with biological female inmates in those same prisons for purposes of equal protection analysis. *See Taking Offense v. State*, 66 Cal.App.5th 696, 725 (Cal.3d. 2021) (holding transgender residents of long-term care facilities were similarly situated to nontransgender residents residing in the same facilities for the purposes of equal protection analysis). Under S.B. 132's policies, biological women are not being

---

[7] To reiterate, Intervenors erroneously claim a finding in Plaintiffs favor would ban transgender inmates from female facilities. Not so. Plaintiffs request a return to the pre-S.B. 132 assessment regime where trans-identifying biological males were not given preferential housing considerations over biological females in the same facilities.



treated the same as trans-identifying biological males in the same facilities. S.B. 132 gives trans-identifying biological males preferences in housing. FAC ¶ 29. They may be placed in a housing facility of their choice, no matter if they have male genitalia and do not present themselves as women. FAC ¶ 31. Trans-identifying biological males' perception of their health and safety is given preference so they receive priority placement single-cell housing, housing with a person of their choice, or the ability to remove any other inmate that they deem "poses a threat from any location they have access to." FAC ¶ 29. S.B. 132 thus provides trans-identifying biological males preferential treatment over biological females housed in the same facility and must satisfy intermediate scrutiny.

S.B. 132's policies are not substantially related to the achievement of important government objectives. All parties agree, prior to S.B. 132 transgender inmates could be housed in a facility opposite their natal sex on a case-by-case basis. Trans-identifying biological males would have their suitability for placement in a female facility scrutinized to consider the rights and risks to both the inmate seeking transfer and the inmates currently in the facility. FAC ¶¶ 19–22. Requests were screened to reduce the risk of victimization and abuse. *Id.* In short, all inmates stood on equal footing.

There is no important government purpose for providing housing preferences to trans-identifying biological males over biological females. As shown supra, these preferences have increased gender violence and made facilities less safe for biological females. Considerations for the health and safety of trans-identifying biological males were already being examined in the pre-S.B. 132 process. S.B. 132 was legislation in search of a problem, made for the purposes of political posturing. Its implementation has put biological females in women's facilities at risk, and it was not substantially related to an important government purpose.

**2.  In the alternative, Plaintiffs allege a viable Rational Basis Equal Protection Claim**

While intermediate scrutiny is appropriate here, S.B. 132 also fails rational basis review. To determine whether a policy is reasonably related to legitimate penological interests, there must be a "valid rational connection between the regulation and the legitimate government interest put forward to justify it," there must be alternative means left open to inmates to exercise affected rights, accommodations to inmates' rights must be weighed against the impact on guards, other inmates and prison resources, and the court looks for alternatives to the policy which would indicate that "the policy

Plaintiffs' Opposition to Motion to Dismiss                                         Case Number: 1:21-cv-01657-JLT-HBK

may be an exaggerated response to prison concerns." *Jones v. Slade*, 23 F.4th 1124, 1134 (9th Cir. 2022) (*quoting Turner v. Safley*, 482 U.S. 78, 84, 89–91(1987)). Legitimate penological interests identified within the Ninth Circuit include: prison security, *Prison Legal News v. Ryan*, 39 F.4th 1121, 1132 (9th Cir. 2022); rehabilitation, *Id.*; reducing sexual harassment, *Id.*; preventing a hostile environment, *Id.*; and orderly operations, *Jones v. Slade*, 23 F.4th 1124, 1136 (9th Cir. 2022).

The only penological purpose Defendants suggest as the basis for S.B. 132 is "safely housing transgender inmates." D. MPA 22. But, as Defendants freely and repeatedly admit, prior to S.B. 132 the safety of transgender inmates was individually examined by prison officials to determine whether transfer to a facility opposite of their biological sex would protect all prisoners within this system. All prisoners' rights and safety were weighed, instead of transgender inmates being given preferences for their "needs," legitimate or not. Further, the legitimacy of their claims was considered rather than having prison officials being forced to bow to their requests regardless of whether the claims were true and regardless of the cost to the rest of the prison population impacted. Plaintiffs have plausibly alleged that S.B. 132 fails equal protection analysis because it serves no legitimate penological purpose. More to the point, this policy was not created by prison officials to address a problem in the system. This policy came from a legislature seeking to score political points on a pet issue.

## CONCLUSION

For these reasons, the Court should deny Defendants and Intervenors' Motions to Dismiss.


Dated: October 24, 2024                    **DHILLON LAW GROUP INC.**


   _/s/ Mark P. Meuser_____
   Harmeet K. Dhillon, Esq.
   Mark P. Meuser, Esq.
   Matthew M. Hoesly, Esq.
   Attorneys for Plaintiffs



Plaintiffs' Opposition to Motion to Dismiss                    Case Number: 1:21-cv-01657-JLT-HBK