# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANINE CHANDLER, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>JEFFREY MACOMBER, et al.,<br><br>Defendant. | Case No. 1:21-cv-01657 JLT HBK<br><br>ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND IN PART<br><br>(Docs. 118, 120) |

The plaintiffs in this case are six women incarcerated in California women's prisons. (*See* Doc. 84 ¶¶ 10–15.) In this lawsuit, they challenge a California law that dictates how prison officials and staff must address and house inmates who identify as transgender, nonbinary, or intersex. The plaintiffs allege that this law has forced three California prison officials, the defendants in this case, to transfer dangerous and violent people from men's prisons into women's prisons, simply because those people say (sometimes untruthfully) that they are transgender, nonbinary, or intersex. The plaintiffs also object more generally that they will be forced to share intimate spaces with transgender, nonbinary, and intersex inmates.

Reasonable people can certainly disagree in good conscience about how to ensure that all inmates are kept safe and treated fairly in these circumstances. A federal court is not necessarily the place to resolve those disagreements. Those who ask a federal district court to step in must show that the court has jurisdiction to do what they ask. The plaintiffs in this case have not done

this.  The reasons are straightforward:

(1)  This Court does not have the authority to manage California's prisons from day to day, such as by making decisions about transfers and housing assignments.

(2)  Even at this relatively early stage of the case, it is clear that the state law in question does not actually force prison officials to transfer inmates without regard for the safety and well-being of others.

(3)  The plaintiffs are not asking the Court to redress some specific harm or injury that has already befallen them.

(4)  The plaintiffs have not explained why the forward-looking order they would like this Court to issue—i.e., confirmation that the state's law is unconstitutional and an instruction that the defendants must not follow it in the future—is likely to prevent future harm.  California had been housing transgender inmates in women's prisons before the disputed law came into effect.

It is possible, however, that different or additional allegations could lay out a narrower and more limited dispute that this Court would likely have jurisdiction to resolve.  For that reason, the Court will permit the plaintiffs to file an second amended or supplemental complaint, if they choose, subject to certain limitations, as explained in more detail below.  The pending motions to dismiss (Docs. 118, 120) are thus **GRANTED** with leave to amend in part.

**ALLEGATIONS**

In 2021, the California Transgender Respect, Agency, and Dignity Act, also known as Senate Bill 132 or simply "S.B. 132," came into effect.  (*Id.* ¶ 23.)  The plaintiffs allege that under this law, if prisoners in men's prisons declare that they identify as women, the California Department of Corrections and Rehabilitation must begin treating them as women, from the pronouns it uses to the facilities where it houses them.  (*Id.* ¶¶ 28–29.)  That is so, the plaintiffs allege, regardless of whether the inmates use a male name, groom themselves in a traditionally masculine way, have ever previously presented themselves as women, have ever sought any care or treatment related to their gender, or plan to do so.  (*See id.* ¶¶ 29–31.)  The plaintiffs allege the health and safety of other inmates are subordinate concerns.  (*See id.* ¶¶ 32, 143.)  They fear that a

transfer may be required under S.B. 132 even for prisoners who are sex offenders with a history of raping women. (*See id.* ¶¶ 35, 39, 47–50, 101.)  In addition, they allege, the law obligates prison officials to give special consideration to the transferring inmates' preferences for particular cell assignments and even cellmates. (*See id.* ¶¶ 28, 29.)

If there were any doubt about the implications of these allegations, the plaintiffs make clear that they believe California has, in effect, given violent men within its prison system "carte blanche access to female facilities." (Doc. 122 at 1.)  They allege S.B. 132 allows any male inmate in a men's prison to transfer into a women's prison, where he may sleep in the same cells as women, shower with women, use the same restrooms as women, and assault women without significant risk of detection, all by the simple expedient of declaring falsely that he identifies as a woman. (*See* Doc. 83 ¶¶ 2–4, 41–44, 62.)

These allegations imply a transfer is a foregone conclusion once an inmate discloses a transgender identity.  They imply as well that the safety and security of others are secondary, even irrelevant concerns under the terms of the statute itself.  Fortunately, that is not so.  The Court must generally assume the plaintiffs' allegations are true at this stage. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018); *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).  It is not necessary to assume an allegation is true, however, if it contradicts some indisputable fact that is subject to judicial notice, or if it contradicts the materials a plaintiff has incorporated into the complaint by reference. *See Khoja*, 899 F.3d at 998–99, 1002–03; *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *as amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001).  The California Penal Code, along with other materials the plaintiffs rely on in their complaint, reveals a more complex reality than they describe in their complaint.

This Court reviewed the statutory language in a previous order. (Doc. 67.)  In brief, S.B. 132 added two sections to the California Penal Code. (*Id.* at 3.)  The first, section 2605, instructs CDCR to check whether newly arrived inmates identify as men, women, or nonbinary; to ask how they prefer to be addressed (him, her, Mr., Ms., etc.); and to give new inmates a chance to disclose whether they are transgender, nonbinary, or intersex. (*Id.* at 3–4 (citing Cal. Pen. Code

3

§ 2605(a)(1)–(3)).)  Inmates can decline to provide this information without discipline, or they can disclose it later.  (*Id.* at 4 (citing Cal. Pen. Code § 2605(b)–(c)).)  The same is true for inmates who were already within CDCR's custody when S.B. 132 became effective.  (*Id.*)  The law then prohibits CDCR staff, along with its contractors and volunteers, from "consistently" addressing inmates differently than they request.  (*Id.* (citing Cal. Pen. Code § 2605(d)).)  It does not impose similar requirements on others, such as inmates or visitors.

The second new section, 2606, addresses aspects of the treatment and housing of any inmates who identify as transgender, nonbinary, or intersex under section 2605.  (*See id.* at 4–5.)  They must be "addressed in a manner consistent with [their] gender identity."  (*Id.* at 4 (quoting Cal. Pen. Code § 2606(a)(1)).)  CDCR must also give "serious consideration" to their "perception of health and safety" in placements, bed assignments, programming, and other similar decisions.  (*Id.* (quoting Cal. Pen. Code § 2606(a)(4)).)  And in general, they must be "housed at a correctional facility designated for men or women based on their preference."  (*Id.* (quoting Cal. Pen. Code § 2606(a)(3)).)  But section 2606 expressly permits CDCR to deny inmates' requests for transfers and to consider the safety of others.  Although CDCR may not deny a request for "discriminatory reasons," such as the inmate's "physical characteristics," "genitalia," "sexual orientation," or factors "present among other people incarcerated at the preferred type of facility," *see* Cal. Pen. Code § 2606(c), the law expressly authorizes CDCR to deny requests and preferences for "management and safety concerns," *see id.* § 2606(a)(4), (b), (d).

This language shows S.B. 132 does not automatically permit the inmates of a men's prison to enter a women's prison with only a declaration of transgender identity.  And an inmate's false declaration, made in bad faith, based on a prurient desire for "access" to a women's prison may be denied based on concerns about prison "management" and the "safety" of the inmates in the women's prison under the plain terms of section 2506.  Even a good faith, honest, and accurate description of one's identity does not necessarily suffice to justify a transfer, if it would raise management and safety concerns.

To explain their belief that the opposite is true, the plaintiffs quote several passages from a report by the California Office of the Inspector General.  (*See* Doc. 84 ¶ 39 (citing Cal. Off.

Inspector Gen., Transgender Special Review, Rep. No. 22-01 SR (Aug. 2023)).)[1]  They did not attach this report to their complaint.  As noted, a district court must normally limit its analysis to the complaint and its attachments when it evaluates a motion to dismiss or a jurisdictional motion that attacks the complaint on its own terms.  *See Khoja*, 899 F.3d at 998; *Leite*, 749 F.3d at 1121.  But if a complaint refers extensively to another document, or if that document forms the basis of a claim, then the court may consider it—all of it, not just the quoted passages—and even assume the statements within it are true.  *See Khoja*, 899 F.3d at 1002–03.  This doctrine is a discretionary tool that district courts can rely on to prevent litigants from portraying a crucial document inaccurately.  *See id.* at 1002.

It is appropriate to consider the entirety of the OIG report in this case, without converting the pending motions into motions for summary judgment or factual jurisdictional attacks.  The complaint quotes the OIG Report extensively, it uses the quoted passages to convey several facts about how CDCR has implemented S.B. 132, and those quotations are some of few factual allegations connecting the plaintiffs' legal claims to S.B. 132 in particular.  (*See* Doc. 84 ¶ 39.)

The report itself is not a particularly long or complex document.  The Office of the Inspector General began the investigation that culminated in that report in response to a request from a group of state senators.  OIG Rep. at 1.  They wanted more information about how CDCR was implementing S.B. 132.  *Id.*  The OIG thus described the process CDCR had created for evaluating inmates' requests for transfers under S.B. 132.  The process begins with a questionnaire that allows an inmate to identify as transgender, nonbinary, or intersex and to express a desire to be housed in a prison consistent with their gender identity.  *Id.* at 5.  After inmates housed in men's prisons complete the questionnaire, they are not immediately transferred to a women's prison (and women not to men's prisons), but rather to one of thirteen "hub" prisons, which offer "specialized programs and services" for transgender, nonbinary, and intersex inmates, such as medical care and mental health services.  *Id.* at 6 & n.4, 9, 11.  The requesting

---

[1]  The Court cites this report as the "OIG Rep." in the remainder of this order, with page citations referring to the numbers on the top of each page.  A copy of the report is available on the website of the Office of the Inspector General at https://www.oig.ca.gov/wp-content/uploads/2023/08/Special-Review-No.-22-01.pdf

inmate must then complete a mandatory, eight-session course. The purpose of this course is to inform them about "cultural and rule differences between men's and women's prisons and prepare them for transfer." *Id.* at 6.

Many inmates decide not to go through with a transfer after completing this course. *See id.* at 18 n.9, 20. If an inmate completes the course and remains interested, their name is added to a list for a counselor to review. *Id.* at 6. The review process is "thorough." *Id.* at 2, 13. It includes a mental health evaluation, a review of the inmate's prison history, and an evaluation of the inmate's entire criminal history. *Id.* at 6. Counselors also interview the requesting inmates. They ask, for example, how old they were when they first started expressing themselves in their current gender and why they believe a different facility would be better for their health and safety. *Id.* at 15. Because only a few counselors conduct these reviews, and because they are so thorough, there is a significant backlog of transfer requests. *See id.* at 2, 13, 18–19. The OIG found that inmates must generally wait more than six months after completing their initial questionnaire before the review is complete. *Id.* at 2.

The next step is a hearing. *See id.* at 6–7. A transfer committee considers the information prepared during the review and hears from the inmate. *Id.* at 6. The committee chairperson (at the time of the report, a warden of one of the two women's prisons) then decides "whether transferring the prospective transferee would raise 'management or safety concerns' and should, therefore, be denied." *Id.* at 6, 15. Inmates whose requests are approved are transferred; those whose requests are denied may file a grievance and pursue challenges in court if they choose. *See id.* at 6–8. After a transfer is complete, the OIG found that the movement of inmates "between the two [women's] prisons, and within each prison, is uniformly processed regardless of gender identity." *Id.* at 8. If problems arise after a transfer, transgender inmates may be "returned to their originally designated prison." *Id.*

The OIG concluded that this review process was "appropriately thorough" but quite protracted. *Id.* at 13. It is "significantly longer and more detailed" than the process for other types of transfers. *Id.* at 14. At the time the OIG completed its review, nearly 400 people had requested a transfer, but CDCR had processed only 55 requests. *Id.* The number of inmates who

had requested a transfer under S.B. 132 was also much lower than the number who identified as transgender, nonbinary, or intersex: only about 40% of that total. *Id.* at 2.

A more recent CDCR report includes similar figures. As of March 4, 2026, about 1,110 of the 2,400 people in the incarcerated population who had identified as transgender, nonbinary, or intersex had requested a transfer. Cal. Dep't Corr. & Rehab., SB 132 Report (Mar. 11, 2026).[2] CDCR has denied far more requests than it granted: it has approved 54 and denied 144. *Id.* At least one of these denials—based on "an impermissible security risk at a women's facility" for an inmate whose "presence would negatively impact the culture at the female institution"—has even been the subject of litigation in this Court. *See Murray v. Harrington*, No. 21-01936, 2024 WL 923487, at *3 (E.D. Cal. Mar. 1, 2024), *report and recommendation adopted*, 2024 WL 1742863 (E.D. Cal. Apr. 23, 2024). Even more people who initially requested a transfer decided not to transfer during the review process, i.e., 148 inmates. *See id.*

The OIG looked into the reasons for the long delays and relatively small numbers of transfers. In addition to staff shortages and other similar causes, the OIG highlighted vague language in S.B. 132 itself. *See* OIG Rep. at 19. As noted above, S.B. 132 authorizes CDCR to deny transfer requests based on "management and safety concerns," but not for "discriminatory reasons." *Id.* One of these prohibited "discriminatory reasons" is "a factor present among other people incarcerated at the prison" where the inmate wishes to be housed. *Id.* The OIG found that language in particular to be "broad" and "challenging" in a way that made for more difficult reviews. *Id.* The OIG hypothesized that the statute could potentially be interpreted as barring CDCR from denying a transfer to a women's prison solely because the requesting inmate had a history of rape: "If people at the women's prison have been incarcerated for crimes involving rape, this may qualify under [S.B. 132] as a factor present among other people at the prison and may preclude the department from using it as the sole basis to deny the transfer request." *Id.* To be clear, the OIG did not endorse this interpretation. It merely cited this language to explain in

---

[2] The Court takes judicial notice of this report. *See, e.g.*, *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 788 (9th Cir. 2018) (taking judicial notice of materials available to the public on a government website). At the time this order was filed, a copy of the report was available at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2026/03/STA472-032026-M.pdf

part why the review process was difficult and time-consuming. *See id.* The OIG agreed with CDCR that more specific criteria, regulations, or statutory language should be developed to avoid this and other uncertainties. *Id.*

The OIG did not specifically confirm whether any inmates had misrepresented their gender identity or had attempted to take advantage of S.B. 132 in bad faith. *See id.* at 30. It did report, however, that several inmates who had been transferred under S.B. 132 believed that at least some transfer applicants (i.e., those who wanted to transfer but had not) "were being less than truthful about their gender identity." *Id.* at 25. "Some believed prospective transferees were seeking to transfer to have sexual relations with incarcerated people who were designated female at birth." *Id.* As one applicant put it, "There are a lot of wolves in sheep's clothing," i.e., "men who are now all of a sudden transgender." *Id.*

The OIG also acknowledged that it would be "difficult" to "accurately assess" an applicant's "sincerity" and "true intentions." *Id.* at 30. Its report notes as well that it is "possible" an inmate could "purposefully misidentify themselves to facilitate a transfer." *Id.* It also found this type of "deception" could "become easier as incarcerated people share information about the process, the interview questions they were asked, and the specific reasons they were denied." *Id.* But again, it described the review process as "appropriately thorough," *id.* at 13, and did not report there were any cases in which inmates had secured a transfer in bad faith or on false pretenses.

In later sections of the report, the OIG described the results of its investigation into the effects of S.B. 132 on inmates' safety and privacy. *See id.* at 25–38. Many people in the two women's prisons expressed concerns about living with transferred inmates. *Id.* at 25. Some of these concerns "derived from the belief that transferees are, generally, physically larger and stronger." *Id.* The OIG report notes as well that some inmates were especially concerned about "showering around transferees, particularly those who have not had gender-affirming surgery." *Id.* It could also be "particularly triggering" for women with a history of abuse to live in "close spaces" with transgender inmates. *Id.* at 29. The OIG also found living conditions could be "problematic" for those "who expressed religious objections to living with unrelated individuals

designated male at birth." *Id.*

Investigators visited the prisons and documented the living arrangements within them, including by photograph. *See id.* at 26–29. The OIG found the women's prisons had separated, divided bathrooms and shower stalls with "adequate shower curtains," but it concluded that "privacy was still potentially compromised when entering and exiting the shower stalls." *Id.* at 29. Inmates could "report safety or security concerns to departmental staff, can request a bed change or be placed in temporary restrictive housing, and may file a grievance if their concerns are not resolved." *Id.* at 3. According to the OIG's report, CDCR had "properly investigated or responded to all allegations of consensual sexual misconduct and sexual assaults" that the OIG was able to review. *Id.* at 4, 34.

In addition to concerns about safety and privacy, the OIG found that S.B. 132 had led to feelings of "inequity and tension" among inmates. *Id.* at 3. Under S.B. 132, the health and safety concerns of transgender, nonbinary, and intersex inmates "must be given serious consideration," whereas "the rest of the incarcerated population . . . must either accept housing assignments or be subject to disciplinary action." *Id.* The OIG found this "disparity" had created "a feeling of resentment" and a "perception that transferees are treated differently." *Id.* "For example, some individuals reported that officers approve transferees' requests for bed moves, even requests for single cells, more often than they do for nontransferees . . . . One staff member also reportedly told an incarcerated person that transferees must be treated like an 'endangered species' for the department to avoid lawsuits." *Id.* at 26.

Beyond the OIG's Report, which the plaintiffs quote most extensively, they refer to a variety of other materials. It is not necessary for present purposes to review these other materials in detail. The Court assumes the complaint portrays their contents accurately. As the plaintiffs describe them, these other materials demonstrate that prison officials knew or should have known that S.B. 132 would lead to increases in the number of inmates who identify as transgender, increased safety risks, increased violence, increased sexual assaults, increased pregnancies, and increased harms to vulnerable inmates, especially among those who have been diagnosed with post-traumatic stress disorder. (*See* Doc. 84 ¶¶ 33–57.) For example, they point out that CDCR

9

observed an increase in the number of inmates who identify as transgender, expected an increase in sexual assault allegations, and began offering condoms and other forms of birth control to inmates in women's prisons. (*Id.* ¶¶ 34, 36.) They also cite research and reports that, they allege, show transgender inmates are relatively more likely to have committed sex offenses, and they allege a disproportionately large number of the inmates in women's prisons have been diagnosed with post-traumatic stress disorder. (*See id.* ¶¶ 35, 40, 42, 47–50, 52.)

In far more personal terms, the plaintiffs allege that transgender inmates and CDCR's efforts to comply with S.B. 132 have imposed a severe personal hardships upon them. Krystal Gonzalez alleges she was sexually assaulted by a person she describes as "a trans-identifying biological male inmate" who transferred into her housing unit, although she does not say exactly when. (*Id.* ¶ 62.) She reported the assault, but "staff failed to pursue her report," ignored the grievance she filed, and accused her of wrongdoing, i.e., of "willful misgendering" the inmate who assaulted her. (*Id.* ¶¶ 63–64.) In her experience, transgender inmates "rush to engage in sexual relationships with female inmates" when they arrive in the women's prison and sometimes put on a "feminine" affect in the presence of prison guards, only to revert to "masculine habits" when guards are away. (*Id.* ¶ 65.)

Janine Chandler alleges she suffers from post-traumatic stress disorder as a result of domestic and sexual abuse she experienced at the hands of her former husband and other relatives. (*Id.* ¶ 10.) She alleges "the presence of criminal, intimidating males gives her flashbacks of her violent husband." (*Id.* ¶ 61.) She is Muslim, and her faith "instructs her not to be unclothed with unrelated males," but as a result of S.B. 132, she alleges that she might now be required to undress in the presence of people who she considers to be men. (*Id.*)

Tomiekia Johnson also suffers from post-traumatic stress disorder as a result of sexual assault and domestic violence in her past. (*See id.* ¶¶ 12, 66.) She alleges the presence of transgender inmates exacerbates her condition. (*Id.* ¶ 66.) Less directly, she alleges she has witnessed or heard about sexual harassment and an attempted rape by an transferred inmate, who she describes as a "large man who dresses and grooms masculinely and is not interested in making any effort to present as a woman." (*Id.* ¶¶ 67–69.) Johnson was not the victim, but she

10

alleges the prison did not reprimand or move the perpetrator away from the alleged victims; instead prison officials placed Johnson and the other accusers in solitary confinement and have accused them of making false reports, including in connection with this very lawsuit. (*Id.* ¶¶ 67–69, 85–87) Johnson also alleges that she is eligible for resentencing and a commutation but has been denied parole "for political reasons." (*Id.* ¶ 87.)

Cathleen Quinn alleges the same transgender inmate "peeped" at her as she used the restroom. (*Id.* ¶ 76.) She made a report, but it led to no consequences. (*Id.* ¶¶ 76–77, 88.) Instead, she alleges, parole officials punished her by extending her incarceration. (*Id.* ¶¶ 88–91.) She alleges the commissioner overseeing her parole hearing told her that "she should have been quiet" about her "victimization" so she could have "gone home." (*Id.* ¶ 92.)

Nadia Romero alleges she has been "repeatedly subjected to unwanted physical touching by a trans-identifying biological male inmate" while she was on a work assignment. (*Id.* ¶ 71.) Prison officials ignored her grievance and lectured her about how she had referred to the inmate who had touched her, i.e. as a man rather than as a woman. (*Id.* ¶ 72.) She describes herself as a "devout Catholic," and her religious convictions do not permit her to refer to transgender women using female pronouns; using those pronouns "is sinful as it is asserting a lie." (*Id.* ¶ 73.) The presence of people she considers men also conflicts with her religious beliefs. (*Id.*)

Channell Johnson alleges she was in a consensual sexual relationship with a transgender inmate "whose background includes having raped a woman in another female prison." (*Id.* ¶¶ 78–79, 93.) Prison staff discovered the relationship and placed the other inmate in administrative segregation. (*Id.* ¶ 80.) When Channel Johnson refused to lie about the relationship, her former partner began to threaten her and her family members. (*Id.*) She alleges she was then transferred to a different prison, while officials took no action to punish her former partner, who continues to threaten her. (*Id.* ¶¶ 81–82, 93.)

The plaintiffs allege S.B. 132 violates their constitutional rights in several ways. They pursue four claims, all via 42 U.S.C. §1983. First, they allege the defendants have subjected them to cruel and unusual punishment in violation of the Eighth Amendment because transfers under S.B. 132 subject them to trauma and an increased risk of sexual assault and violence. (*Id.* ¶¶ 94–

11

106.) Second, they allege S.B. 132 violates the First Amendment because it "effectively compels the speech of female inmates." (*Id.* ¶ 113.) They feel they must "choose between speaking in line with S.B. 132's mandated pronoun language against their own conscience, or remaining in prison longer." (*Id.*) Third, Chandler and Romero allege S.B. 132 forces them to live with and expose themselves to people who are, in their view, unrelated men, a violation of their sincerely held religious beliefs, thus depriving them of their right to exercise their religious beliefs freely in violation of the First Amendment. (*Id.* ¶¶ 121–35.) Fourth, the plaintiffs allege S.B. 132 deprives them of their right to equal protection of the law in violation of the Fourteenth Amendment. They claim the law gives "preference to trans-identifying inmates' housing preferences over the safety and security of female inmates." (*Id.* ¶¶ 136–46.)

The plaintiffs seek an order declaring S.B. 132 unconstitutional, both on its face and as it has been applied; an injunction prohibiting the defendants from "enforcing" S.B. 132 or "otherwise interfering with [their] constitutional rights and federal guarantees"; an award of attorneys' fees and costs; and any other further relief the Court deems appropriate. (*Id.* at 29–30.) They do not seek damages. They also make clear in their opposition brief that they "simply seek an injunction against the enforcement of S.B. 132 . . . and a return to the regime before its enactment." (Doc. 122 at 1–2.)

There are three defendants: the Secretary of the CDCR and the wardens of the two facilities where the plaintiffs are housed. (*See id.* ¶¶ 16–18.) They move to dismiss the complaint for lack of jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). (Doc. 118.) They do not currently dispute the plaintiffs' allegations; their jurisdictional arguments take the complaint at face value. (*See* Doc. 118-1 at 2.) The Court has also permitted several transgender inmates and the Transgender Gender-Variant & Intersex Justice Project to intervene in the case to advocate for their interests. (*See* Docs. 62.) They move to dismiss "for the additional reason that the [plaintiffs'] claims . . . the remedy they seek would not address the harms they allege and the only remedy that could possibly do so is not one this Court could grant." (Doc. 120). Briefing on both motions is complete, and the court determined no hearing was necessary. (*See* Docs. 121–24.)

The pending motions to dismiss are second set of similar motions that this Court has adjudicated. In response to the first set, the Court dismissed the plaintiffs' original complaint based in part on its conclusion that it has no jurisdiction to consider a facial challenge to S.B. 132. The Court permitted the plaintiffs to pursue claims against the individual defendants only (i.e., not CDCR itself) and limited those claims to those that this court has jurisdiction to redress. (Doc. 67 at 26.) The plaintiffs agree the Court's previous order forecloses their facial challenge to S.B. 132. They "do not seek to revive" their facial claim, nor ask the Court to reconsider its previous decision. (Doc. 122 at 12.) They included a facial challenge in their complaint to "preserve the issue for appeal." (*Id.*) The Court accordingly addresses only their challenge to the law as it has been applied to them. As before, the Court concludes that it lacks jurisdiction under Article III.

**JURISDICTION**

Article III of the Constitution gives federal courts jurisdiction to hear "Cases" and "Controversies." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024) (quoting U.S. Const. art. III, § 2). The Supreme Court has interpreted these words as requiring the one who invokes a federal court's jurisdiction to demonstrate three things: first, that it has suffered (or likely will suffer) an "injury in fact"; second, "that the injury likely was caused or will be caused by the defendant" or defendants; and third, "that the injury likely would be redressed by the requested judicial relief." *Id.* at 380. Plaintiffs must meet these requirements "'for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). At the pleading stage, a plaintiff may rely on allegations to meet this standard. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Plaintiffs who satisfy these requirements are said to have "standing" to sue. *All. for Hippocratic Med.*, 602 U.S. at 378. The Supreme Court has reiterated in recent years that standing is a "fundamental" limit on a federal court's jurisdiction and "firmly rooted in American constitutional law." *Id.* at 378, 380, 397 (citations omitted). It has also urged lower courts not to make standing "more complicated than it needs to be." *Bost v. Illinois State Bd. of Elections*, 146

S. Ct. 513, 523 (2026) (quoting *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 547 (2020)); *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 125 (2025) (same). The fundamentals of the standing rule are indeed "well-known." *All. For Hippocratic Med.*, 602 U.S. at 380. But they can be quite difficult to explain and apply succinctly. The Supreme Court has heard and resolved many hard-fought standing disputes over the last few years. *Diamond Alternative Energy*, 606 U.S. at 125 (collecting cases).

Under the first of the three standing requirements, plaintiffs must identify an injury that is both "concrete" and "particularized." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). This means the injury "must be real and not abstract" and "affect the plaintiff in a personal and individual way." *All. For Hippocratic Med.*, 602 U.S. at 381 (quoting *Lujan*, 504 U.S. at 560 n.1). It must also be "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). It "must have already occurred or be likely to occur soon." *All. For Hippocratic Med.*, 602 U.S. at 381. And when plaintiffs seek prospective relief, such as an injunction, they must demonstrate the injury they fear is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Although the word "certainly" implies certainty, this is also a question of likelihoods. *See All. For Hippocratic Med.*, 602 U.S. at 381 (citing *Clapper*, 568 U.S. at 401). A "substantial risk" of future harm can be enough. *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

Second, for causation, plaintiffs must show their "injury likely was caused or likely will be caused by the defendant's conduct." *All. For Hippocratic Med.*, 602 U.S. at 382 (emphasis omitted). This can be difficult to do in a case about a government's efforts to regulate "someone else." *Id.* (emphasis omitted) (quoting *Lujan*, 504 U.S. at 562). In these cases, "causation 'ordinarily hinges on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well.'" *Id.* (alterations omitted) (quoting *Lujan*, 504 U.S. at 562). Plaintiffs in this situation "generally cannot 'rely on speculation about the unfettered choices made by independent actors not before the courts.'" *Id.* at 383 (quoting *Clapper*, 568 U.S. at 415, n.5). They "must show that the 'third parties will likely

14

react in predictable ways'" and in doing so, injure them in turn. *Id.* (quoting *California v. Texas*, 593 U.S. 659, 675 (2021)).  Any "speculative" and "attenuated" links in a proposed chain of cause and effect can prevent plaintiffs from showing they have standing.  *Id.*  If it is too hard to predict how third parties will react, or if the government's actions are too far removed from their allegedly adverse effects, then there is no case or controversy and no jurisdiction.  *See id.*

Redressability, the third part of the test, is often a corollary of causation.  *See Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 288 (2008).  "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury."  *All. For Hippocratic Med.*, 602 U.S. at 381.  But sometimes a plaintiff might not have standing even if the defendant has caused an injury; some injuries are simply beyond a court's power to redress.  *See, e.g.*, *United States v. Texas*, 599 U.S. 670, 677 (2023) (finding no standing to seek an order directing the Executive Branch to make more arrests or initiate more prosecutions).

The complaint in this case falls short of at least one of these requirements for each of the plaintiffs' claims.

## I.    Eighth Amendment

First, the plaintiffs allege S.B. 132 prevents prison officials from protecting them from danger in violation of the Eighth Amendment.  (*See* Doc. 84 ¶ 99.)  As summarized above, some of them have been sexually assaulted or harassed in the past, and others have suffered from the symptoms of post-traumatic stress disorder, exacerbated by the close physical presence of transgender inmates.  (*See id.* ¶¶ 58–82.)  There is no doubt that these alleged injuries are concrete and personal, even wrenching.  The plaintiffs do not allege, however, that the defendants or anyone under their supervision transferred the inmates who were responsible for these injuries under the terms of S.B. 132, rather than some other regulation, such as those that were in place before S.B. 132 came into effect.  For this reason, their complaint does not establish the necessary chain of cause and effect between past injuries and the law they challenge.

The plaintiffs tacitly acknowledge this missing allegation in opposition to the pending motions.  (Doc. 122 at 14 n.2.)  They clarify that it was their intention to allege that their injuries

15

all "arise from inmates transferred under and due to the new policies mandated by S.B. 132." (*Id.*)  They may not amend their complaint by making clarifications and arguments in an opposition brief.  "[A] court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss." *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) (emphasis omitted).  But even if they had alleged clearly that the inmates who assaulted them or caused their distress were transferred under S.B. 132, they have not explained how the forward-looking remedies they seek would redress a harm that has already befallen them.  They do not request damages or another type of retrospective relief, but rather a judicial declaration and an order instructing the defendants not to enforce or comply with S.B. 132 in the future.  An injunction or declaration would not relieve them of the harmful consequences of an event that has already occurred.  (*See* Doc. 67 at 22.)

By contrast, a judicial declaration or an injunction could potentially prevent and thus "redress" a future injury.  The plaintiffs have not demonstrated, however, that the law they ask the court to declare unconstitutional and to enjoin is likely to cause some concrete and particularized future injury in the future.  Injuries and harm in the past do not alone give the plaintiffs standing to pursue an injunction.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 106–07 (1983).  They cannot rely on their allegation that S.B. 132 compels prison officials to transfer dangerous and violent sex abusers into women's prisons whenever they "state that they now identify as transgender."  (Doc. 84 ¶ 4.)  As summarized above, S.B. 132 expressly grants prison officials the authority to deny transfer requests based on concerns about prison management and safety.  CDCR has, accordingly, followed a protracted, multi-step process that includes a mandatory eight-session class, review of the inmate's mental health, a review of the inmate's prison and criminal records, an interview, and a hearing.  Under this process, CDCR has denied many more requests than it has granted.

The plaintiffs underscore the OIG's statement that it could be "difficult" for prison officials to "accurately assess" an applicant's "sincerity" and "true intentions."  OIG Report at 30.  Inmates could potentially "misidentify themselves to facilitate a transfer."  *Id.*  The OIG did not say that it located any inmates who had so "misidentified" themselves, and the plaintiffs do not

16

allege that specific inmates have successfully managed to dishonestly or insincerely insinuate their way into a women's prison and thus have become the likely source of a future harm. The possibility of such a deception does not show an injury is "imminent" or "likely." "Plaintiffs cannot rely on speculation about 'the unfettered choices made by independent actors not before the court.'" *Clapper*, 568 U.S. at 415 n.5 (quoting *Lujan*, 504 U.S. at 562). It would be speculation to assume that dangerous inmates are likely to successfully lie their way through a lengthy and thorough review process and into the plaintiffs' housing units and cells.

Setting aside false claims and pretexts, the plaintiffs allege also that inmates who honestly and accurately identify themselves as transgender will put them a risk. There are reasons to doubt this is true. (*See, e.g.*, Doc. 118-1 at 24.) But for present purposes, the Court will assume it is. Even with the benefit of that favorable assumption, the plaintiffs cannot show they have standing to press the claims they now assert.

To explain why, it is best to begin with the fact that the plaintiffs are not challenging a law that requires them to do something or that forbids them from doing something else. S.B. 132 does not regulate them. It regulates the defendants—the state's prison officials and the officers and staff members under their supervision—by instructing them what they can and cannot consider and what they must and must not do. (*See* Doc. 123 at 8.) S.B. 132 might also be said to indirectly "regulate" transgender, nonbinary, and intersex inmates as well by granting them rights or protections. The plaintiffs and the many other people in CDCR's custody are a further step away from the law. Their claims are about what will happen when CDCR officials interpret and apply S.B. 132 and how other people—such as the inmates who identify as transgender, nonbinary, and intersex under the terms of S.B. 132—will react to the government's actions.

For these reasons, this case is a dispute about a government's efforts to regulate "someone else." *All. For Hippocratic Med.*, 602 U.S. at 382 (emphasis omitted) (quoting *Lujan*, 504 U.S. at 562). The court's jurisdiction hinges "on the response of the regulated (or regulable) third party" and "others." *Id.* (alterations omitted) (quoting *Lujan*, 504 U.S. at 562). To show they have standing, the plaintiffs must offer allegations demonstrating these "third parties will likely react in predictable ways" without resorting to "speculative" and "attenuated" claims about the distant

ripple effects that might spread from any particular official's or officer's actions or any given inmate's reactions. *Id.* (citations and quotation marks omitted).

The plaintiffs have not offered the necessary allegations. It is simply too difficult to make anything more than guesses about how prison administrators, officers, and staff members will handle any given classification decision, housing arrangement, cell assignment, grievance, or safety risk that might attend to the custody or housing of a particular inmate. That is true even if transgender status is statistically linked to sexual assault and violence on the whole, as the plaintiffs allege. Too many other variables are at play, such as the transferred inmate's disciplinary and criminal history, the evidence available to the prison officials who approve any given transfer, how closely correctional officers supervise transferred inmates and their peers, cameras and any other available security measures, the individual housing and cell assignments, and even the architecture of the prisons themselves. Uncertainties like these are what persuaded the Supreme Court that it lacked jurisdiction in *Alliance for Hippocratic Medicine* and *Clapper*: federal courts do not have authority to adjudicate disputes about hypothetical injuries that may or may not occur, depending on how enforcement authorities will act, how third parties will react, and how these actions and reactions might play out in a complex web of surrounding circumstances. *See* 602 U.S. at 390–92; 568 U.S. at 410–14.

A contrasting case helps to explain what is missing from this one. The plaintiffs in *Diamond Alternative Energy* included companies that produced gas and diesel fuel for trucks and cars. *See* 606 U.S. at 108. They challenged California regulations limiting greenhouse gas emissions and increasing electric car production. *See id.* at 106–07. It was not difficult to see how these regulations would reduce fuel sales, and thus why the fuel producers had standing. The regulations would "likely cause a decrease in purchases of gasoline and other liquid fuels for automobiles." *Id.* at 114. That was "the whole point." *Id.* The point of S.B. 132 is not to make prisons more dangerous or create problems for prison management. Just the opposite: it is to ensure that transfers can occur only when they will *not* raise "management or safety concerns." Cal. Pen. Code § 2606(b). Prison administrators may very well fail in this endeavor from time to time, despite their best efforts, but the complaint offers no plausible allegation to show these

18

failures will be predictable or will affect the plaintiffs in particular in predicable ways.

With this said, the plaintiffs do describe some consequences of S.B. 132 that are easier to anticipate. They allege the close presence of transgender inmates in intimate spaces exacerbates the symptoms of their preexisting mental health conditions. It is not speculation to infer that S.B. 132 will lead to an increase in the number of transgender, nonbinary, and intersex inmates who are housed in women's prisons. But as this Court explained in its previous order, it cannot and will not "order CDCR officials to identify, locate, and remove over two dozen [now four dozen] transgender, intersex, and nonbinary individuals from California prisons." (Doc. 67 at 23.)

Quite understandably, the plaintiffs do not ask the Court to undertake such an effort. Now, as before, they ask the Court for a more limited order, one that simply requires the Defendants to reinstate "the regime" as it was before S.B. 132 came into effect. (Doc. 122 at 1–2; *see also* Doc. 41 at 7.) The plaintiffs have not explained how such a limited injunction would prevent them from sharing intimate spaces with transgender, nonbinary, and intersex inmates. Regulations in place since 2017 or earlier have referred transgender inmates "to a classification committee for a determination of appropriate housing at a designated institution." (Doc. 67 at 2–3 & n.2 (quoting Cal. Code Regs. tit. 15, § 3269(g) (2017) and Cal. Code Regs. tit. 15, § 3269(h) (2022–23)).) Transgender inmates could therefore be transferred to women's prisons before S.B. 132 came into effect. In fact, as the defendants point out, federal courts in California were adjudicating disputes related to the housing of transgender inmates before S.B. came into effect. (*See* Doc. 118-1 at 18 (citing *Quine v. Kernan*, 741 F. App'x 358, 361 (9th Cir. 2018) (unpublished); *Norsworthy v. Diaz*, No. 20-01859, 2020 WL 10965424, at *1 (N.D. Cal. June 10, 2020); *Guy v. Espinoza*, No. 19-00498, 2020 WL 309525, at *1 (E.D. Cal. Jan. 21, 2020), *findings & recommendations adopted*, 2020 WL 949556 (E.D. Cal. Feb. 27, 2020)).) By all accounts, and "regardless of the outcome of this suit, transgender women will continue to be housed in women's facilities." (Doc. 67 at 24.)

The answer is the same if redressability is the question. As noted above, the plaintiffs ask the court to reinstate "the regime before [S.B. 132's] enactment, which provided for inclusion of trans-identifying biological males in women's facilities under the process provided for in the

Prison Rape and Elimination Act of 2003." (Doc. 122 at 10.)  Under this "regime," they argue, inmates were "individually vetted to consider the potential ramifications for the entire prison population." (*Id.* at 14.)  But according to the OIG Report—which, again, the plaintiffs rely on in their complaint specifically to substantiate their allegations of danger and future harm— California prison officials *do* consider the ramifications of individual transfers in a protracted, case-by-case process.  (OIG Rep. at 1–2, 5–24.)  And so, by the terms of the plaintiffs' briefing and pleadings, the order they request will essentially instruct the defendants to do what they are already doing.  It will not redress a future harm.

The Court appreciates and does not doubt the sincerity of the plaintiffs' concerns about their safety, privacy, or the effects S.B. 132 may have on prison life.  But federal courts cannot be expected to hear and resolve challenges to any government action that draws objections, even sincere and deeply personal objections.  *See All. For Hippocratic Med.*, 602 U.S. at 392.  If federal courts did have such broad jurisdiction, they would be expected to weigh in on the merits of virtually every government action.  *See id.*  Those who object in general to California's policy can take those concerns to the state's executive and legislative branches, or possibly even its own courts; none of these bodies are constrained by the "Case" or "Controversy" requirement in Article III.  *See id.* at 393.

If a plaintiff's allegations do not show the court has jurisdiction, the court can permit the plaintiff to amend the complaint.  *See* 28 U.S.C. § 1653.  "Leave to amend should be granted generously, after considering 'bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint.'"  *Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1221 (9th Cir. 2023) (quoting *United States v. Corinthian Colls.*, 655 F.3d 984, 995 (9th Cir. 2011)).

The Court perceives no undue delay or unfair prejudice that a further amendment might cause in this case.  The obvious contradictions between the plaintiffs' allegations about S.B. 132's effects and its own plain language could suggest that something less than good faith underlies their counsel's drafting decisions, but any second amended complaint they file on their clients' behalf would be subject to Federal Rule of Civil Procedure 11(b)(3).  The plaintiffs have had one

previous opportunity to amend their complaint, but a further amendment would not be unwarranted for that reason alone.  In many cases, shortcomings in a plaintiff's jurisdictional allegations can "easily" be "remedied by leave to amend," *NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 614 (9th Cir. 2016), and the plaintiffs argue in opposition to the pending motions that they could clarify the connections between their alleged injuries and the law they challenge. (*See* Doc. 122 n.2.)  A further amendment would not be appropriate, however, if it would be an exercise in futility.  *See Barke v. Banks*, 25 F.4th 714, 721 (9th Cir. 2022).  The Court will therefore consider whether an amendment would be futile.

As noted, the plaintiffs argue they could amend their complaint to clarify that the inmates who abused or harassed them were all transferred under S.B. 132.  (Doc. 122 n.2.)  This clarification would not show that this Court has jurisdiction over claims about the mere presence of transgender inmates within the prisons.  The Court will not permit any further amendments based on this theory of harm.  Additional information about specific inmates and events could, however, eliminate some uncertainties about the risk of future abuse and harassment and whether S.B. 132 plays any role in that risk.  It is at least possible that more detailed allegations about specific events and people might show that the plaintiffs have standing to assert claims along these lines.  The Court will therefore consider whether the plaintiffs could potentially state an Eighth Amendment claim based on the risk of abuse and harassment in the future.  It has jurisdiction to do so.  *See Bolden-Hardge*, 63 F.4th at 1221 n.1.

Under the Eighth Amendment, "prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (alteration omitted) (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)).  "[A] prison official violates the Eighth Amendment only when two requirements are met."  *Id.*  "First, the deprivation alleged must be, objectively, sufficiently serious." *Id.* (citation and quotation marks omitted).  For claims based on a failure to prevent harm, inmates must show they are "incarcerated under conditions posing a substantial risk of serious harm." *Id.*  Second, the plaintiff must show the official was deliberately indifferent to inmates' health or safety, i.e., that the defendant both knew of and disregarded "an excessive risk to inmate health or safety."

21

*Id.* at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

The plaintiffs could not state a claim under these standards based on their incorrect allegations about S.B. 132's provisions or the process that CDCR has adopted to process transfers. S.B. 132 does not bar prison officials from considering whether an inmate's declaration of gender identity is subjectively false or in bad faith. (*Contra* Doc. 122 at 14–15.) It does not prohibit prison officials from considering whether inmates who request transfers have a history of violence or sexual assaults that raise management and safety concerns. (*Contra id.*) Transferred inmates do not have their choice of cells or cellmates. (*Contra id.* at 15.)

The plaintiffs argue they could demonstrate deliberate indifference among prison officials by citing (1) statistics showing there is a disproportionate risk of harm associated with the housing of transgender inmates, (2) evidence of previous abuse or harassment by transgender inmates, (3) the unique vulnerability of incarcerated women. (*See id.* at 13–15.) These allegations could potentially show that some transfers might pose a "substantial risk of serious harm," but they would not show that any officials deliberately disregarded those risks. The only allegations that might shed light on any official's state of mind are the plaintiffs' allegations that some prison officials have retaliated against some of the plaintiffs for filing complaints or grievances related to transgender inmates. (*See id.* at 15.) The plaintiffs argue that these allegations support their claims that prison officials are untroubled by the dangers they face. (*See id.*) The defendants, however, are not among the allegedly retaliatory officials. No allegations show the defendants were aware of the alleged retaliation. No allegations show that the allegedly retaliatory officials were responsible for evaluating transfer requests, making cell assignments, or any other similar tasks.

The plaintiffs do not propose any new allegations that might show the Secretary of the CDCR and the two defendant wardens deliberately disregarded any risks of harm to them in particular. They do not ask for permission to do so. These circumstances give the Court no confidence that an amendment would lead to anything but an exercise in futility when it comes to the claims against the CDCR Secretary and the two defendant wardens. The plaintiffs' Eighth

22

Amendment claims against these defendants are dismissed without leave to amend.

The Court cannot exclude the possibility that another official or staff member—someone with more direct responsibility for and knowledge about their housing, cell assignments, supervision, security, and safety—might have deliberately disregarded a risk to one or more of the plaintiffs, or perhaps to another person.  The Court will therefore permit the plaintiffs to assert such a claim in a second amended complaint or, given the passage of time since this case began, in a supplemental complaint.  Claim one is dismissed with leave to amend in part, to this limited extent.

## II.    First Amendment

The plaintiffs' remaining claims have simpler and more fundamental shortcomings, at least as it pertains to this Court's jurisdiction.

Starting with their claims under the First Amendment, although they detail several alleged injuries, their complaint does not connect these injuries to S.B. 132 or to the defendants, and they have not demonstrated that the remedies they seek would redress those injuries. As above, some of the alleged injuries are based on events that occurred in the past.  (*See, e.g.*, Doc. 84 ¶¶ 83–93.) The plaintiffs have not explained how prospective equitable relief, such as a judicial declaration or an injunction, would redress an injury that has already occurred.  The plaintiffs do allege, however, that some of their injuries are ongoing or may occur again in the future.

First, they allege "S.B. 132 requires Plaintiffs to refer to all inmates with their preferred pronouns" in violation of the Free Speech Clause.  (Doc. 84 ¶ 110.)  That is not correct.  S.B. 132 does not obligate inmates to use any particular pronouns or words.  It imposes obligations on CDCR's employees, staff, and volunteers, not the inmates in its custody.  *See* Cal. Pen. Code § 2605(d).  If officers have changed the words in the plaintiffs' grievances or instructed them to use particular words, that is not a result of any provision that was added to the state's Penal Code under S.B. 132.  Enjoining S.B. 132 or declaring that it is unconstitutional would not relieve the plaintiffs of any obligations to use or not to use any particular words.

Second, the plaintiffs allege officers and prison officials retaliate against them for exercising their First Amendment rights, i.e., for using male pronouns rather than female

pronouns when they refer to transgender inmates and for refusing to acknowledge other inmates' professed transgender or nonbinary identities. (*See, e.g.,* Doc. 84 ¶ 111.)  The plaintiffs do not allege, however, that the three people they name as defendants—the CDCR Secretary and the two wardens—have or will retaliate against them or play any role in another person's allegedly retaliatory actions, nor that their actions would be connected to any obligations under S.B. 132. The plaintiffs do not cite any provisions within sections 2605 and 2606 that might permit or require prison officials or officers to take any adverse action against an inmate.  They have not explained why an order enjoining S.B. 132 or a declaration that it is unconstitutional would protect them from similar retaliation in the future.

Third, Plaintiffs Romero and Chandler allege S.B. 132 is "incompatible" with the Free Exercise Clause because they "have sincerely held religious beliefs against nakedness in the presence of males." (Doc. 84 ¶ 125.)  They allege "S.B. 132 unconstitutionally burdens [their] religious practices by forcing female inmates to live, undress, and uncover their bodies to members of the opposite sex, due to the proximity of living in overcrowded housing units with other inmates." (*Id.* ¶ 129.)  An order blocking S.B. 132 or declaring it unconstitutional would not prevent these injuries.  Transgender women were housed in women's prisons before S.B. 132 was passed, and there is no reason to believe that declaring it unconstitutional or enjoining its future enforcement would separate Romero and Chandler from transgender inmates in the future. (*See* Doc. 67 at 2–3, 23–26.)

It is also unclear whether Romero and Chandler are challenging S.B. 132 as it has been applied to them in particular, rather than on its face.  If they are asserting an as-applied claim, they have not alleged that they have suffered any particularized or concrete injury.  They do not allege that they have personally shared intimate spaces with transgender inmates or will soon be forced to do so.  They do not allege that they have been or will soon be forced to undress, shower, or use the toilet in the presence of a transgender inmate, nor that transgender inmates have or will imminently undress, use a shower, or use the toilet in their presence.  In the absence of such an allegation, the Court does not have jurisdiction to adjudicate their general objection to the joint housing of transgender, nonbinary, or intersex inmates with cisgender female inmates. *See All.*

24

*for Hippocratic Med.*, 602 U.S. at 392–93 ("We recognize that many citizens . . . have sincere concerns about and objections to others using mifepristone and obtaining abortions. But citizens . . . do not have standing to sue simply because others are allowed to engage in certain activities—at least without the plaintiffs demonstrating how they would be injured by the government's alleged under-regulation of others.").

In sum, the plaintiffs have not shown that they have standing to assert claims under the First Amendment based on the allegations in their current complaint. No amendment to the complaint could show that this Court has jurisdiction over a claim under the Free Speech Clause. S.B. 132 does not restrict the speech of inmates. No amendments to the complaint could show that this Court has jurisdiction over a retaliation claim based on S.B. 132. Penal Code sections 2605 or 2606 do not permit or require prison officials to retaliate against inmates for expressing opinions, for using any particular language, or for filing grievances. No amendment to the complaint could show that this court has jurisdiction to redress claims based on the mere presence of transgender inmates within California women's prisons. These claims are all dismissed without leave to amend.

It is possible, however, that the plaintiffs could show that they have standing to assert some more specific claims. For example, the Court cannot exclude the possibility that they could assert a retaliation claim about a specific disciplinary or parole decision that was tied to a particular plaintiff's beliefs or statements about transgender inmates. Similarly, it may be possible that one or more plaintiffs could allege claims about a specific housing or cell assignment that forces them to share intimate spaces with transgender inmates and thus to act in contravention of a sincerely held religious belief. But a broad-based injunction or declaration about S.B. 132 in general would not be the appropriate remedy to these potential claims. The Court will not permit the plaintiffs to seek that type of relief in any second amended complaint. Any future First Amendment claim must be tied to a specific action (or anticipated action) by a specific defendant and must seek relief related to that action in particular. Claims two and three are dismissed with leave to amend or supplement in part, subject to these limitations.

///

25

### III.    Fourteenth Amendment

Finally, the plaintiffs allege S.B. 132 violates the Equal Protection Clause of the Fourteenth Amendment because it "overlooks legitimate safety and security interests of female inmates by failing to house men and women inmates separately and apart from one another" without "a compelling governmental interest." (Doc. 84 ¶¶ 139–40.)  The Court dismissed this facial challenge without leave to amend in its previous order.  (Doc. 67 at 25–26.)  Now, as before, an order blocking S.B. 132 would not remedy this injury because transgender women were housed in women's prisons before S.B. 132 came into effect.

The plaintiffs also allege S.B. 132 "violates the Equal Protection clause because it requires the [two women's prisons] to place trans-identifying male inmates in single-sex female prisons at their request, thereby discriminating against female inmates," who have no similar entitlement to the housing of their choice. (*Id.* ¶ 143.)  As summarized above, transgender inmates are not automatically entitled to transfers as a general matter.  According to the OIG Report that the plaintiffs extensively quote, the process for transferring into a women's prison is "significantly longer and more detailed" than the process for other types of transfers.  OIG Rep. at 14.  The OIG also found that the movement of inmates "between the two [women's] prisons, and within each prison, is uniformly processed regardless of gender identity." *Id.* at 8.  The complaint lacks factual allegations showing the plaintiffs have personally suffered any harms as a result of any unequal preferences that S.B. 132 might grant to transgender inmates.  They do not allege, for example, that they have applied unsuccessfully to move to a different prison or for a different bed assignment when a transgender inmate's similar request has been granted.  They do not allege that they intend or wish to apply for a different cell assignment or housing arrangements.  As before, their objection appears to be with S.B. 132 generally, on its face, not with the way it has been applied to them.

For these reasons, the plaintiffs have not made allegations that, if true, would give this Court jurisdiction over their equal protection claims under Article III.  It may be possible for them to assert a viable equal protection claim based on a specific transfer request, bed assignment, or similar decision.  *Cf.* OIG Rep. at 26 ("One staff member also reportedly told an incarcerated

26

person that transferees must be treated like an 'endangered species' for the department to avoid lawsuits."). The Court will permit an amendment or supplement along these lines, but no others. Claim four is dismissed with leave to amend in part.

<strong>CONCLUSION</strong>

The motions to dismiss (Docs. 118, 120) are **GRANTED** with leave to amend or supplement **in part**, as specified above. Any second amended or supplemental complaint must be filed within thirty days of the date this order is filed.

IT IS SO ORDERED.

Dated:    **March 23, 2026**

UNITED STATES DISTRICT JUDGE